**In the Matter Of:**

VICARI vs OHIO CASUALTY

1:17-CV-23733 CMA

# PETE VICARI

*August 09, 2018*

*Vol. III*

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:17-CV-23733 CMA

PETE VICARI GENERAL CONTRACTORS, LLC, a foreign limited liability company,

Plaintiff,

vs.

THE OHIO CASUALTY INSURANCE COMPANY, d/b/a OHIO CASUALTY, a Foreign insurance company; COASTAL MAINTENANCE & RESTORATION, INC., a Florida corporation; COASTAL PREFAB, INC., a Florida corporation; and CRONIN ENGINEERING, INC., a Florida corporation,

Defendants.
___________________________/

COASTAL MAINTENANCE & RESTORATION, INC., a Florida corporation, and COASTAL PREFAB, INC., a Florida corporation,

Counter/Cross/Third-Party Plaintiffs,

vs.

PETE VICARI GENERAL CONTRACTOR, LLC, a foreign limited liability company; CIVIC TOWERS, LLP, a Florida limited liability Partnership; and ALLIED WORLD INSURANCE COMPANY, a foreign insurance company,

Counter/Cross/Third-Party Defendants.
____________________________/

VOLUME III
CONTINUED VIDEOTAPED DEPOSITION OF
PETE VICARI

Thursday, August 9, 2018

9:16 a.m. to 6:00 p.m.

515 East Las Olas Boulevard
Ft. Lauderdale, Florida

Reported By:
DEBORAH LAWRENCE, Court Reporter
Notary Public, State of Florida
Esquire Deposition Solutions
Job # 2522637

APPEARANCES:

On behalf of the Plaintiff
BRUCE PARTINGTON, ESQUIRE
Clark Partington
125 E. Intendencia St.
Pensacola, Florida 32502

On behalf of Defendant Coastal Maintenance and Coastal Prefab
ANTHONY M. LAWHON, ESQUIRE
The Law Office of Tony Lawhon
3003 Tamiami Trail N.
Naples, Florida 34103

On behalf of Defendant Cronin Engineering
JEFFREY BELL, ESQUIRE
Banker Lopez
1200 S. Pine Island Rd.
Planation, Florida 33324

On behalf of Defendant Ohio Casualty
GUY HARRISON, ESQUIRE
Etcheverry Harrison, LLP
150 S. Pine Island Road
Ft. Lauderdale, Florida 33324

On behalf of Defendant Allied
KELSEY BLACK, ESQUIRE
Jonathan P. Cohen, PA
500 E. Broward Boulevard
Ft. Lauderdale, Florida 33394

ALSO PRESENT: Don Savoy, Videographer
Jon Parrish
Brian Moye
PJ Vicari

I N D E X

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| PETE VICARI | | | | |
| BY MR. LAWHON | 284, 440 | | | |
| BY MR. BELL | 478 | | | |

E X H I B I T S

| NUMBER | PAGE |
|---|---|
| DEFENDANT'S EXHIBIT NO. 264 FOR ID | 514 |

PROCEEDINGS

Deposition taken before DEBORAH LAWRENCE, Court Reporter and Notary Public in and for the State of Florida at Large, in the above cause.

Thereupon,

(PETE VICARI)

having been duly sworn or affirmed, was examined and testified as follows:

CONTINUED DIRECT EXAMINATION

BY MR. LAWHON:

Q. Good morning, Mr. Vicari. I want to do a little bit of housekeeping from yesterday and then we will start covering a couple other subjects today.

Before I do that did you do anything to prepare for your testimony today?

A. No.

Q. Didn't look at any documents at all?

A. Nope.

Q. Did you talk to anybody about your deposition testimony yesterday?

A. Nope.

Q. We talked a little bit toward the end of the afternoon, we talked a little bit about it off the record here, but about Thornton Construction coming and taking over some, what sounds like interior work

on Senior. You still being responsible for the exterior and still being responsible for completing Civic Towers and I want to just talk a little bit more about that, see if I can understand what is going on. First of all, do you know what the full name of Thornton is?

Is it Thornton Construction, Inc. or LLC?

A. I do not.

Q. Can you tell me when you first heard Thornton was going to get involved in the project?

A. Maybe a month ago or so.

Q. So this is August 9. Around the 4th of Julyish?

A. Yeah, somewhere around there.

Q. Who told you that?

A. The owner and I had talked about it.

Q. Who specifically on behalf of the owner?

A. Ryan Fuson.

Q. What did you guys talk about?

A. About, um, he finally had got his financing for the hurricane repairs since the insurance company wasn't paying and that if we needed to have this finished by the end of the year that he thought that it would be best that he bring on another contractor. I said I'm okay with that, I'm fine with that.

Q. Was anybody else involved in that conversation?

A. No.

Q. At some point I think you said yesterday you worked out an agreement but there may not be a signed agreement yet.

Am I understanding that correctly as far as what you just described?

A. That's correct.

Q. Is there like a gentleman's agreement or an understanding of what is going to be done between PVGC and the owner that you participated in negotiating?

A. It will be reduced to writing and the attorneys are working on it now.

Q. Tell me all the terms that you agreed to with the owner that are going to be reduced to writing and are getting hashed out between the attorneys?

MR. PARTINGTON: Object to the form.

THE WITNESS: I don't remember them all but in concept Thornton would do the inside, we would do the envelope and the outside of the building. And it would be a deductive change order to my contract for that original contract work for the interiors.

BY MR. LAWHON:

Q. Are there any other terms that you and Ryan negotiated or that you're aware of have become part of the deal?
A. And I think there was an extension of time for the original contracts because of the hurricane delays.
Q. Any other terms that you know of?
A. There may be. I don't remember them all.
Q. Mr. Partington mentioned yesterday that the owner was waiving a claim for liquidated damages against PVGC. Do you remember hearing him saying that?
A. Yes.
Q. Is that part of what is being negotiated -- strike that. Is that part of the deal?
A. It's cause they extended the contract. It waives the LD's.
Q. So it is part of the deal but they go hand in hand. Is that your understanding?
A. Yes.
Q. Are there any other terms that you're aware of?
A. I can't remember. There is so much legal words in there. The page is probably three, four, five pages long. Don't mean much to me.

Q. So let me see if I can refine what we are talking about here. You said that Thornton is doing the inside and PVGC is doing the outside. If I understand it correctly that's just on Senior.
Is that right?
A. Yes.
Q. And your -- strike that. PVGC's contract on Senior is going to have a deductive change order that you called it that is going to essentially extract out the cost of the construction of the interior that Thornton is doing; is that right?
A. Correct.
Q. You testified yesterday that PVGC has done some hurricane damage and remediation work. Did PVGC do that work in Senior and Civic?
A. Both buildings.
Q. And I think you said yesterday there's a pay app for about a million dollars on the hurricane workish and I'm not holding you to the number. But whatever it is?
A. Whatever it is. It's outstanding from the owners.
Q. Is it part of the deal that we just talked about that that gets paid at some point in time?
A. No, that's for work in place.

Q. So that is not part of the deal?
A. Right.
Q. Is there an agreement in place as to when that pay app is supposed to be paid?
A. I'm sure there is. Probably within 30 days of when it was submitted.
Q. Is anything changing about the contract that PVGC has on Civic Towers other than perhaps an extension of time as part of this deal that we are talking about?
A. No, there is a separate contract for the hurricane. But nothing else has changed.
Q. So there is no scope of work change on Civic Towers, there is no deductive change order in terms of cost of construction on Civic Towers or anything like that as part of this deal is what I am asking?
A. Not on Civic, no.
Q. The extension of time that you identified, how much time has been extended?
A. For the overall projects like December 18 I want to say. I mean -- it is to that date. I don't know how many days you are talking about.
Q. Do you know if Thornton is under the same deadline to complete its scope of work on Senior?
A. I do not know that.

Q. So if I can refine the question then. Is PVGC receiving an extension through December 18 to finish whatever work it is supposed to finish on Senior and whatever work it is supposed to finish under its contract on Civic Towers?

A. December 18 is for Civic. There is a minimum amount of work for Senior but will be completed before the December. But just for housekeeping I think they want to use that December date also.

Q. Generally speaking is it your understanding that the owner wants the buildings done before the end of the year?

A. Yes.

Q. Is there a new schedule that has been prepared that is being part of or attached as part of a written agreement that is being done?

A. Yes.

Q. And you said that because there was an extension of time the owner has waived LD's as well. That's against PVGC on both buildings?

A. Yes.

Q. Is there any other compensation, whether it is financial or a benefit otherwise, that PVGC is getting as part of this deal that we just described?

A. No.
Q. No price increases, no additional, there is no builders fee built in, you didn't increase the percentage above cost?
Anything like that?
A. Which contract you talking about?
Q. I'm talking about -- as I understand what you just told me basically what is being negotiated is an amendment to the Civic Towers contract that PVGC has with the owner and Civic Towers Senior with the owner.
Does that sound right?
A. The original contract or the hurricane? There's two.
Q. Yeah, let's put the hurricane contract aside for right now. What I understand is going on in a sort of simple way is there that is an amendment to the two existing prime contracts on both towers?
A. Correct.
Q. Okay. So that is what I am focused on right now. I will talk to you about the hurricane contract in a minute. So my question was is PVGC receiving any other benefit, financial or otherwise, or compensation on either of the prime contracts as part of the negotiations that we have just been talking about?

A. No.
Q. You had -- we had taken a break during your deposition yesterday so that you could text the owner because the owner was coming in.
Did I understand that right?
A. Yes.
Q. Okay. Was the owner coming at least in part to try to hammer out this deal that we are talking about?
A. No.
Q. What was the purpose of the owner coming in?
A. They had some meetings with the architects and some stuff with Thornton to finish. I asked him, originally asked him to come next week but he couldn't. He had to come this week.
Q. Who is he?
A. Ryan.
Q. Is the only one that came?
A. Bob too. He is an employee of them.
Q. He is a employee of?
A. Ryan. Redwood.
Q. I am going to go off on a little tangent here just so I understand what's going on. Is Ryan the representative that you have been dealing with for what I will call both buildings?

A. He is one of the owners like I told you.
Q. Right, and what I am trying to understand I guess is are all the your communications, negotiations going through Ryan relative to both buildings or are you dealing with Ryan on one building and then maybe another investor, another owner on another building?
A. All Ryan.
Q. Do you know who all the owners or investors are of the owner of each building?
A. I already answered that. I said no.
Q. Do you know if they are different on each building?
A. I don't know.
Q. I feel like the piano man who takes the requests and decides where they go. Were there discussions with Ryan about Thornton taking over the work on both buildings?
A. He never told me that.
Q. Never asked if that was an option?
A. Ryan telling me that.
Q. My question is did Ryan ever ask you or talk to you about the possibility of just having Thornton take over the whole project?
A. Yes, if he thought I couldn't finish my building by the end of the year.

Q. Tell me exactly what -- that was all he told you?
A. Yeah.
Q. And what was your response other than the obvious?
A. That I could do it but I couldn't do both with the time constraints that, you know, we now starting all this work. And only had basically five months to do it in. I didn't want to run the risk of doing both buildings. I said let them have the other one.
Q. Were there -- I am just trying to kind of piece it all together in terms of timeline. So I remember when I was there in May I mentioned to you yesterday that the interior was gutted all the way down to the studs and there was no work going on. It seems to me there have been periods of time, if not blocks of time, where there has been no work going on in either tower.
Is my impression accurate?
A. That's correct.
Q. Okay. Can you in sort of a general way, um, start at -- well, generally speaking start with the hurricane and just give me kind of a timeline from the hurricane to today of what work has happened and

during what time period it was happening and when there were breaks or stoppage of work?

A. When the hurricane hit it sustained a lot of damages, both buildings. Um, we had to stop, we couldn't go on without contracts. The owners and the insurance companies had to come and do all their investigation for their insurance claims to document their damages. So that kind of shut us down probably until somewhere around the end of the year or first of the year. So that was one period of two or three months nothing going on. And then they wouldn't let us demo, continue on with the exterior panels because the insurance companies wasn't finished with their investigation and destroying evidence, I guess, for lack of a better word. And so that was a period another shutdown. So when you were there in May there was probably right before that that he finally had the insurance companies agreement to at least demo the sheetrock and that's what we did.

But at that point there was no money for the repairs or replacement of all of that. So the owner was shut down again up until probably around a month ago, let's say or 45 days ago when he got approval from, and I think it's CitiBank, the same bank that's financing the deal, to finance the hurricane repairs.

And then the owner was just, I think they just filed what's called civil remedy notices. I don't understand what that's all about. Just going to end up taking the insurance company to court.

Q. Okay. And so I can understand the demoing of the sheetrock about during what time period did that happen in what you just described?

A. The actual demo started? April, you know, February, March, April. Somewhere around there.

Q. And how long did it take to complete the demo of the drywall, the sheetrock?

A. Two, three months. I'm not sure.

Q. We will probably, if we cover it today, talk to you about the conversations with FL Crane and SWS, Southern Wall Systems and some of the other work that you hired out to complete the panels. My general impression is that some of that work was going on before the hurricane and then maybe some of it was going on after the hurricane.

Is my impression accurate?

A. That's correct.

Q. Okay. So you -- and generally speaking is the time sequence of June, middle of June, end of June, I don't remember the exact date but somewhere around there Coastal is not longer on the job. By

July and early August PVGC has now contracts in place with FL Crane and SWS to do the panel fabrication and the installation of the panels.
Is that roughly your understanding as well?
A. Yes.
Q. Okay. How much work did they get done before the hurricane?
A. Up until the east side of the building on Senior. And well, FL Crane had a lot of panels fabricated in its facility that was heading our direction.
Q. By the time the hurricane came?
A. I believe so. I don't remember all the dates without reading the documents.
Q. How many panels do you think they had? Would you say a lot?
A. I don't remember.
Q. And then after the hurricane what work did they do?
A. When we could move forward with not being prohibited by the insurance or the owners they started coming in putting up panels. We did the demo, subbed it out to someone and then they would just put the panels up. SWS.
Q. When you said we did the demo we're talking

about the exterior panels now?
A. Yes.
Q. We subbed that out. Who did you sub that out to?
A. Serinca.
Q. So when the owner and the insurance company finally said that work could restart again that is when your company subcontracted Serinca to do the demo and that's when SWS started flying panels.
Is that what I am understanding?
A. Yes.
Q. And it sounded like based on the timeline you just gave me that was some time in early 2018?
A. The schedule of contracts will reflect that. I don't remember all the exact dates.
Q. I want to come back to the hurricane stuff a little bit. You mentioned civil remedies notice and I know you don't understand what that is legally. I don't want to ask you about that legally.
But what I do want to understand is it your impression that whatever insurance is in place for the hurricane damage that insurance company or those companies have denied a claim for insurance for hurricane repairs for both buildings?
A. I don't know that to be the case. I don't

know all the details. On the owners side of the claim I don't know all of it. He just told me they are moving forward with civil remedy notices.

Q. Yesterday you said the insurance company wasn't paying. I think I remember you using those words. How do you know the insurance company is not paying?

A. Cause the owner told me that the most he got was not quite $5 million on a claim that is probably worth, I don't know, 50, 60, $80 million.

Q. He told you he actually has received so far payments of $5 million or something close to that?

A. Yes.

Q. When did he tell you that?

A. Couple months back.

Q. You just said you thought the claim was worth 50, 60, $80 million. Did I understand your testimony correctly?

A. Yes.

Q. What makes you arrive at that conclusion?

A. Cause we had done a preliminary estimate. Things have changed since but we felt that just the damages that the building sustained were somewhere around $25 million, $30 million. That does not include the owners lost revenue and his expenses. He

is actually paying for every tenant in a hotel right now and whatever other expenses. And that's what I said. I just threw 50, 60. I don't know what it could be. And it's going to be 25 plus a lot.

Q. Have you seen a proof claim or a claim form of some sort that the owner would have submitted to whatever insurance company has for its claim?

A. No.

Q. Has the owner told you what value they placed on or how much they filed a claim for?

A. No.

Q. When you said we did a preliminary, not sure of the word you used, preliminary calculation or preliminary workup?

A. Preliminary estimate I think.

Q. Is that something in writing?

A. I think so, yeah.

Q. You said it had changed. How has it changed?

A. Quantities and price change. And it was also done on a database that an insurance company uses.

Q. Like Estimate or something?

A. Um, it's a software. One of the experts that used it. I can't remember the name of it.

Q. Do you know if PVGC has been receiving all the expert reports, the estimates, the things that we have been talking about relative to the hurricane?
A. No. My own experts I have. Not the owners.
Q. How many different experts does the owner have?
A. I have no clue.
Q. So you have not seen any of their reports?
A. No, sir.
Q. Do you know the name of the attorney or attorneys that the owner is using to pursue a claim for the hurricane damages?
A. Berger something. The lady's name is Gina. She was on the phone with us one time. I remember it's a law firm. It's Berger something.
Q. Is it a local firm or a Florida firm?
A. It's in Florida. I don't know where they are at.
MR. PARTINGTON: Do you want me to tell you?
MR. LAWHON: Is it Berger Singerman?
MR. PARTINGTON: Yeah. Gavin Gaukroger, I'm not saying it. Gavin Gaukroger, G-A-U-K-R-O-G-E-R I think. And then Gina, I think her last name is Clausen is helping him

with it.
MR. BELL: What's Gavin's last name?
MR. PARTINGTON: Gaukroger. Something like that.
MS. BLACK: G-A-U-K-R-O-G-E-R. My husband works with them.
MR. PARTINGTON: All right. So I spelled it right. Probably said it wrong.
MR. LAWHON: Thank you for that.
MR. PARTINGTON: Sure.
BY MR. LAWHON:
Q. Is PVGC pursuing its own claim for hurricane damages or a lawsuit that is separate and apart from the owners claim?
A. Yes.
Q. Let me talk to you a little bit about that. Who is the person that has been primarily responsible on behalf of PVGC to handle that claim?
A. In what sense?
Q. Getting the information together, the estimates, taking photos, communicating with any insurance agency or reps or adjusters, looking at the reports, talking to people, that kind of stuff.
A. You said a lot. I mean.
Q. Is it more than one person?

A. Yeah.
Q. Okay. Who are the people?
A. Myself, my son PJ and my wife Barbara.
Q. Anybody else?
A. Um, no, I don't think.
Q. What insurance company or companies plural has PVGC made a claim to for hurricane damages or hurricane losses?
A. I don't know. That conglomerate of tiers, layers of many insurance companies. I mean, be specifically you would have to ask Bruce that, my attorney.
Q. And we will hash out all of the details. Whatever you know, I'm not pinning you to any specific insurance information on this. If you don't know it, you just tell me you don't know?
A. I don't know.
Q. Okay. What is the amount of the claim?
A. Almost a million.
Q. What does that consist of?
A. Um, expenses through the downtime of the hurricane. Cleanup of the damages. Um, we had some experts that we hired to do the moisture mapping that the owner requested that was going to be needed for the insurance company. Um, just a whole laundry list

of things. It's all itemized.
Q. When you say it's itemized is it on a spreadsheet or some other format?
A. It's on Excel spreadsheet.
Q. You mentioned experts. What experts have been hired by you or PVGC in connection with pursuing a claim related to the storm?
A. Deep South was one and Dupont was the other.
Q. Dupont?
A. Yeah. Yes. I am not sure if it was Dupont Consultant or whatever. But same thing with Deep South. I don't remember the full name.
Q. Do you remember the person or people from Deep South that's involved in the claim?
A. Earl Carr, C-A-R-R. And there's two other gentlemen there were that's involved. I don't remember their names. Earl is kind of I think its owner. Lead person.
Q. What kind of services is Deep South providing?
A. Moisture mapping and quantifying the damages.
Q. Who from Dupont has been working on the claim?
A. Rick Dupont.

Q. Anyone else?
A. I think that's it. There is some -- there was a mold assessor.
Q. From Dupont?
A. No, another company.
Q. Do you know the name?
A. Eiland & Associates.
Q. Can you spell that?
A. I think it's E-L-M-A-N-D, Elmand. Something like that. E-L-M-A-N-D. They are somewhere here Florida.
Q. What scope of services is Dupont providing related to the storm?
A. He -- once Deep South did the quantifying he does the extensions of pricing.
Q. What does that mean, extensions of pricing?
A. In other words, he will say you got so many square foot of damaged sheetrock. Then takes it and extends that into a unit cost or a quantified cost of historical data. Oh, Xactimate, that's what it is is the software. Takes the Xactimate allowed amount and extends it.
Q. Is Dupont using the Xactimate software?
A. I think he did. Maybe a mixture of blends of one. You would have to adjust it for your areas.

Q. When was a formal claim submitted by PVGC for hurricane damages?
A. Months ago. I don't remember the exact date. Probably six months ago.
Q. What is the status of the claim?
A. Pending. We met, they approved portions of it and the other portion they wanted more information. And it is now Bruce is handling it. I let the attorneys handle it.
Q. What portions were approved?
A. There's a whole list of items. This spread sheet is two pages long what I have.
Q. How much money has PVGC received from any insurance company related to the claim?
A. Zero.
Q. So when you say portions have been approved they said we agree this is covered but they haven't sent any money?
A. That's correct.
Q. Do you know why?
A. No.
Q. Why were other portions denied or disapproved?
MR. PARTINGTON: Object to the form.
THE WITNESS: I didn't know why the

adjuster didn't send a check. But then now it is in the hands of the attorneys. And I don't know all the details. Maybe because of the civil remedy notices that now all of this stuff has been thrown with the attorneys and that's why Bruce is communicating with their attorney.

BY MR. LAWHON:

Q. Is there going to be any additional amounts that PVGC will be asking for from any insurance company related to the hurricane other than the whatever million dollars or so number is that we talked about so far?

A. Probably not but I'm not sure.

Q. What will decide that for you?

A. We don't know if it's a hundred percent closed out or if we have any other items that pop up that need to be done. Whether it is my side of the ledger or the owners side of the ledger.

Q. I had heard word on the street is that some people were hired to open the windows before the hurricane so that damage could happen to one or two of the buildings.

Have you heard that rumor?

A. Yeah, I heard it.

Q. Okay. Is there any truth to it?

A. None whatsoever.
Q. You did not ask, hire or directly or indirectly allow any of the windows to be opened in either of the buildings prior to the storm so that rainwater could get in there.
Is that your testimony?
A. Make sure you understand my word and that is absolutely not true. I was the last one to leave with the owner Bob Duke to make damn sure every window and door was boarded up.
Q. You personally checked every window -- let me finish my question. You personally checked every window and every door in both buildings?
A. Yes, sir.
Q. Were they all closed when you left?
A. They were all closed and I knew that for a fact because I was one of the last planes, private planes to fly out of Miami. Because at that point commercials were all -- at that point commercials were all done. I stayed 'til the very last minute to make sure everything was buttoned up. And the owner Bob Duke was right there with me.
Q. You said you flew out on a private plane. When was that?
A. Right when I left. When it was all over.

When we got it all buttoned up.
Q. How did you return?
A. Private plane.
Q. Same plane?
A. Yes. Before commercials were even in operation.
Q. Whose plane was it?
A. Jag Aviation.
Q. Jag, J-A-G?
A. J-A-G.
Q. That must have been expensive. How much was that?
A. Six, $7,000.
Q. One way or both ways?
A. One way.
Q. Was it the same the other way?
A. It was half.
Q. So all together somebody paid about $10,000 for you to fly on a private plane out and then to come back. Is that what I am understanding?
A. It's in the bill the invoice and I think the insurance company approved it.
Q. Who paid that bill?
A. I did.
Q. Personally or PVGC?

A. PVGC.
Q. Who flew with you?
A. Bob Duke.
Q. Is there any other amount of losses or damages from the hurricane that PVGC believes it has suffered that we have not covered so far?
MR. PARTINGTON: Object to the form.
THE WITNESS: I don't know.
BY MR. LAWHON:
Q. Do you believe there is any more losses or damages that the company has sustained as a result of the hurricane that should be added to or pursued in a claim?
A. I don't know. Maybe. I am going to leave that up to the experts to assess all of that.
Q. Have you been -- are you familiar with the term examination under oath?
A. Yes.
Q. Okay. How are you familiar with that term?
A. You asking me questions under oath.
Q. Have you had to do that in the past?
A. I'm sure I did a deposition before.
Q. For PVGC's insurance claim did you have to provide any insurance company with an examination under oath?

A. No.
Q. Have they requested one?
A. Is it a proof of loss?
Q. No, it's when you sit down kind of like in this setting.
A. No.
Q. They haven't asked for this?
A. No.
Q. Has anybody from PVGC been asked to sit down for an examination under oath by any insurance company related to a hurricane claim?
A. No.
Q. Did any of the Coastal panels sustain any damage as a result of the hurricane?
A. No, I don't think so.
Q. Did any of the Coastal panels leak as a result of water intrusion from the hurricane?
A. Yes.
Q. Tell me which ones?
A. Some on the north side of Senior. I don't remember exactly which one. There is like six panels high but it is on the north side. Northeast corner.
Q. Exactly how many panels, Coastal panels, leaked?
A. I don't know the exact total.

Q. Is it more than or less than five?
A. I don't know the exact total.
Q. Do you have a range or an estimate that you're familiar with?
A. Do not know the exact.
Q. Who is the best person to ask that question?
A. Um, probably me or my superintendents. We seen the water that came in. It is probably two, three levels.
Q. Well, I've asked and you don't know. So is there somebody else that would know exactly how many panels, Coastal panels, you believe or somebody believes have leaked?
MR. PARTINGTON: Object to the form.
THE WITNESS: It would be either me or, um, in general we just seen water. Myself or Ted Brown.
BY MR. LAWHON:
Q. Do you know what units you were in where you saw the water in?
A. No.
Q. Was it more than one unit?
A. Yes.
Q. Do you know what floor?
A. Could have been the third and the sixth

floor, seventh floor.

Q. Were you or Ted or anybody able to pinpoint exactly the origin or source of the leak?

A. It looked like it was the panels that I was here for Mark Buser's deposition where he pointed out that the panels were just sitting on top of one another without a caulk joint. And it's in that area.

Q. Is there an expert report or a consultant that PVGC hired that has written a report about whether or not the Coastal panels were the source of the leak or leaks that you're talking about?

A. I am sure the experts will be doing that. I haven't read their reports. I think a lot of them were just sent in last night or the night before.

Q. Let me back up. Generally speaking we are just talking about Senior right now; right? So make sure I am clear.

You don't claim that any of the Coastal's windows leaked on Civic Tower, do you?

A. I didn't walk Civic. I was in Senior.

Q. Has anybody told you or have you seen any information indicating that any of the Coastal's panels on Civic Tower leaked as a result of the storm?

A. It's hard to determine because Civic was -- a lot of Civic was open. There was not a lot of

panels up. There was a lot of areas that were demoed and had temporary walls. The temporary walls leaked but there is no way to determine whether the temporary walls or the actual panels in Civic. If you look at the picture of the building at the time of the hurricane you will see a lot of it is open.

Q. And I understand there were temporary walls up but the whole interior of the units were demoed anyway so I'm not too worried about that. I just want to come back to the panels themselves.

So as you sit here today you're not aware of specific panels on Civic Towers that was a Coastal panel that leaked after the storm or from the storm?

A. I didn't go look because there was water all over the place.

Q. So back to my question about experts. At some point either you or the owner or both had people come in and assess the damage caused by the storm.

Do I understand that right?

A. Correct.

Q. Okay. Did people or experts also come in to determine the source of any leaking?

A. Yes.

Q. All right. Did they write reports?

A. Yes.

Q. Okay. Where are those reports?
A. In the insurance claim. In the moisture mapping.
Q. Can you direct me to any particular report that indicates Coastal panels leaked?
A. Um, probably in the Deep South or Dupont. They may both cover that.
Q. Is PVGC -- do you know if PVGC is making a claim in this lawsuit against any Coastal company for water leaks resulting from the hurricane?
A. On Civic Senior those panels still have to be addressed. And there will be an additional cost for that. Cause they do not meet the warranty requirements of the caulk joint. Cause the panels were sitting directly on top of one another.
Q. What are those expenses?
A. We don't know yet.
Q. No one has calculated or given you an estimate of what it would cost to repair the caulk joints in the Coastal panels.
Do I understand you correctly?
A. As of today we have not addressed that. We put a Band-aid caulk on it. And we know before the end of the job we got to do something about it. Whether we take the panels down, cut them shorter or,

you know, cut joints in them hanging off the side of the building. There is only so many things you can do work on it when your plate's full.

Q. The plate's full. Is that what you said?

A. Uh-huh.

Q. Is that a yes?

A. Yes.

Q. Are there any other damages that you believe Coastal panels are the source or cause of originating from the hurricane that we haven't covered so far?

A. I think that's it as it relates to the hurricane.

Q. As it relates to the hurricane?

A. Correct.

MR. PARTINGTON: Can we go off the record for one quick second?

(Discussion held off the record.)

BY MR. LAWHON:

Q. Just so I can kind of complete my timeline picture here. I understand sort of right after the hurricane there was a stoppage of work or a shutdown. I mean, obviously, there was a hurricane so that part I understand. But at some point my understanding is the city did not allow anybody to go back into work, into the building for life safety issues, residents or

workers. And there was a period of time for that. And then there was some dispute between the residents and the owners of the residents and PVGC about getting in, getting property, that kind of stuff.

Can you tell me a little bit about that, what you know?

A. Well, because of the water came in through the ventilation shaft on the roof a lot of stuff got wet. A lot of tenants personal items and they had no power. So after a couple days like that a lot of stuff turned to mold. So it was a judgment call on my behalf and the owners that for the tenants life safety and their health. Cause especially in Senior a lot of those people are elderly. They have breathing problems as it is and they can't go in these buildings. And when we pointed that out to the city, um, even though they were arguing, hollering and screaming and picketing and kind of stuff wanting to get back in the building we just said I'm not going to do it, I'm not going to, you know. They are going have to sign waivers and I still don't believe we should let them go in there. We need to protect them from them self. And a lot of these people didn't care. We would hand out masks and they would throw them on the ground and go in the building.

And it got to a point where before they went in the building the mayor got involved and had TV out there and all these people hollering and screaming. And we just clearly told them it is health reasons, you want to let them go in, it's on your back. You take the responsibility, here's the keys, let them go. But it's your back Mr. Mayor. And he backed up. And then he made them be escorted by the police and the police was in jumpsuits, full jumpsuits with masks. Again, escorting them in. Supposed to be getting medicine and personal items, things that they could carry out. And none of them listened. They all tried to come out with TV's and all kinds of stuff instead of getting their medicines. But it was just a fiasco.

Q. Was there a lawsuit that eventually got filed by either the residents or representatives of the resident to try to get back in the building?

A. I don't know. I heard about one but I don't know all the details.

Q. PVGC wasn't a party to that at all, wasn't involved in a lawsuit, didn't get sued, anything like that?

A. No, not by me.

Q. Mr. Parrish corrected me and said it was filed by the city. Does that make a difference to

you? Was PVGC involved in that at all in the lawsuit by the city or what do you know about that lawsuit?
A. I don't know anything about it. I was never served. I'm not involved.
Q. How long -- was there any type of city shutdown or stop work order or anything like that resulting from the hurricane that prohibited PVGC from recommencing work on either of the buildings after the hurricane?
A. I think there was some inspector put something in the system that Maurice Pons, the gentleman in charge of the department was furious over and he actually said you all go back to work, get this thing safe.
Q. Who did he say that to?
A. There was a whole, there was a meeting on site.
Q. Who was at the meeting?
A. Oh, my God. There must have been 10, 15 people in the room. All his inspectors, electrical, plumbing, Jesse Baez who's with JEM, um, myself, I think Rick Dupont was there that day. I mean, there was just, the room was full of people and made it perfectly clear get this building safe and go back to work.

Q. When did that meeting take place?
A. Right after the hurricane. Like couple days after or a week after. Somewhere around there.
Q. Let's say the hurricane was September 10, 11, Saturday, Sundayish, somewhere around there. When, using that weekend as a point of reference, when did you physically come back to the area in your private plane?
A. I came back on as soon as we could land at Okeechobee.
Q. Okeechobee?
A. However you say it.
Q. Okeechobee?
A. Um, as soon as we know the airport was open we flew in. It is either Monday or Tuesday after the storm.
Q. And then how many days after that was this meeting?
A. Probably the following week.
Q. Where exactly did the meeting take place? Lobby, community center?
A. In the management office at Senior. Their temporary office. It was a temporary trailer setup on site.
Q. So Mr. Pons told you to go back to work

after you made the building safe. Do I understand that right?
A. Yes.
Q. Okay. And before you testified you weren't able to go back to work because the insurance company or the owner had some claim about destroying evidence, preserving insurance claims, that kind of stuff?
A. That's correct.
Q. Okay. So even though Mr. Pons said you could go back to work did you go back to work or did you not because you wanted to preserve the evidence?
A. No, no, we only went back to work to start cleaning up the debris and there was parts of the building that, um, had blown open. Probably two or three breaches in the Senior building that actually just collapsed.
Q. So it sounds like there was a lot of cleanup work?
A. Yeah.
Q. And then how long did the cleanup work take?
A. Three, four weeks. Something like that.
Q. And then I understand the owner suspended work because they wanted to decide whether or not they were going to continue the contract work and the renovations on the inside or if they were going to

demo the whole building. And then at some point in time the owner decided to demo both buildings.
Is that generally how?
A. You missed a step.
Q. Okay. Help me out?
A. The owner decided -- well, let me back up. Because of the tenants were creating all kinds of problems for the owner and the city they hired, um, Belfor to come in and remove all of the tenants personal items.
Q. Belfor?
A. Before, B-E-L-F-O-R I think, to come in and just remove their personal items, um, put them in a container. Some tenants there was an option and some tenants accepted the option to take money and just they don't take anything out. Belfor just throws it away. During that process we were stopped again cause they had control of the buildings.
Q. Okay. And then at some point the owner decides they want to demo the entire interior of both buildings. My understanding is that they sent, somebody sent a written notice to PVGC to that effect saying we made this decision, this is what we are going to do.
Does that sound right to you?

A. Might not have been a written notice but we had a change order to ultimately do the work.

Q. Ultimately do what work?

A. The demo.

Q. Do you know when the change order came in?

A. Whatever the date is on it.

Q. Couple of loose topics and then we will get into the contracts with Coastal, contracts. Um, yesterday I was asking you at the end of the day about the permit application and FEMA. Do you remember that discussion?

A. Vaguely.

Q. It's my understanding, um, that a FEMA worksheet is supposed to be submitted with a building permit application.

Is that your understanding as well?

A. I don't know that. I don't get involved with FEMA.

Q. In your vast construction experience have you ever had to submit what's called a FEMA worksheet as part of a building application?

A. No.

Q. Has PVGC ever had to submit a FEMA worksheet?

A. No.

Q. There were, as you know, there was some requests for production of some document requests that we or my co-counsel sent over to your attorney asking for basically a lot of documents related to the project. One of the things I want to focus on is Procore.

Are you familiar with Procore?

A. Vaguely.

Q. Tell me what you know about Procore?

A. It's a system where everybody can comment about RFI's that I don't, it just -- it sends me an e-mail version of whatever everybody does. That's it.

Q. Do you use -- strike that. Did you use Procore at all in connection with this project?

A. I did not.

Q. One of the things that I understand that Procore does is it saves or captures all the notes that people put into that system.

Is that your understanding as well?

A. Yes.

Q. Okay. So far all I have seen is, um, specific reports that it were run through Procore that just only relate to Coastal, not to any of the other trades.

Do you know why that is?

A. The directions we were answering for the discovery. Thought that we were told anything related to Coastal from what I remember.

Q. Who was in charge of collecting documents and responding to the discovery requests on behalf of PVGC?

A. Bridget Sadler.

Q. Do you have -- do you know if all the Procore notes that were inputted into the system regardless of what trade they spoke about are still preserved or still kept or still available?

A. Yes, they are.

Q. Okay. Is Bridget Sadler the person that knows how to run reports and run, and pull out material out of the Procore system?

A. Yes.

Q. Evidently, I didn't cover things as precisely as Mr. Parrish would like so let me back up. I think we want to establish some dates a little better. At least Mr. Parrish does. So let me come back to the hurricane.

Was the hurricane on September 11?

A. 10th I thought.

Q. Exactly what day after September 10 is the first day that anybody walked inside either tower?

A. I think when we got back, um, the city and I think one of my superintendents were already there. Cause when my phone rang I literally turned my phone on when the jet was coming in. I don't know if you all fly out of Miami a lot. Jets go over the ocean, make a turn and they fly in heading west. When we had flown in, turned and I was heading to the airport I turned my phone on and it rang in the jet when we were coming down. And it was one of my superintendents. I think it was -- I think it was Chris. One of them. I don't remember who it was. Immediately handed the phone to a city inspector that was already on the site. And I said if you look up to your north you see a jet, that's me, give me an hour and I will be there and they all waited. By the time I got there they had opened the main door open and they were walking around.

Q. If I'm -- so let me see if I understand you. As you are flying back in on the private jet to come back after the storm you get this phone call and the city officials are already there and you asked them to wait about an hour?

A. Take me at least an hour to get down, get a rental car and get to the site.

Q. Okay. What date was that?

A. Like I said earlier, it was either Monday or Tuesday after the storm.
Q. Are there plane records or is there a credit card receipt? Or how did you pay for the plane?
A. It's on the invoice. It has a date.
Q. Is there a reservation or confirmation? How does it work with private jets? I don't fly those.
A. It's a friend of mine. I just pick up a cell phone to call him, see if he's available.
Q. What's the best document I could look at that will tell me exactly what day you came back?
A. On the hurricane invoice lists Jag Aviation. Has the date and amount.
Q. When you say hurricane invoice is that the spreadsheet that we were talking about before?
A. Yes.
Q. Okay. So that Monday or Tuesday. Did you make it to the building -- let me ask it. Did they wait for you?
A. Yes, some of them did. There was a whole slew of them at fist.
Q. Who was there?
A. Um, I don't remember the guy's name but it was the guy that actually put that stop work notice in the system. I know him if I see him. I don't

remember his name. One of Maurice Pons underlings.
Q. Anybody else there?
A. When I got there it was him and I think an electrical inspector was still there.
Q. Looking for live wires, down live wires?
A. The extent of the damages.
Q. And who else was there? So far I heard you, the city worker, the electrical inspector. Were any of your superintendents or staff people there?
A. I think Jorge Alaya might have been there and Hilda Alvarez.
Q. Jorge Alaya?
A. Yeah, Jorge Alaya. And I don't know. Hilda wasn't there that day. There were so many people there. As soon as I got there we were bombarded with people, tenants, everybody was on us.
Q. And I will come back to the tenants in a second so I can get this a little bit more crystalized for me. So you think Jorge might have been there.
Who's Hilda?
A. Hilda is our secretary.
Q. What's her last name?
A. Alvarez.
Q. She lives here?
A. Miami.

Q. How long this meeting last?
A. Hour maybe.
Q. When is the next time that somebody else goes in the building or one of the buildings?
A. Like who?
Q. Anybody. The workers, tenants, residents, police, anyone?
A. We were in the building trying to see the extent of the damages and, um, probably city people were around there also. We weren't allowing tenants go in cause as soon as we see what had happened, the water and mold, we just said, I locked it down.
Q. Were there any live electrical wires or was there any hot electric that was exposed?
A. No, there is no power. Power was off both buildings.
Q. How long was the power out?
A. Probably a week. We were on emergency generators and the only thing was working was the elevators.
Q. When is the first time a tenant or resident comes to the buildings?
A. They were there when I got there.
Q. When you landed and then you got there they were already there?

A. They were already there.
Q. Were any of them inside any of the buildings?
A. No.
Q. Where were they?
A. Out in the parking lot.
Q. How many?
A. I have no idea. Big group of them.
Q. Were they there the next day too?
A. They were there almost every day. They made a compound in the parking lot. Start harassing people all day long.
Q. When is the first time a tenant or a resident went into one of the buildings?
A. A couple days or so once we got some waivers done by the attorneys. I think the owner might have had them done, sent to us and we started allowing them to go in like I told you earlier, you get whatever personal medicines and stuff like that they need and just get out of there. Because the city had said they basically condemn it because everything's wet and there is mold everywhere.
Q. When you say a couple of days so if I am following the time sequence so far you returned either Monday or Tuesday after the storm.

So if I use that Monday or Tuesday as a point of reference what day of the week would the tenants have been allowed to go in?
A. Wednesday, Thursday, Friday. Somewhere around there.
Q. What is the best document I can look at that will tell me exactly what day they started going in? The waivers or something else?
A. The waivers are dated.
Q. When did any of PVGC employees or staff start going back into the building to do any work, cleanup or otherwise? Again, using these dates as sort of a point of reference.
A. Probably the following week. Or the weekend. Following weekend.
Q. And then were any trades or subcontractors also allowed to come on site to start doing any work, cleanup or otherwise?
A. They were there. We had the electrician come to make sure once things were shut down so that when the power did come back on we didn't hit with a surge and damage something.
Q. Is that Atlantic Coast?
A. Yes.
Q. Okay. When did somebody from Atlantic Coast

come back on the job site?

A. Couple days after. You know, probably Wednesday, Thursday, Friday. Within that week.

Q. Within the week after the storm?

A. Yes, the first week I got back. He had an employee that lived close by and would ride a bike. He was an electrician.

Q. Do you know who that guy was or person?

A. Frank. That's all I know. I don't remember his last name.

MR. LAWHON: Let's take a break.

(Brief recess was taken.)

BY MR. LAWHON:

Q. Mr. Vicari, I just want to button up one other issue that we actually said we were going to put aside on the hurricane stuff and then we will move on from that and that is the hurricane contracts. Do you remember before I wanted to focus on the GC claim for the hurricane work with the insurance company and then we were also focusing on the negotiations that were going on to what I called amending the prime contracts. So let's put those two topics aside. You had mentioned before that there is a contract for PVGC to do hurricane repair remediation or restoration work.

Do I understand that correctly?
A. Yes.
Q. And I think you kind of described yesterday that PVGC has an agreement with the owner to do that work for an amount and then you split 50/50 whatever is left over or something like that with the insurance company. I just wanted to see if I can understand this a little bit better. Okay? So let me back up.
Does PVGC have one master contract to do hurricane work on both buildings or are there separate contracts to do hurricane work on each building or how is it set up?
A. One contract to do Civic.
Q. Is that a signed contract?
A. No, not yet.
Q. Is that part of the negotiations that we were just talking about earlier?
A. Yes.
MR. PARTINGTON: If it helps it is going to be an AIA form that is substantially similar to the main contract.
MR. LAWHON: It is just going to plug in hurricane repair generally as the scope?
MR. PARTINGTON: General scope. I think there is some other changes but in general

there was an attempt to kind of as closely as possible mirror the two since it had already been negotiated.

BY MR. LAWHON:

Q. Remind me if would you, please, what the price is of that contract?

A. I don't know the exact number. Somewhere around the 9 million.

Q. How does the scope of work that you're doing for this hurricane work differ from the existing prime contract, the renovation work?

A. The owners gave me a scope to price that they have determined the work that needed to be done. They are separating it so in the event that they do get on the table with ab insurance company, negotiate that it wouldn't be co-mingled. You have your original contract work and then you have your damages, the hurricane damages that have been determined.

Q. Is there any exterior work at all that PVGC is doing under this hurricane contract that we are just now talking about?

A. No.

Q. So the $9 million is for all interior renovations on Civic?

A. Correct. As you said earlier, when you were

there in May there is no sheetrock. The original contract was only to paint the sheetrock. Now the sheetrock is gone so you have to replace it.

Q. That part I understand cause I saw that. Um, but was the original prime contract, did it also call for interior renovations to any of the units originally?

A. Yes, but not to the extent that we are doing now. It was just basically painting and finishes. Changing the finishes.

Q. I thought you were installing new cabinetry under the prime contract?

A. Part of the finishes.

Q. Okay. Flooring?

A. Yes.

Q. Fixtures?

A. Yes.

Q. New tubs, showers, any of that stuff?

A. Tub surrounds. Not the tubs.

Q. Tub surrounds. What is that?

A. The alcove around it. Tile or synthetic marble. Now there is nothing in it. Everything was ripped out. See, now in the hurricane contract you have to replace the sheetrock, all the tubs, replace everything.

Q. Okay. Let me see if I can drill down on this a little bit. So let's take flooring, for example. Under the original prime contract was PVGC going to remove and install new flooring?
A. Yes.
Q. Okay. Under the hurricane contract is PVGC going to install new flooring?
A. Remove and install. We had 80 something units almost finished that we had to tear it all out. So we are now replacing all the units with the ones that were installed and the ones that were, let's say damaged.
Q. Let me back up. I think I understand what you said. But let me see if I can sort of, I am trying to visualize this. So in my mind when you signed the prime contract and I will just use flooring as an example. When you signed the prime contract part of the scope of work is the floors are old so we're going to rip out all the floors and we're going to put new floors in.
Do I have that right so far?
A. Correct.
Q. Okay. During the course of prosecuting the work under the contract it is my understanding that on Civic Towers some of the flooring was removed and it

was reinstalled.
Do I have that right?
A. Correct.
Q. Who did that work?
A. ATO I think.
Q. Am I now understanding you to tell me that that flooring was damaged as a result of the hurricane so it has all been ripped out and it needs to be reinstalled again?
A. Correct.
Q. The hurricane contract that you just described, does the scope of work include the removal of that flooring and putting in another new floor?
A. It includes the reinstalled of the new floor. The removal has already been in the demo.
Q. The demo is not part of this contract?
A. That was a change order to the original.
Q. Change order to the original prime contract?
A. Yes.
Q. So again, in my simple mind in the big picture here --
A. -- I agree.
Q. I'm sorry?
A. Agree.
Q. Agree with what, that I have a simple mind?

A. No, not what I meant. Go ahead. I'm sorry.
Q. Okay. If I put the picture together I think I am going to put two concepts together what I think I see so far. Is that you're installing a new floor in Civic Towers in some parts twice.
Once ATO has done it already and now you got to do it again; is that right?
A. Correct.
Q. And ATO is suing for the floors that they installed the first time and haven't been paid for. Isn't that part of their lawsuit?
MR. PARTINGTON: Object to the form.
BY MR. LAWHON:
Q. Is that part of their lawsuit?
A. I don't think flooring. I think cabinets. I think cabinets.
Q. Cabinets?
A. Yeah. And maybe some floors. Small amounts.
Q. Is the concept that we are talking about the same relative to the cabinets, meaning that part of the prime contract was to replace the cabinets on Civic?
A. Yes.
Q. Okay. Some of the cabinets were replaced in

some of the units in Civic?
A. Yes.
Q. ATO did that work?
A. Yes.
Q. ATO is claiming they were not paid for that work and is that part of what they are suing for?
MR. PARTINGTON: Object to the form.
THE WITNESS: That's not true. They are overbilling us. They are billing us for too many kitchens that they said they installed and they didn't do.
BY MR. LAWHON:
Q. I understand you disagree with what ATO is suing for. My question more precisely is does ATO claim in the lawsuit rightly or wrongly that they installed cabinets in some of the units in Civic Towers and they have not been paid for those?
A. They can claim it. It's not true.
Q. It's not true because they overbilled for it is what you are telling me?
A. That's right.
Q. And so if I can finish the chain of thought there. Then somewhere there is a change order for demo work to all the interior of Civic Towers both whatever remodeling had been done and whatever hadn't

been done yet.

I understand that right?

A. Correct. Actually both buildings.

Q. Okay. There is a change order to both buildings for the demo?

A. Yes.

Q. Okay. And so when I was there in May that is why I saw everything stripped down to concrete and medical studs cause all the demo work has been done?

A. Correct.

Q. The new hurricane contract that we have been talking about is for PVGC to go in and reinstall essentially the second time what had already been done by ATO and then also go ahead and do all the new flooring that had not yet -- new finish work that hadn't been done in the units in Civic Towers.

That generally right?

A. The hurricane is only replace. If you are going to use floors as an example, the floors that were already done, the hurricane was charged to replacement of those floors. The areas that didn't have floors we are not charging cause that would be double dipping.

Q. So at the time the hurricane came through if some of the units were already stripped down to

concrete you are not charging to demo a floor.
Is that what you're saying?
A. If it was already demoed and there was no new floor we are not charging them to demo. And we are not charging them to put the new floor in. The only thing we are charging them on is for the actual damages that were caused in that unit. Meaning, all the sheetrock was ripped out so now you got to put all the sheetrock back in. You got to tape, float, paint and prime. You got to charge them for that. Cause originally we were just supposed to paint an existing wall.
Q. I understand. I am with you now. How much of the hurricane contract that we are talking about scope of work itself -- well, strike that. That's a bad question.
Has PVGC hired any subs to do that hurricane contract work?
A. We are finalizing all that now.
Q. Who are the subs?
A. Everybody that was originally there. Same subs.
Q. Let me be more precise then if I can. Atlantic Coast is going to do the electric?
A. Yes.

Q. I don't remember who the plumber was?
A. Southwest.
Q. Who's doing the drywall work?
A. LL&J.
Q. Are those the folks from Louisiana?
A. Yes.
Q. Who's doing the painting?
A. LL&J.
Q. Tape, float and painting?
A. All together.
Q. Carpentry?
A. Serinco. The framing.
Q. Does that include installing the cabinets?
A. Yes.
Q. That is within Serinco?
A. He has the cabinets also. He has repair, framing and cabinetry. I think he may have the floors too. I am not sure.
Q. Am I missing anybody other than suppliers? Is there HVAC?
A. Deck Tight Roofing. And Goose Bumps does HVAC.
Q. And is it a fixed price contract for $9 million?
A. Maximum guarantee.

Q. Is it cost plus?
A. Yes.
Q. With the 9 million as the guarantee?
A. Right.
Q. Did you tell me yesterday that it was cost plus 18?
A. Yes.
Q. Okay. You mentioned something about splitting some part of it with the owner. I didn't absorb that very well. Could you explain that for me?
A. When we gave them the estimate or the bid I should say, it is broken down to all the trades. If we save money on a line item by negotiations or whatever, we save that. Just an example, plumbing. If we save money on the plumbing and there is a hundred thousand savings the owner and I split it. It is common in the industry. It is kind of an incentive for both parties to bring cost down.
Q. Explain to me then how the insurance company fits into that contract or that cost savings? And what I mean by that is are you going to then make a claim for $9 million from the insurance company for this work or are you expecting the insurance company to pay draws?
How is that working?

A. The insurance company is not involved. I told you the owner got financing from the bank.

Q. So is the owner making a claim for the $9 million then through its own insurance?

A. I'm sure he will. He's doing basically his due diligence to show that we are trying to hold costs down. Because ultimately the contract, um, could bear 20 percent markup from the insurance company. That's why it is reduced to 18.

Q. So you're trying to show, you and the owner are trying to show that you're saving the insurance company two percent?

A. We are trying to do the right thing.

Q. So you won't know if there is any cost savings until the work is done. I understand that right?

A. That's correct. Until all contracts are committed and the job is basically complete.

Q. Is there an agreement between PVGC and the owner as to when exactly you're going to evaluate whether there has been a cost savings and whether or not that's shared?

A. It's done monthly but it is projected through the whole project.

Q. Is PVGC getting paid then under that

contract, that hurricane contract directly from the owner?

A. Yes.

Q. Through the bank financing?

A. Yes.

Q. Okay. Is the bank going to be doing inspections?

A. Yes.

Q. Do you know who is going to be doing the inspections for the bank? Is it CBRE or somebody else?

A. I think it is that company. The lady's name is Monica. I don't remember her last name. I don't know how to say her last name.

Q. Is there any agreement in place between the owner and PVGC to share any insurance proceeds on any claim that comes in?

A. No.

Q. Is there any agreement between PVGC and the owner to share in any bond claim that is paid as a part of this lawsuit?

A. No.

Q. Are you sure?

A. A bond claim in what sense?

Q. For example, if just hypothetically speaking

if PVGC was to get paid a million dollars by a bonding company in this case like Ohio Casualty my question is is there an understanding or an agreement in place between PVGC and the owner that you would split that somehow?

A. No.

Q. Or share it with the owner?

A. No.

Q. Is there any verbal agreement between you and Ryan Fuson or any representative of the owner to share in any proceeds of this lawsuit in any way, shape or form?

A. No.

Q. And just so I can tie it up. Is there any agreement or understanding between you and Mr. Fuson or any owner to share in any insurance claim proceeds?

A. No.

MR. PARTINGTON: Can I ask a clarifying question about one of your questions you just asked? Because the owner does have an indemnity agreement, indemnity claim for the attorneys fees and costs. I don't know whether it is encompassed within your question or not. It is on the spreadsheet. But for the fees and costs they incurred by being sued, um, there is an

obligation to indemnify them for that. I don't know whether that is within the scope of what you are claiming as splitting the proceeds. That is an obligation that's out there.

MR. LAWHON: Okay. I mean, I am comfortable with the question. If you need to clean that up you can.

THE WITNESS: We need an answer.

MR. PARTINGTON: That's why I was asking to clarify. That's a contractual obligation in the underlying contract.

MR. LAWHON: Understood.

BY MR. LAWHON:

Q. If I wanted to see all the language that the lawyers are putting together to identify what this cost savings is that we have been talking about with the owner on the hurricane contract where is that? Is there a clause in the negotiations that they are doing now? Is it in the prime contract right now?

Can you tell me where that is?

A. It's in the contract. In the hurricane contract.

Q. It's in the hurricane contract. It spells out cause Mr. Partington said something about using the AIA contract form for the hurricane contract.

Is there an addendum or is it somewhere in that contract that it says that if we save money with the subs then we are sharing that with the owner?

A. When I refer to the contract it is AIA form. It's in there.

Q. It seems like -- I haven't seen that provision. Was it added in there or is it already somewhere in there?

A. There's a place you can add.

Q. That's my question. So there has been an addendum that talks about a cost sharing. Is that your understanding?

A. Yes. In the form there's a place you can add what the payment terms are.

Q. And somebody has typed or written that in?

A. Yes.

Q. Is there any other compensation or benefit that PVGC is receiving from the hurricane contract that we haven't covered already?

A. I don't think.

Q. The prime contract for each building, going back to those. Is there any type of provision in there for cost savings under that contract, the original prime contract?

A. In what sense? As a sharing?

Q. In any sense. Either as a sharing or if I am able to finish early I get a credit. Or is there any type of cost savings in any way, shape or form?

A. It was a cost plus maximum guarantee.

Q. Is there anything you were trying -- well, strike that. Is there any part of the contract, the original prime contract, that obligated you or required you to try to find cost savings?

MR. PARTINGTON: Object to the form.

THE WITNESS: No, there was no sharing like this other hurricane one.

BY MR. LAWHON:

Q. And let me make sure I am a little more clear about it. I'm not talking as much about sharing with the owner but more so value engineering or rebates or anything.

Is there something in your original prime contracts that required that you pass on any type of or find any type of cost savings under those contracts?

A. If we did have a savings it would revert to the owner. But we had a maximum guarantee. This one is a little different. If it was a savings it all went to the owner.

Q. So if it happened it went to the owner but

you weren't required to find any cost savings. Am I understanding that right?

A. That's correct. Cause when we started the job and gave the contract we pretty much was -- all the numbers were committed and that's what it was going to be. There wasn't going to be much savings. But if there was it went to the owner.

Q. If there was savings it went to the owner?

A. A hundred percent.

Q. Understand that I think I am getting it. I am almost there. So the prime contracts are cost plus 14 with a guaranteed maximum price. I think the total we talked about was like 32 or $33 million or something like that. I won't hold you to the exact number.

A. Okay.

Q. Okay. Um, let's just say hypothetically speaking you had finished both buildings under the prime contract, they hadn't been amended, no deducted change orders, hurricane and you finished the work for $25 million. Okay. So rough numbers you're now $8 million under the guaranteed maximum price.

You following me so far?

A. Yes.

Q. Is there any agreement in the contract or

otherwise that you get any benefit of that? You get to save it, you get a bonus for it? Any of that $8 million savings underneath the guaranteed maximum price?
A. I said earlier, any savings would go to the owner.
Q. So if you came in that far under, for example, and saved $8 million under the guaranteed maximum price is it your testimony that PVGC would have received no added value or additional benefit from that?
A. That's correct.
Q. We talked a little bit when were talking about the hurricane stuff about ATO and it sort of reminded me. There was another question I meant to ask you before on a different topic.
Did you ever tell anybody you were going to fire Robert Mick?
A. Maybe at one point, yeah.
Q. What do you think happened?
A. Robert Mick got sideways with Jesse Baez which is the third party providers on the project.
Q. For JEM?
A. Yes, he is the owner of JEM. And, um, I got a call from the owner right after it happened and the

owner had told me that he had just got off the phone with Jesse and him and he was told that Jesse and Mick just had an argument and that Jesse said one of them got to go.

Q. Who told you that? Ryan?

A. Ryan.

Q. He said one of them have to go?

A. Yes, Jesse had gave Ryan an ultimatum. Either he goes or Mick goes.

Q. So Jesse told Ryan this and Ryan is passing it on to you?

A. Yes.

Q. Do you know about when this conversation takes place?

A. No, I don't know. I really don't.

Q. So what did you tell Ryan?

A. Let me look into it. I mean, I was at the airport literally. It was like a Friday evening or a Saturday or something. I was flying home when all this happened.

Q. Okay. What did you look into?

A. I called Mick to see what had happened. And in construction sites sometimes tempers will flare and I feel like I am firefighting sometimes, put out fires. And I talked to both of them. And it was

ultimately it was a big misunderstanding. Both of them their egos got in the way and just couldn't, you know, talk as gentlemen and calmly and resolve things.

Q. So somehow you were able to mediate a truce?

A. Yeah.

Q. Or a peace treaty?

A. That's correct.

Q. So okay. Any other time you talked about firing Robert Mick?

A. I think maybe right in the midst of all of that I might have talked to Jon Parrish or Vito or somebody when they call me and I'm telling them what I was involved in handling this and just please, you know, let me get through this and we will figure out whatever issues was they had at the time. I think I mentioned it to them. That's why this is coming up.

Q. Did you mention to one of them that you were going to fire Robert Mick?

A. Potentially, yeah.

Q. Potentially you mentioned it to them?

A. Potentially.

Q. Let me finish my question.

A. Go ahead. I'm sorry.

Q. Potentially you mentioned it to them or you said you were potentially going to fire Robert Mick?

A. Potentially going to fire Robert Mick.
Q. So your recollection is that you left it open as a possibility but you didn't say for sure that you were going to fire him?
A. That's correct.
Q. Did Mr. Parrish send you a letter telling you that you had told him you were going to fire Mr. Mick?
A. Yeah, I vaguely believe that he put it in one of his letters.
Q. Did you ask him to change the letter?
A. I don't remember.
Q. Did you ask him to take out the part about firing Mr. Mick?
A. I don't remember.
Q. So it's possible?
A. I haven't read all those letters to bring me back up to speed.
Q. Is it possible that you asked Mr. Parrish to take that particular statement out of his letter?
A. Possible.
Q. I was asking before about the Procore system and the information that came from it. I don't believe we have all the Procore notes. We just have specific reports that were printed that had Coastal

entries. I am just going to ask you to do me a favor please, and just make sure that PVGC doesn't destroy or alter or amend or modify any of the Procore data so I can make sure we get it all. Okay?

Do you understand what I said?

A. I understand. I would never do that, sir.

Q. Okay. I want to talk to you about your negotiations with Coastal leading up to the contracts that you ended up signing with the different Coastal entities. We will probably do a little bit of that before lunch and then we will probably follow-up with that after lunch. Okay?

Tell me when you first started talking to any Coastal representative about being involved in this project?

A. I don't know specifically.

Q. If we can use some benchmarks. So we had talked yesterday about the closing on the buildings being in January or early February of 2017.

So was it before then?

A. Probably. I'm sure it was.

Q. Would the negotiations have first started taking place in 2017 or 2016?

A. 2016.

Q. Do you know what season it was?

A. No.
Q. Who did you talk to first?
A. Um, PJ did most of it with Vito.
Q. Did you participate in those discussions?
A. Not in the beginning.
Q. Did there come a time before any agreements were signed that you met Vito or any of the Coastal people face-to-face?
A. I think so, yeah.
Q. When would that have been relative to the negotiations?
A. I have no idea.
Q. Do you know if PJ went with you?
A. Possibly.
Q. Where would the meeting have taken place?
A. On site or at their facility.
Q. Well, one is in Miami and one is in Naples. One in Naples, one in Ft. Myers so. Do you know which city?
A. Ft. Myers. Either Ft. Myers or at the job site.
Q. And again so just so we're clear, we are talking about even before the contracts are signed?
A. I believe so, yes.
Q. Do you have a memory of visiting their

facility before the contracts were signed?

A. Possibly or maybe right in that same time period.

Q. Who did most of the negotiations of the contract and the scope of work with the Coastal folks for PVGC?

A. Most of it was done by PJ.

Q. Tell me what your role was?

A. Um, in this negotiation? I kind of let PJ do, you know, bring it to a number and then we got in the specifics after, you know, about I guess could they perform and just overall of all the negotiations that led up to actually sign a contract. Bond requirements and stuff like that.

Q. Did you personally do any homework, due diligence, background check on any of the Coastal companies or any of their principals while the negotiations are going on?

A. No, but I wish I would have.

MR. LAWHON: I haven't done it yet but I guess I'll move to strike that as nonresponsive. Kind of nonresponsive.

MR. PARTINGTON: Overruled.

MR. LAWHON: You're the judge now?

MR. PARTINGTON: Well you objected.

You got to rule on it.

MR. LAWHON: Not yet.

BY MR. LAWHON:

Q. Did anybody -- did you ask anybody on behalf -- let me be very precise in my question so we can avoid the editorializing. Did you ask PJ to do any homework or background check or investigating of any Coastal company or its principals before the contract was signed?

A. We asked STO to write a letter of recommendation to check with STO.

Q. Did you ask STO to do that or did PJ?

A. Um, one of us did. I don't remember. But we got a letter from them.

Q. Did you ask PJ to do any other work besides getting that letter from STO to investigate the Coastal companies or their principals?

A. No.

Q. Did you ask anybody to do any homework or background checking on the Coastal companies or their principals before the contracts were signed?

A. No.

Q. Do you know if PJ did any background or homework or investigating of Coastal or any Coastal company or its principals before the contracts were

signed?
A. We were skeptical and yes, it was PJ or I, one of us like I said, contacted STO.
Q. Right. And I got the STO part so far. Was there any other investigating or background work that PJ did that you know of before the contracts were signed?
A. Other than there was only two people that we were told involved. Kevin and Vito. That's no, we didn't.
Q. Who told you that Kevin and Vito were involved?
A. Vito.
Q. Are you aware of anybody doing any background work on any of the Coastal companies or any of its principals before the contracts were signed other than what you told me so far?
A. No.
Q. If I understood your testimony just a minute ago you said that you let PJ do most of the negotiating until we got to a number.
Did I understand that right?
A. Yes.
Q. Do you remember what the number was?
A. Whatever the contract number is.

Q. Was that number negotiated back and forth between the parties?
A. I am sure it has. I am sure it had been.
Q. Were you part of those negotiations?
A. Not always, no.
Q. The numbers that are in the contract, did Coastal start out at a higher number?
A. I don't remember. Could have been less.
Q. Okay. Are there any other particular terms or conditions that you specifically asked to be part of the contracts?
A. The bond requirements. Performance and payment.
Q. Are there any other specific conditions or terms that you asked be included in the contracts during negotiations?
A. Most of our -- our contract is pretty much standard. I've been using that for many years. So I don't think I would have seen them other than what is already there.
Q. When you say many years, how long are we talking about for that contract for?
A. 30 years.
Q. So safe to say it has been used on a lot of projects?

A. Yes, sir.
Q. Would you consider yourself an expert in understanding your contract form that you have been using for 30 years?
A. I would say so.
Q. On a scale of one to 10, one being very poor and 10 being an expert where would you put yourself on understanding your company's form contract that you used for 30 years?
MR. PARTINGTON: Object to the form.
THE WITNESS: I understand it but I am sure there is some legal ramifications of things that I don't understand. So say seven, eight. Cause over the years attorneys have cleaned it up, changed things and stuff like that.
BY MR. LAWHON:
Q. How come you made sure to ask about the bond requirements?
A. Because there wasn't much history on STO. I should say Coastal, I'm sorry. And they told us it was a start-up so there was no track record. And I was not going to consider giving them the job without a performance and payment bond.
Q. Who said they were a start-up?
A. Vito.

Q. As you sit here today do you have any specific recollection of any of the conversations that you had with Vito negotiating the contract or any of the terms of the contract?
A. No, not specific.
Q. Were there discussions about a schedule before the contracts are signed?
A. Yes, PJ and I and Vito sometimes would talk about his input in the direction of the job and what it would take to fabricate, deliver, install. And also, you know, implement shop drawings first and through that whole process.
Q. Was there ever a date talked about as to when either Coastal's scope of work would have to be done or when the whole project needed to be done, again before the contracts were signed during negotiations?
A. It was always told to them it had to be finished by the end of the year cause of the tax credits. Ramifications if it wasn't finished that the owner would sustain.
Q. Who told them that?
A. I did. I think I have always told them and they know that.
Q. Regardless of what they know my question

specifically for you is who at Coastal did you tell that the project had to be done by the end of the year before the contracts were signed?
A. It would be either Vito or Kevin cause those were the guys we were talking to early on. Jon Parrish and Brian didn't come on until later.
Q. As far as you know?
A. In the negotiations or discussions?
Q. I had asked you before if you met Coastal people before the contracts were signed face-to-face and you recall possibly one meeting.
Were Vito and Kevin -- would Vito and Kevin have been at that meeting or was it just one or the other?
A. Possibly they were both there. I don't remember which we did. We meet at the site or at the facility first. But we did both.
Q. Do you believe you did both before the contracts were signed?
A. I don't remember.
Q. Is it possible you did one meeting before and then one meeting after?
A. Possible.
Q. Is there anything about those face-to-face meetings that you recall talking about specifically

with the Coastal people?

A. Always schedule was always a topic.

Q. What was discussed about the schedule?

A. Can they implement it and meet the schedule. Because they were the critical subs for the whole job. Everybody followed them.

Q. And when you say could they meet the schedule, what schedule are we talking about? Was there a written schedule in place or just end of the year tax credit issue?

A. No, it was a schedule that there were discussions with Paul Landry and Vito and his team that Paul Landry put together a schedule from all the information that he had with the subs. They would talk about duration and Paul would put it all together.

Q. You believe that Paul Landry spoke to somebody from Coastal before the contracts were signed about the schedule?

A. I think so, yeah.

Q. How do you know that?

A. Paul was telling me he was communicating with them all.

Q. Who did he talk to?

A. He talked to all the subs.

Q. I'm sorry, let me be more precise. Who from Coastal did he talk to about the schedule before the contracts were signed?
A. I'm not sure.
Q. In the negotiations leading up to the contracts were there any discussions with Coastal's people about sequencing the work? And what I mean by that is do we demo one building at a time, do we demo both simultaneously, should we work on one building at a time, should we work on both buildings simultaneously, should we work on them in sections? That kind of sequencing.
Did those discussions take place?
A. Yes.
Q. What was discussed?
A. That they wanted to do vertical stacks, you know, from the bottom going straight up. And we needed to do it with the time that -- let me back up. The time that it needed to do that whole building they would have to work on both buildings simultaneously they felt to meet the end date of completion.
Q. Did they, somebody from Coastal, propose any alternatives to sequencing other than what you just described vertical stacks both buildings simultaneously?

A. I don't remember that. Because the way the tenants had to be moved out.
Q. Can you explain that to me? Was there -- how did the tenants have to be moved out?
A. The building was a hundred percent occupied.
Q. Both buildings?
A. Both buildings. May have might have had one or two units vacant but pretty much a hundred percent occupied. And you couldn't demo a stack until the tenant would move out. And you couldn't go horizontal because the building was in such bad shape. If you took all the bottom off the tops would come crumbling down. So you had to do it vertical.
Q. Well, you said you had to do it. What I just understood you to say is you couldn't do it horizontally starting at the bottom because if you took out the exterior panels of the bottom the panels above them would coming crashing down; right?
A. Possibly. They were in bad shape.
Q. So you said you had to do it vertically but you motioned your hand actually from bottom to top. Was it going from the top to bottom?
A. Well, vertical is up and down; right?
Q. Yeah, but where was the sequencing supposed to start. At the top moving down for the demo?

A. Demo top, yeah.
Q. Okay. Was there a discussion with the Coastal people during the negotiations that tenants were still going to be in the building, they were going to be partially occupied while they were demoing?
A. Yes.
Q. Did they talk to you at all about wanting large sections of the building to be unoccupied or asking you if more people could be moved out before they started demoing?
A. They agreed to a stacking plan. There was a demolition plan and there was phases all the way around the building that we were going to demo these areas and you could put these areas back up. You could fabricate your panels and put it back up. And they agreed to it all.
Q. And when you say phases how many phases were there for Civic Towers?
A. Seven, eight. Something like that. Maybe nine. I don't remember. It's all on the drawings.
Q. How many phases were there for Senior?
A. About the same.
Q. Do I understand your testimony to be that when Coastal was supposed to start its demo work on,

let's say phase one, were all the tenants supposed to be out of phase one?

A. Yes.

Q. But the tenants could stay in phase two, three, etc. while Coastal is working only on phase one?

A. No, you had to turn over. You couldn't empty the whole side of the building. The direction was from the owner and the agreement, whatever all the subs, that you had to finish a phase back before they can demo others or remove people out.

Q. Can you explain what you mean by phase back?

A. Well, you have to put the panel back in and the tenants would have to be brought back it. It have to be a finished unit. They weren't going to allow us to empty the whole building without putting people back in.

Q. So let me refine it a little bit then. So let's just start with phase one. Is this your understanding of what the plan was supposed to be. So they start on phase one, they start the demo work. The tenants are all supposed to be out of phase one for that entire phase.

Am I correct so far?

A. Correct.

Q. All right. So they demo the panels, they put up temporary walls in phase one. Am I understanding you to tell me that they had to finish the demo of phase one and install the new panels on phase one so that all the tenants could move back in phase one before they could start anything on phase two?
A. I think there might have been one phase of grace, so to speak. Let's say phase two you could empty out but they wouldn't let them start on phase three.
Q. Until they finished phase one?
A. Correct.
Q. And what is the best document or documents for me to look at to understand exactly what the agreement was for when tenants were going to be moved out of each building?
A. The schedule.
Q. The schedule?
A. The owner would move. When we tell them to move they were on top of it. They didn't hold us up.
Q. So if I look at the schedule it will tell me exactly what tenants are moving out of which units on what date?
A. Potentially it would. But because of the

delay those tenants didn't move.

Q. You said potentially. So what is the second best document or documents for me to look at that would tell me exactly what tenants were supposed to move out of which units on what dates?

A. The schedule would show you.

Q. Well, you said potentially so I wasn't sure. If I looked at the schedule right now is it your testimony that it will say these units will be completely empty on this date through this date?

A. Correct, on phase one and part of two. But if you are being delayed but not putting phase one and phase two back those tenants in three and four are not going to start moving. Because the owner is putting them all in hotels.

Q. I understand what the owner is doing in terms of moving people out. When you're talking about delays those aren't in the schedule that is provided to a trade, at least the original schedule. So let me see if I can take it a step further.

Is it your testimony that the schedule tells me exactly what tenants are supposed to move out of what units, when for every single phase?

A. Potentially, yes.

Q. Okay. Well, now we are back to potentially.

So what other document or documents should I look at to make sure that I am certain of what the schedule was for tenants to move out of specific units by specific dates?

A. The schedule would show potentially what are the move dates.

Q. Why do you keep saying potentially?

A. Because that is what's planned. It's not actual. It's not as-built. That is what the plan is. Now, when you have delays and you push the plan back --

Q. -- okay. And I'm not asking about delays. We will talk about that. But if I understand your testimony even though we start on phase one if I wanted to know right now -- strike that.

When the schedule is first provided to a subcontractor on this project what you're telling me is I could have looked at the schedule right then and if I wanted to know when tenants are supposed to move out of phase five on Civic Towers it's in the schedule?

A. Yes.

THE VIDEOGRAPHER: I need to go off the video record for a moment.

MR. LAWHON: Okay. Hold that thought.

We might just break for lunch.
(Luncheon recess was taken.)
BY MR. LAWHON:
Q. I think we ended our last session, Mr. Vicari, talking about the sequencing and I think the very last couple of questions was about what documents I could look at to determine what tenants were supposed to move out of what units on what date.
Do you remember that line of questioning?
A. Yes.
Q. Okay. And I don't remember if it was on the record or off the record but Mr. Partington was kind enough to show me the schedule, a schedule that just indicated that owner was have to access available by a certain date.
Have you since our break, have you been able to think of any other documents that I could look at that would tell me in more detail what tenants were supposed to move out on what dates?
A. No.
MR. PARTINGTON: And just for the record, the schedule I showed you was the schedule that is attached to the owner/contractor Civic Towers agreement.
MR. LAWHON: The prime contract?

MR. PARTINGTON: Prime contract, yeah.
Just so that if there's a question about it later that's what I showed you.
BY MR. LAWHON:
Q. Have you ever seen a move out plan document or anything originating from the owner that identifies who's moving out, what dates out of what units?
A. I don't think so.
Q. Let me come back to the contracts then as we are leading up to the signing of the contracts with Coastal. When do you believe the contacts were supposed to be signed with Coastal?
A. Supposed to be?
Q. Yes.
A. Probably late 2016.
Q. Is there a reason they weren't signed in late 2016?
A. Um, the owner was not ready in finalizing the deal to go forward.
Q. When you say finalizing the deal, they hadn't actually closed or they hadn't even decided if they were going to proceed with the purchase?
A. I don't think they closed and they had some issues with tax credit program or something. But they wasn't a hundred percent ready.

Q. Do you know when they became a hundred percent ready?
A. Not unless you show me a document. I don't remember the date.
Q. Some time in late 2016, is that around the time the owner decided they were a hundred percent ready to move forward with the closing?
A. No, I think it was probably early 2017.
Q. So was the -- is it fair to say there was a delay in signing the Coastal contracts because there was a delay in the owner closing?
A. In signing the contract with us.
Q. There was also -- so there are three delays. There's a delay in the closing which precipitates a delay in signing the prime contracts which precipitates a delay in signing the Coastal subcontract/sub agreement.
Is that fair?
A. Yes.
Q. Do you -- so I can use a point of reference. Do you remember the dates that the Coastal contracts were actually signed?
A. No.
Q. Have you read them before?
A. A year or so ago.

Q. Did you read them before they were signed?
A. Yes.
Q. Did you make any changes yourself personally to any of the drafts of the contracts?
A. Possibly.
Q. Do you know how many drafts were exchanged, if any?
A. Um, there were drafts going back and forth. Even between my attorney and Mr. Parrish.
Q. How many times?
A. I don't remember.
Q. Which attorney was doing that for PVGC? Was that Mr. Partington's firm?
A. Bruce.
Q. Bruce waves his hand. As you sit here today you don't remember how many drafts but you believe there were several drafts?
A. I think so.
Q. Ultimately when the drafts are done and there is a final agreement to be signed would you have read the agreement or any of the agreements before they were signed?
A. I think so.
Q. Let's start with Coastal Maintenance contracts. What I am going to do is provide you with

a binder that has a number of exhibits in it and we will start with, I think what is marked previously to a deposition as exhibit number two. Bear with me one second.

Is it your understanding that the Coastal Maintenance subcontract agreement for Civic Towers and Civic Towers Senior are identical other than price and maybe a number of panels?

A. Should be.

Q. The general contract language is the same. Should it be?

A. Yes.

Q. Okay. Let me talk to you about a couple of things in exhibit two. And let me ask you to look at article 1e which is titled Scope of Work.

Do you see that?

A. Yes.

Q. Will you read that to yourself and then let me know when you're done?

A. Okay.

Q. You had a chance to read that?

A. Yes.

Q. Yes?

A. Yes.

Q. Okay. So are we in agreement so far that

this is the subcontract agreement between PVGC and Coastal Maintenance & Restoration related to Civic Towers?

A. Yes.

Q. Okay. And just so I can make sure my record is super clean will you look at, I will come right back to the paragraph. Look at page seven, if you would, please.

A. Okay.

Q. On the bottom there are two signatures. Do you see those?

A. Yes.

Q. And the bottom left is a signature for Pete Vicari General Contractor. Do you see that?

A. Yes.

Q. Whose signature is that?

A. Mine.

Q. Okay. It is in blue and then underneath it there's a witness with a date. Do you see that?

A. Yes.

Q. Whose signature is the witness's?

A. PJ.

Q. Is that PJ's writing as well for the date?

A. Yes.

Q. So if I can take you back to page one, the

very top of the contract it says this agreement entered into this 26th day of January 2017 that date is not actually correct, is it?

MR. PARTINGTON: Object to the form.

MR. LAWHON: Well, strike that question.

BY MR. LAWHON:

Q. Do you see the date at the top of the subcontract agreement?

A. Yes, the date that we probably sent it to the, um, sub. We normally send it to them. We don't sign until the sub comes back and sends it to us.

Q. And as you sit here today are you sure that the final version of the agreement that we are looking at exhibit two was sent to Coastal to be signed on January 26, 2017?

A. Should be.

Q. Do you know what date Coastal signed it?

A. Looks like it's the 16th by the date on the signature page.

Q. Do you remember were you and Mr. DePinto together signing the contract together, same day?

A. I don't think so. I don't remember.

Q. So let me go back to my question then. Would you -- do you agree or disagree that the

effective date of the contract is February 16, 2017 which is the date both parties signed it or is it January 26, 2017?
MR. PARTINGTON: Object to the form.
THE WITNESS: I think there was a meeting of the minds on January 25, is that it? Or 26th, kind of blurred on this copy, that this was the agreement. It probably was delayed because of the bonds.
BY MR. LAWHON:
Q. Which bonds?
A. Performance and payment bonds.
Q. Whose bonds?
A. Coastal's.
Q. You don't know that for sure. You are just speculating?
A. No, I think there was a period of time they were having difficulties getting the actual bonds so possibly that's why it pushed back the date.
Q. Why do you believe they were having difficulty getting bonds?
A. Cause we kept asking for them and this lady, their agent Chelsea or whoever her name is, something like that, was having difficult actually getting the bonds.

Q. Did she tell you that?
A. I think Bridget and her spoke.
Q. So let me be more precise if I can. Did anybody from Coastal ever tell you personally that they were having difficulty getting a bond?
A. They were telling me there wasn't any problems and they were coming, they were forthcoming. But I had Bridget look into it and she called them and there was -- I don't remember all the details. But something about the form or what was supposed to be on it. You know. I don't remember all the details. But there was issues with her actually getting the bond from the company or getting authority to sign them.
Q. Her, being the agent or whoever Bridget talked to?
A. The agent. And it's a lady's name. I don't remember her name. I am sure it's in one of these files.
Q. What you told me so far is what Bridget is telling you are her conversations with the agent?
A. Yes. She's keeping me informed. Bridget's office is right next to mine.
Q. You didn't talk to the agent -- did you talk to the agent yourself?
A. No, sir.

Q. Coming back to the contract then and let me go back more precisely to article 1e that you read. It says furnish labor material, tools and equipment to manufacture, provide and install all pre-manufactured metal wall panels accordingly to STO's specifications.
Did I read that sentence correctly?
A. Yes.
Q. Okay. So let me start with furnish labor, materials, tools and equipment to manufacture provide. Was Coastal -- was Coastal Maintenance & Restoration contracted to manufacture panels?
A. This statement was added because at the last minute Coastal -- I will look at it as one entity, wanted to split them. So I wanted both entities to be responsible for that. I remember that coming up.
Q. When you say at the last minute what makes you think that's what happened?
A. That's what happened. We were told it was one company. And then they went from Prefab to Maintenance. The one was going to do the manufacturing, one was going to do the erection. But to me I always looked at it like they are one. So one person. I wanted it to read the same. They both be responsible for the manufacturing, erection, everything.

Q. Was Mr. Partington assisting with the drafting and the negotiations and completion of the Coastal Prefab agreement as well as the Coastal Maintenance subcontract?
A. More so, yes. But more so for insurance I think also.
Q. But just so I understand he wasn't just doing one contract but not the other; is that right?
A. Yes.
Q. So he was doing both?
A. Right.
Q. Okay. And when you say at the last minute what time period are we talking about if I can use February 16 when you signed as a point of reference?
Is it a day before, five days before?
A. No, no, probably weeks or months. It was probably late '16 is when they told us they were going to be separating.
Q. So they tell you in late '16 they want to divide out the two companies and the scopes of work and the contracts are signed in the middle of February which in my math is about two months.
Does that sound right?
A. Yes.
Q. So coming back to my specific question and

I'll be very precise with my question. Was Coastal Maintenance contracted under this subcontract agreement to manufacture STO panels?

A. It says it does. Install all pre-manufactured wall panels according to specifications.

Q. I know what it says.

A. And equipment to manufacture.

Q. I understand what it says. My question is when you signed this contract and you can look at it now if you need to but we will look at it later. You signed the Coastal Prefab purchase agreement on exactly the same date. So you signed them all at once. So you understood there were two separate agreements for two separate scopes of work when you signed these agreements.

Is that fair?

A. Yes.

Q. Okay. So even though you knew that is it your testimony that by signing the subcontract agreement for Coastal Maintenance where it specifically says manufacture you intended that Coastal Maintenance was still going to manufacture panels?

A. Who was going to manufacture?

Q. Coastal Maintenance.
A. Yes, provide all the equipment for the manufacture.
Q. It says furnish all the labor, all the materials, all the tools and all the equipment. So your understanding when you signed both sets of contracts for both Coastal companies, your understanding when you signed these on behalf of PVGC was that Coastal Maintenance was going to furnish all the labor and all the material and do all the manufacturing.
Am I understanding that correctly?
MR. PARTINGTON: Object to the form.
THE WITNESS: Would actually provide the equipment to do the manufacturing. That's what it says.
BY MR. LAWHON:
Q. They were supposed to furnish all the labor, all the material, all the tools and all the equipment to manufacture the panels?
A. Right.
Q. And the way you read that does not actually involve the manufacturing itself. Is that what you're telling me?
A. You could read it that way. That's a legal

determination.
Q. But you when signed this did you understand Coastal Maintenance would be doing any of the manufacturing of the panels?
A. I wanted them to be responsible. Both parties to be responsible for the completeness of it all.
Q. The next word after manufacture is provide and the way I read that is they are also supposed to deliver the panels.
When you signed this contract did you understand that scope of work to require Coastal Maintenance to also deliver panels to PVGC under this agreement?
A. I don't see where it says provide.
Q. You see the word manufacture?
A. To manufacture, provide and install. Right, that's correct.
Q. So my record is clear when you signed the Coastal Maintenance agreement we are looking at you understood that Coastal Maintenance was going to be obligated by contract to deliver the panels as well?
A. That's correct.
Q. And if the language is exactly the same in both Coastal Maintenance contracts is your answer the

same for both contracts, that you expected Coastal Maintenance to manufacture and to deliver panels on both towers?

MR. PARTINGTON: Object to the form.

THE WITNESS: I haven't seen it but if you're going to tell me it's identical I would say yes.

BY MR. LAWHON:

Q. Go ahead and take tab three and look at article 1e of tab three. Do you see the exact same language?

A. Yes.

Q. So would your answer -- and that's the Senior contract. Do you see that?

A. Yes.

Q. So would your answer be the same, that you expected Coastal Maintenance to manufacture and deliver panels under this subcontract for the Senior Tower?

A. That's right.

MR. PARTINGTON: Object to the form.

BY MR. LAWHON:

Q. Moving down a little bit right under E there's a little section about demo and it has got some bullet points there. Do you see that?

A. Yes.
Q. Okay. Let's go a little below that. There's a section that says install STO panel?
A. Right.
Q. Bullet point number two, will you read that to yourself and let me know when you're done?
A. Okay.
Q. You had a chance to read that?
A. Yes.
Q. Do you understand what you read?
A. Uh-huh.
Q. Is that a yes?
A. Yes.
Q. So as I read that it makes a distinction between repairing the existing embedments versus removing and replacing the embedment.
Do you understand that same distinction?
A. Yes.
Q. Do you understand what that means?
A. Yes.
Q. Okay. What's an embedment?
A. It is a steel -- in this case it was a gage material that was embedded to the concrete. Existing concrete.
Q. On each floor of each tower?

A. Yes.

Q. Was it -- would you agree with me that as what we just read is written if Coastal Maintenance is repairing the exiting embedment it's included within the contract price?

Do you agree with that statement?

A. Yes.

Q. If they are removing embedments that are there and replacing them with new embedments would you agree with me that is not included in the contract price?

A. I would not agree with you.

Q. Why not?

A. Because Vito elected himself not to repair them and just replace them. That's why it's included in the shop drawings.

Q. Okay. You said something a little different than the contract language so let's come back to that. Would you -- let's forget for a minute what decision you believe that Vito on behalf of Coastal Maintenance made. Let's just focus on what the contract says.

A. Sure.

Q. Okay. So let me go back to my question. Do you agree with my statement that the contract language of what you just read does not include removing and

replacing the embedments as part of the contract price?

A. That's correct. Only repair.

Q. Okay. So what you just said is that Vito made a decision on his own not to repair them but instead he made a decision to replace them and so that shouldn't be extra work.

Is that basically what you're telling me?

A. No, that is what happened.

Q. I understand you're saying that's what happened. And I haven't gotten to the actual work itself. Okay?

A. I understand.

Q. You're getting ahead of me but I'm just talking to you about the contract language. But since you said that let me make a note.

A. Go ahead.

Q. Okay. Forget for a minute that Vito, as you testified, made a decision to replace instead of repair. Forget that for a minute. Okay. Well done.

If in fact embedments on Civic Towers really needed to be replaced and could not be repaired would you agree with me that would be extra work the contract we just read?

A. Restate that again?

Q. Sure. If an objective person had decided that the embedments needed to be replaced instead of repaired would you agree that is extra work under the contract language that we just read?
A. Let me read it again. Possibly.
Q. What would decide whether or not it would be considered extra work relative to the embedment replacement work?
A. No one asked whether they were reparable or not. They just was determined that they were not going to deal with them, they were going to go with steel panels.
Q. Yeah, and okay. You're sort of getting into the facts not just --
A. -- trying not to.
Q. Understanding the language. But let me try and ask it a different way. What would need to happen in your mind for replacement -- sorry, let me back up.
In your mind what would need to happen in order for any removal of embedments from concrete slabs and reinstalling of new embedment, what would need to happen in order for you to agree that is extra work?
A. They would have to send us an RFI in writing, make a determination whether they could be

repaired or not.
Q. And tell me can you show me where in the contract it requires that they send an RFI before any embedment removal and replacement is considered extra work?
A. I think it is referred to in the general conditions also about extra work.
Q. And I'll give you a minute --
A. -- I haven't read this in a while. There is something here. It's either in here or the general conditions which talks about changes.
Q. I will give you some time.
A. I am not going to sit here and try to peruse it. I would have to read the whole thing from front to back. You would have to give me 30 minutes or so.
Q. I thought you had told me earlier that you would have graded yourself out as a seven or eight in terms of being an expert on your own contract?
A. That's correct, but I haven't read it in a while.
Q. Did you read any of these contracts before you signed them?
A. A year, over a year ago.
Q. Is that the last time that you read these contracts?

A. Yes. Otherwise, you have to refresh my memory. This is the last time I signed any of these contracts for all the subs back then.

Q. I may revisit that with you.

MR. PARTINGTON: Can I ask for a clarification on what you're asking him to look for?

MR. LAWHON: Not yet. Bear with me.

BY MR. LAWHON:

Q. So far what you told me and I realize you said you need time to read the contract a little bit more but so far what you told me is in order for the removal and replacement of embedments under the contract language that we just read to be extra work Coastal would have had to issue an RFI to you and then get your approval to do that work. And you believe that language is either in the general conditions or in a change order provision.

Am I understanding that so far?

A. Correct. And approval from the owner.

Q. And approval from the owner. Is there anywhere else in the contract you would point me to that would tell me what else needs to be done in order for that extra work to be considered deemed and approved extra work?

A. Um, it probably be in the general conditions that sets out all the requirements of what is required, what you have to do to get a change order. RFI's, send all the documents in, get owner approval before any of them are approved.

Q. Okay. So let's move away from the contract now for just a minute and we will sort of jump a little bit into the facts themselves and the embedment work here. So if I can fast forward the discussion you understand that one of the change orders or extra work items that Coastal Maintenance believes it is owed by PVGC is for what they consider to be extra work under the contract for removal and replacement of embedments.

You understand that's the claim; right?

A. Yes.

Q. Okay. And I understand you disagree with that?

A. Yes.

Q. Tell me all the reasons why you believe that is not owed to Coastal Maintenance?

MR. PARTINGTON: Object to the form.

THE WITNESS: They didn't get approval first. Because Vito had already told us that he was just going to replace them all. Wasn't

going to deal with the actual repair. And I think part of that decision was that Cronin decided that the light gage material was not going to be strong enough.
BY MR. LAWHON:
Q. The light gage material of the existing embedments?
A. Yes. It's apples and oranges.
Q. And I'm not following you.
A. The embed was and I don't remember what gage it was. But let's assume it is 16 gage. The angles put in were like quarter inch or half inch gages. I mean, thickness material. They were totally different types of material. One is steel angle, one is like flashing material let's say.
Q. And just so I am clear on what you're saying. The angles that Coastal Maintenance ended up using to replace the existing angles is the thicker material and the existing ones, the old ones is the the light gage material?
A. Yes.
Q. So you're saying it's apples and oranges because it's two different materials?
A. Correct.
Q. And what does that have to do with whether

or not that's extra work?

A. It could possibly have been extra work if they had followed the procedures early on. But it was told to me it was going to be done as part of the overall contract.

Q. It was told to you it was going to be done as part of the overall contract. By whom?

A. From Vito and it was ultimately implemented in all the shop drawings.

Q. And I will come back to the shop drawings. Before you signed -- well, strike that. Are we in agreement so far that the contract language makes a distinction between repairing existing embedments and removing and replacing them?

Do you agree with that?

A. Yes.

Q. Do you also agree that the first one, repairing, is covered in the contract scope and price and the second one is not?

A. The second one as referring to what?

Q. Removing and replacing the embedments. That is not included in the contract price but repairing them is.

Do we agree with that concept?

A. The repairing is in the contract, not the

replacement.
Q. So the replacement -- in a perfect world the replacement is extra work. Do you agree with that concept?
A. Correct.
Q. And you told me what needs to be done in your mind in order for it to qualify as approved extra work. Is that a fair way to say it?
A. Yes.
Q. Okay. So let me come back to the facts then. And you told me that Vito decided to do the work of removing and replacing the embedments because it's in the shop drawings as well.
Do I understand you so far?
A. Yes.
Q. Okay. Did you see the existing embedments from the original building before they were removed or replaced or repaired?
A. Yeah.
Q. You saw them with your own eyes?
A. Yeah.
Q. What condition were they in?
A. Some were rotten, some were good.
Q. What percentage of them do you believe were good?

A. I have no idea. Probably more good than bad.

Q. In your mind what distinguishes between whether one is good and one was bad?

A. One was rotten and the other one was solid.

Q. What do you mean by rotten?

A. Deteriorated. Rust.

Q. You saw some of the embedments and they were completely solid and they weren't fused into or borne down into the concrete and they could have been repaired.

Is that what you're telling me?

A. Yes.

Q. Did you discuss with any of the Coastal people whether or not certain embedments should be repaired rather than be replaced before that work took place?

A. That was what the plan was, to reuse them.

Q. To reuse all of them?

A. And repair what was necessary.

Q. And is this plan in writing?

A. It was discussed. That's what we drafted a contract based off of.

Q. Let me move past cause we have contract language here so I am past the discussion for now on

this issue and I am moving into the work that is actually being performed.

A. Okay.

Q. After the contract is signed by you February 16 my specific question for you is did you discuss with anybody at Coastal as to whether or not you wanted some of the embedments to be repaired versus having them replaced?

A. Vito said he was going to change -- wasn't going to repair them. They were going to replace them. And I said totally up to you, you all was designing this thing.

Q. Was that discussion -- when was that discussion?

A. Somewhere right around all cause the shop drawings were already in play when these contracts were being signed.

Q. So I understand you by the time you signed the contract you're telling me that you understood that Coastal Maintenance was going to replace the embedments and not repair any of them?

A. That's correct.

Q. Okay. Did you discuss that with the owner at all?

A. The owner? Oh, Ryan?

Q. Yes.
A. No.
Q. Do you know if the existing angles or the embedments themselves met current code?
A. I'm not an engineer.
Q. If an engineer decided -- strike that. If an engineer concluded that they did not meet code and they needed to be replaced do you have any reason to disagree with that?
A. If he would have came back with documents to submit an RFI that it needs to replace I would have read it and make that determination. But I didn't get anything.
Q. And I understand you say you didn't get anything. My question though is how would you have made that decision whether the engineer is correct or not if you are not an engineer?
A. I would have asked ours to look at it. When I say ours, the engineer for the owners. Bliss & Nyitray.
Q. Did Bliss & Nyitray approve the shop drawings?
A. I think they did. Ultimately.
Q. The ones that you're telling me had the embedments already in them?

A. Yes. The steel or the gage repairs?

Q. Okay. Well, now, I am confused. The shop drawings that you told me had the embedments in them, did it have a repair in them or a replacement in them?

A. It had the steel replacement. I want to be clear cause you were talking about existing embedments when you asked that question.

Q. When I asked the earlier question about whether or not they met code, yes. But so we can make sure we both agree.

Is it your understanding that whatever shop drawings Bliss & Nyitray read that were prepared by Cronin, all of those shop drawings had the new steel embedments, the steel angles in them; is that right?

A. Yes.

Q. Getting ahead of myself a little bit but since we're talking about this subject I'll take a breath, I'll slow down and see if you can follow along. We agree that when Coastal was no longer working on the project they had not gotten to the point where they, being Coastal Maintenance, had replaced all of the embedments on either Tower?

Is that a fair statement?

A. That's correct.

Q. Okay. I believe, correct me if I am wrong,

I believe Southern Wall took over -- well, strike that. Who took over the scope of work that involved either repairing or replacing the existing embedments?
A. Southern Wall Systems.
Q. Did they repair or replace the embedments that were existing that Coastal Maintenance never got to?
A. They finished installing what materials that were on site and then supplied new angles for the balance of the job.
Q. Can I interpret that to mean that Southern Wall replaced every single embedment that was on both towers that Coastal hadn't gotten to?
A. That's correct.
Q. Did they do an RFI first?
A. It was in the shop drawings.
Q. My question though was not about the shop drawings, was it?
A. They had all new shop drawings.
Q. My question, I will ask it again. If you would answer my question for me, please. My specific question for you was did Southern Wall issue an RFI to PVGC asking if they could get approval or blessing to replace all the embedments?
A. No.

MR. PARTINGTON: Object to the form.
BY MR. LAWHON:
Q. Did Southern Wall Systems -- well, strike that. You said it was in the shop drawings that Southern Wall ended up using. Are those the ones that Georgia Panel or CDC or which ones are we talking about?
A. Cronin and Georgia Panel.
Q. I understand they were in Cronin's. Are you telling me that Southern Wall used Cronin's and Georgia Panels shop drawings to decide what embedments got replaced?
Am I understanding that correctly?
A. Yes.
Q. And tell me how that process worked? How did Southern Wall go through the process of using Cronin's and Georgia Panels shop drawings to decide what embedments were going to be replaced?
A. He looked at the shop drawings to finish -- there is an area that CDC is responsible for which is, let's say the north side of both buildings. He looks at those shop drawings and installs it based on that. Whether the existing embedders will tear, that wasn't even an issue because it was already in the shop drawings to be done that way.

Q. It was already in Cronin's shop drawings?
A. Yes.
Q. Did you ever voice an objection to Southern Wall telling them well, hold on a second, I haven't approved or the owner hasn't approved replacing the embedments yet so don't put them in your shop drawings?
A. No.
Q. Did you voice that objection to anybody?
A. No.
Q. So I understand it so far Southern Wall has shop drawings that are from Cronin that have replacements of embedments in them. Georgia Panel does new shop drawings that also has the replacements of the embedments in it. And then Southern Wall takes those shop drawings and replaces all of the embedments in both towers.
Is that a fair statement?
A. Close.
Q. What did I miss?
A. Southern, on the panels that were completion of Coastal's Cronin wouldn't give up their shop drawings because we had to have a change in the engineer for the city. So CDC had to do repair drawings, I should say. And Southern used the CDC

repair drawings for the balance of the contract. I'm sorry, the balance of the panels that had not been done. And then as we continued on from that point on with FL Crane they had Georgia Panel do another set of shop drawings for the balance of the building.

Q. Did the CDC shop drawings also show a full replacement of the embedments?

A. Yes, and more work.

MR. LAWHON: Okay. Well, move to strike that as nonresponsive.

BY MR. LAWHON:

Q. The embedments that we are talking about and I just want to focus on the embedments. So far what I think I heard you say is there are three sets of shop drawings from three different engineers that show replacing the embedments in both towers.

Is that a fair statement?

A. Yes.

Q. Okay. And you did not voice an objection to any of those shop drawings designating the replacement of the embedments to any of those engineers.

Is that a fair statement?

A. That's right.

Q. You also didn't voice an objection to anybody, subcontractors, trades, anyone about having

each of those three engineers recommend the replacement of the embedments in the shop drawings.
Is that a fair statement?
A. Yes.
Q. Was the replacement of the embedments in Southern Wall's base contract price or was that an extra under their contract?
A. No, it was not.
Q. I probably didn't ask that question very well.
A. No.
Q. I didn't. Want to switch seats? Was the replacement of the embedments that we have been talking about included in Southern Wall's contract price?
A. No.
Q. Was it an extra for Southern Wall to do?
A. No.
Q. Which was it or what was it?
A. It was included in his price.
Q. So when I read both of Southern Wall's contracts on both towers it's your testimony I am going to see that doing the embedment work is included in the contract price?
A. The replacement.

Q. The replacement of the embedments. Thank you. It's in the contract price?
A. Based on the Georgia Panel shop drawings.
Q. Okay. Is that --
A. -- and the balance of the Cronin and CDC.
Q. But when Southern Wall -- was that negotiated before the Southern Wall contract was signed? Meaning, was there a discussion between you and members of Southern Wall over including the replacement of the embedments in the contract?
A. I just gave, I gave FL Crane, Southern what I had on the shop drawings and they decided how they were going to go forward. The engineers decided.
Q. You let the engineers decide?
A. Uh-huh.
Q. Is that a yes?
A. Yes.
Q. Okay. And did the engineer's decision dictate what Southern Wall contract was going to include as far as the embedments go?
A. Yes.
Q. Does the contract that we have been looking at, exhibit two, indicate that Coastal Maintenance is supposed to do any fire stopping or draft stopping?
A. No, I don't think so. It's tied to the shop

drawings though.
Q. I'm sorry?
A. It's tied to the drawings.
Q. Where in the contract does it say that?
A. Should say part of shop drawings that they are going to design.
Q. And just so we are clear, I don't want to get confused. We have Coastal Prefab and we have Coastal Maintenance. And Coastal Prefab was going to design the shop drawings.
Do we agree with that?
A. Yes.
Q. Okay. I just want to stay focused on Coastal Maintenance's contract right now.
A. Probably not in this one but I would think it would be covered under Prefab.
Q. As you sit here today are you aware of any contractual provision in the subcontract agreement we are looking at for Coastal Maintenance that requires Coastal Maintenance to perform any fire stopping or draft stopping work?
A. I would have to read their proposal because there was an exclusion before and there is not an exclusion here. So I would have to see both of their proposals.

Q. Okay. We'll come back to that in one second cause we can do that. Before I come back. Are you familiar with the term fire stopping?

A. Yes.

Q. Are you familiar with the term draft stopping?

A. Yes.

Q. What experience do you have in overseeing, managing, supervising or being involved with fire stopping or draft stopping prior to getting involved in this project?

A. We do that a lot in almost every building.

Q. Tell me what fire stopping is?

A. Could be couple different things. It could be spray foam, mineral wool. It could be a cementitious based type fireproofing or you spray it on the steel. There is many different ways of doing it.

Q. Of all the different ways that you just identified what is their basic purpose?

A. For fireproofing and smoke from penetrating from one floor to the others. In some cases fire too.

Q. Each of the ways that you just identified, the spray foam, the mineral wool or the cementitious materials, each of those is it your understanding and

experience they are designed to stop fire and smoke or one or the other?

A. Could be both. Depends on the makeup of the product.

Q. What's the difference between draft stopping and fire stopping, if there even is one?

A. Draft stopping is normally in ceilings that are divided off. It could be for a floor also but mostly in ceilings where a particular code may require you have to segment an area no greater than X depending on the code. And it is to stop the draft, backdraft or fire from rolling from one area to the other.

Q. Did I understand what you just said to mean that you most commonly experience draft stopping or employ it in ceilings?

A. Ceilings and ceilings between floors, let's say. This is an example. This ceiling and the floor above it.

Q. So because there's a dropped ceiling here it would be in between the tiles and the concrete slab right above it?

A. Correct.

Q. Did you have any conversations with Coastal Maintenance representatives before you signed this

contract about fire stopping or draft stopping?

A. There was in their proposal they excluded it and we told them they can't, it has got to be inclusive of all your work.

Q. Who did you tell that to?

A. Vito.

Q. When did you tell Vito that?

A. Early on. I don't remember specific date but it was before we signed the contract. Cause we didn't put that exclusion in.

Q. And I will come back to the exclusionary language in just a minute. Let me make sure that I accurately understand your testimony. You had, you're testifying that you had a conversation with Vito DePinto before everybody signed the Coastal Maintenance contracts that we looked at so far, February 16, 2017 specifically telling Vito that Coastal has to include fire stopping in its work.

Is that a fair statement?

A. We call it fire safing this particular.

Q. And that's the word you use?

A. Fire safing. That is what the inspectors, everybody is using in this job on this terminology.

Q. Forget everybody else. I am just talking about Pete Vicari. My question for you when you had a

conversation with Vito about fire stopping and now you're saying fire safing what exactly to the word as best as recall did you tell him about that particular subject?

A. That he would have to be inclusive of all his work. And subs notorious try to segment portions of the work as an exclusion that they don't want to do and it puts the burden on us get somebody else to come in in the middle of their work and work within them to do something. And I historically don't want to do that. You do your work complete or we don't want to deal with you basically. I passed on contracts before when it wasn't complete.

Q. So here you're telling me that at some point before the contracts are signed you had this conversation with Vito DePinto; right?

A. Yes.

Q. Okay. Can you be more specific as to the date, the time, the circumstances, who was present? Anything like that?

A. January. December, January.

Q. Was anybody else participating in that talk?

A. I don't remember.

Q. Was anybody else -- was that a face-to-face talk or was that over the phone?

A. Possibly over the phone.
Q. What other possibility is there that you would have had a conversation with Vito DePinto about fire something?
A. Or at the site. Site or at his facility.
Q. What terms did you use when you were referring to it when you were talking to Vito? What did you call it?
A. Fire safing.
Q. Fire safing?
A. Yes.
Q. You're certain that's the word that you used?
A. I am almost positive. I don't say fireproofing. I know it as a fire safing.
Q. Was that important to you before you signed these contracts on behalf of PVGC with Coastal Maintenance and Coastal Prefab to have an understanding of some Coastal company doing fire safing?
A. That's what I just said earlier. The completeness has to be there.
Q. I understand the completeness issue but I'm trying to be more specific about fire safing. My question is is fire safing in particular, was that an

important issue to you to make sure that some Coastal company was going to be responsible for doing that?
A. Yes. Can I take one break? Just a second, five seconds. I just want to tell him something.
Q. Tell who?
A. PJ. Nothing about this but. Nothing about this. About the text.
MR. LAWHON: We can go off the record but we'll all stay in the room.
THE WITNESS: That's fine.
(Discussion held off the record.)
THE WITNESS: Okay. Keep going. Apologize for interrupting.
BY MR. LAWHON:
Q. You mentioned a couple times the bids. Let's look at those. And let me see if I can tell you where they are. Good place to find them is toward the back of exhibit number 72 but you're going to have to take some of the pages at a time. You can't move them all at once. Look at the bottom right hand corner.
Have you heard the term bate stamps in lawsuits before?
A. Yes.
Q. So you know what those are?
A. Yes.

Q. We are on 5597. I think we are looking at -- well, you had mentioned Coastal had bids and I am going to be more specific. And I directed you to 5557.

MR. PARTINGTON: 5597.

BY MR. LAWHON:

Q. Excuse me, 5597 through 5599. Thank you, sir. Those three pages. Take a look at those three pages and let me know when you are done.

A. Okay.

Q. And before we jump into the meat of this I want to ask you to look back at the three pages before it which are 5594 to 5596. Generally do you see that 5594 to 5596 is a proposal or bid from Coastal Prefab?

You see that on the top?

A. Yes.

Q. And do you see that at the bottom in the middle of each page?

A. Yes.

Q. Okay. And then the bid that were just talking about 5597 through 5599 is Coastal Maintenance & Restoration on the top. Do you see that?

A. Yes, I think so.

Q. Go ahead and take a look. I want to make sure we agree with each other.

A. Yes.
Q. And on each page of 5597 to 5599 or at least on 5597 and 5599 it says Coastal Maintenance & Restoration. Is that a fair statement?
A. Yes.
Q. Okay. So the dates of both of those are August of 2016. Do you see that?
A. August 22, yes.
Q. So as of August 22, 2016 the Coastal companies had actually been split up into two different companies and their scopes of work had been proposed in two separate companies?
A. Correct.
Q. Which is six months before the January contracts/closing date; is that right?
A. Yes.
Q. Okay. So that's --
A. -- six months after we first initiated talking with them.
Q. I understand. You said they switched up the company names at the last minute. Those were your words? I remember those.
A. Exactly.
Q. Do we agree now it wasn't at the last minute?

A. It probably wasn't.
Q. Six months is probably or are we pretty certain that's not the last minute?
A. You're bringing it to my attention it's probably right.
Q. Do you have any reason to dispute that you received these bids on or around August of 2016?
A. No.
Q. Let's go back to Maintenance if we can. And you had mentioned to me a little while ago that there was an exclusion and I am looking on the second page Coastal 5598. Under the exclusions there are, I don't know, looks like ten or 11 or 12 exclusions.
Do you see those?
A. Yes.
Q. Item number five says fireproofing of any kind. Is that what you were referring to?
A. That's correct.
Q. So when you received Coastal's bid, Coastal Maintenance's bid in August of 2016 it specifically said we exclude fireproofing of any kind.
Do we agree with that?
A. In exclusions.
Q. In the exclusions. Okay. And going back to the contract that was signed you testified earlier

that that exclusion was taken out and it's not in the contract.

Did I understand your testimony correctly?

A. Correct.

Q. Okay. Where in the Coastal -- let me ask it this way. Is it your understanding that under the Coastal Maintenance contract that we just looked at that Coastal Maintenance was responsible for performing any type of fireproofing for the contract price that's identified in the Coastal Maintenance contract?

A. It was negotiated that it was not part of -- not going to be an exclusion. That it was supposed to be part of the contract and their work. Cause it was identified on his shop drawings. At this time it would be identified on the shop drawings cause I don't think in August they had started it all.

Q. You said a lot there that I wrote down. So let me unpack it a little bit here.

A. Okay. Can we go back to the contract?

Q. Sure. Why don't you show me where in the Coastal Maintenance contract for Civic Tower, exhibit two, it says that Coastal Maintenance is supposed to be responsible for doing any fire safing, fire stopping, draft stopping, anything like that?

A. First of all, it would list any exclusions here. This is the specification and titles right here area. It would list if there is any exclusions.

Q. I understand what you just said. With all do respect, sir, that doesn't answer my question.

A. Well, I'm sorry.

Q. Let me ask it again.

A. Okay.

Q. Show me where in the Coastal Maintenance contract that we are looking at it specifically says Coastal Maintenance is responsible for doing any type of fire safing, fireproofing or draft stopping?

MR. PARTINGTON: Object to the form.

MR. LAWHON: What's wrong with the form of that question?

MR. PARTINGTON: Cause he's answered it. And you're -- well.

MR. LAWHON: That's the objection, that it has been asked and answered?

MR. PARTINGTON: Yeah, asked and answered.

BY MR. LAWHON:

Q. Okay. Go ahead?

A. I think it refers to the building envelope replacement package.

Q. Where are reading from, sir?
A. Right where somebody wrote four. There is an arrow right on it. In B.
Q. You're talking about Article 1b specifications entitled. And you're referencing the building envelope replacement package?
A. Materials.
Q. Materials specification. It is your testimony that that language tells me that Coastal Maintenance is responsible for doing fire safing or fireproofing or draft stopping?
Do I understand your testimony correctly?
A. Yes, you have to tie the two together with the shop drawings.
Q. Do the specifications that we are talking about right now refer to the architect's plans and specs or the shop drawings?
A. I would say all of it.
Q. And where does it say anything with shop drawings?
A. Where does it tell me what to do? I mean, it specifically talks about the plans from Perez & Perez and the building envelope replacement package. I am not trying to be argumentative. I don't want to split hairs with you but.

Q. I will tell you what. I will do it this way.
A. I'm sorry.
Q. You tell me -- so far what I heard you tell me is based on the reference to the architect's replacement package/material specifications in 1b it is your testimony that tells Coastal Maintenance under this contract it's responsible for doing fire safing, draft stopping or fire stopping.
Do I understand you so far?
A. Yes, they would have to use some basis to form their bid. They would have to look at something.
Q. So they looked at the plans from the architect and they presented a bid?
A. And their shop drawings.
Q. And they presented -- well, which comes first? Doesn't the bid usually come first because you don't typically -- forget this project for a minute. But okay. Normally in construction would you agree with me nobody starts any shop drawings until they have a contract?
That usually how it works?
A. Yes.
Q. Okay. So I understand this was a different situation because you asked them to start on the shop

drawings before they actually signed a contract with you.

So here we had the shop drawing process going on before the contract was signed; right?

A. Yes, cause they were kind of like a delegated design.

Q. Okay. Let's focus on just the fire safing, fire stopping, draft stopping issue. And if it is okay with you cause I am getting tired of saying all three can we just agree that they cover, if I say fire safing that means all three?

A. That's fine.

Q. Okay. Great. So I understand that the shop drawings were based on at least in part looking at the architect's plans which included the replacement package material specifications.

That's what you're telling me; right?

A. Yes.

Q. Okay. And is it your testimony that the shop drawings include fire safing?

A. Yes.

Q. Cronin's shop drawings include fire safing?

A. I believe so, yes.

Q. Tell me exactly what the shop drawings say about fire safing?

A. I don't remember. You have to pull them out. It has been years since I looked at them.

Q. What material is specified?

A. Mineral wool I think.

Q. And where is the mineral wool supposed to go in the shop drawings?

A. Um, any areas between the floors and any king studs maybe.

Q. When you say any areas between the floors what do you mean?

A. At the edge of the panel. The panel as it meets every floor.

Q. So mineral wool is supposed to be installed in the king panels at every location at every location as the panel meets the floor.

Is that what you are saying?

MR. PARTINGTON: Object to the form.

THE WITNESS: Yes.

BY MR. LAWHON:

Q. Did I understand that correctly?

A. Yes.

Q. Who is supposed to install the mineral wool according to the shop drawings?

A. I would say it's Prefab. Prefab. Coastal Prefab cause it's on their shop drawings.

Q. Okay. What else do you remember from the shop drawings that depicts or identifies fire safing to be done?

A. I don't remember all the details. You would have to pull them out and look at them.

Q. So if Coastal Prefab is installing mineral wool somewhere in the panels then would you agree with me that Coastal Maintenance really had no responsibility to do any fire safing under its contracts?

MR. PARTINGTON: Object to the form.

THE WITNESS: Possibly but I looked at them as one and both of them as one. So I said earlier you don't want to have some kind of overlapping so to speak.

BY MR. LAWHON:

Q. Is there any other language in the Coastal Maintenance contract you can point me to that tells me that Coastal Maintenance was responsible for fire safing?

A. No.

Q. I am going to fast forward a little bit. There was a disagreement between -- well, strike that. At some point after Coastal Maintenance and Coastal Prefab are operating under their respective agreements

you went to Coastal representatives and told them that they needed to do fire stopping.
Is that a fair statement?
A. Yes.
Q. And they said no?
A. That's correct.
Q. After Coastal was no longer on the project did somebody do any type of fire safing?
A. Yes.
Q. Who did it?
A. State Line.
Q. Who is that?
A. State Line.
Q. Who is State Line?
A. That's what they do. Fire safing.
Q. That's the name of the company?
A. State Line Fire something. I don't remember the name.
Q. They specialize in fire safing?
A. Yes.
Q. Do you know if you need a license to do fire safing?
A. No.
Q. No, you don't -- that's a bad question. Do you need a license for fire safing?

A. I don't know.
Q. Did State Line do fire safing on both towers?
A. Just the mineral wool. We were doing the caulking.
Q. What caulking are we talking about?
A. Penetrations.
Q. When you say we, who is we?
A. Um, Pete Vicari General Contractors.
Q. Who specifically is doing it?
A. We subbed it.
Q. To who?
A. To Serinca I think. And the electrician is doing his own.
Q. What do you mean the electrician is doing his own?
A. When you have a fire rated wall like corridor and there's an outlet, the hallways, when you have outlet in that hallway you have to fire protect that out let cause that's a rated wall. Maybe one hour or two hour, whatever the occupancy is. In this case it's one hour. And you have to -- it's caulking but it comes in a pack. You just pack the whole back of the outlet that seals the back of it. Cause an outlet has holes in it. So you have to fire rate

that.

Q. That doesn't have anything to do with any of the Coastal companies scope of work, does it?

A. No, you didn't ask me that. You said any fire rated.

Q. So we are clear. So the electrician's fireproofing or fire safing that we just talked about, you're not claiming that one of the Coastal companies should have done that all, are you?

A. That's correct.

Q. Caulking the penetration that you told me that PVGC has subbed out to Serinca, are you claiming that the Coastal companies should have done that?

A. No, it's in a different area.

Q. Has State Line -- I think I asked this but I'm not sure. Did State Line, have they completed whatever scope of work they were hired to do on the project?

A. Senior they have. Civic they still -- pretty close.

Q. Is the fire safing that State Line did depicted on any shop drawings?

A. I think it is on the Coastal drawings.

Q. Cronin you mean?

A. Cronin, yes.

Q. Did State Line use Cronin's shop drawings to determine where they were going to do fire safing?
A. When Coastal abandoned the job we had to bring in new engineers and State Line used CDC and FL Crane/Georgia Panels in the areas. In those areas.
Q. Okay. So back to my question then cause you said -- I asked you if fire safing, the fire safing that State Line did, if it was on any shop drawings and you said on Coastal's which we agree is Cronin; right?
A. Yes.
Q. So my question is did State Line use Cronin's shop drawings to determine what fire safing they were going to perform and it was going to go?
A. Well, I was trying to make it clear for you. The answer is no because Cronin wouldn't give us the shop drawings.
Q. And that was just a yes or no question. So they did not use Cronin's shop drawings. Did State Line use anybody's shop drawings to identify for them where fire safing was supposed to be performed?
A. The CDC drawings for the completion of Coastal's panels and FL Crane/Georgia Panels for those areas.
Q. For what areas?

A. The completion of the balance of the panels that were not there, CDC did the panels that were on site and are responsible for those now. To go further past those panels FL Crane and Georgia Panel designed the balance of the building for FL Crane and those panels were installed. There's a line of delineation.

Q. And the line of delineation is between the Coastal panels and what we will call the Coastal Prefab and the FL Crane panels.

Is that your line of delineation?

A. That's correct.

Q. All right. So let's take them in pieces. Is it your testimony that CDC prepared shop drawings that were ultimately approved and used to perform fire safing of some sort by State Line on Coastal panels?

A. Yes and no. There is some drawings for completion and repairs. There is many details. There is many drawings.

Q. I understand that but I am just focusing on the fire safing scope that we are talking about?

A. That's correct.

Q. So there is CDC has shop drawings that show fire safing of some sort to be done in Coastal's panels or just where they are?

A. I think the fire safing may be part of both

of them. It is the completion of the Cronin details and the repairs of CDC's.

Q. The repairs that are on the CDC shop drawings?

A. Shop drawings, correct.

Q. Okay. Let's move over to the FL panels. Do the FL panels that got installed on both buildings include in them fire safing?

A. No.

Q. So when you testified earlier about CDC's drawings having fire safing for the Georgia Panel -- when you said the CDC/Georgia Panel shop drawings that were prepared for FL Crane's panels I think I misunderstood you. You're not testifying that either of those shop drawings required FL Crane to manufacture panels with any fire safing in them.

Is that right?

A. That's correct. Theirs. Cause they fabricate them totally different and they excluded it and we had to handle that.

Q. So earlier you testified that when we were talking about Coastal's bid and the fact that they excluded the fire safing you said it's a whole package, we don't work like that, you have to do it all or you don't do any of it. You decided to agree

to let FL Crane exclude out the fire safing.
Am I understanding that?
A. That's correct, cause I was thankful that they were even coming in to get involved in this project.
Q. And because you were so thankful you were willing to just exclude out the fire safing for them?
A. That's correct, because State Line was already on the job starting doing the balance of the Coastal panels.
Q. Did Southern Wall do any fire safing?
A. State Line did it all.
MR. LAWHON: Let's take five.
(Brief recess was taken.)
(Mr. Moye exits deposition.)
(End of Volume III.)

# DEPOSITION ERRATA SHEET

Assignment No. #2522637

Case Name: Vicari vs. Ohio Casualty et. al

## DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition/examination under oath taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET, hereof, with the understanding that I offer these changes as if still under oath.

Signed on the 13th of August, 2018.

_______________________________

PETE VICARI

Job #2522637

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:__________________
______________________________________________________
Reason for change:____________________________________
Page No._____Line No._____Change to:__________________
______________________________________________________
Reason for change:____________________________________
Page No._____Line No._____Change to:__________________
______________________________________________________
Reason for change:____________________________________
______________________________________________________
Page No._____Line No._____Change to:__________________
______________________________________________________
Reason for change:____________________________________
Page No._____Line No._____Change to:__________________
______________________________________________________
Reason for change:____________________________________
Page No._____Line No._____Change to:__________________
______________________________________________________
Reason for change:____________________________________
Page No.____Line No._____Change to:___________________
_______________________________________________________
Reason for change:_____________________________________
SIGNATURE:___________________________DATE:_____________
PETE VICARI JOB #2522637

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:____________________

________________________________________________________

Reason for change:______________________________________

Page No._____Line No._____Change to:____________________

________________________________________________________

Reason for change:______________________________________

Page No._____Line No._____Change to:____________________

________________________________________________________

Reason for change:______________________________________

Page No._____Line No._____Change to:____________________

________________________________________________________

Reason for change:______________________________________

Page No._____Line No._____Change to:____________________

________________________________________________________

Reason for change:______________________________________

Page No._____Line No._____Change to:____________________

________________________________________________________

Reason for change:______________________________________

Page No._____Line No.______Change to:___________________

SIGNATURE:_______________________DATE:_________________

PETE VICARI Job #2522637

STATE OF FLORIDA

COUNTY OF PALM BEACH

I, the undersigned authority, certify that PETE VICARI personally appeared before me on the 9th of August, 2018, and was duly sworn.

Dated this 13th of August, 2018.

____________________________

DEBORAH LAWRENCE
Notary Public, State of Florida
My Commission Expires: 4/6/2020
My Commission No: FF 979563

Job #2522637

CERTIFICATE

THE STATE OF FLORIDA
COUNTY OF PALM BEACH

I, DEBORAH LAWRENCE, Court Reporter and Notary Public in and for the State of Florida at Large, do hereby certify that the aforementioned witness was by me first duly sworn to testify the whole truth; that I was authorized to and did report said deposition in stenotype and that the foregoing pages are a true and correct transcription of my shorthand notes of said deposition.

I further certify that said deposition was taken at the time and place hereinabove set forth and that the taking of said deposition was commenced and completed as hereinabove set out.

I further certify that I am not an attorney or counsel of any of the parties, nor am I a relative or employee of any attorney or counsel of party connected with the action, nor am I financially interested in the action.

The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or direction of the certifying reporter.

DATED this 13th of August, 2018.

______________________________
DEBORAH LAWRENCE, Court Reporter

Job #2522637

**Exhibits**

**2522637 Pete. Vicari DEFENDANT. EXHIBIT264**

**$**

**$10,000** 309:18
**$25** 299:24 350:21
**$30** 299:24
**$33** 350:13
**$5** 299:9,12
**$7,000** 309:13
**$8** 350:21 351:2,8
**$80** 299:10,17
**$9** 334:23 342:23 343:22 344:3

**1**

**10** 319:19 320:4 325:24 361:6,7
**10th** 325:23
**11** 320:5 325:22 416:13
**12** 416:13
**14** 350:12
**15** 319:19
**16** 379:1 382:14,17,19 394:11 398:5 410:17
**16th** 378:19
**18** 289:20 290:2,6 343:6 344:9
**1b** 419:4 420:6
**1e** 376:15 381:2 386:10

**2**

**20** 344:8
**2016** 355:23,24 373:15,17 374:5 415:7,9 416:7,20
**2017** 355:19,23 374:8 378:2,16 379:1,3 410:17
**2018** 298:13
**22** 415:8,9
**25** 300:4 379:6
**26** 378:16 379:3
**26th** 378:2 379:7

**3**

**30** 289:5 360:23 361:4,9 391:15
**32** 350:13

**4**

**45** 295:23
**4th** 285:12

**5**

**50** 299:10,17 300:3
**50/50** 333:5
**5557** 414:4
**5594** 414:13,14
**5596** 414:13,14
**5597** 414:1,5,7,21 415:2,3
**5598** 416:12
**5599** 414:7,21 415:2,3

**6**

**60** 299:10,17 300:3

**7**

**72** 413:18

**8**

**80** 336:8

**9**

**9** 285:12 334:8 343:3

**A**

**ab** 334:15
**abandoned** 427:3
**absolutely** 308:8
**absorb** 343:10
**accepted** 322:15
**access** 372:14
**accurate** 294:20 296:20
**accurately** 410:13
**actual** 296:8 314:4 341:6 371:9 379:18 389:11 394:1
**add** 348:9,14
**added** 310:12 348:7 351:10

381:12

**addendum**
348:1,11

**additional**
291:2
307:8
315:12
351:10

**addressed**
315:12,22

**adjust**
305:25

**adjuster**
307:1

**adjusters**
302:22

**affirmed**
284:7

**afternoon**
284:23

**agency**
302:22

**agent**
379:23
380:14,
16,20,23,
24

**agree**
306:17
337:22,
24,25
378:25
388:2,6,
10,12,24
389:23
390:3,22
395:15,
17,24
396:3
400:10,19
407:11
414:25
415:24
416:22
420:19
421:10
423:7
427:9
429:25

**agreed**
286:15
367:12,17

**agreement**
286:5,6,
10 289:3
290:17
295:18
333:4
344:19
345:15,19
346:3,9,
15,21
350:25
368:9
369:16
372:24
374:17
375:20,21
376:6,25
377:1
378:1,9,
14 379:8
382:3
383:3,12,
21
385:14,20
395:12
407:18

**agreements**
356:6
375:21
383:15,16
423:25

**ahead**
338:1
340:14
353:23
386:9
389:14,17
400:16
414:24
418:23

**AIA**
333:20
347:25
348:4

**airport**
320:14
326:7
352:18

**Alaya**
328:10,
12,13

**alcove**
335:21

**allowed**
305:21
331:3,17

**allowing**
329:10
330:17

**alter**
355:3

**alternative s**
365:23

**Alvarez**
328:11,23

**amend**
355:3

**amended**
350:19

**amending**
332:21

**amendment**
291:9,17

**amount**
290:7
303:18
305:21
310:4
327:13
333:5

**amounts**
307:8
338:19

**angle**
394:14

**angles**
394:11,
17,18
399:3
400:14
401:9

**answering**
325:1

**anybody's**
427:20

**Apologize**
413:13

**app**
288:18
289:4

**apples**
394:8,22

**application**
323:10,
15,21

**approval**
295:23
392:16,
20,21
393:4,23
401:23

**approve**
399:21

**approved**
306:6,10,
16 309:22
392:25
393:5
396:7
403:5
428:14

**April**
296:8,9

**architect**
420:14

**architect's**
419:16
420:5
421:15

**architects**
292:12

**area**
313:7
320:7
402:20
409:10,12
418:3
426:14

**areas**
305:25
314:1
340:21
367:15
422:7,9
427:5,24,
25

**arguing**
317:17

**argument**
352:3

**argumentati ve**
419:24

**arrive**
299:20

**arrow**
419:3

**article** 376:15 381:2 386:10 419:4
**as-built** 371:9
**assess** 310:15 314:18
**assessor** 305:3
**assisting** 382:1
**Associates** 305:7
**assume** 394:11
**Atlantic** 331:23,25 341:24
**ATO** 337:5 338:6,9 339:3,5, 13,14 340:14 351:14
**attached** 290:16 372:23
**attempt** 334:1
**attention** 416:4
**attorney** 301:10 303:12 307:6 324:3 375:9,12
**attorneys** 286:14,17 301:11 306:9 307:2,5 330:16 346:21 361:14
**August** 285:12 297:1 415:7,8,9 416:7,20 417:17
**authority** 380:13
**Aviation** 309:8 327:12
**avoid** 358:6
**aware** 287:2,21 314:11 359:14 407:17

**B**

**B-E-L-F-O-R** 322:12
**back** 298:16 299:15 309:20 313:15 314:10,16 316:24 317:19 318:5,7, 17 319:13,24 320:7,9, 25 321:5, 10,12 322:6 325:18,21 326:1,19, 20 327:11 328:17 331:11,21 332:1,5 333:8 336:13 341:9 348:22 354:18 360:1 365:18 367:15,16 368:10, 12,13,14, 17 369:5 370:13,25 371:11 373:9 375:8 377:7,25 378:12,24 379:19 381:1,2 382:25 388:18,23 390:18 391:15 392:3 395:10 396:10 399:10 408:1,2 410:11 413:18 414:12 416:9,24 417:20 425:23,24 427:6
**backdraft** 409:12
**backed** 318:7
**background** 357:16 358:7,20, 23 359:5, 15
**bad** 341:16 366:11,19 397:2,4 424:24
**Baez** 319:21 351:21
**balance** 401:10 404:1,2,5 406:5 428:1,5
**Band-aid** 315:23
**bank** 295:24 344:2 345:4,6, 10
**Barbara** 303:3
**base** 405:6
**based** 298:12 397:23 402:22 406:3 408:16 420:5 421:14
**basic** 408:20
**basically** 291:8 294:8 324:4 330:21 335:9 344:5,18 389:8 411:12
**basis** 420:11
**bate** 413:21
**bear** 344:7 376:3 392:8
**beginning** 356:5
**behalf** 285:17 302:18 317:12 325:5 358:4 384:8 388:20 412:17
**Belfor** 322:9,11, 16
**believes** 310:5 312:13 393:11
**BELL** 302:2
**benchmarks** 355:17
**benefit** 290:24 291:23

348:17 351:1,10

**Berger** 301:13, 15,21

**bid** 343:11 414:14,20 416:19,20 420:12, 14,17 429:22

**bids** 413:15 414:2 416:7

**big** 330:8 337:20 353:1

**bike** 332:6

**bill** 309:21,23

**billing** 339:9

**binder** 376:1

**bit** 284:12, 22,23 285:3 298:17 302:16 317:5 328:18 333:8 336:2 351:13 355:10 368:18 386:23 392:11 393:8 400:16 417:19 423:22

**BLACK** 302:5

**blends** 305:24

**blessing** 401:23

**Bliss** 399:19,21 400:12

**blocks** 294:18

**blown** 321:14

**blue** 377:18

**blurred** 379:7

**boarded** 308:10

**Bob** 292:19 308:9,21 310:3

**bombarded** 328:15

**bond** 345:20,24 357:13 360:12 361:17,23 380:5,12

**bonding** 346:1

**bonds** 379:9,11, 12,13,18, 21,25

**bonus** 351:2

**borne** 397:9

**bottom** 365:17 366:12, 16,17,21, 22 377:10,13 413:20 414:17

**breaches** 321:15

**break** 292:2 332:11 372:1,16 413:3

**breaks** 295:2

**breath** 400:18

**breathing** 317:14

**Brian** 363:6

**Bridget** 325:7,13 380:2,8, 14,19

**Bridget's** 380:21

**bring** 285:24 343:18 354:17 357:10 427:4

**bringing** 416:4

**broken** 343:12

**brought** 368:14

**Brown** 312:17

**Bruce** 303:11 306:8 307:6 375:14,15

**builders** 291:3

**building** 286:22 293:5,6, 9,12,25 297:8 299:23 314:5 316:2,25 317:19,25 318:2,17 319:24 321:1,14, 15 322:1 323:14,21 327:18 329:4,8 331:11 333:11 348:21 365:8,9, 19 366:5, 11 367:4, 9,14 368:8,16 369:17 396:17 404:5 408:12 418:24 419:6,23 428:5

**buildings** 288:16 290:12,21 292:25 293:4,17 294:10 295:4 298:24 307:22 308:4,13 317:16 319:8 322:2,18, 21 329:4, 16,22 330:3,14 333:10 340:3,5 350:18 355:18 365:10, 20,24 366:6,7 402:21 429:7

**built** 291:3

**bullet** 386:25 387:5

**Bumps** 342:21

**burden** 411:8

**Buser's** 313:5

**button** 332:14

**buttoned** 308:21 309:1

**C**

**C-A-R-R** 304:15
**cabinetry** 335:11 342:17
**cabinets** 338:15, 16,17,21, 22,25 339:16 342:13,16
**calculated** 315:18
**calculation** 300:13
**call** 292:25 317:11 326:20 327:9 335:6 351:25 353:12 410:20 412:8 428:8
**called** 288:9 296:2 323:20 332:21 352:22 380:8
**calmly** 353:3
**captures** 324:17
**car** 326:24
**card** 327:4
**care** 317:24
**Carpentry** 342:11
**Carr** 304:15
**carry** 318:12
**case** 298:25 346:2 387:22 425:22
**cases** 408:22
**Casualty** 346:2
**caulk** 313:7 315:14, 19,23
**caulking** 425:5,6, 22 426:11
**caused** 314:18 341:7
**CBRE** 345:10
**CDC** 402:6,20 403:24,25 404:6 406:5 427:4,22 428:2,13, 22 429:3
**CDC's** 429:2,10
**CDC/GEORGIA** 429:12
**ceiling** 409:18,20
**ceilings** 409:7,9, 16,17
**cell** 327:9
**cementitious** 408:16,24
**center** 320:21
**chain** 339:22
**chance** 376:21 387:8
**change** 286:22 288:8 289:13,14 300:20 323:2,5 337:17,18 339:23 340:4 350:20 354:11 392:18 393:3,10 398:9 403:23
**changed** 289:12 299:22 300:18,19 361:15
**changing** 289:7 335:10
**charge** 319:12 325:4 341:10
**charged** 340:20
**charging** 340:22 341:1,4, 5,6
**check** 307:1 357:16 358:7,11
**checked** 308:11,12
**checking** 358:20
**Chelsea** 379:23
**Chris** 326:10
**circumstances** 411:19
**Citibank** 295:24
**city** 316:24 317:16 318:25 319:2,5 322:8 326:1,12, 21 328:8 329:9 330:20 356:19 403:24
**Civic** 285:3 288:15 289:8,13, 15,17 290:5,6 291:9,10 313:19, 20,23,24, 25 314:4, 12 315:11 333:13 334:24 336:25 338:5,23 339:1,16, 24 340:16 367:19 371:20 372:24 376:6,7 377:2 389:21 417:22 426:19
**civil** 296:2 298:17 299:3 307:4
**claim** 287:10 298:23 299:1,9, 16 300:5, 7,10 301:11 302:12, 14,18 303:7,18 304:7,14, 24 306:1, 5,14 310:13,23 311:11 313:18 315:2,9 321:6 332:18

339:15,18 343:22 344:3 345:17, 20,24 346:16,21 393:15

**claiming** 339:5 347:3 426:8,12

**claims** 295:7 321:7

**clarification** 392:6

**clarify** 347:10

**clarifying** 346:18

**clause** 347:18

**Clausen** 301:25

**clean** 347:7 377:6

**cleaned** 361:14

**cleaning** 321:13

**cleanup** 303:22 321:17,20 331:12,18

**clear** 313:17 319:24 349:14 356:22 385:19 394:16 400:6 407:7 426:6 427:15

**close** 299:12 332:6 403:19 426:20

**closed** 307:16 308:15,16 373:21,23

**closely** 334:1

**closing** 355:18 374:7,11, 14

**clue** 301:7

**co-counsel** 324:3

**co-mingled** 334:16

**Coast** 331:23,25 341:24

**Coastal** 296:25 311:13, 16,23 312:12 313:10 314:12 315:5,9, 20 316:9 323:8 324:23 325:3 354:25 355:8,9, 14 356:7 357:5,16 358:8,17, 20,24 359:15 360:7 361:20 363:1,9 364:1,18 365:2,22 367:3,25 368:5 373:11,12 374:10, 16,21 375:24 376:5 377:2 378:15,18 380:4 381:10,13 382:3 383:1,12, 21,23 384:1,7,9 385:3,12, 20,21,25 386:1,17 388:3,20 392:15 393:11,21 394:17 397:14 398:6,20 400:19,21 401:6,13 406:23 407:8,9, 14,19,20 409:24 410:15,18 412:17, 18,19 413:1 414:2,14, 21 415:3, 9 416:12, 19 417:5, 7,8,10, 22,23 418:9,11 419:9 420:7 422:24 423:6,8, 17,19,24 424:1,7 426:3,8, 13,23 427:3 428:8,15

**Coastal's** 313:18,22 362:14 365:6 379:14 403:22 416:19 427:9,23 428:23 429:22

**code** 399:4,7 400:9 409:9,11

**collapsed** 321:16

**collecting** 325:4

**comfortable** 347:6

**comment** 324:10

**commercials** 308:19 309:5

**committed** 344:18 350:5

**common** 343:17

**commonly** 409:15

**communicating** 302:21 307:6 364:22

**communications** 293:3

**community** 320:21

**companies** 295:6,13, 18 298:23 303:6,10 357:17 358:17,20 359:15 382:20 384:7 415:10, 11,12 426:3,8, 13

**company** 285:21 296:4 298:6,8, 22 299:4, 6 300:7, 21 303:6, 25 305:5 306:14 307:10 309:22 310:11,24 311:10 315:9 321:5 332:19 333:7

334:15 343:19, 22,23 344:1,8, 12 345:12 346:2 358:8,25 380:13 381:19 412:19 413:2 415:21 424:16

**company's** 361:8

**compensation** 290:23 291:23 348:17

**complete** 289:24 296:10,16 316:19 344:18 411:11,13

**completed** 290:8 426:16

**completely** 370:10 397:9

**completeness** 385:6 412:22,23

**completing** 285:2

**completion** 365:21 382:2 403:21 427:22

428:1,17 429:1

**compound** 330:11

**concept** 286:20 338:20 395:24 396:4

**concepts** 338:3

**concluded** 399:7

**conclusion** 299:20

**concrete** 340:8 341:1 387:23,24 390:20 397:10 409:21

**condemn** 330:21

**condition** 396:22

**conditions** 360:10,14 391:7,11 392:17 393:1

**confirmation** 327:6

**confused** 400:2 407:8

**conglomerate** 303:9

**connection**

304:6 324:14

**considered** 390:7 391:4 392:24

**consist** 303:20

**constraints** 294:7

**construction** 284:24 285:7 288:10 289:15 323:19 352:23 420:19

**consultant** 304:11 313:8

**contacted** 359:3

**contacts** 373:11

**container** 322:14

**continue** 295:12 321:24

**continued** 284:9 404:3

**contract** 286:23 287:16 288:7 289:7,11 290:5 291:6,9, 13,15,21

321:24 332:23 333:9,13, 14,21 334:6,11, 17,20 335:2,5, 12,23 336:3,6, 16,17,24 337:11, 16,18 338:22 340:11 341:14,18 342:23 343:20 344:7 345:1 347:11, 17,19,21, 22,23,25 348:2,4, 18,21,23, 24 349:6, 7 350:4, 19,25 357:5,13 358:8 359:25 360:6,17, 22 361:3, 8 362:3,4 372:25 373:1 374:12 376:10 378:1,22 379:1 381:1 382:8 383:10 385:11,22 386:14 388:5,10, 18,21,24 389:1,15,

24 390:4 391:3,18 392:11, 14,22 393:6,13 395:5,7, 12,18,22, 25 397:23,24 398:4,19 404:1 405:6,7, 14,24 406:2,7, 10,19,22 407:4,14 410:1,9 416:25 417:2,7, 9,11,14, 20,22 418:10 420:8,21 421:1,4 423:18

**contracted** 381:11 383:2

**contractor** 285:24 377:14

**Contractors** 425:9

**contracts** 287:5 291:18,24 295:5 297:1 298:14 323:8 332:17,22 333:11 344:17 349:18,20 350:11

355:8
356:23
357:1
358:21,25
359:6,16
360:11,15
362:7,16
363:3,10,19 364:18
365:3,6
373:9,10
374:10,15,21
375:4,25
382:21
384:7
385:25
386:1
391:21,25
392:3
398:16
405:22
410:16
411:12,15
412:17
423:10

**contracts/closing**
415:15

**contractual**
347:10
407:18

**control**
322:18

**conversation**
286:2
352:13
410:14
411:1,16
412:3

**conversations**
296:14
362:2
380:20
409:24

**copy**
379:7

**corner**
311:22
413:20

**correct**
286:9
288:12
291:19
294:21
296:21
306:19
314:20
316:14
321:8
334:25
336:22
337:3,10
338:8
340:3,10
344:17
350:3
351:12
353:7
354:5
368:24,25
369:13
370:11
378:3
385:18,23
389:3
391:19
392:20
394:24
396:5
398:22
399:16
400:24,25
401:14
409:23
415:13
416:18
417:4
424:6
426:10
428:11,21
429:5,18

**corrected**
318:24

**correctly**
286:7
288:4
299:18
315:21
333:1
381:6
384:12
402:13
417:3
419:12
422:20

**corridor**
425:18

**cost**
288:10
289:15
291:4
305:19
315:12,19
343:1,5,18,20
344:14,21
347:16
348:11,23
349:3,4,8,19
350:1,11

**costs**
344:6
346:22,24

**couple**
284:13
299:15
317:10
320:2
323:7
330:15,23
332:2
372:6
376:13
408:14
413:15

**court**
284:2
296:4

**cover**
296:13
315:7
325:17
421:10

**covered**
306:17
310:6
316:10
348:19
395:18
407:16

**covering**
284:13

**Crane**
296:14
297:2,9
404:4
406:11
428:4,5,9
429:15

**Crane's**
429:13

**Crane/georgia**
427:5,23

**crashing**
366:18

**creating**
322:7

**credit**
327:3
349:2
364:10
373:24

**credits**
362:20

**critical**
364:5

**Cronin**
394:2
400:13
402:8
403:12,22
406:5
426:24,25
427:9,16
429:1

**Cronin's**
402:9,10,17 403:1
421:22
427:1,13,19

**crumbling**
366:12

**crystalized**
328:18

**current**
399:4

**cut**
315:25
316:1

## D

**damage**
288:14
298:22
307:21
311:14
314:18
331:22

**damaged**
305:18

336:12 337:7

**damages** 287:10 295:4,8 299:23 301:12 302:13 303:7,22 304:22 306:2 310:5,11 316:8 328:6 329:9 334:17,18 341:7

**damn** 308:9

**data** 305:20 355:3

**database** 300:21

**date** 289:21 290:10 296:24 306:4 323:6 326:25 327:5,13 362:13 365:21 369:24 370:10 372:8,15 374:4 377:19,23 378:2,8, 10,18,19 379:1,2, 19 383:13 410:8

411:19 415:15

**dated** 331:9

**dates** 297:14 298:15 325:19 331:12 370:5 371:4,6 372:19 373:7 374:21 415:6

**day** 319:22 323:9 325:24,25 327:11 328:14 330:9,10, 12 331:2, 7 378:2, 22 382:15

**days** 289:5,22 295:23 317:10 320:2,17 330:15,23 332:2 382:15

**deadline** 289:24

**deal** 287:3,15, 18 288:23 289:1,9, 16 290:25 292:8 295:25 373:19,20 390:11

394:1 411:12

**dealing** 292:24 293:5

**DEBORAH** 284:2

**debris** 321:13

**December** 289:20 290:2,6, 8,9 411:21

**decide** 307:14 321:23 390:6 402:11,17 406:14

**decided** 322:2,6 373:21 374:6 390:1 394:3 396:11 399:6 406:12,13 429:25

**decides** 293:15 322:20

**decision** 322:23 388:19 389:5,6, 19 394:2 399:16 406:18

**Deck** 342:21

**deducted** 350:19

**deductive** 286:22 288:8 289:14

**deemed** 392:24

**Deep** 304:8,11, 14,19 305:14 315:6

**delay** 370:1 374:10, 11,14,15, 16

**delayed** 370:12 379:8

**delays** 287:6 370:18 371:10,12 374:13

**delegated** 421:6

**delineation** 428:6,7, 10

**deliver** 362:10 385:10, 13,22 386:2,18

**demo** 295:12,18 296:8,11 297:22,25 298:8 322:1,2,

20 323:4 337:15,16 339:24 340:5,9 341:1,4 365:8 366:9,25 367:1,14, 25 368:11,21 369:1,4 386:24

**demoed** 314:1,8 341:3

**demoing** 296:5 367:6,11

**demolition** 367:13

**denied** 298:23 306:22

**department** 319:12

**depending** 409:11

**Depends** 409:3

**depicted** 426:22

**depicts** 423:2

**Depinto** 378:21 410:15 411:16 412:3

**deposition** 284:2,20 292:3 310:22

313:5 376:3
**design** 407:6,10 421:6
**designating** 404:20
**designed** 409:1 428:4
**designing** 398:12
**destroy** 355:2
**destroying** 295:14 321:6
**detail** 372:18
**details** 299:1 303:13 307:3 318:19 380:9,11 423:4 428:17 429:1
**Deteriorated** 397:7
**determination** 385:1 390:25 399:12
**determine** 313:24 314:3,22 372:7 427:2,13
**determined** 334:13,18 390:10
**dictate** 406:19
**differ** 334:10
**difference** 318:25 409:5
**difficult** 379:24
**difficulties** 379:18
**difficulty** 379:21 380:5
**diligence** 344:6 357:16
**dipping** 340:23
**direct** 284:9 315:4
**directed** 414:3
**direction** 297:11 362:9 368:8
**directions** 325:1
**directly** 308:2 315:15 345:1
**disagree** 339:13
378:25 393:17 399:9
**disagreement** 423:23
**disapproved** 306:23
**discovery** 325:2,5
**discuss** 397:14 398:5,23
**discussed** 364:3 365:15 397:22
**discussion** 316:17 323:11 367:2 393:9 397:25 398:13,14 406:8 413:11
**discussions** 293:16 356:4 362:6 363:8 364:12 365:6,13
**dispute** 317:2 416:6
**distinction** 387:14,17 395:13
**distinguishes** 397:3
**divide** 382:20
**divided** 409:8
**document** 295:7 324:2 327:10 331:6 369:14 370:3 371:1 373:5 374:3
**documents** 284:17 297:14 324:4 325:4 369:14 370:3 371:1 372:6,17 393:4 399:10
**dollars** 288:18 307:11 346:1
**door** 308:10,13 326:16
**double** 340:23
**downtime** 303:21
**draft** 406:24 407:21 408:5,10 409:5,7, 11,15 410:1
417:25 418:12 419:11 420:9 421:8
**drafted** 397:22
**drafting** 382:2
**drafts** 375:4,6, 8,16,17, 19
**drawing** 421:3
**drawings** 362:11 367:21 388:16 395:9,10 396:13 398:16 399:22 400:3,12, 13 401:16, 18,19 402:4,11, 17,19,22, 25 403:1, 7,12,14, 16,23,25 404:1,5, 6,15,20 405:2 406:3,12 407:1,3, 5,10 417:15,16 419:14, 17,20 420:15,20 421:1,14, 20,22,24

422:6,23, 25 423:2 426:22,23 427:1,8, 13,17,19, 20,22 428:13, 16,18,22 429:4,5, 11,12,15

**draws**
343:24

**drill**
336:1

**dropped**
409:20

**drywall**
296:11 342:3

**due**
344:6 357:15

**Duke**
308:9,22 310:3

**duly**
284:7

**Dupont**
304:8,9, 10,23,25 305:4,12, 23 315:6 319:22

**duration**
364:15

**E**

**E-L-M-A-N-D**
305:9,10

**e-mail**
324:12

**Earl**
304:15,17

**earlier**
327:1 330:18 333:17 334:25 351:5 391:16 400:8 412:21 416:25 423:14 429:10,21

**early**
297:1 298:13 349:2 355:19 363:5 374:8 395:3 410:8

**east**
297:8

**edge**
422:11

**editorializing**
358:6

**effect**
322:22

**effective**
379:1

**egos**
353:2

**Eiland**
305:7

**elderly**
317:14

**elected**
388:14

**electric**
329:14 341:24

**electrical**
319:20 328:4,8 329:13

**electrician**
331:19 332:7 425:13,15

**electrician's**
426:6

**elevators**
329:20

**Elmand**
305:9

**embed**
394:10

**embedded**
387:23

**embedders**
402:23

**embedment**
387:16,21 388:4 390:7,21 391:4 393:8 401:12 405:23

**embedments**
387:15 388:8,9 389:1,21 390:2,20 392:13 393:14 394:7 395:13,21 396:12,16 397:8,15 398:7,21 399:4,25 400:3,6, 14,22 401:3,5, 24 402:11,18 403:6,13, 15,16 404:7,12, 13,16,21 405:2,5, 13 406:1, 10,20

**emergency**
329:18

**employ**
409:16

**employee**
292:19,20 332:6

**employees**
331:10

**empty**
368:8,16 369:10 370:10

**encompassed**
346:23

**end**
284:22 285:23 290:12 293:25 295:9 296:3,23 315:24 323:9 362:19 363:2 364:9 365:21

**ended**
355:9 372:4 394:17 402:5

**engineer**
399:5,6, 7,16,17, 19 403:24

**engineer's**
406:18

**engineering**
349:15

**engineers**
404:15,21 405:1 406:13,14 427:4

**entered**
378:2

**entire**
322:20 368:23

**entities**
355:10 381:14

**entitled**
419:5

**entity**
381:13

**entries**
355:1

**envelope**
286:21 418:24 419:6,23

**equipment**
381:3,9 383:8 384:2,5,

15,19

**erection** 381:21,24

**escorted** 318:8

**escorting** 318:10

**essentially** 288:9 340:13

**establish** 325:19

**estimate** 299:21 300:15,23 312:3 315:19 343:11

**estimates** 301:2 302:21

**evaluate** 344:20

**evening** 352:18

**event** 334:14

**eventually** 318:15

**everything's** 330:21

**evidence** 295:14 321:6,11

**Evidently** 325:17

**exact** 296:24 298:15 306:3 311:25 312:2,5 334:7 350:14 386:10

**examination** 284:9 310:17,24 311:10

**examined** 284:7

**Excel** 304:4

**exchanged** 375:6

**exclude** 416:21

**excluded** 410:2 429:19,23

**exclusion** 407:23,24 410:10 411:7 416:11 417:1,13

**exclusionary** 410:11

**exclusions** 416:12,13,23,24 418:1,3

**Excuse** 414:7

**exhibit** 376:3,14 378:15 406:23 413:18 417:22

**exhibits** 376:1

**existing** 291:18 334:10 341:11 387:15,23 394:6,18,19 395:13 396:16 399:3 400:6 401:3,6 402:23

**exiting** 388:4

**expected** 386:1,17

**expecting** 343:23

**expenses** 299:25 300:2 303:21 315:16

**expensive** 309:11

**experience** 323:19 408:8 409:1,15

**expert** 301:2 313:8 361:2,7 391:18

**experts** 300:24 301:4,5 303:23 304:5 310:15 313:12 314:16,21

**explain** 343:10,19 366:3 368:12

**exposed** 329:14

**extended** 287:16 289:19

**extends** 305:19,22

**extension** 287:4 289:9,18 290:2,20

**extensions** 305:15,16

**extent** 328:6 329:9 335:8

**exterior** 285:2 295:12 298:1 334:19 366:17

**extra** 389:7,23 390:3,7,22 391:4,7 392:14,24,25 393:10,12 395:1,2 396:3,7 405:7,17

**extract** 288:9

**eyes** 396:20

**F**

**fabricate** 362:10 367:16 429:19

**fabricated** 297:10

**fabrication** 297:2

**face-to-face** 356:8 363:10,24 411:24

**facility** 297:10 356:16 357:1 363:17 412:5

**fact** 308:17 389:21 429:22

**facts** 390:14 393:8 396:10

**fair** 374:9,18 383:17 396:8 400:23 403:18 404:17,22 405:3 410:19 415:4 424:3

**familiar** 310:16,19

312:4 324:7 408:3,5

**fast**
393:9 423:22

**favor**
355:1

**February**
296:9 355:19 379:1 382:14,21 398:4 410:17

**fee**
291:3

**feel**
293:14 352:24

**fees**
346:22,24

**felt**
299:22 365:21

**FEMA**
323:10, 13,18,20, 23

**fiasco**
318:14

**figure**
353:14

**filed**
296:1 300:10 318:16,25

**files**
380:18

**final**
375:20 378:14

**finalizing**
341:19 373:18,20

**finally**
285:20 295:17 298:7

**finance**
295:25

**financial**
290:24 291:23

**financing**
285:20 295:25 344:2 345:4

**find**
349:8,19 350:1 413:17

**fine**
285:25 413:10 421:12

**finish**
290:3,4 292:13 293:24 308:12 339:22 340:15 349:2 353:22 368:10 369:3 402:19

**finished**
285:23 295:13 336:9 350:18,20 362:19,20 368:15 369:12 401:8

**finishes**
335:9,10, 13

**fire**
351:18 353:18,25 354:1,4,7 406:24 407:20 408:3,9, 13,22 409:1,6, 12 410:1, 18,20,22 411:1,2 412:4,9, 10,15,19, 24,25 417:24 418:12 419:10 420:8,9 421:7,8, 10,20,22, 25 423:2, 9,19 424:2,8, 15,17,19, 21,25 425:2,17, 19,25 426:5,7, 21 427:2, 7,13,21 428:14, 20,23,25 429:8,11, 16,23

**firefighting**
352:24

**fireproofing**
408:16,21 412:15 416:16,21 417:9 418:12 419:11 426:7

**fires**
352:25

**firing**
353:9 354:14

**firm**
301:15,16 375:13

**fist**
327:21

**fits**
343:20

**fixed**
342:23

**Fixtures**
335:16

**FL**
296:14 297:2,9 404:4 406:11 427:4,23 428:4,5,9 429:6,7, 13,15

**flare**
352:23

**flashing**
394:15

**flew**
308:23 310:2 320:15

**float**
341:9 342:9

**floor**
312:24 313:1 337:13,15 338:4 341:1,4,5 387:25 408:22 409:8,18 422:12,15

**flooring**
335:14 336:2,4, 7,16,25 337:7,13 338:15 340:15

**floors**
336:18, 19,20 338:9,18 340:19, 21,22 342:17 409:17 422:7,9

**Florida**
284:4 301:16,17 305:11

**flown**
326:7

**fly**
308:18 309:19 326:5,6 327:7

**flying**
298:9 326:19 352:19

**foam**
408:15,24

**focus**
324:5
332:18
388:21
404:13
421:7

**focused**
291:20
407:13

**focusing**
332:20
428:19

**folks**
342:5
357:5

**follow**
400:18

**follow-up**
355:11

**foot**
305:18

**forget**
388:19
389:18,20
410:24
420:18

**form**
286:18
300:5
306:24
310:7
312:14
333:20
338:12
339:7
346:12
347:25
348:4,13
349:3,9
361:3,8,
10 378:4
379:4
380:10
384:13
386:4,21
393:22
402:1
418:13,14
420:12
422:17
423:11

**formal**
306:1

**format**
304:3

**forthcoming**
380:7

**forward**
297:20
299:3
373:19
374:7
393:9
406:13
423:22

**framing**
342:12,17

**Frank**
332:9

**Friday**
331:4
332:3
352:18

**friend**
327:8

**front**
391:14

**Ft**
356:18,20

**full**
285:5
304:12
316:3,4
318:9
319:23
404:6

**furious**
319:12

**furnish**
381:3,8
384:4,9,
18

**fused**
397:9

**Fuson**
285:18
346:10,15

G

**G-A-U-K-R-O-G-E-R**
301:24
302:5

**gage**
387:22
394:3,6,
10,11,20
400:1

**gages**
394:12

**Gaukroger**
301:23
302:3

**gave**
298:13
334:12
343:11
350:4
352:8
406:11

**Gavin**
301:22,23

**Gavin's**
302:2

**GC**
332:18

**general**
294:22
296:16
312:16
333:24,25
376:10
377:14
391:6,10
392:17
393:1
425:9

**generally**
290:11
294:23
296:22
313:15
322:3
333:23
340:17
414:13

**generators**
329:19

**gentleman**
319:12

**gentleman's**
286:10

**gentlemen**
304:16
353:3

**Georgia**
402:6,8,
11,17
403:13
404:4
406:3
428:4
429:11

**Gina**
301:13,24

**give**
294:24
326:14
391:8,12,
15 403:22
427:16

**giving**
361:22

**God**
319:19

**good**
284:11
396:23,25
397:1,4
413:17

**Goose**
342:21

**grace**
369:9

**graded**
391:17

**Great**
421:13

**greater**
409:10

**ground**
317:25

**group**
330:8

**guarantee**
342:25
343:3
349:4,22

**guaranteed**
350:12,22
351:3,8

**guess**
293:3
295:14
357:11,21

**gutted** 294:15
**guy** 327:24 332:8
**guy's** 327:23
**guys** 285:19 363:5

**H**

**hairs** 419:25
**half** 309:17 394:12
**hallway** 425:19
**hallways** 425:18
**hammer** 292:8
**hand** 287:18,19 317:24 366:21 375:15 413:20
**handed** 326:11
**handle** 302:18 306:9 429:20
**handling** 306:8 353:13
**hands** 307:2
**hanging** 316:1
**happen** 296:7 307:21 390:17, 19,22
**happened** 294:25 329:11 349:25 351:20,25 352:20,22 381:17,18 389:9,11
**happening** 295:1
**harassing** 330:11
**hard** 313:24
**hash** 303:13
**hashed** 286:17
**heading** 297:10 326:6,7
**health** 317:13 318:4
**heard** 285:9 307:19, 23,24 318:18 328:7 404:14 413:21 420:4
**hearing** 287:11
**held** 316:17 413:11
**helping** 301:25
**helps** 333:19
**high** 311:22
**higher** 360:7
**Hilda** 328:11, 13,20,21
**hire** 308:2
**hired** 296:16 303:23 304:6 307:20 313:9 322:8 341:17 426:17
**historical** 305:20
**historically** 411:10
**history** 361:19
**hit** 295:3 331:21
**hold** 344:6 350:14 369:21 371:25 403:4
**holding** 288:19
**holes** 425:25
**hollering** 317:17 318:3
**home** 352:19
**homework** 357:15 358:7,19, 24
**horizontal** 366:10
**horizontally** 366:16
**hot** 329:14
**hotel** 300:1
**hotels** 370:15
**hour** 326:14, 22,23 329:2 425:21,22
**housekeeping** 284:12 290:9
**hundred** 307:15 343:16 350:9 366:5,8 373:25 374:1,6
**hurricane** 285:21 287:5 288:14,18 289:12 291:13, 15,21 294:24,25 295:3,25 296:18,19 297:7,12, 18 298:16, 22,24 301:3,12 302:12 303:7,8, 22 306:2 307:10,21 310:5,12 311:11, 14,17 314:6 315:10 316:10, 12,13,21, 22 319:7, 9 320:2,4 325:21,22 327:12,14 332:16, 17,19,24 333:10, 11,23 334:10, 18,20 335:23 336:6 337:7,11 340:11, 18,20,24 341:14,17 345:1 347:17, 21,23,25

348:18
349:11
350:20
351:14

**husband**
302:6

**HVAC**
342:20,22

**hypothetically**
345:25
350:17

**I**

**idea**
330:8
356:12
397:1

**identical**
376:7
386:6

**identified**
289:18
408:20,23
417:10,
15,16

**identifies**
373:6
423:2

**identify**
347:15
427:20

**Immediately**
326:11

**implement**
362:11
364:4

**implemented**
395:8

**important**
412:16
413:1

**impression**
294:20
296:17,20
298:21

**incentive**
343:17

**inch**
394:12

**include**
299:25
337:12
342:13
388:25
406:20
410:18
421:20,22
429:8

**included**
360:15
388:4,10,
15 395:22
405:14,
20,23
421:15

**includes**
337:14

**including**
406:9

**inclusive**
410:4
411:5

**increase**
291:3

**increases**
291:2

**incurred**
346:25

**indemnify**
347:1

**indemnity**
346:20,21

**indicating**
313:22

**indirectly**
308:3

**industry**
343:17

**information**
302:20
303:15
306:7
313:22
354:23
364:14

**informed**
380:21

**initiated**
415:18

**input**
362:9

**inputted**
325:9

**inside**
286:20
288:3
321:25
325:25
330:2

**inspections**
345:7,10

**inspector**
319:10
326:12
328:4,8

**inspectors**
319:20
410:22

**install**
336:4,7,8
362:10
369:4
381:4
383:4
385:17
387:3
422:22

**installation**
297:3

**installed**
336:11
338:10
339:10,16
422:13
428:6
429:7

**installing**
335:11
338:4
342:13
401:8
423:6

**installs**
402:22

**insurance**
285:21
295:6,7,
13,18
296:4
297:21
298:6,21,
22,23
299:4,6
300:7,21
302:22
303:6,10,
15,25
306:14
307:9
309:22
310:23,24
311:10
315:2
321:5,7
332:19
333:6
334:15
343:19,
22,23
344:1,4,
8,11
345:16
346:16
382:5

**intended**
383:22

**interior**
284:25
288:10
294:15
314:8
322:20
334:23
335:6
339:24

**interiors**
286:24

**interpret**
401:11

**interrupting**
413:13

**intrusion**
311:17

**investigate**
358:16

**investigating**
358:7,24
359:5

**investigation**
295:7,14

**investor**

293:6

**investors**
293:8

**invoice**
309:21
327:5,12, 14

**involve**
384:23

**involved**
285:10
286:1
304:14,16
318:2,21
319:1,4
323:17
344:1
353:13
355:14
359:9,12
401:2
408:9,10

**issue**
332:15
364:10
392:15
398:1
401:22
402:24
412:23
413:1
421:8

**issues**
316:25
353:15
373:24
380:12

**item**
343:13
416:16

**itemized**
304:1,2

**items**
306:11
307:16
317:9
318:11
322:10,13
393:11

**J**

**J-A-G**
309:9,10

**Jag**
309:8,9
327:12

**January**
355:19
378:2,16
379:3,6
411:21
415:14

**JEM**
319:21
351:23,24

**Jesse**
319:21
351:21
352:2,3, 8,10

**jet**
326:4,8, 14,19

**jets**
326:5
327:7

**job**
296:25
315:24
332:1
344:18
350:4
356:20
361:22
362:9
364:5
401:10
410:23
427:3

**joint**
313:7
315:14

**joints**
315:20
316:1

**Jon**
353:11
363:5

**Jorge**
328:10, 12,13,19

**judge**
357:24

**judgment**
317:11

**July**
297:1

**Julyish**
285:13

**jump**
393:7
414:11

**jumpsuits**
318:9

**June**
296:23,24

**K**

**keeping**
380:21

**Kevin**
359:9,11
363:4,12

**keys**
318:6

**kind**
294:12,24
295:8
302:23
304:17,19
311:4
316:19
317:4,18
321:7
333:3
334:1
343:17
357:9,22
365:12
372:12
379:7
416:17,21
421:5
423:14

**kinds**
318:13
322:7

**king**
422:8,14

**kitchens**
339:10

**knew**
308:16
383:19

**L**

**labor**
381:3,8
384:4,10, 18

**lack**
295:15

**lady**
379:22

**lady's**
301:13
345:12
380:16

**land**
320:9

**landed**
329:24

**Landry**
364:12, 13,17

**language**
347:14
376:10
385:24
386:11
388:18,24
389:15
390:4,16
392:14,17
395:12
397:25
410:12
419:9
423:17

**large**
284:4
367:9

**late**
373:15,17
374:5
382:17,19

**laundry**
303:25

**law**
301:15

**LAWHON**
284:10
286:25
301:21
302:9,11
307:7
310:9

312:18
316:18
332:11,13
333:22
334:4
338:13
339:12
347:5,12,
13 349:12
357:20,24
358:2,3
361:16
371:25
372:3,25
373:4
378:5,7
379:10
384:17
386:8,22
392:8,9
394:5
402:2
404:9,11
413:8,14
414:6
418:14,
18,22
422:19
423:16

**LAWRENCE**
284:2

**lawsuit**
302:13
315:9
318:15,21
319:1,2
338:11,14
339:15
345:21
346:11

**lawsuits**
413:22

**lawyers**
347:15

**layers**
303:10

**LD's**
287:17
290:20

**Lead**
304:18

**leading**
355:8
365:5
373:10

**leak**
311:16
313:3,11

**leaked**
311:24
312:13
313:19,23
314:2,13
315:5

**leaking**
314:22

**leaks**
313:11
315:10

**leave**
308:8
310:14

**led**
357:13

**ledger**
307:18

**left**
308:15,25
333:6
354:2
377:13

**legal**
287:23
361:12
384:25

**legally**
298:18,19

**letter**
354:6,11,
20
358:10,
14,16

**letters**
354:10,17

**levels**
312:9

**license**
424:21,25

**life**
316:25
317:12

**light**
394:3,6,
20

**liquidated**
287:10

**list**
303:25
306:11
418:1,3

**listened**
318:12

**lists**
327:12

**literally**
326:3
352:18

**live**
328:5
329:13

**lived**
332:6

**lives**
328:24

**LL&J**
342:4,8

**LLC**
285:7

**Lobby**
320:21

**local**
301:16

**location**
422:14

**locked**
329:12

**long**
287:25
296:10
306:12
319:5
321:20
329:1,17
330:12
360:21

**longer**
296:25
400:19
424:7

**looked**
313:4
370:8
371:18
381:22
402:19
410:16
417:7
420:13
422:2
423:12

**loose**
323:7

**loss**
311:3

**losses**
303:8
310:4,10

**lost**
299:25

**lot**
295:3
297:9,16
300:4
302:24
313:13,25
314:1,6
317:8,9,
10,13,23
321:17
324:4
326:5
330:6,11
360:24
408:12
417:18

**Louisiana**
342:5

**lunch**
355:11,12
372:1

**luncheon**
372:2

**M**

**made**
303:7
318:8
319:23
321:1
322:23
330:10
361:17
388:21
389:5,6,
19 399:16

**main**
326:16
333:21

**Maintenance**

375:24 376:6 377:2 381:10,20 382:4 383:2,21, 23 384:1, 9 385:3, 13,20,21, 25 386:2, 17 388:3, 20 393:11,21 394:17 398:20 400:21 401:6 406:23 407:9,19, 20 409:25 410:16 412:18 414:21 415:3 416:9 417:7,8, 10,22,23 418:9,11 419:10 420:7 423:8,18, 19,24

**Maintenance's**
407:14 416:20

**make**
308:7,9, 20 313:16 318:25 326:6 327:18 331:20 343:21 349:13 355:2,4 371:2 375:3 377:5 389:16 390:25 399:12 400:9 410:12 413:1 414:24 427:15

**makes**
299:20 381:16 387:14 395:12

**makeup**
409:3

**making**
315:8 344:3

**man**
293:14

**management**
320:22

**managing**
408:9

**manufacture**
381:4,9, 11 383:3, 8,22,23, 25 384:3, 20 385:8, 16,17 386:2,17 429:16

**manufacturing**
381:21,24 384:11, 15,23 385:4

**mapping**
303:23 304:21 315:3

**marble**
335:22

**March**
296:9

**Mark**
313:5

**marked**
376:2

**markup**
344:8

**masks**
317:24 318:9

**master**
333:9

**material**
325:15 381:3 384:10,19 387:23 394:3,6, 13,14,15, 19,20 421:16 422:3

**materials**
381:9 384:5 394:23 401:8 408:25 419:7,8

**math**
382:22

**Maurice**
319:11 328:1

**maximum**
342:25 349:4,22 350:12,22 351:3,9

**mayor**
318:2,7

**meaning**
338:21 341:7 406:8

**means**
387:19 421:11

**meant**
338:1 351:15

**meat**
414:11

**mediate**
353:4

**medical**
340:9

**medicine**
318:11

**medicines**
318:14 330:19

**meet**
315:13 363:16 364:4,7 365:21 399:7

**meeting**
319:16,18 320:1,18, 20 329:1 356:15 363:11, 13,21,22 379:6

**meetings**
292:12 363:25

**meets**
422:12,15

**members**
406:9

**memory**
356:25 392:2

**mention**
353:17

**mentioned**
287:9 294:14 298:17 304:5 332:23 343:8 353:16, 20,24 413:15 414:2 416:10

**met**
306:6 356:7 363:9 399:4 400:9

**metal**
381:5

**Miami**
308:18 326:5 328:25 356:17

**Mick**
351:18,21 352:2,9, 22 353:9, 18,25 354:1,8,

14

**middle**
296:23
382:21
411:9
414:18

**midst**
353:10

**million**
288:18
299:9,10,
12,17,24
303:19
307:11
334:8,23
342:24
343:3,22
344:4
346:1
350:13,
21,22
351:3,8

**mind**
336:15
337:20,25
390:18,19
396:7
397:3

**minds**
379:6

**mine**
327:8
377:17
380:22

**mineral**
408:15,24
422:4,5,
13,22
423:6
425:4

**minimum**
290:7

**minute**
291:22
308:20
359:19
381:13,16
382:12
388:19
389:18,20
391:8
393:7
410:12
415:21,25
416:3
420:18

**minutes**
391:15

**mirror**
334:2

**missed**
322:4

**missing**
342:19

**misunderstanding**
353:1

**misunderstood**
429:14

**mixture**
305:24

**modify**
355:3

**moisture**
303:23
304:21
315:2

**mold**
305:3
317:11
329:12
330:22

**moment**
371:24

**Monday**
320:15
327:1,17
330:25
331:1

**money**
295:20
306:13,18
322:15
343:13,15
348:2

**Monica**
345:13

**month**
285:11
295:22

**monthly**
344:23

**months**
294:9
295:11
296:12
299:15
306:3,4
382:16,22
415:14,18
416:2

**morning**
284:11

**motioned**
366:21

**move**
297:20
332:16
357:21
366:10
369:5,20,
21 370:1,
5,22
371:3,6,
19 372:8,
19 373:5
374:7
393:6
397:24
404:9
413:19
429:6

**moved**
366:2,4
367:10
369:16

**moving**
299:3
366:25
369:23
370:14,17
373:7
386:23
398:1

**Myers**
356:18,20

**N**

**names**
304:17
415:21

**Naples**
356:17,18

**needed**
285:22
303:24
334:13
362:15
365:18,19
389:22
390:2
399:8
424:2

**negotiate**
334:15

**negotiated**
287:2,14
291:8
334:3
360:1
406:7
417:12

**negotiating**
286:12
359:21
362:3

**negotiation**
357:9

**negotiations**
291:25
293:3
332:20
333:16
343:13
347:18
355:8,22
356:11
357:4,12,
18 360:4,
16 362:17
363:8
365:5
367:3
382:2

**night**
313:14

**nonresponsive**
357:22
404:10

**north**
311:20,22
326:13
402:21

**Northeast**
311:22

**Notary**
284:3

**note**
389:16

**notes**
324:17
325:9
354:24

**notice**
298:17
322:22
323:1
327:24

**notices**
296:2
299:3
307:4

**notorious**
411:6

**number**
288:19
307:11
334:7
350:15
357:10
359:21, 24,25
360:1,7
376:1,3,8
387:5
413:18
416:16

**numbers**
350:5,21
360:6

**Nyitray**
399:20,21
400:12

**O**

**oath**
310:17, 20,25
311:10

**Object**
286:18
306:24
310:7
312:14
338:12
339:7
349:9
361:10
378:4
379:4
384:13
386:4,21
393:22
402:1
418:13
422:17
423:11

**objected**
357:25

**objection**
403:3,9
404:19,24
418:18

**objective**
390:1

**obligated**
349:7
385:22

**obligation**
347:1,4, 11

**obvious**
294:5

**occupancy**
425:21

**occupied**
366:5,9
367:5

**ocean**
326:5

**office**
320:22,23
380:22

**officials**
326:21

**Ohio**
346:2

**Okeechobee**
320:10, 11,13

**open**
307:20
313:25
314:6
320:14
321:14
326:16
354:3

**opened**
308:3
326:16

**operating**
423:25

**operation**
309:6

**option**
293:19
322:14,15

**oranges**
394:8,22

**order**
286:23
288:8
289:14
319:6
323:2,5
337:17,18
339:23
340:4
390:20,22
392:12, 18,23
393:3
396:7

**orders**
350:20
393:10

**origin**
313:3

**original**
286:23
287:5
291:13
334:17
335:1,5
336:3
337:17,18
348:24
349:7,17
370:19
396:17

**originally**
292:14
335:7
341:11,21

**originating**
316:9
373:6

**outlet**
425:18, 19,24,25

**outstanding**
288:21

**overbilled**
339:19

**overbilling**
339:9

**overlapping**
423:15

**Overruled**
357:23

**overseeing**
408:8

**owed**
393:12,21

**owner**
285:16,17
286:12,16
287:10
290:12,20
291:10,11
292:3,4, 7,11
293:6,9
295:21
296:1
298:6
299:8
300:6,9
301:5,11
303:24
304:18
308:9,21
314:17
321:6,22
322:2,6, 8,19
330:16
333:4
343:9,16
344:2,3, 10,20
345:2,16, 20 346:4, 7,10,16, 20 347:17
348:3
349:15, 22,24,25
350:7,8
351:6,24, 25 352:1
362:21
368:9
369:20
370:14,16
372:14
373:6,18
374:6,11
392:20,21

393:4 398:23,25 403:5

**owner/ contractor** 372:24

**owners** 288:22 293:1,8 295:5 297:21 299:1,25 301:4 302:14 307:18 317:3,12 334:12 399:19

**P**

**pack** 425:23

**package** 418:25 419:6,23 421:16 429:24

**package/ material** 420:6

**pages** 287:25 306:12 413:19 414:8,9, 12

**paid** 288:24 289:4 309:18,23 338:10 339:5,17 344:25 345:20 346:1

**paint** 335:2 341:9,11

**painting** 335:9 342:7,9

**panel** 297:2 314:13 368:13 387:3 402:6,8 403:13 404:4 406:3 422:11,15 428:4 429:11,12

**panels** 295:12 296:16 297:3,9, 15,22,24 298:1,9 311:13, 16,21,23 312:12 313:4,6, 10,23 314:1,4, 10,12 315:5,11, 14,20,25 316:9 366:17 367:16 369:1,4 376:8 381:5,11 383:3,5, 24 384:20 385:4,10, 13,22 386:2,18 390:12 402:11,17 403:21 404:2 422:14 423:7 427:5,23 428:1,2, 4,6,8,9, 15,24 429:6,7, 13,16

**paragraph** 377:7

**parking** 330:6,11

**Parrish** 318:24 325:18,20 353:11 354:6,19 363:6 375:9

**part** 287:2,14, 15,18 288:23 289:1,9, 16 290:16,25 291:24 292:7 316:22 323:21 333:16 335:4,13 336:18 337:16 338:11, 14,21 339:6 343:9 345:21 349:6 354:13 359:4 360:4,10 370:11 389:1 394:2 395:4,7 407:5 417:12,14 421:14 428:25

**partially** 367:5

**participate** 356:4

**participate d** 286:12

**participati ng** 411:22

**parties** 343:18 360:2 379:2 385:6

**Partington** 286:18 287:9 301:19,22 302:3,7, 10 306:24 310:7 312:14 316:15 333:19,24 338:12 339:7 346:18 347:9,24 349:9 357:23,25 361:10 372:12,21 373:1 378:4 379:4 382:1 384:13 386:4,21 392:5 393:22 402:1 414:5 418:13, 16,20 422:17 423:11

**Partington' s** 375:13

**parts** 321:13 338:5

**party** 318:20 351:22

**pass** 349:18

**passed** 411:12

**passing** 352:10

**past** 310:21 397:24,25 428:4

**Paul** 364:12, 13,15,17, 22

**pay** 288:17 289:4 327:4 343:24

**paying**
285:22
299:5,7
300:1

**payment**
348:14
360:13
361:23
379:12

**payments**
299:12

**peace**
353:6

**Pending**
306:6

**penetrating**
408:21

**penetration**
426:11

**Penetrations**
425:7

**people**
302:23
303:2
304:13
307:20
314:17,21
317:14,23
318:3
319:20,23
324:18
328:9,14,
16 329:9
330:11
356:8
359:8
363:10
364:1
365:7
367:3,10
368:11,16
370:17
397:15

**percent**
307:15
344:8,12
350:9
366:5,8
373:25
374:2,6

**percentage**
291:4
396:24

**Perez**
419:22,23

**perfect**
396:2

**perfectly**
319:24

**perform**
357:12
407:20
427:14
428:14

**performance**
360:12
361:23
379:12

**performed**
398:2
427:21

**performing**
417:9

**period**
295:1,10,
15 296:6
317:1
357:3
379:17
382:13

**periods**
294:17

**permit**
323:10,15

**person**
302:17,25
304:13,18
312:6
325:13
332:8
381:23
390:1

**personal**
317:9
318:11
322:10,13
330:19

**personally**
308:11,12
309:25
357:15
375:3
380:4

**peruse**
391:13

**pete**
284:6
377:13
410:25
425:9

**phase**
368:1,2,
4,5,10,
12,19,21,
22,23
369:2,4,
5,6,8,9,
10,12
370:11,
12,13,23
371:14,20

**phases**
367:13,
18,22

**phone**
301:14
326:3,8,
12,20
327:9
352:1
411:25
412:1

**photos**
302:21

**physically**
320:7

**piano**
293:14

**pick**
327:8

**picketing**
317:18

**picture**
314:5
316:20
337:21
338:2

**piece**
294:13

**pieces**
428:12

**pinning**
303:14

**pinpoint**
313:2

**PJ**
303:3
356:3,13
357:7,9
358:6,12,
15,23
359:2,6,
20 362:8
377:22
413:6

**PJ's**
377:23

**place**
288:25
289:3
297:1
298:21
314:15
320:1,20
345:15
346:3
348:9,13
352:14
355:23
356:15
364:9
365:13
397:17
413:17

**plan**
367:12,13
368:20
371:9,10
373:5
397:18,21

**plane**
308:23
309:3,4,
7,19
320:8
327:3,4

**planes**
308:17,18

**planned**
371:8

**plans**
419:16,22
420:13
421:15

**plate's**
316:3,4

**play**
398:16

**plug**
333:22

**plumber** 342:1
**plumbing** 319:21 343:14,15
**plural** 303:6
**point** 286:4 288:24 295:20 308:18,19 314:17 316:23 318:1 320:6 322:1,19 331:2,13 351:19 374:20 382:14 387:5 392:22 400:21 404:3 411:14 423:18,24
**pointed** 313:5 317:16
**points** 386:25
**police** 318:8,9 329:7
**Pons** 319:11 320:25 321:9 328:1
**poor** 361:6
**pop** 307:16
**portion** 306:7
**portions** 306:6,10, 16,22 411:6
**positive** 412:14
**possibility** 293:22 354:3 412:2
**possibly** 356:14 357:2 363:11,15 366:19 375:5 379:19 390:5 395:2 412:1 423:12
**potentially** 353:19, 20,21,24, 25 354:1 369:25 370:2,7, 24,25 371:5,7
**power** 317:10 329:15,17 331:21
**pre-manufactured** 381:4 383:5
**precipitates** 374:14,16
**precise** 341:23 358:5 365:1 380:3 383:1
**precisely** 325:18 339:14 381:2
**Prefab** 381:19 382:3 383:12 407:8,9, 16 412:18 414:14 422:24,25 423:6,25 428:9
**preliminary** 299:21 300:12, 13,14,15
**prepare** 284:15
**prepared** 290:16 400:12 428:13 429:13
**present** 411:19
**presented** 420:14,16
**preserve** 321:11
**preserved** 325:11
**preserving** 321:7
**pretty** 350:4 360:17 366:8 416:2 426:20
**previously** 376:2
**price** 291:2 300:20 334:6,12 342:23 350:12,22 351:4,9 376:7 388:5,11 389:2 395:18,22 405:6,15, 20,24 406:2 417:10
**pricing** 305:15,16
**primarily** 302:17
**prime** 291:18,24 332:21 334:10 335:5,12 336:3,16, 17 337:18 338:22 341:10 347:19 348:21,24 349:7,17 350:11,19 372:25 373:1 374:15
**principals** 357:17 358:8,17, 21,25 359:16
**printed** 354:25
**prior** 308:4 408:10
**private** 308:17,23 309:3,19 320:8 326:19 327:7
**problems** 317:15 322:8 380:7
**procedures** 395:3
**proceed** 373:22
**PROCEEDINGS** 284:1
**proceeds** 345:16 346:11,16 347:3
**process** 322:17 362:12 402:15,16 421:3
**Procore** 324:6,7, 9,14,17, 22 325:9, 15 354:22,24

355:3

**product**
409:4

**production**
324:2

**program**
373:24

**prohibited**
297:21
319:7

**project**
285:10
293:23
324:5,14
344:24
351:22
355:15
362:15
363:2
371:17
400:20
408:11
420:18
424:7
426:18

**projected**
344:23

**projects**
289:20
360:25

**proof**
300:5
311:3

**property**
317:4

**proposal**
407:22
410:2
414:14

**proposals**
407:25

**propose**
365:22

**proposed**
415:12

**prosecuting**
336:23

**protect**
317:22
425:19

**provide**
310:24
375:25
381:4,9
384:2,14
385:8,15, 17

**provided**
370:18
371:16

**providers**
351:22

**providing**
304:20
305:12

**provision**
348:7,22
392:18
407:18

**Public**
284:3

**pull**
325:14
422:1
423:5

**purchase**
373:22
383:12

**purpose**
292:11
408:20

**pursue**
301:11

**pursued**
310:12

**pursuing**
302:12
304:6

**push**
371:10

**pushed**
379:19

**put**
291:15
297:23
315:23
319:10
322:13
324:18
327:24
332:15,22
336:20
338:2,3
341:5,8
352:24
354:9
361:7
364:13,15
367:15,16
368:13
369:2
394:12
403:6
410:10

**puts**
411:8

**putting**
297:22
337:13
347:15
368:16
370:12,14

**PVGC**
286:11
287:11
288:3,13, 14 289:8
290:2,21, 24 291:9, 22 297:1
301:1
302:12,18
303:7
304:6
306:1,13
307:9
309:25
310:1,5
311:9
313:9
315:8
317:3
318:20
319:1,7
322:22
323:23
325:6
331:10
332:23
333:4,9
334:19
336:3,6
340:12
341:17
344:19,25
345:16,19
346:1,4
348:18
351:9
355:2
357:6
375:12
377:1
384:8
385:13
393:12
401:23
412:17
426:12

**PVGC's**
288:7
310:23

**Q**

**qualify**
396:7

**quantified**
305:19

**quantifying**
304:21
305:14

**Quantities**
300:20

**quarter**
394:12

**question**
290:1
291:22
293:21
308:12
312:6
314:16
339:14
341:16
346:2,19, 23 347:6
348:10
351:15
353:22
358:5
362:25
373:2
378:6,24
382:25
383:1,9
388:23
398:5
399:15
400:7,8
401:17, 20,21,22
405:9
410:25
412:25

418:5,15
424:24
427:6,12,
18

**questioning**
372:9

**questions**
310:20
346:19
372:6

**quick**
316:16

**R**

**rainwater**
308:5

**ramifications**
361:12
362:20

**rang**
326:3,8

**range**
312:3

**rate**
425:25

**rated**
425:17,20
426:5

**read**
313:13
354:17
374:24
375:1,21
376:18,21
381:2,6,
23
384:22,25
385:9
387:5,8,
10,14
388:3,25
389:24
390:4,5
391:9,14,
19,21,24
392:11,14
399:12
400:12
405:21
407:22

**reading**
297:14
419:1

**ready**
373:18,25
374:2,7

**realize**
392:10

**reason**
373:16
399:8
416:6

**reasons**
318:4
393:20

**rebates**
349:16

**recall**
363:11,25
411:3

**receipt**
327:4

**received**
299:11
306:13
351:10
416:7,19

**receiving**
290:2
291:22
301:1
348:18

**recess**
332:12
372:2

**recollection**
354:2
362:2

**recommencing**
319:8

**recommend**
405:1

**recommendation**
358:11

**record**
284:24
316:16,17
361:21
371:24
372:12,22
377:5
385:19
413:8,11

**records**
327:3

**reduced**
286:13,16
344:9

**Redwood**
292:21

**refer**
348:4
419:16

**reference**
320:6
331:2,13
374:20
382:14
420:5

**referencing**
419:5

**referred**
391:6

**referring**
395:20
412:7
416:17

**refers**
418:24

**refine**
288:1
290:1
368:18

**reflect**
298:14

**refresh**
392:1

**reinstall**
340:12

**reinstalled**
337:1,9,
14

**reinstalling**
390:21

**relate**
324:23

**related**
304:7
305:13
306:14
307:10
311:11
324:4
325:2
377:2

**relates**
316:11,13

**relative**
293:4
301:3
338:21

356:10
390:7

**remediation**
288:14
332:24

**remedies**
298:17

**remedy**
296:2
299:3
307:4

**remember**
286:19
287:8,11,
23 294:14
296:24
297:13,17
298:15
299:5
300:25
301:14
304:12,
13,17
306:3
311:21
323:10
325:3
326:11
327:23
328:1
332:9,18
342:1
345:13
354:12,15
358:13
359:24
360:8
363:16,20
366:1
367:21
372:9,11
374:4,21
375:11,16
378:21,23
380:9,11,

17 381:15 394:10 410:8 411:23 415:22 422:1 423:1,4 424:17

**Remind** 334:5

**reminded** 351:15

**remodeling** 339:25

**removal** 337:12,15 390:20 391:4 392:13 393:13

**remove** 322:9,13 336:4,8 368:11

**removed** 336:25 396:17

**removing** 387:16 388:8,25 395:14,21 396:12

**renovation** 334:11

**renovations** 321:25 334:24 335:6

**rental** 326:24

**repair** 315:19 332:24 333:23 342:16 388:14 389:3,5, 20 394:1 397:20 398:10,21 400:4 401:5 403:24 404:1

**repaired** 389:22 390:3 391:1 396:18 397:11,16 398:7

**repairing** 387:15 388:4 395:13, 18,22,25 401:3

**repairs** 285:21 295:21,25 298:24 400:1 428:17 429:2,3

**reparable** 390:9

**replace** 335:3,24 338:22 340:18 388:15 389:6,19 393:25 394:18 398:10,20 399:11 401:5,24

**replaced** 338:25 389:22 390:2 396:18 397:16 398:8 399:8 400:22 401:12 402:12,18

**replacement** 295:21 340:21 390:8,18 391:4 392:13 393:13 396:1,2,3 400:4,5 404:7,20 405:2,5, 13,25 406:1,10 418:25 419:6,23 420:6 421:15

**replacements** 403:13,14

**replaces** 403:16

**replacing** 336:10 387:16 388:9 389:1 395:14,21 396:12 401:3 403:5 404:16

**report** 313:8,9 315:4

**Reporter** 284:3

**reports** 301:2,8 302:23 313:13 314:24 315:1 324:22 325:14 354:25

**representative** 292:24 346:10 355:14

**representatives** 318:16 409:25 424:1

**reps** 302:22

**requested** 303:24 311:2

**requests** 293:15 324:2 325:5

**require** 385:12 409:9

**required** 349:8,18 350:1 393:3 429:15

**requirements** 315:14 357:14 360:12 361:18 393:2

**requires** 391:3 407:19

**reservation** 327:6

**resident** 318:17 329:21 330:14

**residents** 316:25 317:2,3 318:16 329:6

**resolve** 353:3

**respect** 418:5

**respective** 423:25

**responding** 325:5

**response** 294:4

**responsibility** 318:6 423:9

**responsible** 285:1,2 302:17 381:15,24 385:5,6 402:20 413:2

417:8,24 418:11 419:10 420:8 423:19 428:3

**restart** 298:7

**Restate** 389:25

**restoration** 332:24 377:2 381:10 414:22 415:4

**result** 310:11 311:14,17 313:23 337:7

**resulting** 315:10 319:7

**return** 309:2

**returned** 330:24

**reuse** 397:18,19

**revenue** 299:25

**revert** 349:21

**revisit** 392:4

**RFI** 390:24 391:3 392:15 399:11 401:15,22

**RFI's** 324:11 393:4

**Rick** 304:25 319:22

**ride** 332:6

**rightly** 339:15

**rip** 336:19

**ripped** 335:23 337:8 341:8

**risk** 294:9

**Robert** 351:18,21 353:9,18, 25 354:1

**role** 357:8

**rolling** 409:12

**roof** 317:8

**Roofing** 342:21

**room** 319:20,23 413:9

**rotten** 396:23 397:5,6

**rough** 350:21

**roughly** 297:4

**rule** 358:1

**rumor** 307:23

**run** 294:9 324:22 325:14

**Rust** 397:7

**Ryan** 285:18 287:1 292:17, 21,23 293:4,5, 7,16,20, 21 346:10 352:5,6, 8,10,16 398:25

**S**

**Sadler** 325:7,13

**safe** 319:14,24 321:1 360:24

**safety** 316:25 317:12

**safing** 410:20,22 411:2 412:9,10, 15,20,24, 25 417:24 418:12 419:10 420:8 421:7,11, 20,22,25 423:2,9, 20 424:8, 15,19,22, 25 425:2 426:7,21 427:2,7, 13,21 428:15, 20,23,25 429:8,11, 16,23

**Saturday** 320:5 352:19

**save** 343:13, 14,15 348:2 351:2

**saved** 351:8

**saves** 324:17

**saving** 344:11

**savings** 343:16,20 344:15,21 347:16 348:23 349:3,8, 19,21,23 350:1,6,8 351:3,5

**scale** 361:6

**schedule** 290:15 298:14 362:6 364:2,3, 4,8,9,11, 13,19 365:2 369:18, 19,22 370:6,8, 18,19,21 371:2,5, 16,18,21 372:13, 22,23

**scope** 289:13,24 305:12 333:23,24 334:9,12 336:18 337:12 341:15 347:2 357:5 362:14 376:15 385:12 395:18 401:2 426:3,17 428:20

**scopes** 382:20 383:15 415:11

**screaming** 317:18 318:3

**seals** 425:24

**season** 355:25

**seats** 405:12

**seconds**
413:4

**secretary**
328:21

**section**
386:24
387:3

**sections**
365:11
367:9

**segment**
409:10
411:6

**send**
307:1
354:6
378:11
390:24
391:3
393:4

**sends**
324:11
378:12

**Senior**
285:1
288:4,8, 15 289:24
290:4,7
291:10
297:9
311:20
313:16,20
315:11
317:13
320:22
321:15
367:22
376:7
386:14,18
426:19

**sense**
302:19
345:24
348:25
349:1

**sentence**
381:6

**separate**
289:11
302:13
333:10
383:14,15
415:12

**separating**
334:14
382:18

**September**
320:4
325:22,24

**sequence**
296:23
330:24

**sequencing**
365:7,12, 23 366:24
372:5

**Serinca**
298:5,8
425:13
426:12

**Serinco**
342:12,15

**served**
319:4

**services**
304:19
305:12

**session**
372:4

**set**
333:12
404:4

**sets**
384:6
393:2
404:14

**setting**
311:5

**setup**
320:23

**seventh**
313:1

**shaft**
317:8

**shape**
346:12
349:3
366:11,19

**share**
345:16,20
346:7,11, 16

**shared**
344:22

**sharing**
348:3,11, 25 349:1, 10,14

**sheet**
306:12

**sheetrock**
295:19
296:6,11
305:18
335:1,2, 3,24
341:8,9

**shop**
362:11
388:16
395:9,10
396:13
398:15
399:21
400:2,11, 13
401:16, 17,19
402:4,11, 17,19,22, 24 403:1, 6,12,14, 16,22
404:5,6, 14,20
405:2
406:3,12, 25 407:5, 10
417:15,16
419:14, 17,19
420:15, 20,25
421:3,13, 20,22,24
422:6,23, 25 423:2
426:22
427:1,8, 13,17,19, 20
428:13,22
429:3,5, 12,15

**shorter**
315:25

**show**
344:6,10, 11 370:6
371:5
372:13
374:3
391:2
404:6,15
417:21
418:9
428:22

**showed**
372:22
373:3

**showers**
335:18

**shut**
295:8,22
331:20

**shutdown**
295:16
316:21
319:6

**side**
297:8
299:1
307:17,18
311:20,22
316:1
368:8
402:21

**sideways**
351:21

**sign**
317:21
357:13
378:12
380:13

**signature**
377:13, 16,21
378:20

**signatures**
377:10

**signed**
286:5
333:14
336:16,17
356:7,23
357:1
358:9,21
359:1,7, 16 362:7, 16 363:3, 10,19
364:18
365:3

373:12,16 374:22 375:1,20, 22 378:15,18 379:2 382:14,21 383:10, 12,13,16 384:6,8 385:2,11, 19 391:22 392:2 395:11 398:4,17, 18 406:8 409:25 410:9,15 411:15 412:16 416:25 421:1,4

**signing**
355:9 373:10 374:10, 12,15,16 378:22 383:20

**similar**
333:21

**simple**
291:17 337:20,25

**simultaneously**
365:9,11, 20,25

**Singerman**
301:21

**single**
370:23 401:12

**sir**
301:9 308:14 355:6 361:1 380:25 414:8 418:5 419:1

**sit**
311:4,9 314:11 362:1 375:15 378:13 391:13 407:17

**site**
319:17 320:24 326:13,24 331:17 332:1 356:16,21 363:16 401:9 412:5 428:3

**sites**
352:23

**sitting**
313:6 315:15

**situation**
420:25

**sixth**
312:25

**skeptical**
359:2

**slab**
409:21

**slabs**
390:21

**slew**
327:21

**slow**
400:18

**Small**
338:18

**smoke**
408:21 409:1

**software**
300:24 305:21,23

**solid**
397:5,9

**son**
303:3

**sort**
291:17 294:22 300:6 316:20 331:13 336:14 351:14 390:13 393:7 428:15,23

**sound**
291:12 322:25 382:23

**sounded**
298:12

**sounds**
284:25 321:17

**source**
313:3,10 314:22 316:9

**South**
304:8,12, 14,19 305:14 315:6

**Southern**
296:15 401:1,4, 11,22 402:3,5, 10,16 403:3,11, 15,21,25 405:6,14, 17,21 406:6,7, 9,11,19

**Southwest**
342:2

**speak**
369:9 423:15

**speaking**
290:11 294:23 296:22 313:15 345:25 350:18

**specialize**
424:19

**specific**
303:14 314:12 324:22 354:25 360:14 362:2,5 371:3,4 382:25 398:5 401:21 410:8 411:18 412:24 414:3

**specifically**
285:17 303:11 355:16 360:10 363:1,25 383:22 410:17 416:20 418:10 419:22 425:10

**specification**
418:2 419:8

**specifications**
381:5 383:6 419:5,15 420:6 421:16

**specifics**
357:11

**specs**
419:17

**speculating**
379:16

**speed**
354:18

**spell**
305:8

**spelled**
302:8

**spells**
347:23

**split**
333:5 343:16

346:4 381:14 415:10 419:25

**splitting** 343:9 347:3

**spoke** 325:10 364:17 380:2

**spray** 408:15, 16,24

**spread** 306:11

**spreadsheet** 304:3,4 327:15 346:24

**square** 305:18

**stack** 366:9

**stacking** 367:12

**stacks** 365:16,24

**staff** 328:9 331:10

**stamps** 413:21

**standard** 360:18

**start** 284:13 294:23 321:12 330:11 331:11,17 360:7 366:25 367:25 368:19,21 369:6,10 370:14 371:14 375:24 376:2 381:8 420:25

**start-up** 361:21,24

**started** 296:8 297:21 298:9 330:17 331:7 350:3 355:13,22 367:11 417:17

**starting** 294:8 366:16

**starts** 420:20

**State** 284:3 424:11, 13,14,17 425:2 426:15, 16,21 427:1,4, 8,12,19 428:15

**statement** 354:20 381:12 388:6,24 400:23 403:18 404:17,22 405:3 410:19 415:4 424:3

**status** 306:5

**stay** 368:4 407:13 413:9

**stayed** 308:20

**steel** 387:22 390:12 394:14 400:1,5, 13,14 408:17

**step** 322:4 370:20

**STO** 358:10, 11,12,16 359:3,4 361:19 383:3 387:3

**STO's** 381:5

**stop** 295:4 319:6 327:24 409:1,11

**stoppage** 295:2 316:21

**stopped** 322:17

**stopping** 406:24 407:20,21 408:3,6, 10,13 409:5,6, 7,15 410:1,18 411:1 417:25 418:12 419:11 420:9 421:8 424:2

**storm** 304:7 305:13 308:4 313:23 314:13,18 320:16 326:20 327:2 330:25 332:4

**straight** 365:17

**street** 307:19

**strike** 287:15 288:7 324:13 341:15 349:6 357:21 371:15 378:5 395:11 399:6 401:1 402:3 404:10 423:23

**stripped** 340:8,25

**strong** 394:4

**studs** 294:16 340:9 422:8

**stuff** 292:13 298:16 302:23 307:4 317:4,8, 11,18 318:13 321:7 330:19 332:16 335:18 351:14 357:14 361:15

**subbed** 297:22 298:3 425:11 426:12

**subcontract** 376:6 377:1 378:9 382:4 383:2,20 386:18 407:18

**subcontract /sub** 374:17

**subcontract ed** 298:8

**subcontractor**
371:17

**subcontractors**
331:16
404:25

**subject**
400:17
411:4

**subjects**
284:13

**submit**
323:20,23
399:11

**submitted**
289:6
300:6
306:1
323:14

**subs**
341:17, 20,22
348:3
364:5,14, 25 368:10
392:3
411:6

**substantially**
333:20

**sued**
318:21
346:25

**suffered**
310:6

**suing**
338:9
339:6,14

**Sundayish**
320:5

**super**
377:6

**superintendents**
312:7
326:2,9
328:9

**supervising**
408:9

**supplied**
401:9

**suppliers**
342:19

**supposed**
289:4
290:3,4
318:10
323:14
341:11
366:24
367:25
368:1,20, 22 370:4, 22 371:19
372:8,19
373:12,13
380:10
384:18
385:9
406:24
417:13,23
422:5,13, 22 427:21

**surge**
331:22

**surrounds**
335:19,20

**suspended**
321:22

**sustain**
311:13
362:21

**sustained**
295:3
299:23
310:11

**switch**
405:12

**switched**
415:20

**sworn**
284:7

**SWS**
296:14
297:2,24
298:9

**synthetic**
335:21

**system**
319:11
324:10,18
325:9,15
327:25
354:22

**Systems**
296:15
401:4
402:3

**T**

**tab**
386:9,10

**table**
334:15

**takes**
293:14
305:18,21
352:14
403:15

**taking**
284:25
293:16
296:4
302:21
355:23

**talk**
284:19
285:3,19
291:21
293:21
296:13
302:16
353:3
355:7
356:2
362:8
364:15,24
365:2
367:8
371:13
376:13
380:23
411:22,25

**talked**
284:22,23
285:16
288:23
307:12
350:13
351:13
352:25
353:8,11
355:18
362:13
364:25
380:15
426:7

**talking**
288:2
289:10,22
291:6,7, 25 292:8
297:25
301:3
302:23
313:11,16
327:15
333:17
334:21
338:20
340:12
341:14
347:16
349:14
351:13
355:13
356:23
360:22
363:5,25
364:8
370:17
372:5
382:13
389:15
400:6,17
402:6
404:12
405:14
410:24
412:7
414:21
415:19
419:4,15
425:6
428:20
429:22

**talks**
348:11
391:11
419:22

**tangent**
292:22

**tape**
341:9
342:9

**tax**
362:19
364:10
373:24

**team**
364:12

**tear**
336:9
402:23

**Ted**
312:17
313:2

**telling**
293:20
339:20
353:12
354:6
364:22
371:17
380:6,20
384:24
389:8
397:12
398:19
399:24
402:10
403:4
410:17
411:14
421:17

**tells**
370:21
419:9
420:7
423:18

**tempers**
352:23

**temporary**
314:2,3,7
320:23
369:2

**ten**
416:13

**tenant**
300:1
329:21
330:13
366:10

**tenants**
317:9,12
322:7,9,
14,15
328:16,17
329:6,10
331:3
366:2,4
367:3
368:1,4,
14,22
369:5,16,
23 370:1,
4,13,22
371:3,19
372:7,18

**term**
310:17,19
408:3,5
413:21

**terminology**
410:23

**terms**
286:15
287:1,7,
21 289:14
294:13
348:14
360:9,15
362:4
370:17
391:18
412:6

**testified**
284:8
288:13
321:4
389:19
416:25
429:10,21

**testifying**
410:14
429:14

**testimony**
284:15,20
299:18
308:6
351:9
359:19
367:24
370:9,21
371:14
383:20
405:22
410:13
417:3
419:9,12
420:7
421:19
428:13

**text**
292:3
413:7

**thicker**
394:18

**thickness**
394:13

**thing**
304:11
319:14
329:19
341:6
344:13
391:14
398:12

**things**
299:22
301:2
304:1
316:2
318:11
324:5,16
325:17
331:20
353:3
361:12,15
376:14
408:14

**Thornton**
284:24
285:6,7,
10 286:20
288:2,11
289:23
292:13
293:16,22

**thought**
285:23
293:24
299:16
325:2,23
335:11
339:22
371:25
391:16

**thousand**
343:16

**threw**
300:3

**throw**
317:24

**thrown**
307:5

**throws**
322:16

**Thursday**
331:4
332:3

**tie**
346:14
419:13

**tied**
406:25
407:3

**tiers**
303:9

**Tight**
342:21

**til**
308:20

**Tile**
335:21

**tiles**
409:21

**time**
287:4
288:24
289:9,18,
19 290:20
294:7,17,
18 295:1
296:6,23
297:12
298:13
301:14
314:5
317:1
322:2
326:15
329:3,21
330:13,24
338:10
340:13,24
353:8,15
356:6
357:2
365:8,10,
18,19
374:5,6
379:17
382:13
391:12,24
392:2,11
398:18
411:19
413:19
417:15

**timeline**
294:13,24
298:12
316:19

**times**
375:10
413:15

**tired**
421:9

**titled**
376:15

**titles**
418:2

**today**
284:13,15 294:25 296:13 314:11 315:22 362:1 375:15 378:13 407:17

**told**
285:15 291:8 293:1,18 294:1 299:2,8, 11 300:9 313:21 318:4 320:25 325:2 330:18 344:2 352:1,2, 5,10 354:7 359:9,11, 17 361:20 362:18, 22,23 380:19 381:18 382:17 391:16 392:10,12 393:24 395:4,6 396:6,11 400:3 410:3 424:1 426:11

**tools**
381:3,9 384:5,19

**top**
313:6 315:15 366:21, 22,25 367:1 369:21 378:1,8 414:15,22

**topic**
351:16 364:2

**topics**
323:7 332:22

**tops**
366:12

**total**
311:25 312:2 350:12

**totally**
394:13 398:11 429:19

**tower**
294:19 313:19,23 325:25 386:19 387:25 400:22 417:22

**towers**
285:3 289:8,14, 15 290:5 291:9,10, 18 314:12 336:25 338:5 339:17,24 340:16 367:19 371:20 372:24 376:6,7 377:3 386:3 389:21 401:13 403:17 404:16 405:22 425:3

**track**
361:21

**trade**
325:10 370:19

**trades**
324:24 331:16 343:12 404:25

**trailer**
320:23

**treaty**
353:6

**truce**
353:4

**true**
308:8 339:8,18, 19

**truth**
307:25

**Tub**
335:19,20

**tubs**
335:18, 19,24

**Tuesday**
320:15 327:2,17 330:25 331:1

**turn**
326:6 368:7

**turned**
317:11 326:3,7,8

**TV**
318:2

**TV's**
318:13

**type**
319:5 348:22 349:3,18, 19 408:16 417:9 418:11 424:8

**typed**
348:15

**types**
394:14

**typically**
420:18

**U**

**Uh-huh**
316:5 387:11 406:15

**ultimately**
323:2,3 344:7 353:1 375:19 395:8 399:23 428:14

**ultimatum**
352:8

**underlings**
328:1

**underlying**
347:11

**underneath**
351:3 377:18

**understand**
285:4 288:4 291:7,16 292:5,23 293:2 296:3,5 298:18,20 299:17 308:7 314:7,19 315:21 316:20,23 321:1,22 324:16 326:18 333:1,7 335:4 336:13 339:13 340:2 341:13 344:15 350:10 355:5,6 359:22 361:11,13 367:24 369:15

370:16 371:13 382:7 383:9 385:2,12 387:10, 17,19 389:10,13 393:10, 15,17 396:14 398:18 399:14 402:9 403:11 409:14 410:13 412:23 415:20 417:3 418:4 419:12 420:10,24 421:13 422:20 428:19

**understanding**
286:7,11 287:19 290:11 297:4 298:10 309:20 316:23 322:21 323:13,16 324:19 336:24 337:6 346:3,15 348:12 350:2 361:3,8 368:20 369:3 376:5 384:6,8, 12 390:16 392:19 400:11 402:13 408:25 412:19 417:6

**understood**
347:12 359:19 366:15 383:14 385:21 398:19

**unit**
305:19 312:22 341:7 368:15

**units**
312:19 314:8 335:6 336:9,10 339:1,16 340:16,25 366:8 369:23 370:5,9, 23 371:3 372:8 373:7

**unoccupied**
367:9

**unpack**
417:19

**V**

**vacant**
366:8

**vaguely**
323:12 324:8 354:9

**vast**
323:19

**ventilation**
317:8

**verbal**
346:9

**version**
324:12 378:14

**versus**
387:15 398:7

**vertical**
365:16,24 366:13,23

**vertically**
366:20

**Vicari**
284:6,11 332:14 372:5 377:14 410:25 425:9

**video**
371:24

**visiting**
356:25

**visualize**
336:15

**Vito**
353:11 356:3,7 359:9,11, 13 361:25 362:3,8 363:4,12 364:12 388:14,20 389:4,18 393:24 395:8 396:11 398:9 410:6,7, 14,17 411:1,16 412:3,7

**voice**
403:3,9 404:19,24

**W**

**wait**
326:22 327:19

**waited**
326:15

**waived**
290:20

**waivers**
317:21 330:15 331:8,9

**waives**
287:17

**waiving**
287:10

**walk**
313:20

**walked**
325:25

**walking**
326:16

**wall**
296:15 341:12 381:5 383:5 401:1,4, 12,22 402:3,5, 10,16 403:4,11, 15 405:17 406:6,7, 9,19 425:17,20

**Wall's**
405:6,14, 21

**walls**
314:2,4,7 369:2

**wanted**
306:7 321:11,23 332:18 333:7 347:14 365:16 371:15,19 381:14,23 385:5 398:7

**wanting**
317:18 367:8

**warranty**
315:13

**water**
311:17 312:8,16, 20 314:14 315:10 317:7 329:12

**waves**
375:15

**ways**

309:14 408:17, 19,23

**Wednesday** 331:4 332:3

**week** 292:14,15 320:3,19 329:18 331:2,14 332:3,4,5

**weekend** 320:6 331:15

**weeks** 321:21 382:16

**west** 326:6

**wet** 317:9 330:21

**whatsoever** 308:1

**wife** 303:3

**window** 308:9,11, 13

**windows** 307:20 308:3 313:19

**wires** 328:5 329:13

**witness's** 377:21

**wool** 408:15,24

422:4,5, 13,22 423:7 425:4

**word** 295:15 300:13 307:19 308:7 385:8,16 410:21 411:2 412:12

**words** 287:24 299:6 305:17 415:22

**work** 284:25 286:24 288:14, 15,25 289:13,24 290:3,4,7 293:17 294:8,16, 18,25 295:2 296:15,17 297:6,18 298:7 316:3,21, 24 319:6, 8,13,25 320:25 321:5,10, 12,18,20, 23,24 323:2,3 327:7,24 331:11,17 332:19,25 333:5,10, 11 334:9, 10,11,13, 17,19 336:18,24 337:4,12 339:3,6, 24 340:9, 15 341:15,18 342:3 343:23 344:15 350:20 357:5 358:15 359:5,15 362:14 365:7,9, 10,11,20 367:25 368:21 376:15 382:20 383:15 385:12 389:7,11, 23 390:3, 7,8,23 391:5,7 392:14, 16,24,25 393:9,11, 13 395:1, 2 396:3, 8,12 397:16 398:1 401:2 404:8 405:23 407:21 410:4,18 411:6,7, 9,11 415:11 417:14 426:3,17 429:24

**worked** 286:5 402:15

**worker** 328:8

**workers** 317:1 329:6

**working** 286:14 304:23 329:19 343:25 368:5 400:20

**workish** 288:19

**works** 302:6 420:22

**worksheet** 323:14, 20,24

**workup** 300:14

**world** 396:2

**worried** 314:9

**worth** 299:10,17

**write** 314:24 358:10

**writing** 286:13,16 300:16 377:23 390:25 397:21

**written** 290:17 313:9 322:22 323:1 348:15 364:9 388:3

**wrong** 302:8 400:25 418:14

**wrongly** 339:15

**wrote** 417:18 419:2

**X**

**Xactimate** 305:20, 21,23

**Y**

**year** 285:23 290:13 293:25 295:9,10 362:19 363:2 364:10 374:25 391:23

**years** 360:18, 21,23 361:4,9, 14 422:2

**yesterday** 284:12,20 286:4

287:9
288:13,17
292:3
294:15
299:4
323:9
333:3
343:5
355:18