**In the Matter Of:**

PETE VICARI vs OHIO CASUALTY INSURANCE

1:17-CV-23733 CMA

**PETER G. VICARI**

*October 19, 2018*

ESQUIRE
DEPOSITION SOLUTIONS
800.211.DEPO (3376)
EsquireSolutions.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PETE VICARI GENERAL CONTRACTOR, LLC,
a foreign limited liability company,

Plaintiff,

v. CASE NO.: 1:17-CV-23733 CMA

THE OHIO CASUALTY INSURANCE
COMPANY, d/b/a OHIO CASUALTY, a
Foreign insurance company; COASTAL
MAINTENANCE & RESTORATION,
INC., a Florida corporation; COASTAL
PREFAB, INC., a Florida corporation; and
CRONIN ENGINEERING, INC., a Florida
Corporation,

Defendants.
___________________________________/

COASTAL MAINTENANCE & RESTORATION,
INC., a Florida corporation, and COASTAL
PREFAB, INC., a Florida corporation,

Counter/Cross/Third-Party Plaintiffs,

v.

PETE VICARI GENERAL CONTRACTOR, LLC,
a foreign limited liability company; CIVIC TOWERS,
LLLP, a Florida limited liability limited
Partnership; and ALLIED WORLD INSURANCE
COMPANY, a foreign insurance company,

Counter/Cross/Third-Party Defendants.
____________________________________/

VIDEOTAPE DEPOSITION OF PETER G. VICARI

Friday, October 19, 2018
10:15 a.m. - 2:56 p.m.

Esquire Deposition Solutions
44 West Flagler Street
Fourteenth Floor
Miami, Florida 33130

APPEARANCES:

Bruce D. Partington, Esquire
Keith Lamothe Bell, Jr., Esquire (Telephonic)
Clark Partington
106 East College Avenue, Suite 600
Tallahassee, Florida 32301

Counsel for Pete Vicari General Contractor

Guy W. Harrison, Esquire
Etcheverry & Harrison LLP
150 S Pine Island Rd Ste 105
Fort Lauderdale, FL 33324

Counsel for The Ohio Casualty Insurance Company

Anthony M. Lawhon, Esquire
Anthony M. Lawhon, P.A.
3003 Tamiami Trail North, Suite 200
Naples, Florida 34103

Counsel for Coastal Maintenance & Restoration, Inc., and Coastal Prefab, Inc.

Jeffrey M. Bell, Esquire
Banker Lopez Gassler, P.A.
1200 S Pine Island Rd Ste 170
Plantation, FL 33324

Counsel for Cronin Engineering, Inc.

Kelsey K. Black, Esquire
Jonathan P. Cohen, P.A.
500 East Broward Boulevard, Suite 1710
Fort Lauderdale, Florida 33394

Counsel for Allied World Insurance Company

ALSO PRESENT:

Robert Pacheco

- - -

I N D E X



| DEPOSITION OF PETER G. VICARI | PAGE |
|---|---|
| Direct Examination by Mr. Lawhon | 5 |



E X H I B I T S

DEFENDANT'S EXHIBITS



| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 324 | Project schedule | 85 |
| 325 | Photographs | 103 |



\- - -

Deposition taken before Cicely Moore, Florida Professional Reporter and Notary Public in and for the State of Florida at Large, in the above cause.

\- - -

THE VIDEOGRAPHER: We're now back on video record. This Disc No. 1. Today's date is October 19, 2018, and the time is 10:15 a.m. Would counsel please introduce yourselves and your affiliation, and the witness --

MR. PARTINGTON: Bruce Partington representing Pete Vicari General Contractor.

MS. BLACK: Kelsey Black representing Allied World.

MR. BELL: Jeff Bell for Cronin Engineering.

MR. HARRISON: Guy Harrison for Ohio Casualty.

MR. LAWHON: Tony Lawhon for Coastal Maintenance and Coastal Prefab.

THE COURT REPORTER: Please raise your right hand. Do you swear or affirm that the testimony you are about to give will be the truth, the whole truth and nothing but the truth?

THE WITNESS: Yes.

THE COURT REPORTER: Thank you.

THEREUPON,

PETER G. VICARI,

having been first duly sworn or affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. LAWHON:

Q. Good morning, Mr. Vicari.

A. Vicari.

Q. Vicari. My apologies. Good morning, Mr. Vicari. We are here to continue your deposition. Do you remember the rules that I gave you during our earlier session?

A. Yes.

Q. Okay. Are you okay following those?

A. Yes.

Q. Did you do anything to prepare for your testimony today?

A. No.

Q. Have you read the transcript of your earlier deposition testimony so far?

A. Briefly.

Q. Did you have any changes to any of that testimony or comments?

A. I think there's one so far.

Q. What would that be?

A. I don't remember. It's still sitting on my desk in New Orleans.

Q. Do you remember what the subject was about?

A. No.
Q. I had spent some time talking to your son about going through the licensing process with DBPR when I took his deposition, and much of his testimony, in my mind, seemed to direct me to you being in charge of handling a lot of talking to the lawyer and the process of gathering information. So I'm going to ask you some questions about the licensing, okay?
A. Sure.
Q. All right. My first question is: Given your experience in construction, why didn't you apply for the license?
A. Because of my age. I'm going to eventually pass the torch to my son.
Q. You're going to pass the?
A. Torch.
Q. Torch.
A. You know, retire soon, and then he can continue on.
Q. Did you and your son talk about who should apply for the license?
A. Briefly. I mean, it's our overall plan is when I retire, he can continue on. No different than when I did when my dad retired.
Q. Was there a plan to start doing more construction

in Florida?
A. Not really.
Q. So this was always contemplated to be just a one project in Florida?
A. For the future, if we would have gotten an invite to negotiate another job, we'd already have it. It's like I had before when Raymond was my qualifier.
Q. Were there any discussions with you and your son about possibly expanding into Florida around the time that you were thinking of working on this project?
A. Not expanding with a full-time office, no.
Q. Or how about even just taking more projects on after this one in Florida, was there a discussion about that?
A. No, unless it was negotiated with a client that we already worked for.
Q. One of the -- one of the apartment complexes that your son talked about were the Sugarmill Apartments, and I think you and I talked about those briefly during your deposition. Do you remember those?
A. Briefly.
Q. As I recall it, those apartment complexes were damaged by Hurricane Katrina?
A. Yes.
Q. And you guys came in to do the renovation and

repair work from -- resulting -- the damage resulting from the hurricane; is that right?
A. Yes.
Q. Okay. Were there -- were there any buildings that were completely destroyed?
A. In what sense "completely" means?
Q. Down to the foundation?
A. No.
Q. Okay. Were there any that were partially destroyed?
A. Yes.
Q. Where you had to build up walls or any of the concrete -- any of the masonry work?
A. A lot of them their roofs blew off, not just deck, roof framing, so the ceiling of the third floors were just open to the air.
Q. How about any of the -- the rest of the structure, other than the roof and the framing, did any --
A. It all got wet.
Q. It got wet?
A. Because the roof framing blew off and it rained all the way down.
Q. So you basically had to gut the -- all the inside?
A. In some of the buildings, yes.

Q. And what did that look? I mean, did we gut it down to studs, or did you actually like take all the studs out too and just gut it down to a shell?
A. Gutted down the studs and then treated the studs for mold.
Q. Before your son decided to apply for his certified general contractors license in Florida, did you do any homework, research, or investigation about the requirements for that license?
A. I think my wife went online to just see what the requirements were and how to go about applying. I didn't specifically go online and look. I think she did.
Q. Did she talk to you at all about what he found?
A. Yeah.
Q. Was there any discussion about what the eligibility requirements were in order for him to receive a certified general contractors license?
A. Yes.
Q. Okay. And what did you discuss?
A. I think she might have made contact with -- the first thing we had to do was to get a registered agent and someone that could handle the application, and I think she -- I don't know the name of the company, but it was Jackie. You know, you all have already taken that deposition, whatever that company is. And she -- my wife

was confused, and I kind of a little bit was also. So Jackie referred us to David Bryant, who's an attorney, to help prepare the application.

Q. And we'll come to Mr. Bryant in a little while. I want to take it in little pieces because there was some work and some communication back and forth with Jackie. Her name is Jackie Farris. Does that sound right?

A. Yeah. I just know Jackie. If her name is Farris, okay.

Q. Before we get to Mr. Bryant, let's talk about Jackie Farris a little -- Farris a little bit. You said you were confused. What were you confused about?

A. The -- some of the -- the forms, the way they had it, the way the questions were asked, didn't make sense to me.

Q. One of the particular questions was whether or not you had engaged in new construction of four stories or higher. Do you remember those -- that question or that issue?

A. Vaguely, yeah.

Q. Okay.

A. The four story higher question.

Q. Did your wife do any research or investigation about what it meant to be four stories or higher before you got Jackie involved?

A. You'd have to ask her that.
Q. Did she discuss it with you at all?
A. Vaguely.
Q. What did she say?
A. Because she had discussions with Jackie between themselves, and she'd come tell me and say, well, you know, Jackie's referring to -- to do something in a certain way, but she's not sure. But she wanted to -- she's not an attorney, and she wanted us to get -- talk to an attorney.
Q. Do you remember -- did you talk to your wife at all about the distinction between renovation work and new construction?
A. Yeah.
Q. Did your wife tell you that renovation work didn't count to make your son eligible for a certified general contractors license?
MR. PARTINGTON: Object to the form.
BY MR. LAWHON:
Q. Strike the question.
Was there any discussion with your wife about whether or not renovation work allowed your son to secure a certified general contractors license?
A. I think there was, but there was the new construction within a year, one project had to be within a year or -- or a 12-month period or something like that,

that it would meet the requirement.

Q. If it was renovation work or if it was new construction?

A. New construction.

Q. Did you understand from your wife's conversations with you that renovation work did not count for making somebody eligible for the certified general contractors license?

MR. PARTINGTON: Object to the form.

A. Not from her, because that happened -- all that discussion happened between Jackie and Barbara and very little with me. And then we right away got David Bryant on the phone, and all those discussions you're talking about happened with him with me.

BY MR. LAWHON:

Q. Okay. And I'll come to Mr. Bryant. I just want to know what you -- what you understood before you started talking to Mr. Bryant and what issues came up that confused you. So that's what I'm trying to nail down a little bit here. So there's two issues I have. One is the four stories or higher, and the other is new construction versus renovation work. So let me focus -- let me stick with the renovation work versus new construction.

My question for you is: Before you got on the phone with Mr. Bryant and started talking to him, did you

understand whether or not renovation work counted to make somebody eligible for a certified general contractors license?

A. I don't think so, because the distinction was about the four story and higher. That's what the emphasis was.

Q. Before you started talking to Mr. Bryant, had your wife told you that she was learning from Jackie Farris that four stories or higher meant four floors of construction, not 4 -- 40 feet or height by feet?

MR. PARTINGTON: Object to the form.

A. No.

BY MR. LAWHON:

Q. Okay. Did your wife talk to you at all about what four stories or higher meant or had been interpreted to her before you started talking to Mr. Bryant?

A. Not specifically with her. She was struggling with the form itself. It wasn't clear.

Q. We marked some exhibits from during your son's deposition, and so I'm going to go over a couple of those with you right now. Take a moment to look at the exhibit you have in front of you, and let me know when you're done.

MR. BELL: Can you identify that number, please?

MR. LAWHON: 303.

MR. PARTINGTON: Yeah, it's Exhibit 303.

MR. BELL: 303.
A. Okay.
BY MR. LAWHON:
Q. Have you seen this before?
A. No.
Q. Okay. The -- there's an e-mail exchange in this Exhibit 303 between your wife and Jackie Farris on August 24, 2016, and I just want to direct your attention to Jackie Farris's response at the bottom there. It says, "Were all of these projects new construction? If any of them were renovation work, the processor will not give time for renovations unless it was an addition. Only new construction work will be considered." Do you see that sentence?
A. Yes.
Q. Is that something you talked to your wife about, new construction versus renovation work?
A. As I said earlier, it was not clear, and she was struggling with the how you separate it, and that's why she referred us to David.
Q. And that suggests to me that because -- well, strike that.
That suggests to me that you had a conversation with your wife about renovation versus new construction because she was confused. So am I --

A. Just briefly. Just briefly. I was busy at the time on other projects, and I said, "Well, you got to figure it out." And right away, Jackie gave her David Bryant.

Q. The next exhibit I want to show you is 304. Take a moment to look at that. Let me know when you're done.

A. Okay.

Q. Have you seen that e-mail before?

A. No.

Q. The -- it's the same day as the one from before, it's just a little bit later, and Jackie Farris is responding to a question that your wife asked. She says, "He has more than plenty of time if all of the projects you had listed was new construction or addition work." Do you see that?

A. Yes.

Q. Okay. You don't remember if she talked to you about that on August 24th?

A. Huh-uh.

Q. Okay. I think this is Exhibit No. 305. Take a moment to look at that. Let me know when you're done.

A. Okay.

Q. Have you seen this e-mail before?

A. No.

Q. All right. Did you read it?

A. I'm reading it now.
Q. Oh, okay.
A. Perused it. I didn't read every word. Okay.
Q. Did you understand what you read?
A. Yeah.
Q. Okay. The -- is it fair to say that the gist of this is that without four stories of new construction, any project is not going to qualify for a certified general contractors license? Is that what you read?
A. It's what I read, but I'd have to -- how do I say this and be nice? Found out later that Miss Jackie doesn't really know what she's doing.
Q. How'd you find that out?
A. From the attorney that represents many contractors in the board. He had to clean up a lot of mess she messed up.
Q. Which attorney is that?
A. Fred Dudley.
Q. Mr. Dudley told you that Miss Farris doesn't want what she's doing?
A. Yeah.
Q. When did he tell you that?
A. When he -- when he started representing us in front of the -- I mean, I don't know what department -- the administration, whatever the hearing was.

MR. PARTINGTON: I'm not going to let him go any further than that. To the extent you want to ask about communications with Dudley, just -- I don't know whether that -- we had that in the same discussion we had the other day.

MR. LAWHON: We did; although, now what I think you're suggesting is a partial waiver is okay.

MR. PARTINGTON: No, because that doesn't relate to the substance of the administrative proceeding. That was just -- this is just conversation he had. Every conversation you have with an attorney is not necessarily privileged. But I don't believe that particular communication would fall within the privilege anyway because it's just random general discussion. It doesn't relate to the substance of the -- of the specific licensing proceeding. So everything else would fall within our discussion the other day.

MR. LAWHON: Not sure that I agree just yet, but let me ask a couple more questions here.

BY MR. LAWHON:

Q. This conversation that you just mentioned that you had with Mr. Dudley about Jackie Farris, I think I said when was it? Can you give me like a date or a time or how early on in the representation it took place?

A. No.
Q. Was it over the phone or was it in person?
A. Person.
Q. Where was it in person at?
A. His office.
Q. His office where, in Tallahassee?
A. Yes.
Q. How many times did you go up there to visit with Mr. Dudley in person?
A. Once or twice.
Q. Months or dates of when you did that?
A. I don't remember.
Q. Was at least one of the times very early on when -- well, strike that.
Was one of the times when Mr. Dudley had already been retained or when you were interviewing him to consider hiring him or his firm?
A. I think it was after he'd been retained and after coastal made all those complaints. So you can pick a date.
Q. When you say "made all those complaints," when the administrative complaint was actually -- or the complaint was actually lodged against the license?
A. Right.
Q. So you think you went up two times, one early on after he was retained and one after Coastal had already

complained about the license?
A. I think it was only one time I went to his office.
Q. Which -- so only one time. Who was present with you?
A. My wife and my other -- another attorney.
Q. Who was that attorney?
A. Keith Bell.
Q. And this conversation took place in Mr. Dudley's office?
A. Yes.
Q. What was the purpose for having the meeting?
A. To discuss the complaint.
Q. Did anybody else participate in the meeting, whether maybe conference call by phone, or did somebody else come into the meeting later on, anything like that?
A. I think there was one other person, I don't remember his name, but he used to be a board member of the -- of the -- what is it D -- the contractors board.
Q. Construction Industry Licensing Board?
A. Yeah, somebody Mr. Fred got as an expert. I don't remember his name.
Q. It was a gentleman as opposed to a female?
A. It was a gentleman.
Q. Do you remember the first or the last name?

A. I do not.
MR. PARTINGTON: And it's the same person we discussed the other day.
BY MR. LAWHON:
Q. So what else was discussed during this meeting?
A. The whole application.
Q. When you say the whole application, did you actually sit down with the application itself and go through it?
MR. PARTINGTON: So I'm going to stop it here because now you're getting into the substance of the communications between attorney and client, which is privileged and what we said the other day, I was not going to permit them to answer. So you can -- we can go through it question by question, and I can say object and instruct him not to answer, or you can just consider that I will -- I will give that instruction to any question that you asked about the substance of that meeting or any other communications and move on to another topic.
MR. LAWHON: So your position is that he -- by disclosing the commentary about Jackie Farris during the course of this meeting while they're meeting about the administrative complaint, that's not a waiver of the privilege? That's your position?

MR. PARTINGTON: That's my position, absolutely, for the reasons I said whenever it was, about 10 minutes ago.
MR. LAWHON: Well, I'm just going to reserve the right to come back to that one, because I think it's a waiver and we may have to argue about it.
BY MR. LAWHON:
Q. I want to come back to this e-mail here because we got a little ahead of ourselves. And did you read at the bottom of the e-mail, Jackie Farris is essentially recommending that your son apply for a certified building contractor license, not a certified general contractor? Did you see that?
A. Yes.
Q. Did you understand the difference between the two back then?
A. Yes.
Q. What do you understand the difference to be?
A. Today, I understand the difference is certified building contractor could do the job, this particular job, because we were not altering the structure.
Q. Where did you get that understanding from?
A. It's in the --
Q. I'm sorry?
A. It's in the statute. It's in there.

Q. Did you actually go read the statute or the regs and find that out yourself?
A. Yes.
Q. How did you know where to look?
A. I think my wife maybe went online or something later after all these complaints were filed and we started reading into it, and I actually pointed it out to Mr. Fred Dudley after.
MR. PARTINGTON: I don't want you to say anything else about communications with Fred.
THE WITNESS: Okay.
BY MR. LAWHON:
Q. And if I understood what you just said, a certified building contractors license was sufficient to work on Civic Tower and Civic Tower Senior, the entire scope of the prime contract, because you didn't alter the structure; is that what you said?
A. That's correct.
Q. So back to my question then, other than -- well, other than the -- reading what you read, did you do any other research to determine whether or not PJ should be applying for a certified general contractors license or a certified building contractors license?
A. At that point we were represented by David.
Q. Do you think you were represented by David by

August 30th?
A. It was before the application went in.
Q. Before it went into DBPR?
A. Yes.
Q. Okay. So that was September 6th or so. So you think David Bryant was hired before that date?
A. Look at his check date.
Q. Look at his what?
A. The check date, the date that we sent him a check. That would probably initiate the representation.
Q. Was there a written agreement signed with Mr. Bryant?
A. I don't remember.
Q. Is the date of the check the date that he was hired?
A. It would be the date that -- either day before or the same day that I talked to him, when I first talked to him about handling the case.
Q. How soon after you talked to him about handling the case did you send him a check? Like a day later? A week later?
A. I don't remember.
Q. How did you find Mr. Bryant?
A. From Jackie.
Q. So Mr. Bryant was hired because -- did Jackie

recommend hiring him, or did she just -- did you ask or your wife ask for a name of an attorney because you didn't -- you were confused by what Jackie was telling you?

A. She recommended to -- I think there might have been a call -- one call where I was on after all of this with Jackie, and she recommended David Bryant because she wasn't quite clear, and she says you really ought to hire David Bryant because he does a lot of this representation for people that do licenses.

Q. Is that a call that you and your wife were on, like a conference call with Jackie?

A. I believe so.

Q. All right. Other than that call, did you speak to Jackie directly yourself, or did your wife do all the communicating?

A. She did it all.

Q. Did you ever e-mail or text Jackie or communicate with her in any other way?

A. I don't think so.

Q. So, so far, if I understand you correctly, there's only one time that you communicated with Jackie Farris at all, and it's this phone call that you just identified?

A. Yes.

Q. What else from that phone call do you remember?

A. Nothing. It was just very -- it was very brief.
Q. Before Mr. Bryant was hired, did you participate in drafting or preparing information that went in the DBPR application?
A. Briefly.
Q. Who found all the projects that went in there?
A. I think we kind of all did.
Q. What was your role?
A. Just quickly look through our master log of jobs and point out which ones I thought qualified. PJ did the same, Barbara did the same. But it was mostly her because she -- she does all the licenses stuff.
Q. Barbara does all the licenses?
A. Uh-huh.
Q. If I -- if I show you Exhibit 302, ask you to take a look at that, and I'll represent to you that is a draft or at least the first application. And while you're perusing it, if you would be so kind to look at page 14 of 24.
A. Everything's 5 of 24. Where's the 14?
Q. It'll -- it'll be farther back.
A. Okay.
Q. Do you recognize the signature you see there?
A. Yes.
Q. And it's dated August 23rd of 2016, do you see

that?
A. Yes.
Q. Before August 23rd of 2016, did you type or prepare any of the information that's in this application?
A. No.
Q. Was that your wife, your son, or both of them?
A. Probably -- Barbara would do all the typing, and some of the handwritten notes is her signature.
Q. Her notes or her signature?
A. Her notes. No, her notes is in her handwriting. I just seen on one page.
Q. Did anybody else provide information for this application?
A. Other than us three?
Q. Correct.
A. David Bryant.
Q. Well, this is August 23rd of 2016. You think Mr. Bryant is hired by that date?
A. I just don't know what -- is this the one that went into the licensing board?
Q. If -- if that will help you --
A. I don't remember the dates.
Q. That's -- this is Exhibit 307, and there's a date stamped on the top of that, and I'll represent to you I believe that's the one that was submitted to DBPR.

A. September 8th? Is that right?
Q. 8th, 6th, something like that.
A. Whatever. I can't make it out.
Q. It doesn't matter. Somewhere between -- so my question is: Was Mr. Bryant hired before August 23rd, or was he hired between August 23rd and September 6th or 8th, if you know?
A. I don't remember. Look at the check dates.
Q. Did you -- do you remember specifically any particular projects that you assisted in identifying or locating that went into either Exhibit 302 or 307?
A. Yes. After a discussion with David Bryant, I pointed out one.
Q. Which one is that?
A. The Midship project, which was new construction.
MR. BELL: I'm sorry. Which project?
THE WITNESS: Midship.
BY MR. LAWHON:
Q. And if you look at Exhibit 302, so that's the first draft of the application, you'll see on page -- I guess I'll call it the first page 5 of 24, you'll see the Midship Marine project identified there. Do you see that?
A. Yes.
Q. So this is already on the application as of August 23 of 2016?

A. Uh-huh.
Q. Do you think it made its way to the application as of August 23 of 2016 because you told Mr. Bryant about it and it was added by that date?
A. Not sure, but there was one that we pointed out that was new construction.
Q. Other than Midship Marine, is there anything else that you did to contribute to either Exhibit 302 or Exhibit 307?
A. There's another application that's missing.
Q. What would that be?
A. Well, there's one where Midship was pointed out as a equivalent height.
Q. And I'll represent to you that that was submitted to DBPR as a supplement --
A. Okay.
Q. -- after where we are right now.
A. Okay.
Q. So we're not that far down the road yet. I'll show that to you a little bit later.
A. Okay.
Q. So back to my question: Is there --
A. No. The answer is "no" here on this question.
Q. Before September 6th or 8th, whatever that date is there that the application submitted to DBPR, did you

personally do any research or homework to understand what four stories or more in height meant?
A. No.
Q. Did you discuss that with Mr. Bryant?
A. Yes.
Q. Before the application had been submitted to DBPR or after?
A. Whenever Mr. Bryant was hired. I'm -- you got to put all these dates together.
Q. All right. So we'll put the dates aside for a minute. But the -- was it in your first conversation with Mr. Bryant that you discussed with him four stories or higher and what that meant?
A. Yes.
Q. Tell me about that conversation.
A. I was little bit confused on that statement four stories or higher, and when I got with Mr. Bryant, when I was referred to him and we sent him all the application and he looked at it, we had another conversation, and that's when he clearly said four stories or higher. So normally, a four-story building is 40 feet. So you built a building over 40 feet? I said, yes, sir. And that's how this got in.
Q. He didn't say anything about four floors being four stories or higher, he just told you you can go by

feet?
A. The footage.
Q. Was this a conversation you had with him in person or by the phone?
A. On the phone. And he wanted me to send him pictures of the buildings that we talked about, mostly all of them. We did and I think he called back -- we overnighted pictures, and he called back a day or so later, and he confirmed that that's how we should fill it out.
Q. When you say he confirmed, who talked to him, you or your --
A. I did.
Q. -- or your wife?
A. I did.
Q. Did you ever go visit him face to face?
A. Never met the guy.
Q. How many conversations in total do you believe you had with Mr. Bryant?
A. Three, four.
Q. Did anybody else participate in those talks besides you?
A. I think Barbara might have on one of them.
Q. Did you ever e-mail him?
A. Maybe once or twice.
Q. Did Mr. Bryant ever provide you with a statute or

some authority or anything that he was relying on for him supposedly telling you you go by feet, not by floors?
A. I don't think so.
Q. Did you ever ask?
A. No.
Q. Did he ever give you a written opinion that four stories in height meant feet, not floors, or anything to that effect?
A. I don't think so.
Q. Did you talk to Mr. Bryant about the distinction between renovation work and new construction?
A. I don't specifically remember any, no. He had all the pictures.
Q. I'm sorry?
A. He had all the pictures, so he could see it. I don't think there was a discussion about that.
Q. Unless the pictures -- were the pictures of completed projects or in the midst of construction?
A. Completed.
Q. Can somebody tell whether that was a renovation job or new construction by looking at a completed picture?
A. If he was looking at the form, and -- and we might have had some discussion which one we were -- I don't remember all the details, but he had all the pictures that he was looking at. And then we sent to blow them up and

prepared for the hearing at the board.
Q. How many times did you talk to Mr. Bryant about what it meant to engage in new construction four stories or higher?
A. I don't remember.
Q. Was it more than one time?
A. I have no idea.
Q. If I understand correctly, the Midship Marine project is only one -- one -- strike that.
If I understand correctly, the Midship Marine project only has one floor; is that right?
A. Yes.
Q. Did you ever discuss in any more detail with Mr. Bryant what the definition of a story was?
A. No. No.
Q. Show you what we marked before as Exhibit No. 317. Take a moment to look at that. Let me know when you're done.
A. Okay.
Q. Have you seen that letter before?
A. I think so.
Q. Okay. So I think before when we were talking about Midship Marine, you had pointed out that you thought there was a reference in the application to the equivalent of six stories or equivalent of stories.

A. Yes.
Q. Did I understand your testimony?
A. Uh-huh.
Q. Okay. So let me have you sort of start at the beginning here. In the application that's Exhibit 302 --
A. Okay.
Q. -- find the first page 5 of 24 and the reference to Midship Marine, and how does it identify the Midship Marine project?
A. 70-foot tall -- 70-foot tall structural steel building.
Q. Okay. And then in the application that was actually submitted to DBPR, which is Exhibit 307, I think, what does it say in that location for Midship Marine?
A. Same thing.
Q. 70-foot tall?
A. Yeah.
Q. Okay. And so now, come to the letter that you got from DBPR that we were just looking at and go to the first page of the letter, the letter itself. Do you see where it says, "Midship Marine must reflect stories not feet. Please revise"?
A. Correct.
Q. Okay. Did you see that when you received the letter?

A. Vaguely. I think so.
Q. Did you discuss that specifically with Mr. Bryant, that you had to make -- that you had to represent to DBPR how many stories the building was, not the feet?
A. And he told me to put equivalent to six stories.
Q. He told you to write that language into the -- or put that -- that into the application?
A. Yes.
Q. Okay. And who actually typed that in or made that change?
A. Barbara probably did.
Q. So you would have told her to do that?
A. Yeah. She might have been on the call with us. I don't remember.
Q. Did you ask him any questions about the distinction between stories and feet, or you just did what he said?
A. He was my -- he was the attorney.
Q. The -- I know this letter is addressed to your son. Do you remember how it was received? Mail? Fax?
A. No.
Q. Do you recall going over it with your son?
A. Briefly. Not with PJ. Probably Barbara.
Q. Did -- not with PJ, but with Barbara?

A. Uh-huh.
Q. Is that a "yes"?
A. Yes.
Q. Do you remember talking to Barbara about the difference between the number of stories and the number of feet of a building?
A. No, not with her.
Q. So after you get this letter, is the first thing you do is call David Bryant and talk to him about it or what happens next?
A. Probably.
Q. Were there any other changes made to the application?
A. I'm not sure.
Q. So I do see on the package that you have now, or the September 20 -- Exhibit 317, it has a project that wasn't on any of the other applications, which is the Lafayette auditorium. And it should be --
A. Correct.
Q. So how did that make its way on to the supplement to the application?
A. By representation of the attorney.
Q. What do you mean by that?
A. Well, he was discussing heights, show us buildings that are higher.

Q. He told who that?
A. Me.
Q. So how did you come across the Lafayette auditorium?
A. Because it was a building we had finished.
Q. Did you tell him that or did you go do research? Did you remember it during a call? How did it come up?
A. I think that one was right -- we were winding it down right as it all happened.
Q. Winding what down?
A. Completing it.
Q. Do you believe you were in -- do you believe you were working on that project while the application was getting processed?
A. It was being -- it was in the substantial completion stage.
Q. Why wouldn't it have been on one of the other two drafts we just talked about?
A. I don't know.
Q. Did you discuss with Mr. Bryant specifically the Lafayette auditorium?
A. Uh-huh, yes.
Q. What was discussed exactly?
A. About the height.
Q. What was he told about the height?

A. That it was -- it was -- if you would compare that to a one story, it was much taller. So it was equivalent to a four-story building.
Q. How many floors does it have?
A. Has one.
Q. Now showing you Exhibit No. 308, and it consists of several pages, so just go ahead and look through those, I think it's four or five pages, and let me know when you're done.
A. Okay.
Q. So let's start with the first page. Do you recognize this document?
A. Yes.
Q. Tell me what it is.
A. Looks like the permit for Midship.
THE COURT REPORTER: Looks like what?
A. The permit for Midship Marine, to be specific.
BY MR. LAWHON:
Q. Is the contractor information, the address, and the state license number all accurate for PVGC?
A. Yes.
Q. Who would have filled this out?
A. Don't remember.
Q. Do you see under "Pete Vicari," under the name of the contractor it says "1," dash, story, "STY open shed"?

A. Vaguely. It's really -- can barely make it out.
Q. I understand it's a little -- but I -- I see "1-STY." Do you see that?
A. It's a bad copy of mine. If that's what it says. I can't make out the "1." I see "STY."
Q. You see the "STY"?
A. Yes.
Q. Do you see in the box down here where it says "square feet per floor"?
A. Yes.
Q. There's a reference to just the first floor and it says "at cost"?
A. Yes.
Q. Okay. Do you know why this application would refer to this building as a one-story building?
A. I have no idea.
Q. Would you have been -- do you have reviewed and approved of permit applications before they were submitted?
A. No.
Q. Did you ever think that was required, or did you trust your supers or project managers or whoever is submitting them to submit to the jurisdiction accurate, complete information about projects?
MR. PARTINGTON: Object to the form.
A. The plan reviewer would do most of this work,

would fill out all of this. This is the plan reviewer's signature.

BY MR. LAWHON:

Q. On the bottom left side?

A. Yes.

Q. Whose signature on the bottom right?

A. I think that's Bernard Crump.

Q. That says "Owner or Agent"?

A. "Approved by."

Q. Yes. But to the right of it over here --

A. I have no idea.

Q. -- it says "Owner or Agent."

A. I have no idea who that is.

Q. You didn't have a policy or procedure at this time to require that you personally look at and approve or review permit applications, did you?

MR. PARTINGTON: Object to the form.

A. No.

BY MR. LAWHON:

Q. If you turn to the third page of Exhibit No. 308, can you let me know what that is, please?

A. Looks like the permit for St. Bernard Parish.

Q. Is the contractor information and address accurate for PVGC?

A. At this time it is.

Q. And underneath the address, it identifies the height of the building as 34 feet. Do you see that?
A. Yes.
Q. And the number of stories right next to it, do you see the number of stories there?
A. Three.
Q. Okay. Was that accurate information?
A. I'd have to look at it, but I don't think it is.
Q. What do you think it should say?
A. I think it -- I consider it to be four.
Q. Why would you consider it four stories?
A. If you give me a picture, I'll show you.
Q. Here's Exhibit 312. It's several pages. First, let me know if you recognize the pages, the photographs that are depicted there?
A. Yes.
Q. Tell me what that is.
A. It's the -- that's the -- I don't remember seeing it -- I remember the building from this direction.
Q. There are other -- there are other pictures if you'd like.
A. This is St. Bernard, the project.
Q. All four of them?
A. Yes.
MS. BLACK: Are we at a good place to take a

break anytime soon?
MR. LAWHON: Just a few minutes. You okay?
THE VIDEOGRAPHER: (Nods head.)
BY MR. LAWHON:
Q. Okay. So is that -- is that the building that PVGC worked on that's depicted in the permit application for St. Bernard we were just going over?
A. Yes.
Q. Okay. So tell me why that's -- you think that's higher than a three-story building?
A. Can I ask who took these?
Q. I don't know who took those, but that is the building, right?
A. Yes.
Q. Okay.
A. There's another floor on top of that roof.
Q. Describe the floor for me.
A. Let's call it a penthouse. It sit -- it doesn't sit even with the edge. It's back further. So you could see that the picture was taken up like this. If they would have went further back and took a picture, you'd see another floor up there.
Q. Is that penthouse depicted in any of the pictures you have there?
A. No.

Q. Square footage-wise, how big is it?
A. I don't remember.
Q. Was it already there or did you build it new?
A. We had to redo it. This building was flooded and severely wind damaged from Katrina. This building was flooded, full first floor.
Q. So up 10 feet?
A. Eight.
Q. Okay. The --
A. You have one, two, three, and I considered that the fourth one up there.
Q. And when you say you had to redo it, so there was a structure, there are walls and a ceiling over -- that make up the footprint, if you will, of the penthouse that you've called it, right?
A. Right.
Q. Okay. Were the walls still there?
A. We had to redo them all, take them all off, start all over rebuilding them.
Q. Interior as well?
A. Everything.
Q. And how -- is it like a studio apartment size? Is it the size of this room?
A. It's about three times this size.
Q. And what went in that room?

A. I think there was one part of it was mechanical equipment, and then there was some office something up there.

Q. Let me show you Exhibit No. 311. Have you seen that before?

A. No.

Q. The -- the first line underneath the photograph says "St. Bernard Parish, LA, March 27, 2009." Is that -- does that date sound familiar?

A. I don't -- I'm not -- I -- I don't even know what this is. I haven't seen it before.

Q. There's a description of damage to the St. Bernard Parish Government Complex. Is that what that building is that's shown --

A. Yes.

Q. -- in the photographs?

A. Uh-huh. Yes.

Q. It says, "A 12-foot high storm surge swept debris into the meeting room, contaminated masonry walls, and damaged wood floors, metal doors, windows, and blinds." Does that sound like the damage that you saw?

A. This is incorrect.

Q. What's not correct about it?

A. It didn't have a 12-foot storm surge.

Q. Okay. How high was it?

A. About 8 foot.
Q. 8-foot, okay. Regardless of the size of the storm surge, is that the damage that you folks had to remediate and renovate? It was from a storm surge; am I understanding that?
A. It was much more than -- much more work than what they just pointed out.
Q. The next sentence says, "This two-story government complex consists of a two-story main building and a single story meeting hall." Is that an accurate description of the building?
A. No.
Q. So this is wrong, and when you say it's four stories, you're right? Am I --
A. No. If you look at the permit it says three stories.
Q. But you called it four stories?
A. And I called it four stories. Because I don't know who did this. The parish would have done this permit. It's their own permit.
Q. For your construction?
A. Uh-huh.
Q. Okay. Yes?
A. Yes.
Q. And so when they say it's 34 feet in height, you

think that's wrong?
A. I think it is.
MR. LAWHON: We can take a break.
THE VIDEOGRAPHER: Going off video record 11:11 a.m.
(Brief recess.)
THE VIDEOGRAPHER: We're now back on video record 11:33 a.m., Disc No. 2.
BY MR. LAWHON:
Q. Mr. Vicari, we were talking about the St. Bernard Parish complex, and I just wanted to clarify something I thought you said. Looking at the permit information, which is part of Exhibit No. 308, I did notice that the information is typed. Is -- was it common practice then for the government to input all that information and type it in, or would PVGC have done that?
A. In Louisiana we don't do them. The owner or the architect does them.
Q. Fills in the information that goes into the permit?
A. They do all the application. We just show up and pay the fee.
Q. There's a signature at the bottom where it says "Contractor Signature." Do you see that?
A. Yes.

Q. Do you know whose signature that would have been?
A. It's none of our people.
Q. Do you know why they would have signed on the contractor's signature line?
A. Normally, like I say, the owner would do the process or the architect. That way when it comes time for bid, whoever is the low bid, the permits were already done, completed.
Q. How many different floors are in that building complex?
A. In this one, I think it's four.
Q. What's on the first floor?
A. Office.
Q. Offices?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. Okay. What's on the second floor?
A. Office.
Q. How are the offices different?
A. It's a government complex. There's many offices.
Q. Well, I mean, one could be for the building department, the other could be for taxing authority.
A. There's many departments in there. I can't tell you who's in there.

Q. Have you been in the building before?
A. Yeah.
Q. After it was completed?
A. There's no signage up. We didn't -- all we did was put the offices back. They came in later and identified what departments were.
Q. The -- what are the -- what are the floors composed of, are they concrete, are they wood or --
A. I think it's concrete.
Q. Did you guys install the floors or were they already there?
A. They were there.
Q. So offices on the first floor, offices on the second floor. Well, let's do this. Do you have the picture?
A. Yes.
Q. Okay. So what I'm looking at here is the first page, the first picture of Exhibit 312, and see these pillars out front?
A. Yes.
Q. Okay. So from the bottom of the pillar to the top of the pillar, is that one floor?
A. Yes.
Q. Okay. And then above that I see windows.
A. Yes.

Q. Is that the second floor?
A. I think that's part of second and third.
Q. What do you mean by that?
A. It's split. There's one, two, three. The third floor is the parish president's office.
Q. Is that the only thing that's on the third floor?
A. Half of that whole wing is the parish president. I think the other half is the council's office.
Q. And then you consider the -- what you call the penthouse to be the fourth floor?
A. Yes.
Q. And just so I'm clear, did PVGC build any of the flooring materials on any of the floors?
A. The penthouse. It sustained heavily wind damage.
Q. Is the floor of the penthouse the actual flat roof of the third floor?
A. Yes.
Q. Did you have to create a floor for the penthouse, or was it already basically using the existing roof for the third floor?
A. The floor was there. The walls and roof and all was blown away.
Q. And the exterior superstructure there that you're looking at in the pictures there, did PVGC have to build any of that new, or was that already intact and you just

did interior renovations from the storm?
A. I think we did some -- we did some rebuild.
Q. What did you rebuild?
A. Some of the panels.
Q. What do you mean panels?
A. These are concrete panels.
Q. So you think you replaced some of those?
A. Yes. I think they had some severe damage on a lot of them.
Q. How many?
A. I have no idea. I just remember there was some work we done on them.
Q. The -- I may have asked you this. I'm not sure if I did or not. We had talked about the Lafayette auditorium being added. Did you tell me if that's one floor or is it more than one floor?
A. One floor.
Q. So just so we keep things in sequence here, after the application to DBPR is submitted, your son gets that letter back from DBPR September 22nd that we just went over that says we need more information, and Midship Marine has to show the number of stories not feet. Do you remember that letter?
A. Yeah, this one.
Q. Okay. And then the supplement, I'll call it,

more information, if you will, that's part of that exhibit that's attached is prepared, who prepared that?

A. I think with the help of David Bryant, my wife and I prepared it and put the -- the equivalent of -- of number structures like this one specifically, equivalent of six stories, and I guess they agreed with us because they gave us the license.

Q. The -- did you type in the equivalent of six stories, or is that something your wife did?

A. Barbara.

Q. What exactly did you contribute to that supplement other than conveying to Barbara that Mr. Bryant had told you to use the phrase "equivalent to six stories"?

A. I think we were all on the call together with him.

Q. Is there anything else that you contributed to that particular supplement?

A. I think that was it because they were specific in their letter about Midship.

Q. You mentioned that a license was issued. Was there supposed to be a hearing before that?

A. Yes.

Q. What do you know about that?

A. We had a -- we had had all the pictures of all of these projects that were listed blown up. I sent them out

to a photographer, blew them up, I want to say two-by-four, two-by-three, but they were large size. And we had a presentation that we were prepared to go in front of the board. I want to say it was going to be in Melbourne because the board moved around the state. And we were -- we were preparing to do that, to present our case to the board, why we should have the license. And we had -- we had hotel rooms booked, we had -- we had our date on the calendar, and for some reason my secretary checked the website to see the status of -- of how the application was moving, she come in my office, she said you got a license. She had already printed it out. They issued it on the information that we submitted.

Q. Between the time that the supplement was done and sent to DBPR -- by the way, who sent that in?

A. I guess Barbara did.

Q. Do you remember who submitted the application itself to DBPR, was that Barbara or was that Mr. Bryant?

A. Barbara. No, Barbara.

Q. So by the -- by September -- I think the tag line on the fax at the bottom of that page is September 26. Do you see that?

A. This one?

Q. Yes.

A. Yeah.

Q. Is that PVGC's fax?
A. Looks like it.
Q. So between September 26th and the time that you found out that a license had been issued from your secretary, had you spoken to Mr. Bryant at all in between that time about what four stories in height meant?
A. Not -- not after that. Once this had been submitted, that discussion was over.
Q. How did you find out there was a hearing that was going to be taking place in front of the board?
A. When we made our submission, they gave us -- I think they meet monthly, every 45 days. Whatever it was, they told us that if you get your application in on a certain date, you will be on this date. And we got a letter -- I think we got a letter or something telling us the date and time and everything where the place was going to be at.
Q. Do you remember the date of the -- that the hearing was supposed to take place?
A. No, I don't.
Q. Was it in some time in 2016?
A. Oh, yeah.
Q. So the materials we've been looking at are August and September of 2016. How soon after that do you think the hearing was set? Are we talking October? November?

December?
A. Yeah, it was right after this. October, November it would have been.
Q. Was Mr. Dudley hired by that point in time?
A. No.
Q. Do you remember if Mr. Dudley was hired in 2016 or in 2017?
A. Probably '17.
MR. LAWHON: And, Bruce, just so we have a record of it, any communications that I ask Mr. Vicari about with Mr. Dudley, you're going to object and instruct him not to answer on the grounds of privilege.
MR. PARTINGTON: Yes. Dudley had nothing to do with the initial licensing.
MR. LAWHON: I understand that part.
MR. PARTINGTON: So I just wanted to be sure that was -- that was clear because you're kind of asking about the two things at the same times and hearings. And so, no, he had nothing to do with the initial licensing. Only after the Coastal parish filed the complaint, we got notice of it. So based on that, yes. Based on the two reasons we talked about the other day, communications with Dudley would be attorney-client privilege. Any communications or filings with the CILB would be under the statutory privilege.

BY MR. LAWHON:
Q. All right. Let's gather up all these exhibits here. I'll put these in order when we're done.
All right. Let's move on to a couple of other topics. I'm going to kind of cover a couple of different things related to the project. I want to start with your relationship with the owners, and if I understand it correctly, there are, technically speaking, two different owners for -- a different owner for each tower; is that right?
A. Entity, but I think it's the same person, same people.
Q. So is -- is Ryan still your primary contact?
A. Yes.
Q. Is there anybody else on behalf of the owner or owners that is your -- a primary contact?
A. There's many primaries. I deal with three people there.
Q. Who are the three?
A. Ryan Fuson, Bob Duke, and Nick Boehm -- Boehm.
Q. B-o-h-m?
A. You want the right spelling?
Q. No, that's just if you remember.
A. B-i-h-o-e-m, I think it is.
MR. PARTINGTON: I think it's B-o-e-h-m.

A. Something.
BY MR. LAWHON:
Q. Okay. And Ryan is F-u-s-o-n?
A. F-y-s-o-n. F-y-s-o-n.
MR. PARTINGTON: It's F-u.
A. No, it's F-u, F-u-s-o-n.
BY MR. LAWHON:
Q. I think it's R-y-a-n for his first name.
A. R-y-a-n.
Q. Are Ryan, Bob, and Nick the principals of the Civic Towers entity and also the Senior entity?
A. No. Ryan is one of the owners. The other guys are just employees.
Q. Is Ryan an owner in both entities?
A. Yes.
Q. So I'm going to work backwards. How would you describe your relationship with the owners now?
A. Fine.
Q. No problems, complaints by the owners about your performance, timeliness of performance, quality of work, anything like that?
A. It's just construction -- regular construction issues, but we have very candid calls and very friendly calls almost twice a day.
Q. Have there been times when they've complained

about any of PVGC's work or the timeliness of its work?
A. Yeah. I mean, that's -- every owner does that.
Q. In your experience, that's just common in construction?
A. Yeah. You work through them and you get -- you get it done. It's not that they -- it's argumentive, it's just they may not agree what's going on and you discuss it and you figure a way and you move on.
Q. What types of issues have the owners complained about relative to PVGC's scope of work?
A. Biggest complaint was Coastal's work.
Q. Be more precise. What about Coastal's work?
A. Oh, there's -- that -- you got -- I don't have the time today to tell you everything about Coastal's problems, but I can sum it up that it was -- they were bad subs, bad work, bad engineering.
Q. And my question was: What more precisely did the owners tell you were their complaints about Coastal's work?
A. Panels not fitting, panels too short, windows in the wrong location, clips not installed properly, wrong clips installed, angles that were just one bolt holding an entire panel in the wall. And, you know, that -- that was all on my shoulders because it's my sub.
Q. Any other complaints that the owners made to you about Coastal's work?

A. Not working fast enough.
Q. Anything else?
A. I'm -- I can't remember them all, but there's -- they're all in the documents.
Q. Is that the only thing that the owners complained about relative to what I would consider to be within PVGC's scope of work?
A. That was the biggest most issue that had tension between us and the owner. All the other issues, the hurricane was -- was negotiated outright, and we back working on that. It's just by the time all that had taken place, we couldn't physically do both buildings. So we agreed to let somebody else do one and I do the other one.
Q. You said that Coastal was the number one complaint by the owners. What was number two?
A. Probably the roof now because after the hurricane the roofers are in dire need. I mean, a lot of buildings have roof problems, and it's just they -- they just overloaded.
Q. Overloaded meaning they don't have the time or the resources to get to the roof?
A. Yes, the timing it took to get to the roof.
Q. What was number three?
A. I don't know if there is a number three.
Q. So it's your recollection that the only major

complaints the owners had would be Coastal and a shortage of resources for getting the roof done quickly after the hurricane?

A. And if I put a percentage, it's probably 95 Coastal, 5 percent roof.

Q. You'd mentioned that you couldn't physically do the work and so that's why -- excuse me -- the other tower was turned over to another contractor. Did I understand that testimony --

A. Yes.

Q. -- correctly?

A. Yes.

Q. What do you mean by that?

A. We had 300 apartments to do in five months, and the building sustained severe damage, so it had to be all demoed, rebuilt. It's just -- I got -- I kind of figured my limits, and the owner knew what my limits were, and that's -- we felt like it would be best, to try to make the deadline, to bring in another contractor.

Q. What was the deadline?

A. The deadline is mid-December.

Q. Of '18?

A. '18.

Q. Whose idea was it to bring in another contractor?

A. Little bit of both of us.

Q. What do you mean by that?

A. Well, he was insisting that if -- if we can't finish it all, we need to come up with a reason -- or a plan, I should say, to get it done in a certain period of time, and he -- there were so many moving parts between the insurance company and the owners because the insurance company wasn't paying, and he'd have to go and borrow his own money, and then the timing. I just said, look, to get it done to try -- because there's tax credits at risk -- to get it done at the end of the year, you're going to have to bring somebody else. I cannot do 300 units in five months. I don't know if there's any one company can do that.

Q. The way you just described it made it sound like it was your idea initially to -- to -- to say, I can't do both buildings at the same time.

A. It was discussions between owners. It was -- I mean, I'm kind of summing up what happened, but it was probably discussion over a week or 10 days. You know, once he realized, okay, we got to get started, I'm going to borrow money, I'm not going to wait on the insurance company, how do we do this.

Q. I just want to make sure I understand. I realize this was discussed over a period of time. Whose idea was it first to suggest bringing in another contractor?

A. Either both of us or maybe the owner. It just

all came up that that's the way it would be best to get it completed. And I didn't fight him. If it was him, I didn't fight him. I agreed, you know, okay. It's all about finishing the job.

Q. Is that other contractor Thornton?

A. Yes.

Q. How were they found?

A. Not sure.

Q. Did you have anything to do with finding them?

A. No.

Q. You'd mentioned the insurance company wasn't paying. The -- what's the status of the claim or claims right now?

A. My claim they haven't paid me, and I -- I understand they might have paid the owner a little bit, very little.

Q. Remind me how much your claim was for.

A. A million, somewhere around there.

Q. How much have they paid, if any?

A. Nothing.

Q. Not a dime?

A. Not a penny.

Q. Is it -- what's the status of the claim?

A. Mine?

Q. Yes.

A. They've now said they're going to adjust that, for whatever that means.
Q. Did they do that in writing?
A. It was either a letter to me or a letter to my attorney or e-mail, something.
Q. Is there a PA that's handling that claim for PVGC?
A. No.
Q. You're doing it all yourself?
A. Yes.
Q. The owner's claim, how much is that for?
A. I have no idea.
Q. You said you believe some of it's been paid. How do you know that?
A. A little under 5 million.
Q. What's the status of that claim?
A. I have no idea.
MR. PARTINGTON: They filed something like 20 or 30 different civil remedy notices, if that tells you much about the status of the claim.
MR. LAWHON: That's a lot.
MR. HARRISON: They're going to have to work hard for their money is what that tells me.
MR. PARTINGTON: So it may be more useful for you if I -- because if I give you a short explanation of

that, I can do it on the record or off the record, because I've been involved in it.

MR. LAWHON: Of the insurance claims?

MR. PARTINGTON: Yeah. Not in terms of the amounts, but -- so originally, the insurer's response was you're not an additional insured, even though the contract clearly requires us to be -- the insurance policies that we were provided say we are. We then pointed that out, and they said, oh, yeah, I guess you are an additional insured, so entitled to your own claim. And so that was just -- they finally conceded that a couple weeks ago.

MR. LAWHON: A year later?

MR. PARTINGTON: Yeah. When was the hurricane? So -- so now they're adjusting the claim, and there's discussions going back and forth on that. So -- but there still hasn't been a check.

MR. LAWHON: Okay. I understand. Thank you.

BY MR. LAWHON:

Q. I'm going to go through some of the contract language now with you with the subcontractor contracts and the purchase agreements. So bear with me, I'm going to grab those for you, okay. Figured this was --

A. Just point me to the tabs.

Q. I have to remember.

A. Oh.
Q. So I think we ended --
THE VIDEOGRAPHER: Oh, I'm sorry. I did stop.
We're now back on video record 11:59 a.m.
BY MR. LAWHON:
Q. I think we ended the last session of your deposition when we were talking about fire stopping, and we were going through the contract language about where you believed fire stopping was mentioned in the subcontract agreements and the purchase agreements. I want to cover two other subjects with you relative to those contracts, and then we'll move on to another issue.
One is the issue of the slab edge repair work that was done by Coastal. What you have in front of you, I think they're Exhibits 2 and 3 and 92 and 93, or 93 and 94, I don't remember exactly, but are the four contracts between PVGC and the Coastal entities and just -- I think you remember this, but you recall Coastal Maintenance has two subcontract agreements with PVGC, one for each tower; Coastal Prefab has a purchase agreement with PVGC, one for each tower. Does that sound right to you?
A. Yes.
Q. Okay. So I'll try to do them all together. If you feel there's a reason to separate them --
A. That's fine.

Q. -- we can. So the slab edge repair work, I think we would all agree that that's not going to be anywhere in the purchase agreements for Coastal Prefab, right?
A. For the change order specifically to that work?
Q. Even the scope of work, that wouldn't have been covered or contemplated by the Coastal Prefab purchase agreements at any time, would it have been?
A. If they damaged that, they'd have to replace it.
Q. "They" being who?
A. Coastal.
Q. Which Coastal?
A. Maintenance.
Q. Okay.
A. Because they were doing -- Maintenance was doing the work, right?
Q. Yes.
A. Prefab was actually the panels, okay.
Q. Yes. So now that you've refreshed your memory about that, is there any reason for us to talk about slab edge repairs as it relates to Coastal Prefab?
A. No. It would be Maintenance.
Q. So let's focus on the subcontract agreements.
A. Okay.
Q. Before -- you signed all those on behalf of PVGC, right?

A. I think I did. Yes.
Q. All right. And I believe they're all dated February 16th of 2017. Does that sound right to you?
A. 16.
Q. February 16, 2017?
A. Right.
Q. All right. Use that date as a point of reference. Before that date, had you talked to anybody at Coastal Maintenance about the possibility or the need to do slab edge repair work as part of Coastal Maintenance's scope of work?
A. You got to be specific. Slab edge repair as far as the concrete or the slab edge embed repair?
Q. Let me be more precise then.
A. Please.
Q. I'm going to separate those into two categories of work. I'm calling the concrete repair or restoration work the slab edge repairs; and then the angle plates, the embedments themselves, we'll call that the embedment work --
A. Okay.
Q. -- or something to do with the embedments. Does that work?
A. That's fine.
Q. Okay. And I'm going to treat them separately,

okay?
A. That's fine.
Q. Back to my question: Before February 16 of 2017, did you talk to anybody at Coastal about what we've called slab edge repairs?
A. No. But in the contract, if they damaged the edge they got the repair it.
Q. Where does it say that?
A. It's in the contract or in the specification. Anytime a subcontractor damages a existing material or whatever, it's on their nickel to repair it.
Q. That's just part of your form contract is what you're telling me?
A. Yes. I don't remember specifically where it's at, but it's -- it's 101 construction. If you damage something, you got to pay for it.
Q. Is there any specific mention of slab edge repairs themselves or the phrase "slab edge repairs" or "slab edge restoration" or anything like that in either of the subcontract agreements for Coastal Maintenance that you know of?
A. Well, it wasn't anticipated because we finished the whole building without slab edge repairs. Crane didn't damage it -- or I should say the demo -- Serinca didn't damage it like Coastal did.

Q. All right. Move to strike as nonresponsive.
My question was just about the contract, and I think what I'm understanding you telling me is that by the time you signed the subcontract agreements with Coastal Maintenance, there were no discussions about slab edge repairs because they weren't anticipated to be needed; is that a fair statement?
A. Correct. That's right.
Q. Okay. Embedments or the embedment work, was anything relative to replacing or repairing embedments discussed with anybody at Coastal before you signed any of the contracts that we're looking at?
A. Yes.
Q. Tell me what was discussed.
A. With Vito, that it was -- he knew what was there and that he would replace or repair whatever was necessary to attach his panel to the structure.
Q. Who had those conversations with Vito?
A. PJ and I both did.
Q. Was it just Vito or anybody else from Coastal?
A. Vito was the only one we really talked to throughout the whole negotiations. Kevin maybe once or twice, and I don't remember -- Kevin Rae -- Rear, I think his name is.
Q. Rae.

A. Rae. That's who we -- that's who we -- 99 percent of the time it was just Vito.
Q. And so if we look at the -- the subcontract agreements for Coastal Maintenance and PVGC for both towers, are they the same?
A. Should be, other than price.
Q. Okay. The language should be the same, the -- the articles should have the same substance and scope of work and language --
A. Should be.
Q. -- is that a fair statement? Okay.
So if we look at the first page of -- what are you on, Exhibit 2?
A. Yes.
Q. Under the -- under Article 1E, the "Install Sto Panel" section, do you see where I am?
A. E, "Scope of Work"?
Q. Yes.
A. Okay.
Q. And then there's a section that says "Demo"?
A. Right.
Q. And then underneath that it says "Install Sto Panel"?
A. Correct.
Q. And the second bullet point I see says "Repair of

existing embedments for attachment of Sto Panel clips." Do you see that?

A. Yes.

Q. And then it says in parenthesis, "Note, this does not include any removal of embedments from concrete slab and reinstalling of new embedments in new concrete." Do you see that?

A. Correct.

Q. My understanding of that is it's making a distinction between repairing the existing embedments that were already on the building and having to remove those and put new ones in. Is that the distinction that you understand as well?

A. Possible.

Q. Do you interpret that any differently?

A. No. I agree.

Q. So if Coastal Maintenance had to remove the embedments and install new ones, that's not within the scope of work that we just read, correct?

A. It is and it's not, because if they going to remove it, they have a section in here that they have to notify timely and submit, you know, the proper change order requests. So we have to be -- we have to be notified if they are going to remove -- if a -- if an embed was just too deteriorated and cannot attach, there's a procedure

they have to follow.
Q. So what you're telling me is that when you say it is and it is not, removing and replacing the embedments is actually not part of the contracted price for the scope of work, it's extra work, but if they're going to do it, there's a procedure they have to follow in order to get your approval to do that; is that a fair statement?
A. Yes.
Q. Basically, we call that change order work?
A. Yes.
Q. All right. And do you believe -- I mean, we'll read it if we have to, but I'm trying to save time. Do you believe that the language making the removal and the replacement of the embedments is the same in both contracts for Coastal Maintenance?
A. I'll take your word it is.
Q. Don't take my word for it. They're your contracts. So we can look if you need to.
MR. PARTINGTON: Let me just object to the form on that because he's being deposed individually. I mean, it's the company's contracts.
MR. LAWHON: I -- I've -- I've made that clear. I understand the objection, and I know why he's here. You're welcome to object to the form. But I'm asking him what he understands, and I think we all know that.

BY MR. LAWHON:
Q. So --
A. Looks to be the same.
Q. The -- so let's also talk about the schedule.
A. Done with this?
Q. Not with the contracts yet because we're going to talk about the schedule that goes with them a little bit. And I believe there is a -- there is at least a part of a schedule that's attached to the printed version of the contracts. I think it's an exhibit. Are you familiar with that schedule?
A. No. I've seen it before. I'm not too familiar with it because my scheduler put it together.
Q. Your scheduler being who?
A. Paul Landry worked with Vito to put this together.
Q. And how do you know that?
A. Because he was hired to do that to get to each trade and come up with their durations and put a schedule together, and I know they had many discussions about it.
Q. When did those discussions take place?
A. Before the contract was signed, and even after, as updates were needed.
Q. Paul Landry works for Palcon?
A. Yes.

Q. Have you worked with him before?
A. Yes.
Q. On how many other projects before this one?
A. Two, three, four, five. I don't know.
Q. When did he work with Vito before the contract was signed on the schedule?
A. Many times. I don't know specifically what day and time. We had to have it done to be attached to this contract.
Q. And I realize you don't know the exact day and time, but I'm trying to figure out, using February 16 of 2017 as a point of reference, would it have been the week before, the month before?
A. The year before. It would have been months before that they were putting it together.
Q. In 2016?
A. Right.
Q. I believe PVGC and Coastal rep started talking some time in the summer 2016. Does that sound about right?
A. Vaguely, yeah.
Q. When, relative to the summer of '16, do you think Vito and Mr. Landry would have been talking about the schedule?
A. No idea.
Q. Were you participating in any of those

communications?

A. Not with them. Paul would communicate with me directly.

Q. Did you have regular meetings with him or just occasionally he would tell you where he stood with different trades?

A. About weekly.

Q. Did he go over schedules with you?

A. Yeah.

Q. Did you go over a lot of schedules between the summer of '16 and February of '17 when these contracts were signed?

A. Paul did?

Q. Did you go over --

A. With Paul.

Q. -- several -- yes.

A. Yes.

Q. Did you ever go over -- excuse me -- a schedule with Vito before the contracts were signed?

A. A verbal schedule of kind of durations that he anticipated what it would take, yes.

Q. When did you do that?

A. In '16 when we were negotiating with him because all that information -- you have to understand, Coastal was the critical path to the whole job, and we couldn't be

successful unless they were, and we needed to understand their durations, how long it would take them to do the demo, how long it would take them to put the new panel up, and if they couldn't get it done properly, the whole job can't move. So we had to be assured that his durations that he was telling us, he believed in them.

Q. Did he give you -- in your verbal conversation with Vito, did he give you a schedule?

A. I think he gave the schedules -- if there was anything, it was between him and Paul, but we -- we had -- with Vito, we discussed it verbally.

Q. And I'm trying to find out what you discussed.

A. About durations. He was telling me it takes so long for the shop drawings, it was going to take him so long to fabricate, so long to demo, and then Paul and him got together and put it all together.

Q. How long did he tell you it would take for the shops?

A. Less than 20 days, three weeks.

Q. He told you that during one of your calls with him about the schedule?

A. Yeah. I think there's something in an e-mail. I think there's something in writing about it. Because we had tried to turn him loose earlier on just his shop drawings -- when I say early, early even before the

contract was signed -- to give him time to get that out the way, and he still wasn't able to do it.
    Q. During your talk with Vito about the verbal schedule, how long did he tell you he needed to fabricate?
    A. I want to say he told me it was -- he could do -- once he got up and going, it would be 10 to 12 panels a day would come out the facility, and it would take him a week to 10 days to get started.
    Q. He told you this before the contract was signed?
    A. Yes.
    Q. What other dates or benchmarks did he give you during your discussions with him about a verbal schedule?
    A. I want to say he -- I think it was something about the demolition. He thought he could do it within the same duration as a panel would be delivered, that he'd have enough time to have the demo of the wall, so when a panel got there it could go right up.
    Q. So basically, the delivery and installation of the panel and the demo work would be -- would be done concurrently?
    A. Yes.
    Q. Did he give you a duration as to how long it would take to do the demo work?
    A. A week. He said he could do a drop in a week. Stack, drop, whichever one you want to call it.

Q. They're the same?
A. It's an apartment, vertical stack.
Q. Did he give you any other dates or benchmarks or durations during your talk with him about the verbal schedule before the contract was signed?
A. Vito talked a lot about how great they were and --
Q. I was just asking about the schedule.
A. I understand. Just hear me out for a minute.
-- that the schedule, that the way he presented himself, that all these dates and all, they could make it, whether it be the shop drawings, the fabrication, the demolition, all that. And just the dates he gave us, none of them worked. None of them were reality, we found out.
Q. What other dates did he give you?
A. What I gave you so far.
Q. You gave me the shop drawings, you gave me fabricating panels, and you gave me a time to start after panels -- time to start on the panels, and then you gave me demo.
A. I think and then he said it would take him a couple days to caulk them in once they're were installed.
Q. Okay. What other dates did he give you, if any?
A. I think that was it.
Q. As you were leading up to signing the contract,

were there written schedules that were provided to any of the Coastal entities before the contract was signed? Is Mr. Landry and -- and Vito exchanging written schedules?

A. They are.

Q. As you were leading up to signing the contract, did you talk to Vito or anybody from Coastal about needing to adjust the schedule because it's taking too long to sign the contracts or anything like that?

A. No.

Q. At any time before the contracts were signed by you for either the subcontract agreements -- strike that.

At any time before you signed either of the subcontract agreements for Coastal Maintenance, did you have any discussions with any Coastal member or representative about adjusting the schedule?

A. Why would you need to? The answer is no, because the durations start when the contract's signed.

Q. So even if there's a date on the schedule that is before the signing of the contract, it's your testimony that that starts when the contract is signed?

A. Yes.

Q. So if the contract is signed on February 16th, but there's dates in the schedule that say do this on February 1st, they were already to have done that even though they haven't signed a contract?

A. But they had written authority to do so, like shop drawings. They had authority and the owner had committed to pay that fee. That was supposed to be done.

Q. Would it be your testimony that any date that's in the schedule that's attached to the subcontract agreements that comes before February 16th and required Coastal Maintenance to do something, they had received written authorization to do it already?

A. Yes.

Q. Is there a schedule also attached to the purchase agreements for Coastal Prefab?

A. Yes.

Q. And if there are dates in that schedule that required Coastal Prefab to do something before February 16 of 2017, would it be your testimony that Coastal Prefab had written authorization to do that before they signed the contracts?

A. Let me correct it. Prefab is the fabricator, right?

Q. Yes, sir.

A. They had authority -- I got confused when I said earlier about maintenance. Prefab -- Prefab had authority to start the shop drawings before this date.

Q. Before this date, and you're pointing to the schedule that's in the contract --

A. February --
Q. -- the purchase agreements for Coastal Prefab, correct?
A. That's right.
Q. So let me go back to my earlier question then. If there is a date in the schedule attached to the purchase agreements for Coastal Prefab that says Coastal Prefab is supposed to start something or complete something before February 16 of 2017, is it your testimony they would have received written authorization to do that work before they signed the contract?
A. Yes.
Q. Was there anything that you can think of that Coastal Maintenance was supposed to do, complete, or start doing before they signed their subcontract agreements, per the schedule? Demo? Anything?
A. Well, it's a little bit confusing because in early on, we looked them -- we looked at them as one. When it got time to contract, that's when they split it. We would look -- you know, Vito always represented Coastal Prefab and Maintenance was one entity. They would fabricate it, they would install it, they would do anything, and then we were told to split them. So we told Vito, you have authority, go get your shop drawings done.
Q. You don't believe there was any reference made to

you that Coastal Maintenance and Coastal Prefab were two separate companies much before the contracts and the agreements were signed?

A. They weren't. It was right before when they started splitting them.

Q. So those are signed in early '17. If I were to ask you, did you know at any time in 2016 that Coastal Maintenance and Coastal Prefab were separate companies, what would your answer be?

A. I think it was -- when we first started talking to them, he represented it was one entity, and towards the latter part of '16, I guess when they realized the job was going to be a reality, they started splitting.

Q. You think that happened at the end of '16?

A. Uh-huh. Yes.

Q. Other than the shop drawings, is there any other scope of work for Coastal Prefab that you believe they were given written authorization to start before the purchase agreements were signed?

A. Just -- just the shop drawings.

Q. Is there any scope of work that Coastal Maintenance was required to start on before they signed the subcontracts February 16 of 2017?

A. I think they did some scanning of the building so they could understand where the floors were to do the shop

drawings. I don't remember specifically what date, but it was -- I think they did it before. They actually went out there and cut holes in the buildings and scanned it.

Q. Coastal Maintenance did that?

A. Hell, I don't know who did it. You know, Vito did it.

Q. Vito himself?

A. No, but he had people do it. I mean, I don't know if he's charging to this company or that company. It's a moving target.

Q. Is there any work beyond the scanning that you just identified that Coastal Maintenance was authorized to start doing before February 16 of 2017?

A. Just anything related to the shop drawings they had to do.

Q. So coming back to the schedules, I had asked you if you had had any discussions with any Coastal Maintenance representative about adjusting the schedule before the subcontracts were signed. Now, let me look back at the prefab contracts, the agreements. Did you have any discussions with any Coastal Prefab representatives about adjusting the schedule attached to the Coastal Prefab agreement, before February 16 of 2017?

A. I don't remember.

Q. Is it possible you had a discussion with Kevin or

Vito before Coastal signed any of these agreements, about them asking you or asking somebody from PVGC to adjust the schedule?
A. If it did -- if they did, I wouldn't allow it because they -- the shop drawings were really behind schedule, and they had already given this information to Paul, and I think we gave -- we gave the schedule that Paul built, we gave it to the owners. So clearly, if they wanted additional time, it was their problem. They misrepresented how long it was actually going to take them to do the shop drawings.
Q. So if I understand what you just said, you don't remember a specific conversation with any Coastal rep about them asking to adjust the schedule, but if they had asked you to do that before the contracts and agreements were signed, you would have said no?
A. Right, because we've already passed the schedule -- duration schedule on to the owners.
Q. This is 319 from PJ's depo. Showing you Exhibit No. 319. Take a moment to look at that, and let me know when you're done.
A. Looks like the front page of the general conditions.
Q. Have you had a chance to look at that?
A. You just gave it to me.

Q. Yeah. Have you had a minute to look at it?
A. It's just the front page of the general conditions.
Q. Well, it's a little more than that, so I'll cover it with you here. So look at the top left-hand corner.
A. Okay.
Q. Do you see it's actually an e-mail from Kevin Rae to Bridgette Saddler?
A. Okay.
Q. Do you see that?
A. Yes.
Q. Who is Bridgette Saddler?
A. My secretary.
Q. Is that her e-mail address in your office?
A. Yes.
Q. And it's dated February 14, 2017, at 6:08 p.m. Do you see that?
A. Yes.
Q. And the subject line says "AIA A-201 Initial Page," right up here, subject?
A. Yes.
Q. All right. And down for part 8 under time, it says "Schedule needs to be updated 2/14/17," and it has Mr. Rea's initials. Do you see that?
A. Yes.

Q. Okay. Did you ever see this e-mail?
A. I don't remember.
Q. Would this have been something that Bridgette typically would have brought to your attention, a request to adjust the schedule?
A. Possible.
Q. You don't remember ever seeing this before the contracts were signed?
A. Is there a change order changing the dates?
Q. My question was: Have you -- did you -- do you recall seeing -- do you recall seeing this before the contracts were signed?
A. The reason I'm answering -- the reason why I gave you that answer, if you show me the change order it would -- it would -- I would remember if I seen it or not.
Q. I'm asking you from your memory, irrespective of any other paperwork. Are you telling me that the only way you'll remember whether or not you were asked to change or update the schedule before the contracts were signed is if you saw a change order that says that?
A. Yes.
MR. LAWHON: I need to make a couple of copies so that everybody has one. So -- and the lunch is here. Why don't we break for lunch, sort of. Let's go off the record.

THE VIDEOGRAPHER: Going off video record 12:30 p.m.

(Brief recess.)

THE VIDEOGRAPHER: We're now back on video record 12:55 p.m.

(Defendant's Exhibit No. 324 was marked for identification.)

BY MR. LAWHON:

Q. Mr. Vicari, I'm now showing you Exhibit No. 324. Ask you if you've seen that before?

A. I don't remember it.

Q. You don't remember seeing it before?

A. I might have. I just don't remember it.

Q. If I can summarize it, it's a -- it appears to be a letter to you and PJ, enclosing contracts and referencing requested schedule changes. Am I summarizing that correctly?

A. Yes.

Q. It says, "we have not received the requested schedule changes." That sound like somebody had requested a schedule change. Does that refresh your memory as to having any conversations with anybody from any of the Coastal companies about asking them to adjust the schedule?

A. I don't remember it, but the document speaks for itself.

Q. And then if you could look at Exhibit No. 117.
A. 117. Oh.
Q. Yes. Take a moment to look at that, and let me know when you're done.
A. Okay.
Q. Have you seen that before?
A. I'm not in the e-mail chain.
Q. I understand. That wasn't my question.
A. No, I don't remember seeing this.
Q. In the middle of the first page of Exhibit 117, Vito DePinto is sending an e-mail to PJ, February 14 at 4:50 p.m., that says, "PJ, Robert Warren will be on site tomorrow to coordinate with your team. Please forward the updated schedule per our request last week." Do you see those two sentences?
A. Yes.
Q. Did PJ ever mention to you before any of the agreements or contracts were signed, that Coastal had been asking for updates or changes to the schedule?
A. No.
Q. By the time the contracts were signed with Coastal on February 16 of 2017, was PVGC already behind schedule if I used the schedule attached to those contracts?
A. If I was behind schedule?

Q. Yes.
A. I would probably say yes, because of the Coastal's inability to not meet the schedule.
Q. What exactly was behind by February 16 of 2017?
A. Submittals.
Q. Submittals of what?
A. Shop drawings.
Q. Anything else?
A. Starting construction looks like move temporary -- I don't even think they started the temporary walls at that point.
Q. Would they have been permitted to do that?
A. Had they had the shop drawings. And part of the problem was they were having problems getting their bonds, which delayed signing of the contract.
Q. Let me take those one at a time. You said temporary walls. As of February 16, 2017 -- well, strike that.
Would a permit have been necessary before Coastal could have installed temporary walls on either tower?
A. No.
Q. No permitting -- no permitting would have been required for that at all?
A. Had they had their shop drawings approved early and the job could have went forward, they could -- the

people were going to start moving -- when we tell them we're ready to go, they would start moving tenants. They could go in those units and put those temporary walls up.

Q. Do you believe they should have started doing that before February 16 of 2017, when they signed the contracts?

A. The contract that they signed says February 1 they would be starting.

Q. Did -- I haven't seen a written authorization for them to proceed with installing temporary walls between February 1 and February 16. Have you?

A. I think they had the contract before, the 16th or 17th when it was signed.

Q. I realize they had the contract. In fact, it was negotiated back and forth a little bit, wasn't it?

A. Not that I remember.

Q. Wasn't Mr. Partington working on changes and negotiating the contract terms before it was signed in February of 2017?

A. No terms. I think it was some insurance issues. But they -- they couldn't -- those could have been worked out if they had their bonds ready to go.

Q. And I understand you're saying that. Let me come back to the temporary walls. Are you -- do you know of a written authorization instructing any of the Coastal

companies to start installing or fabricating temporary walls before February 16 of 2017?

A. We wanted to, but they couldn't get the contract signed.

Q. That wasn't my question, so I'll ask it again.

A. Okay, please.

Q. Are you aware of a written authorization directed to any Coastal company, that they start fabricating or installing temporary walls before February 16, 2017?

A. The schedule reflected the 1st, and it was sent -- this contract was sent to them in, I think, January.

Q. Other than the schedule that you're pointing to that's an exhibit to the contract, are you aware of any other written authorization directing Coastal -- a Coastal company to fabricate or install temporary walls before they signed the contracts?

A. I think the contract giving it to them, like we ready to move, gives them authorization.

Q. Anything else you're aware of besides the contract and the schedule?

A. There may be some letters. I don't -- you'd have to show them to me.

Q. You had mentioned couple of times that you believe Coastal had, I think as you described it, problems

getting their bonds. Is that what you said?
A. Yes.
Q. What do you mean by that?
A. Bridgette, my secretary, was keeping me up to speed that there was a lady that they -- whoever the agent was, was having difficulty actually getting the performance and payment bonds.
Q. What did Bridgette tell you?
A. That she was trying to get approval from home office.
Q. When?
A. Before the contract was actually signed and sealed and delivered to us.
Q. Did anybody tell you what the supposed problems were, challenges or holdups were, in getting the bonds issued?
A. No.
Q. Do you know how long it took to get -- do you know how long it took for Coastal to get the bonds in place?
A. Probably a month.
Q. What makes you think that?
A. If we gave it to them in January, and we didn't sign until February. That's a month.
Q. Is it your testimony the only reason that the

contract -- the contracts and agreements with the Coastal companies were signed in February and not January is because of the bonds?

A. That's a fact. That was the problem.

Q. Bear with me one second.

Let's change topics a little bit, Mr. Vicari. You know what a kickback is?

A. A kickback?

Q. Yes.

A. Is it money transferring to someone else, similar to that?

Q. You never heard -- you never heard of the never heard of the term in the construction industry before?

A. Kickback?

Q. Yes, sir.

A. Some fraudulent act, I guess, or illegal act. Is that what you're talking about?

Q. I don't know if it's illegal or fraudulent. I'm just asking if you've heard --

A. Well, you explain the question. Give me a definition of kickback.

Q. You get paid back from a subcontractor or a trade, or you get some type of compensation from the subcontractor or trade, in exchange for getting the job or the contract on the job.

A. Okay. I understand.
Q. You scratch my back, I'll scratch yours, kind of thing?
A. Okay.
Q. Is there a different word used for that transaction or in Louisiana that you know of?
A. No.
Q. Were -- were there any kickbacks paid to you or your son or PVGC from any subcontractor or trade on this project?
A. I'm going to give you the same answer that you asked me about the windows open. Absolutely not. It's foolish.
Q. Did you or your son or PVGC receive any benefit or compensation or anything of value back from any subcontractor or trade on this project?
A. No.
Q. Do you know anybody that did on this job?
A. I don't know.
Q. Never heard of it happening on this job?
A. No.
Q. How would you rate your performance overseeing the construction and management of this project?
A. Me personally, you want to rate myself?
Q. Rate yourself.

A. On this job, 8.
Q. Were you using a scale 1 to 10 or --
A. Yes.
Q. -- or 1 to 100?
A. 1 to 10.
Q. Thought I'd ask.
Is that an overall grade for from the beginning of the project to today?
A. Be specific. What phase?
Q. Well, would you give yourself a lower grade for a different phase?
A. I would give myself a higher grade for a certain phase.
Q. What phases would you give yourself a higher grade?
A. When Coastal walked off, to get somebody else back on the site, I've been -- I was praised by many people to get somebody back on in 30 days.
Q. Praised by who?
A. The owner.
Q. So would you give yourself a 10 at that time?
A. Yes.
Q. Do you think that there was a time at all while you've been personally involved in the project that you would rate your performance lower than an 8?

A. No.
Q. How would you rate PJ's performance on this project?
A. Nine.
Q. How come he gets a higher score?
A. I think he's a little more astute and more intelligent with all the computers and stuff like that.
Q. How would you rate PJ's knowledge of construction?
A. Nine.
Q. How would you rate yours?
A. Of construction in general or this project?
Q. Construction in general.
A. It would have to be an 8 or 9. I'm not going to say I'm a 10. If I would, I'd say I'm perfect, and nobody's perfect.
Q. You gave yourself a 10 a little while ago.
A. For getting a replacement sub.
Q. So you were perfect in doing that?
A. Yes. In the industry, most subs would not even want to get involved in something like this.
Q. Did you say your knowledge of construction was an 8 or a 9?
A. Yes.
Q. I think you gave PJ a 9?

A. Yes.
Q. How come you gave him a higher score than you?
A. Because I said because his technology.
Q. But I was talking about construction, knowledge of construction itself.
A. PJ's very sharp.
Q. Okay. How would you rate PVGC's performance on this project overall, company as a whole?
A. 8, 9.
Q. Was there ever a phase of the project that you would give PVGC a lower score?
A. We can only be successful because we have good subs, and when you have a problem like this with Coastal, it's real difficult to turn that around, and I think we did a very good job turning it around and -- and bringing the job in the durations that were originally planned.
Q. Is there -- other than the time that you were working with -- strike that.
Other than the time that PVGC was working with Coastal, is there a time that you would rate PVGC's performance on this job lower than an 8?
A. Personally, I think it probably was lower with the time we were dealing with the insurance company. I would have done things differently if I would have been able to control it.

Q. Meaning after the hurricane?
A. Right.
Q. What would you have done differently?
A. I would have had -- I would have took control of the settlement, put in negotiations with the insurance company.
Q. How did you think that would have affected the course of events?
A. I think money would have flowed faster.
Q. Meaning you would have been able to --
A. From the insurance companies and stuff like that.
Q. Meaning if you took it over, you would have gotten money out of them faster?
A. Yes. I did many times before.
Q. Who was in charge of doing it?
A. The owner.
Q. When you say you did it many times before, what do you mean?
A. The Sugarmill complex that Favrot & Shane owned, that was a $125 million or more insurance claim. It got settled in less than a week.
Q. Because of your efforts?
A. Yes.
Q. Settled in less than -- in less than a week, meaning a check was issued from the insurance company?

A. We had an agreement, a plan of action, and everybody went to work in less than a week.

Q. When did the first settlement payment come?

A. Every month. It was a cost plus.

Q. And when I'm saying settlement payment, it's coming directly from the insurance company?

A. It went to the owner, and the owner disbursed it to us every month.

Q. So you said you've done this many times before. That's one project where you personally were able to make an insurance company pay pretty fast. Can you name any others?

A. My office building for Katrina was totally destroyed. One meeting with the insurance company was a hundred percent total.

Q. How long before the insurance company started writing checks?

A. Less than 30 days, one check.

Q. Any other projects that you --

A. There was a church that was -- we were hired to negotiate the -- the -- it caught fire, Assembly of God, I think it was. We were hired to negotiate with the insurance company.

Q. When was the church fire?

A. It was after Katrina. I don't remember a

specific date.
Q. When was your office damaged?
A. Katrina.
Q. Was that '09?
A. I don't remember.
Q. You don't remember?
MR. PARTINGTON: Katrina was '5, '05.
MR. LAWHON: '05.
BY MR. LAWHON:
Q. So how would you rate your experience in handling insurance claims?
A. Pretty good. I don't like to do it, but I can do it.
Q. If we're still using your 1 to 10 scale, how would -- what would you rate it?
A. 8, 9.
Q. Did you talk to the owner about taking over the insurance claims here?
A. It was too -- it was too big. He wouldn't divulge all the issues. So I just kind of took a backseat, said it's all yours. He was making it too big, I should say.
Q. We were talking about your and PJ's and PVGC's performance on this project. Let me come back to that a little bit differently. I'm going to assume that one of

the answers to my next question is going to be Coastal, so let's put Coastal aside for a minute, okay. Did you have any difficulty dealing with any subs or trades on this project?
A. Other than Coastal?
Q. That's why I put them aside.
A. We ultimately had an issue with ATO. Other than that, everybody's still on site.
Q. Did you have any -- so when -- has there ever been a time that you really -- that you personally haven't been in charge of managing or supervising construction on that project?
A. No.
Q. So you've been the guy in charge for PVGC the whole time?
A. Yes.
Q. Have you had trouble dealing with any subs or getting them to do work or comply or having to tell them the same problems over and over again to fix, other than you might tell me Coastal?
A. And ATO.
Q. And ATO.
A. Just normal course of construction, you have foremans that sometimes don't listen and you got to keep reminding them. No, other than that just normal

construction stuff.
Q. Did you -- was -- while you've been supervising or managing the project, Civic Towers project, has it been OSHA compliant at all times?
A. I think so.
Q. Is there any OSHA violations that you're aware of?
A. No.
MR. PARTINGTON: So, can I take a quick break? I'm sorry. I've gotten two calls here in a row from my dad.
MR. LAWHON: Yes, go ahead.
THE VIDEOGRAPHER: Going off video record 1:16 p.m.
(Brief recess.)
THE VIDEOGRAPHER: We're now back on video record 1:21 p.m., Disc No. 3.
BY MR. LAWHON:
Q. Mr. Vicari, we were talking about OSHA. Was -- while you were supervising and managing the job, did you run it safely at all times?
A. I believe so.
Q. Was there ever a time there was a danger of injury or damage to any of the trades or people that were working on the job while you were supervising and managing

it?

MR. PARTINGTON: Object to the form.

A. None were reported.

BY MR. LAWHON:

Q. What's that?

A. None was reported.

Q. Regardless of whether somebody reported it or not, my question was: While you were supervising and managing the project, was there ever a time that any person was exposed to danger or harm?

MR. PARTINGTON: Object to the form.

A. Everybody's exposed to it.

BY MR. LAWHON:

Q. Let me refine the question then. Was there ever a time while you were supervising or managing the job, that anybody that was working on the job was exposed to harm or injury as a result of a safety violation?

A. You have to be more specific. I mean, construction is -- there's issues every day you got to prevent.

Q. Well, obviously, there's OSHA requirements, right?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. And I assume that PVGC has its own safety protocol and procedures?
A. Yes.
Q. That employees, trades, subcontractors, are all required to follow?
A. Yes.
Q. And if there's a violation of any of the safety protocol or procedures, is there also a procedure in place that requires reporting of those safety -- those procedures?
A. Yes.
Q. Is there also a procedure in place that any OSHA violations are supposed to be reported?
A. Not OSHA, safety violations.
Q. We'll go with safety violations. Are you aware of any safety violations that were reported on this project?
A. To OSHA or us?
Q. Either one.
A. No.
Q. Does OSHA require that anybody on this -- strike that.
Would OSHA regulations or requirements have required that anybody working on this construction site wear a hard hat?

A. Employees, yes.
Q. And were -- would OSHA requirements also require steel-toed shoes?
A. Possibly, where they're working.
Q. What would that many?
A. Depend on where they're working, they'd have to have them.
Q. Where?
A. If they fooling with steel maybe or in a place where they could be electrocuted.
Q. What was the first answer?
A. Steel.
Q. What about steel?
A. If they fooling with steel.
Q. Flew?
MR. PARTINGTON: Fooling.
A. If they fooling with steel.
BY MR. LAWHON:
Q. Fooling.
A. Lifting steel.
(Defendant's Exhibit No. 325 was marked for identification.)
BY MR. LAWHON:
Q. I'm going to show you a series of pictures, Mr. Vicari, that we've marked as, I believe this is Exhibit

No. 325. Have you had a chance to look at number -- the photos in Exhibit 325, Mr. Vicari?
A. Yes.
Q. Okay. Is that you?
A. Yes.
Q. On the job site?
A. Yes.
Q. Okay. You're not wearing a hard hat. Why?
A. Because nobody is working above me.
Q. Did you ever wear a hard hat on the job?
A. No, sir.
Q. I'm sorry?
A. No, sir.
Q. Okay. Is there any particular day that you ever wore a hard hat on this job?
A. Never have, because I'm not walking in areas where people are working above me.
Q. Ever, in the last two years?
A. And I'm not -- and I'm not an employee; I'm an employer. Read your OSHA regs.
Q. Did you wear steel-toed shoes on this job?
A. No, sir.
Q. Did you ever?
A. No.
Q. Did you ever get into an argument with Robert

Warren about you not wearing a hard hat on the project?

A. When Robert and I had a discussion about it, it was because he was doing something wrong, and he lashed out at -- lashed out at me, and that's probably what you're talking about, and it's because he would always come in, and we'd have a staff meeting -- I mean a production meeting at 3 o'clock, and he'd come in and tell me he was going to do something the next day, and it was never the truth. And I came to him one day in the middle of a discussion with his guys and walked up to him without a hard hat when they wasn't working, and he -- because I put him on the spot, he came and said, "You are not wearing a hard hat. Get out of my work area." And I looked around, I was like, "We in the parking lot. Nobody working here." So that's probably what you talking about.

Q. That's what you told him, that you were working in the parking lot?

A. We were talking in the parking lot.

Q. I'm sorry. That you were -- I misspoke. Is that what you told Mr. Warren that you were talking in the parking lot?

A. When we were talking in the parking lot.

Q. Did you ever tell Mr. Warren that you didn't have to wear a hard hat because you were an employer?

A. I didn't -- I don't know if I specifically told

him that. But they were very hard to deal with, they were inexperienced, and they were lashing out at me at every time they could.

Q. The incident that you just described, is that the only time that Mr. Warren instructed you to wear a hard hat?

MR. PARTINGTON: Object to the form.

A. Maybe once or twice before, and that's when I had him ejected from the site.

BY MR. LAWHON:

Q. You had him ejected from the site because you told somebody from Coastal that he doesn't respect authority, right?

A. That's correct. He never listens and he don't follow schedules. I was told day one when I met him at Coastal's facility, Vito told me, "The guy is hard to control, but I will manage him. But he's a good, hard worker." And everything he said proved to be true.

Q. Were there ever any other instances where Mr. Warren indicated to you that he wanted you or asked you to be wearing a hard hat?

A. Maybe. Maybe he did. But I'm the employer. If you look at OSHA, it always talks about employee.

Q. Did you tell him that?

A. I think I might have told him that and I said,

put it this way, I will not be underneath where you're working. I'm going to always be off to the side.

Q. Is there -- did you tell any other subcontractors to fire any of their employees because they didn't respect authority, besides Mr. Warren?

A. I don't think so. I think he was the only one we had to get off the site. He had a problem with everybody. He couldn't get along with nobody, either of my superintendents.

Q. Did you ever have a problem with anybody else's employees not respecting authority?

A. No.

Q. Was there ever a time that PVGC was behind schedule, according to the written schedules as they were updated, other than when Coastal was on the project?

A. Other than?

Q. Yes.

A. Then it would be a completion schedule.

Q. Well, let me back up because you raise a good point. As I understand it, the completion schedule, when Coastal's contracts were originally signed, was December of 2017 for the entire project; is that right?

A. I believe so, yeah.

Q. Okay. And what was defined as completion? Was it substantial completion, was it issuance of a CO, or some

other measure?
A. Substantial.
Q. Did the completion date -- we'll call it the original completion date. Does that work for you?
A. Yes.
Q. Okay. So the original completion date of December 2017. Did there come a time when the original completion date changed?
A. Because of Hurricane Irma, durations with FL Crane were on schedule to finish on time with the Civic building maybe pushing substantial completion back couple weeks. But we -- we felt like we could make the original because of the -- when they got on site and the amount of panels they were putting up and people just following right behind them and the progression of work.
Q. If I understand you correctly, are you telling me that even after Hurricane Irma, when you were able to recommence construction on both towers, you believed that you were still going to meet the original completion date as we've defined it?
A. With Senior.
Q. On Senior?
A. Civic would have been a couple weeks behind. That was our goal.
Q. And if I use September 10, September 11th, as the

date at Hurricane Irma hit, what date or what month did you determine that you were going to meet your original completion date on Senior and just be a couple of weeks behind on Civic? Did you figure this out in September? October? When?

A. Somewhere around that both, around September, October, because the amount of panels that FL Crane was going to be able to produce.

Q. Did PVGC have to hire more trades or more labor or bring in more resources to meet that original completion date, as you've described it, or did PVGC have to do anything else, accelerate its schedule, to meet that original completion date, or was it just because FL Crane was flying so fast?

A. Both. All of the three.

Q. What -- did PVGC bring in additional trades or resources to work on the -- either of the towers after Irma?

A. We brought in -- first of all, FL Crane worked pretty much around seven days a week to get the panels moving, where they normally wouldn't have. And then we brought in Serinca, another company to supplement ATO. And I think that was it.

Q. Was Serinca working on the project at all before Irma?

A. I think so.
Q. Did -- did PVGC instruct Serinca to add more labor or more resources above and beyond what it was already providing in its original contract after Irma?
A. We gave them more work -- we gave them additional work, so they had to bring on more forces. We gave them more items of work.
Q. Is that because ATO was no longer doing that work?
A. Yes.
Q. So they replaced ATO in some part?
A. Correct. Originally, just the demolition, and then he said he could do the cabinets. Then he said he could do the flooring. So they just kept on adding.
Q. Did PVGC ask or require any of its subcontractors to accelerate their work or schedules after Irma?
A. No.
Q. So it doesn't sound to me like PVGC did anything differently after Irma to meet the original completion date that it had done before Irma, other than having FL Crane making panels. Am I understanding that right?
A. Say that again.
Q. Sure. Is there anything you can point me to that PVGC did differently after Irma than before Irma, so that PVGC could get done faster?

A. Well, after Irma we were shut down. We couldn't do nothing.

Q. Until you were -- but at some point you were allowed to recommence?

A. Only on the panels. But we were -- it was piecemeal because the insurance companies would had to do all the investigations. So they were kind of -- it was slow roll, so to speak.

Q. And so maybe I misunderstood you before. So let me come back to this. What you told me a little while ago was that even after Irma, once you were able to start construction again, you believed you could still complete substantial completion by the original completion date both towers, except Civic was going to be a couple of weeks behind.

A. I didn't say that.

Q. Okay. Well, that -- that's what I heard.

MR. PARTINGTON: I think there was some confusion.

MR. LAWHON: Well, I'll -- thank you, but I'll sort through it. I appreciate it.

BY MR. LAWHON:

Q. Okay. Now, I think I know what you meant, but it sounded different to me. So let me try and come back to it. I thought I heard you say that even after Irma, you

believed PVGC could still complete within the original completion date?

A. No.

Q. Did I understand that correctly?

A. No, that's not the case.

Q. What were you talking about then when you said you thought that you could have been completed on Senior, but you were only a couple of weeks behind on Civic?

A. Was referring to had Irma not happened, we could have finished on time.

Q. Okay. Let me ask it a different way then. So Irma, as I said, hit September 10th or 11th. So let's use that point of reference, okay. And I know there's a couple of days before then, when you have to get into hurricane preparedness mode. So let's start with September 1st. As of September 1st, not knowing anything about any hurricane coming, did you believe that you could continue to work and finish by the original completion date in your prime contract on Senior?

A. Yes.

Q. Were you also on target to finish PVGC's scope of work under the prime contract on Civic by the original completion date, but you were going to be a couple of weeks past that?

A. That's correct.

Q. And if I understand your prime contracts, they have some period of time of float days before liquidated damages pop in, right?

A. Correct.

Q. What are those days? Is it 120 days or something like that?

A. I don't remember.

Q. Okay. Well, whatever it was, you would have been within -- you would not have been subject to breach or liquidated damages under either prime contract if Irma had not hit, was that your expectation as of September 1?

A. Yes.

Q. Had you -- actually, strike that.

As of September 1st, had Mr. Landry -- excuse me -- actually prepared schedules indicating that both Civic Towers and Civic Tower Seniors -- Senior were still on target to complete by the original completion dates?

A. Yes.

Q. By September 1st, had PVGC done anything to accelerate the schedule, or had PVGC brought in any additional resources to work faster?

A. In September?

Q. Yeah, by September 1st, before the hurricane?

A. FL Crane.

Q. Other than FL Crane?

A. And Southern Wall Systems.
Q. Other than those two companies?
A. That's it.
Q. Did PVGC ask any subcontractor or trade to accelerate their schedules prior to September 1st?
A. Prior to and before Coastal walked?
Q. We'll do both. So let me ask it this way. We'll work backwards. After Coastal is no longer working on the job, but before September 1st, had PVGC asked any subcontractor or trade to accelerate their work or schedules?
A. I don't remember.
Q. While Coastal was working on the project, did PVGC ask any trade, other than Coastal, to accelerate its work or schedule?
A. No.
Q. I want to talk to you a little bit about the shop drawing design, review, and approval process. How involved were you in that process relative to Coastal -- Coastal's shop drawings?
A. The only involvement, I would get -- I would get calls from the owner beating up on us because our subcontractors can't seem to get it -- as in his term, can't seem to get their shop drawings right. And I always took up for Coastal. And -- and about maybe the third

phone call I got, I went down there and had a meeting with Cronin and the whole Coastal group.

Q. Where did that meeting take place?

A. Cronin's office.

Q. When was that?

A. Some time before the completion of it, of the shop drawings.

Q. Other than that meeting, were you actively involved in the shop drawing design, review, and approval process, or was that mostly PJ?

A. It was PJ, but I kept getting -- I would get the phone calls, the grief from the owner, the architect, that -- telling me, you know, you got to get your subs to get this one right because we were on like the sixth or fifth submission on it.

Q. Other than you getting those phone calls, who was responsible for working through that process on behalf of PVGC?

A. PJ.

Q. You mentioned a meeting at Cronin's office.

A. Yes.

Q. What month did that take place?

A. February, March.

Q. Of '17?

A. Yes.

Q. Who was there?
A. I know Vito and Kevin was. Brian Moler -- is that how you say it -- might have been there.
Q. Moye?
A. Moye.
Q. M-o-y-e?
A. Yeah. I know Kevin and Vito definitely, Mr. Cronin, and there was two of his employees there, two or three of his employees in their conference room.
Q. Anyone else from PVGC?
A. I'm not sure if PJ was with me or not or Mick.
Q. Anybody else participate by phone?
A. I don't think so.
Q. Tell me what happened at that meeting.
A. I went there to explain to them how that, you know, they're behind schedule, it's -- they need to get these done right. The -- Jim -- I had got to try to streamline the process. The shop drawings would normally go to the architect. Then the architect would sign them off and send them to Jim. I asked the owner to get Jim and the architect to look at the drawings simultaneously, that way if either one of them had comments, it could be submitted back to Cronin to put it on the drawings.
Well, Cronin definitely had problems getting those comments answered and getting them on the drawings.

And I shouldn't have just -- not Cronin, because I don't deal with them. I'm dealing at this time with Coastal because Cronin works for them, and they can't seem to understand to get all those comments on the drawings. And I went there to stand on somebody's desk and say, you know, you all got to figure this out and get it done. You all are delaying starting this project.

Q. Is standing on somebody's desk just a euphemism?

A. It's a term. It's a term for push, you know, come on, guys, hurry up, get it done.

Q. And that's what you said during this meeting?

A. I was not nice at that meeting.

Q. What was their response or reaction?

A. They assured me they would have them completed overnight and sent them back.

Q. Did that happen?

A. Yeah, and it was wrong.

Q. It was wrong?

A. Incomplete.

Q. How were they wrong or incomplete?

A. Still needed information on the drawings about -- I forgot all the details, but if you look at the submittals, how they went in, they always came back with answers from the architects or the engineers, what was missing, what didn't get clarified, what didn't get added.

Q. Did PVGC pay for the shop drawings on time?
A. What do you say on time? When we got paid, we paid them.
Q. Well, let me back up. Didn't you promise or represent to Coastal that PVGC would pay for the shop drawings once they were completed?
A. Incorrect. I think they might have wanted payment when they were submitted, but they wasn't correct. So I'm not going to pay for something that's not correct.
Q. So you told them you would pay for the shop drawings when they were submitted -- when they were submitted, completed, and correct?
A. Right. And it's -- we have a pay when pay. Had they done it right, if they submit it within a month, we submit it to the owner and then the owner pays us.
Q. I understand what the contract says.
A. Right.
Q. I'm just talking about what you told them you would do.
A. Right.
Q. Okay. Did you ever tell them that you would pay -- PVGC would pay for the shop drawings when they were finished and submitted, regardless of whether or not they had been approved?
A. Oh, no. It's going to be correct. I mean,

finished means finished correctly, not seven different shop drawings.
Q. Did you ever tell anybody from -- from Coastal that PVGC would pay for the shop drawings when they had been approved by the architect?
A. Maybe, maybe not. They have to be a hundred percent complete and approvable by Jim. Not so much the architect, just the architect. Both of them.
Q. Did you ever tell somebody from Coastal that you would have PVGC pay for the shop drawings when they obtained their bond?
A. Pay for the shop drawings when they paid -- when they obtained the bond?
Q. Yeah.
A. I don't remember.
Q. You can put the binder that has the first 91 or so exhibits on the ground for a minute. I think that's the first one in front of you. And we'll focus on the second one. And I'm going to direct you to Exhibit No. 107. Did you find Exhibit 107?
A. Yeah, I've been here.
Q. So it's an e-mail from Vito to you and PJ, attaching the pay application from Coastal Prefab for application number one. Am I saying that right?
A. Yes.

Q. For Civic Towers and Senior, right?
A. Right.
Q. And if I'm looking at the schedule of values correctly, essentially it's indicating that it's seeking payment for the shop drawings for being done?
A. Correct.
Q. Okay. So January of '17 is when PVGC received this; is that right?
A. Yes.
Q. Didn't it receive the shop drawings, I think, January 25th of 26th?
A. A shop drawing.
Q. Some shop drawings?
A. Incomplete.
Q. Shop drawings were submitted on January 25 or 26, right?
A. Uh-huh.
Q. Is that a "yes"?
A. I'll assume so. There was seven or eight of them.
Q. The first submittal was January 25 or 26, right around there, right?
A. I believe somewhere around there.
Q. If you could look at Exhibit 115.
A. Okay.

Q. Do you see that e-mail?
A. Yes.
Q. It's dated February 17, 2017. So it's almost 30 days from when the pay application that we just went over has been submitted, right?
A. Right.
Q. The second -- the third sentence says, "You should have all information by tomorrow afternoon to wire the draw." Do you see that?
A. Yes.
Q. What draw is it talking about?
A. I guess the one he's talking about for the shop drawings.
Q. Had you had a conversation with anyone from Coastal before they signed the contract about paying the draw?
A. Not unless we have approved shop drawings. They're not -- I don't front money.
Q. Is it your testimony that you would not have represented to anybody at Coastal before the contracts were signed February 16th, that they were going to receive a payment?
A. I don't think I did.
Q. Let's look at Exhibit 139, please.
A. Okay.

Q. Have you seen that sequence of e-mails before?
A. I'm on the e-mail chain. Probably.
Q. So they're both dated March 14th of 2017. This is about six weeks after the pay application, right?
A. Right.
Q. And Kevin Rae -- Kevin Rae is writing in this first sentence of his e-mail, "I just wanted to check on the status of the bank draw/pay apps for Coastal Prefab and Coastal Maintenance & Restoration." Do you see that?
A. Yes.
Q. Right below it, it says, "Also, can you please check with Pete or PJ and see if we can get the release of funds for the Coastal Prefab shop drawings since they are now approved?" Do you see that?
A. Yes.
Q. Did you discuss that with Bridgette?
A. I might have.
Q. You don't remember talking to her about whether or not it was okay to pay?
A. Right.
Q. Do you know if by March 14 of 2017, had PVGC delivered any pay applications to the owner?
A. I don't know. I don't remember.
Q. If it had, would it have included or excluded application number one that we just went over from January

from Coastal Prefab?
A. It might have or it might not have, because knowing if it wasn't approved shop drawings, we wouldn't have submitted it; but if we did submit it, the owner my point have paid it, because they wasn't approved.
Q. As you sit here today, you don't know which scenario took place?
A. Show me -- show me the pay request.
Q. I'm just asking, do you know?
A. No.
Q. Do you know when the shop drawings were finally approved?
A. I don't remember the specific date.
Q. Do you know when the payment for the shop drawings was finally made to Coastal Prefab?
A. No.
MR. LAWHON: Let's take five.
THE VIDEOGRAPHER: Going off video record 1:55 p.m.
(Brief recess.)
THE VIDEOGRAPHER: We're now back on video record 2:08 p.m.
BY MR. LAWHON:
Q. I know you've got to leave, you said, at 3 o'clock. I have other things I want to talk to you about,

so I'm just going to try to cover at least a couple of subjects over the last hour here. Change orders from Coastal, change orders from Coastal Maintenance, and change orders from Coastal Prefab, were -- did you participate in the review and approval process of change orders from Coastal Maintenance or Coastal Prefab?
A. I think so, yes.
Q. Did you ever approve any change orders from Coastal Maintenance verbally or in writing?
A. I'd have to look at them I think there might have been one or two I might have approved.
Q. What do you think they were for?
A. I don't remember.
Q. Do you think you approved it in writing or just verbally?
A. Let me see the change order. I would have initialed the change order.
Q. Okay. If you had approved it in writing, it would be signed off by you or by PJ or either one of you?
A. Right.
Q. Either one of you?
A. It would be -- mostly all change orders come through me, both, and then he -- he -- I do it first, and then he takes it and gets with Bridgette and puts them together.

Q. The -- we don't have time to go through it. There's a lot of change orders, and just based on time, I'm not going to go through each one of them, but I just want to work from your memory because you're here individually, so I'm asking what you remember approving.
Do you remember approving any change order work from Coastal Maintenance for slab edge repairs or embedment work?
A. I think in the beginning I did, until I realized what was happening.
Q. Did you approve any change orders from Coastal Maintenance for any delays, either for weather or for anything else?
A. Vaguely seem to remember something about delays, rain. I don't remember if it got approved or not.
Q. Did you approve any change orders for Coastal Maintenance for wind?
A. I don't remember.
Q. Did you approve any change orders for Coastal Prefab for delays that were resulting from the several tests that the windows -- the water tests that the windows failed?
A. I don't remember approving those because I don't -- I didn't agree with it.
Q. You didn't agree with the -- that Coastal had

sustained delays in production as a result of the window test failures?
A. That's correct.
Q. Didn't you tell somebody from Coastal at one point in time to put together a change order for back charges for their delays and their losses because you were going to pass it on the Zinsel Glass?
A. I told them to present it. I didn't say I was going to approve it. And by contract, I have to -- they have to present it, and then we have to review it all. And if it has merits, we were obligated to do that, but I didn't believe them because they didn't even have approved shop drawings at that time.
Q. Did you -- did you ever tell somebody from Coastal that you would take their change order or their request for back charges because of the window failures and actually deliver it to Zinsel Glass?
A. They were asking me to do that. I wasn't agreeing to do that.
Q. You never agreed to do that?
A. That's correct.
Q. Did you ever tell Coastal -- did you tell any representatives from Coastal Prefab to stop production of the panels until you could work out the problems with the windows?

A. They were -- they were fabricating at their own risk at that point. They had no approved shop drawings.
Q. That wasn't my question, Mr. Vicari.
A. Okay.
Q. I'll ask it again. Did you ever tell anybody from Coastal Prefab to stop making the panels while you tried to resolve the window defect issue?
A. I don't remember telling them to stop.
Q. Did you ever tell anybody from Coastal Prefab to ever stop production of the windows -- excuse me -- production of the panels at any time?
A. I don't remember that.
Q. Did you ever tell anybody at Coastal Prefab that you were going to try and negotiate a lifetime warranty on the windows for the owner?
A. Because of -- yes, but I got to explain, because of issues in the factory of the window manufacturer, and Coastal had issues also. It was installation and fabrication issues.
Q. My question was: Did you ever tell anybody at Coastal that you were going to negotiate a lifetime warranty on the windows because of defects in the windows?
A. Yes, but it wasn't just defects in the windows. It was defects in installation also.
Q. Did you tell Coastal Prefab to stop production of

the panels while you negotiated a lifetime warranty?
A. No.
Q. Did you ever approve any change order from Coastal Prefab for additional time resulting from delays or losses or shutdown of production because of the window problems?
A. I don't think so.
Q. Of all the change orders that we just talked about subject matter-wise, slab edge repairs, embedments, weather, back charges, of all of these Coastal Maintenance or Coastal Prefab change orders, my question for you is this: Did PVGC ever submit any of those change orders to any of the owners for payment or for approval?
A. Maybe the first concrete repair, slab edge repair.
Q. Did PVGC get paid for that first change order that was submitted to the owner for concrete slab edge repairs?
A. I don't remember.
Q. The -- as you may recall, the May of 2017 pay applications from both Coastal Maintenance and Coastal Prefab were never paid. Does that sound right?
A. Was that the shop drawing one?
Q. Oh, no, no. This is in May, way later.
A. Why wasn't it?

Q. Well, you can tell me.
A. I don't remember.
Q. Part of the reason that I understand it wasn't paid is because PJ marked it down.
A. Okay.
Q. Well, let me ask this: Were you involved in any of the evaluation or decision-making related to Coastal Maintenance's payment applications?
A. No.
Q. Were you involved at all in whether they got approved or disapproved?
A. No.
Q. Did PJ ever ask you for advice or recommendations as to whether or not any of Coastal Maintenance's pay applications should be approved or disapproved?
A. Yes. He asked me what should he do, and I said you need to pay them for material -- in labor and material that is installed on site, and then the owner allowed them to bill for storing material, and that's the only thing you can pay. If they have front-loaded -- it's a term in the construction industry -- you can't allow that, because we have to represent to the owner that it's true and accurate.
Q. So other than what you just described, was there ever any other time that you gave a recommendation or advice to PJ as to whether or not PVGC should approve or

disapprove of a pay application from Coastal Maintenance?
A. The last pay app when they tried to overbill, he consulted with me.
Q. So we are using the terms that we understand each other correctly about, the last pay applications from Coastal Maintenance and Coastal Prefab were in June. The one right before it are the May pay applications that PJ marked down, reduced.
A. Okay.
Q. So are we -- are you clear about the difference between the two pay apps?
A. Yes.
Q. May and June?
A. Uh-huh.
Q. So June is the final one?
A. There was two, I think, in June.
Q. Well, one from Coastal Maintenance, but two from -- there are pay apps from Coastal Maintenance, there's pay apps from Coastal Prefab.
A. And then they were revised. So there's two from both of those groups.
Q. Oh, they were revised in May and in June?
A. No, in June.
Q. They were revised in June?
A. Right.

Q. Do you --
A. But two -- the bill came, and then it was revised again for June.
Q. I understand. Were any of the May or the June, original or revised, were any of those pay applications paid to Coastal Maintenance or Coastal Prefab?
A. I know the last one wasn't. I can't -- I don't remember if the May one was.
Q. Is PJ the best person to ask those questions to?
A. Yes. Well, look at the pay apps.
Q. So before when I was asking you what role you played in approving or disapproving pay apps for Coastal Maintenance, let me ask you the same question just so I can get my head wrapped around it for Coastal Prefab. Do you -- did you ever give approval or disapprove to any of the Coastal Prefab's pay applications or was that PJ's job?
A. It was PJ's job. Unless he had an issue, he would call me.
Q. Did you give him any recommendations or advice about any Coastal Prefab payment applications?
A. On the last one. The last two, I should say.
Q. What was the recommendation or the advice?
A. To pay -- I think at that point they had walked or we had got some letter about, you know, pay this million five or we walking, and that's when I got involved and had

a meeting with them.
Q. And you had a meeting with them?
A. With Kevin and Vito.
Q. Was that before or after the June 13th meeting where you called all the trades and everybody in and Kevin -- not Kevin -- Vito and Jon were on the phone?
A. I think it was after.
Q. Okay. So that meeting that I just described where you called all the trades in for a big meeting and -- and Vito and Jon were on the phone, that was on June 13th.
A. All right.
Q. Does that sound right?
A. Okay.
Q. So I'll come back to that in a minute. I'm kind of trying to do this sequentially.
A. But that's not the meeting I was talking about.
Q. I understand that. It was after.
Did you ever recommend to PJ that any of the May payment applications to Coastal Prefab or Coastal Maintenance should be paid in whole or in part?
A. I don't -- I said do whatever is right, whatever they got installed or -- and still works, do it.
Q. That's all you would have told him?
A. Yeah.
Q. Did you ever recommend to PJ that he approve or

disapprove any of the June pay applications for Coastal Maintenance or Coastal Prefab?
A. That's the one that I got involved with and had the meeting with them because he couldn't approve it. It was a million five, and they only had 8 -- what, 8, 10 percent of the panels up. He said, Daddy, it's too -- it's too -- the disparity is too big.
Q. You used the term "front-loading" before.
A. Uh-huh.
Q. Is that a construction term?
A. Yeah.
Q. What does that mean?
A. It means where a sub is trying to excessively overbill.
Q. So they're charging more upfront than they should be, that's why it's called front-loading?
A. Right.
Q. Did --
A. Than percentage complete or the actual invoice. Like we understand the -- earlier you showed me a pay request for Cronin's shop drawings for -- between both companies was some $400,000. That wasn't what Cronin got charged -- was charging them for.
Q. So you think the very first pay application that we went over was front-loaded?

A. Yes.
Q. Do you think the May pay applications were front-loaded as well?
A. I don't remember details about the May. I got involved with that -- those last two.
Q. Do you think the last two pay applications were front-loaded?
A. Yes, sir.
Q. Did you arrive at that conclusion based on your own independent investigation, or based on what PJ or somebody else told you?
A. Based on what PJ did his analysis of what work was installed and what invoices they had for storing material, it didn't match. It was like a million five they was asking for, and then Vito revised it to a half a million. I'm using round numbers.
Q. There was a meeting, a big meeting June 13th, I think was the date that I just mentioned, where you had indicated to all the trades they were all supposed to be there. I think the subcontractors, every representative from all the subcontractors showed up?
A. Right.
Q. Coastal Maintenance and Coastal Prefab had some people there, and then Vito and Jon were on the phone. Do you remember that meeting?

A. Yes.
Q. Okay. I think you called that meeting?
A. Right.
Q. Do you remember why?
A. Because Coastal was behind schedule, and I wanted the input from Coastal, and then I wanted all the subs to be there to hear what Coastal was -- I asked for a recovery, an acceleration, and they needed -- because Coastal was the driving critical path of the job, every sub followed them. If Coastal didn't get ahead, they couldn't do their job. So once I asked for the plan from Coastal to come with a recovery plan, and I had to have the subs' input, other subs to have input that they could all blend in and match in the schedule and complete on time.
Q. Did Coastal provide you with a recovery or acceleration schedule?
A. Yeah, also with a cost to do that also.
Q. What was the cost?
A. A million dollars. I don't know, it was crazy.
Q. The -- did you talk about it at the June 13th meeting?
A. Little bit, but I just ended the meeting because it was just not going to be constructive because Jon was just insisting on getting paid this money, and he didn't -- he didn't want to look at the facts that he was behind

schedule.
Q. Did you -- did you tell Jon or Vito during that meeting that they were on schedule, or they were close to being on schedule with three or four days of float, or anything like that?
A. Huh-uh. I don't remember that.
Q. Is it your testimony that you said at the June 13th meeting that Coastal was in fact behind schedule?
A. I think so. I think Paul Landry's schedule would reflect that.
Q. Do you know how far behind you believed they were?
A. I don't remember.
Q. Was your objection to Coastal's recovery or acceleration schedule just the fact that they were expecting to be paid for it, or did you have some other problem with the plan?
A. I said earlier, because they were behind schedule, they were part of the problem. You know, I can't get over the dollar issue if I know indeed they're behind schedule and they're not doing what they're supposed to be doing and show that they got good faith in trying to bring it on schedule. They just wasn't doing it. They were incapable.
Q. Was it your expectation that whatever

acceleration plan Coastal was going to propose, that they should have proposed to do it at no charge to PVGC?

A. No. If they were -- if they were on schedule and it wasn't delaying, they didn't delay on the shop drawings and they didn't delay on demolition and they didn't delay on putting up panels, if they would have done all those things in good faith, if they would have done them and showed that they -- they knew what they were doing, I was going to support an effort to go to the owner, because he's the one put it in my head, give me an acceleration plan. If it's reasonable, I'll pay it. But it wasn't reasonable.

Q. Are you the only one that evaluated the acceleration schedule on behalf of PVGC, or did you have somebody else look at it, a consultant look at it, or anything like that?

A. I think at that point I shut it down because I just -- you know, I had Paul look at it, and he said they can't support it.

Q. That's what he told you?

A. Yeah, because the schedule would reflect they're behind. So how do you pay -- pay -- why do you want to pay somebody when they are causing the delays?

Q. Did Paul tell you that before the June 13th meeting or at some point after that?

A. We talked about it before and after.

Q. I think you mentioned a little while ago that after that meeting you had a meeting with Kevin -- excuse me -- with Vito and Jon?
A. Yes. No.
Q. When was that --
A. Vito and Kevin.
Q. Vito and Kevin. When was that meeting?
A. Couple of days after they walked, and it was about payment.
Q. Where was that meeting?
A. They didn't want -- Dominick Baruffi, the Sto guy, insisted they come to a meeting. They didn't want to come to Miami, so I said I'd go wherever. We met at some fish restaurant in Fort Lauderdale. They wanted to come across and meet on 95, so I said no problem, I'll go wherever. I'll go to Naples if they want me to. But they -- we kind of met there.
Q. Were you on time?
A. I don't know. Who knows.
Q. Who went to that meeting?
A. Vito, Kevin, myself, Mick -- Robert Mick, and James Bennett.
Q. Anybody else?
A. That's it.
Q. What took place at that meeting?

A. The discussion was over the payment that we got a bill for a million five. And Jon, we got this nasty letter that he was going, you know, unless he got it. I said, I can't go along with that. Then I got another 500,000 one I talked about from Vito.

So I said, guys, you got to give me an invoice that's correct. Now, I will hire a third party. And the company was Absolute Engineering, I think their name was. I will hire a third party. Whatever this third party says, we'll pay that, I'll pay it. And I said, or I will -- I would be happy to, if you consent from your bonding company, I'll pay the $500,000.

And they sat there with their arms folded. They didn't eat or nothing. We all ate other than Vito and Kevin. They were pretty rude just sitting there with their arms folded and wouldn't be committal -- committal to anything. And I tried to work it out with them right then and there, and they just didn't want to hear it. They said, we got to go back and talk to Jon. I said, well, get him on the phone. This job's important. They wouldn't even get him on the phone. They said, we'll go back and talk.

And it ended at that. And Absolute tried to get him -- tried to get Vito two or three times, and he wouldn't even have any input in it.

Q. Had you hired Absolute to do a analysis of the pay applications or what might be due to the Coastal companies before you went to this meeting that you just described?

A. I think I had talked to them about doing it. They hadn't done anything yet. And I proposed to this third party would do it, and whatever they come up with, whether you right, I'm right or wrong or whatever, whatever that number is, you give them the input, I give them the input, they do -- the third party look at it, and whatever they come up with, that's what I'll pay, and they didn't want to have nothing to do with it.

Q. Other than Absolute and Dominick Baruffi, who else, if anybody, did you reach out to, outside of the project, for help? Any other consultants? Any other subcontractors? Anybody to replace Coastal? Anything before this meeting?

A. I don't remember if I talked to Crane before or after.

Q. Jeremiah Lowell?

A. Yes. I think I might have called him to see if he could come in and help these guys, help them.

Q. How'd you find him?

A. I actually wanted to give him the job from the beginning, but I was --

Q. How'd you find him from the beginning?
A. I know of FL Crane. They're a pretty big company in the Louisiana/Mississippi market, and they do a lot of that type of work, and I wanted to give -- negotiate with FL Crane, but Vito told me that I couldn't do that because he had a territorial right and that that Miami job had to be done with him, and I found out later that was a lie. Dominick said no -- no Sto affiliate has any territory rights.
Q. I think you've used the word a couple of times, so I guess I'll just ask the question: Do you think Vito DePinto is a liar?
A. I don't normally like to judge people. I don't think -- I think at some point, judgment day's from the man upstairs. I really would -- I really would refrain from even answering that question.
Q. But I think that's the second time that you've specifically used the word "lie" when you've been talking about something that Vito said. So --
A. I haven't --
Q. -- are you -- are you changing your testimony or are you considering him to be a liar?
MR. PARTINGTON: Object to the form.
A. I don't think I specifically called him a liar.
BY MR. LAWHON:

Q. You said that he told you something and that was a lie, and this was the second time you've said that. That's why it caught my attention.
A. Well, if you want to put it in that text, I guess he was.
Q. Did anybody else from Coastal lie to you?
A. They made commitments. They couldn't live up to them. That's a nice way to say it.
Q. I consider a difference between making a promise that's unkept because of things outside your control or an accident or unexpected things, and just an outright lie when you know at the time you promise something you have no intention of delivering. Do you understand the difference that I just made?
A. I agree.
Q. Okay.
A. But I'm trying to be nice about. Do you want -- yeah, I guess they all were lying to me.
Q. That's what I'm trying to get at. You think they were telling you things knowing they weren't going to be able to keep the commitments, just to promise it to you?
A. That's right.
Q. Other than Vito, who do you think was doing that from Coastal?
A. I think Jon Parrish, and he didn't come into this

towards January maybe he got involved, because most early on it was just Vito. And then when Jon Parrish popped up, like who's this guy now? And he's -- he deserved what he got by being disbarred, or whatever it is, I don't know.

Q. I'll be moving to strike that because I don't think I asked that question.

A. You didn't, but I just offered it.

Q. Yeah, I know.

A. I'm sorry.

Q. You've done that a few times.

A. I'm sorry.

Q. So let's try to keep your answers responsive to my questions, okay. You can editorialize later.

MR. PARTINGTON: I don't think that was necessarily unresponsive, but you can move to strike it if you want. But, anyway. You asked for --

MR. LAWHON: Actually, it was a yes-or-no question, did anybody else -- well, I asked, did anybody else lie to you? I didn't ask for an extemporaneous discussion of why he thought they did. But we'll leave it at that.

BY MR. LAWHON:

Q. Do you -- so, so far you mentioned Vito and Jon. Is there anybody else from Coastal that you believe, by name only, lied to you while they were working on this

project?
A. Robert.
Q. Robert Warren?
A. Yes.
Q. Anybody else?
A. There was Jason, I want to say. There was another superintendent. I think his name is Jason. I don't know his last name. He tried to do the right thing, but he always made commitments that he just didn't fulfill. And this was in the staff meetings.
Q. Do you think he made commitments that he couldn't fulfill knowing at the time he made the commitment he was not going to fulfill it, or do you think he made commitments and he was trying really hard but just other reasons he couldn't -- it couldn't happen?
A. I think he knew it intentionally, just telling me what I want to hear.
Q. Anybody else?
A. I never had much contact with Brian. I mean, that's the only people that was involved. Kevin was once in a while you'd hear from him.
Q. But no lies from Kevin?
A. Huh-uh.
Q. No?
A. I don't think so, no.

Q. No. Did -- did you ever offer to loan money to Coastal while at any time on this project?
A. It was the half a million that when we met, if it was over and above what was actually on site, it would be actually a loan.
Q. I'm not following what you just said.
A. That when I said when we met, and then I'm using this round number, Vito's invoice of a half a million dollars, if we got consent of surety, I would pay that as a loan. In other words, if -- if we said you're entitled to 100,000 and you want 500, there would be a $400,000 difference, so that would be a loan, but I'd want consent of surety.
Q. Did you talk about loaning money to Coastal and charging them interest?
A. I don't remember we discussed any interest.
Q. Did you ever offer to loan any other subs money on the project or during the project?
A. I do it every week.
Q. What's that?
A. I do it every week.
Q. You do it every week?
A. Uh-huh.
Q. On this project?
A. Uh-huh.

Q. Yes?
A. Yes.
Q. Do subs come to you and ask for loans?
A. Yes.
Q. Every week?
A. Not every week, but if sometime the payment is late, they come to me, say, look, I'm short on cash, can you help me? And I'll do it.
Q. Do you ever charge interest?
A. Sometimes.
Q. What decides whether you do or not?
A. If they don't know how to manage their money and they're constantly at the -- asking me every month, every month, I kind of try to teach them a lesson that they need to know how to manage their money. So if they want to spend wildly, I'm going to charge them interest. And not -- you know, whatever the fair rate is, 5, 6, 10. No more than 10 percent.
Q. Ten percent for how long?
A. Until however long they pay me. Either they get the work done and then we can take it off the next pay request or however long it takes them to pay me.
Q. Are there subs on this particular project that have come to you regularly for loans?
A. Yes.

Q. Which ones?

A. Serinca. Once or twice, LLJ. I think that's it.

Q. Are there any subs that you've actually loaned money to and then have paid you back a loan plus interest on this project?

A. No, except ATO.

Q. So you actually loaned money to ATO plus interest, and then they repaid it with the interest while on the project?

A. They offered that. I didn't want it. They offered it.

Q. But that's what happened?

A. They're not on the site. I thought you were referring to people here on site, subs that are here now.

Q. We were talking about the whole project. So -- so -- but if I understood what you said, they offered to pay interest on a loan from you. You gave them the loan. They, ATO, paid it back with interest?

A. Because they were paying 36 percent interest, and they said, why don't you loan us the money and we'll pay you, I don't know, whatever it is, 6, 8 percent. They were the only ones that ever -- I actually loaned money to that paid interest.

Q. When you were talking to Dominick Baruffi around this June period that we've been talking about here, did

you -- did you tell him that Coastal had abandoned the job?
A. I think I might have, yeah.
Q. Did you tell him that you believed or you thought that Coastal was bankrupt or was filing bankruptcy or use the term "bankrupt"?
A. I don't remember that.
Q. Did you tell anybody that Coastal was bankrupt or was filing bankruptcy or use the term "bankrupt"?
A. I don't think so.
Q. Did you tell anybody else besides Dominick Baruffi that Coastal abandoned the job?
A. Probably the owners, the -- my attorneys and FL Crane people and SWS.
Q. Did you ever tell anybody that Coastal was going out of business?
A. I don't remember that.
Q. At some point after Coastal was no longer on the job, Coastal's bonding company got involved, Mr. Harrison got involved, and at some point shortly after he was involved, Coastal prepared a proposal to come back on to the project and finish the project within budget on time. Do you remember that?
A. Vaguely.
Q. Okay. And that -- you had the option to accept or reject that proposal. It was rejected. Can you tell me

why?
A. They were incapable.
Q. They weren't capable?
A. I didn't think they were capable of doing it.
Q. Is that the only reason?
A. Probably.
Q. So even with the bonding company supervising, holding the money, and fulfilling all the conditions of the bond, you still would not believe that Coastal could have gotten the work done?
A. I think there were some issues surrounding that after we did that. That's legal issues, I'm going to leave to the attorneys to figure out, some selections on the bond and stuff like that.
Q. Were there any other factors personally for you that led you to disapprove of the proposal that Coastal had made to come back on the job?
A. I didn't believe they were capable with the experience or the financial where to do it, because we were getting calls from all kind of suppliers and subs and everybody.
Q. Suppliers and subs for who?
A. That we didn't even know existed.
Q. Coastal's suppliers and subs?
A. Yes. They didn't even tell us they subbed out --

subbed the labor. Per the contract, they have to tell us that. Who's Ford Drywall? All of a sudden, we get all these liens and stuff. Who the hell is this?
Q. Did you -- other than lawyers, did you consult with anybody else as to whether or not you should accept Coastal's offer to return back to the job and complete the work on time and on schedule and in budget?
A. The owners.
Q. Who'd you talk to?
A. Ryan.
Q. Anybody else from the owner?
A. No.
Q. What was Ryan's assessment or opinion?
A. Same as mine.
Q. For the same reason, incapable?
A. Yeah.
Q. Speaking of the owner, as we sit here today, so right now, October 19th, October 19, 2018, has the -- have any of the owners made a claim against PVGC for any damages related to this project?
A. I don't think so. That's -- that's not been resolved or pending or something?
Q. Well, I'm going to take it in a couple of pieces. Let's not figure out right now -- let's not talk about right now whether it's been settled or resolved. I just

want to know if a claim's been made?

A. I don't think so.

Q. Okay. Was a written formal notice ever presented to PVGC by any of the owners of a claim being made against PVGC on this project?

A. No.

Q. Has one ever been threatened, whether verbally in talking to Ryan or by an e-mail or anything like that?

A. I don't think so.

Q. Has anybody from the owner ever indicated to you that they reserve the right or they may sue or they may look for a claim for delay damages?

A. For LDs, liquidated damages, if I don't finish on time.

Q. So the answer is, yes, the owner has at least indicated to you in some way that they might have or might pursue a claim for liquidated damages against PVGC?

A. Ryan will tell me that every week.

Q. Did it ever get to the point where it turned into a written formal claim with some dollar amount associated with it?

A. No.

Q. As you sit here today, do you think that claim is still open or is it resolved?

A. We're still -- contract's not over with yet.

Q. I understand that. Has -- has the -- have the owners indicated that they are no longer going to ever pursue LDs, or have they indicated to you that they might, depending on whether or not you ever finish this project or any other factor?
A. I think they will if we don't finish on time.
Q. On time meaning December of 2018?
A. Yes.
Q. As you sit here today, there is no pending lawsuit, arbitration, or other proceeding against PVGC by any of the owners, right?
A. Correct.
Q. And as you sit here today, there is no formal notice of a claim with a dollar amount attached to it that's been presented by any of the owners to PVGC related to this project?
A. Not that I remember. Other than a legal bill.
Q. What do you mean by that?
A. ATO and -- and the legal fees associated with them getting out of this.
Q. What do you mean by -- okay. You told me two things, so let's take tell me the one by one. You said legal bills from ATO. What does that mean?
A. For the owner's attorney that has been charged to the owner for representation getting out of ATO and this

case because I have to indemnify him, the owner.
Q. As you sit here today, does PVGC owe that money to the -- any of the owners, whether it's the legal fees associated with ATO Golden, legal fees associated with Coastal?
A. Yes.
Q. How have you and the owners agreed that's to be paid, if you have at all?
A. To -- we kind of punt it to the end of the job, whether it comes out at the end of the job or either any funds come out of this.
Q. Bruce has mentioned before that there were some settlement discussions and some settlement documents of some sort that eventually led to amendments to the contracts. Was that part of the discussion that led to the amendments of the contracts, was that one of the factors or was that --
A. That's one of them, yeah.
Q. So if I look at those documents, I'm going to see some discussion in there about punting claims for attorneys' fees?
A. It won't -- you won't see the word "punt," but it's delaying, you know, to the end.
Q. I understand. Like fooling, that's just a word you're using. I got it. But I know what the legal

language looks like.

MR. PARTINGTON: You need to speak Louisiana, and then you'd understand.

MR. LAWHON: Apparently, I need to go visit there more frequently.

BY MR. LAWHON:

Q. If I understand what you told me, loosely using the term "punting," the claim has been preserved or it's sitting out there subject to looking at it when you finish the job and when this lawsuit's over and when ATO Golden lawsuit's over. Is that --

A. Correct.

Q. -- kind of how it's going to work?

A. Uh-huh.

Q. Yes?

A. Yes.

MR. BELL: Deferred.

THE WITNESS: Good word.

BY MR. LAWHON:

Q. Speaking of ATO Golden, did you ever tell Jon Parrish that you were going to fire Robert Mick?

A. Yes.

Q. Did Jon Parrish send you a letter indicating that you had said you were going to fire Robert Mick, and you asked him to take back the letter and write another letter

without that language in the letter?
A. I don't remember that.
Q. When exactly did you tell Jon Parrish that you were going to fire Robert Mick?
A. I don't remember. I just remember the discussion.
Q. Why did you tell him that?
A. Robert -- well, Mick we call him, got sideways with Jessie -- I don't remember -- Jessie Baez, the owner of JEM. And I had just got off the phone -- just before Jon called, I had just got off the phone with Ryan who, I mean, came upside one side of me and down the other because of Mick and Jessie getting in an argument. And when I had got off the phone, I mean, no sooner I set my phone down, it rang. It was Jon. He could tell I was kind of furious.
MR. LAWHON: I'm pretty sure I have a fair amount more material I would like to cover with Mr. Vicari, but we're being told he has to leave at 3 o'clock. So now is probably a time for us all to get our respective positions on the record so that he can leave on time.
I believe I still have relative topics to cover with him, and I also believe there are still documents that are outstanding that I've asked for that haven't been produced yet that I would like time to ask questions about. So for those reasons, I am going to

say that I reserve the right to ask him additional questions. I believe Mr. Bell would like to do the same.

MR. BELL: Yeah. I'm going -- I am not going to have a lot, but there's going to be, I'm guessing, between a half hour and an hour.

THE WITNESS: Ain't happening today.

MR. LAWHON: Understood. And --

MR. BELL: No, we get that.

MR. LAWHON: Your attorney will talk to you about that.

MR. BELL: I'm saying we'll have to figure out a time. You know, there's a few days actually opening up that -- whatever, I don't know what your schedule is like, but that we could all look at.

MR. PARTINGTON: My position is that we are far beyond the time allowed by the case management order, and so that's my position.

MR. BELL: Well, is it your position he will not be made available again, or are you not making that strong a position right now?

MR. PARTINGTON: Well, it's a little interesting, I guess maybe the best way to put it, because both he and PJ have been deposed individually, but they've been asked predominately, you know, corporate related

questions. So my position is that the time has expired, but I'm not taking a position on whether or not you will be entitled to take a 30(b)(6) of the company because we haven't seen a topic list, I mean, all that stuff. So --

MR. BELL: Well, maybe that's something we can do, Tony, get together between me, you, and Guy, and do a 30(b)(6) notice.

MR. HARRISON: I've reserved my question for the for --

MR. BELL: For a 30(b)(6).

MR. HARRISON: -- for a 30(b)(6). I don't really care to depose Mr. Vicari personally.

THE VIDEOGRAPHER: This concludes today's videotape deposition. The time is 2:56 p.m.

MR. LAWHON: Go ahead, I'm sorry. I didn't mean to cut you off. I just wanted to get him situated.

MR. HARRISON: No. Like I said, to the extent that I have questions, then I'm going to reserve them for a 30(b)(6) because I think that's where my questions would be pertinent.

MR. LAWHON: Okay. Well, I think at this point then we'll go ahead and conclude today, and we'll see if we're going to come back another time or not. And I would like to order.

MR. PARTINGTON: And he'll read.
(This deposition was concluded at 2:56 p.m.)
\- - -

C E R T I F I C A T E O F O A T H

STATE OF FLORIDA )
)
COUNTY OF MIAMI-DADE)

I, the undersigned authority, certify that PETER G. VICARI personally appeared before me and was duly sworn on Friday, October 19, 2018.

WITNESS my hand and official seal this 2nd day of November 2018, Miami, Florida.

______________________________
Cicely Moore
Notary Public State of Florida
Commission #GG124933
Expires July 17, 2021

C E R T I F I C A T E O F R E P O R T E R

STATE OF FLORIDA )
)
COUNTY OF MIAMI-DADE)

I, Cicely Moore, Court Reporter, certify that I was authorized to and did stenographically report the foregoing deposition of PETER G. VICARI; that a review of the transcript was requested; that the foregoing transcript is a true and complete record of the testimony given by the witness.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Dated this 2nd day of November, 2018.

CMoore

Cicely Moore
Notary Public State of Florida
Commission #GG124933
Expires July 17, 2021

ESQUIRE ERRATA SHEET

Esquire Job ID: J2914501

Case Caption:

Pete Vicari General Contractor

vs.

The Ohio Casualty Insurance Company, et al.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the above-captioned matter or the same has been read to me and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the ESQUIRE ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath. Signed on the ______ day of ____________, 20___.

_________________________________

PETER G. VICARI

ESQUIRE ERRATA SHEET

Page No._____Line No._____Change to:______________
________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
________________________________________________
Reason for change:________________________________

SIGNATURE:_______________________DATE:___________
PETER G. VICARI

ESQUIRE ERRATA SHEET

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

SIGNATURE:_______________________DATE:___________

PETER G. VICARI

**Exhibits**

**2914501 Peter.G. Vicari. EXHIBIT324**

**2914501 Peter.G. Vicari. EXHIBIT325**

**$**

**$125** 96:20
**$400,000** 133:22 145:11
**$500,000** 139:12

**0**

**05** 98:7,8
**09** 98:4

**1**

**1** 4:6 37:25 38:5 88:7,11 93:2,4,5 98:14 113:11
**1-STY** 38:3
**10** 21:2 42:7 59:18 75:6,8 93:2,5,21 94:15,17 98:14 108:25 133:5 146:17,18
**100** 93:4
**100,000** 145:11
**101** 66:15
**107** 119:19,20
**10:15** 4:7
**10th** 112:12
**115** 120:24
**117** 86:1,2,10
**11:11** 45:5
**11:33** 45:8
**11:59** 63:4
**11th** 108:25 112:12
**12** 75:6
**12-foot** 43:18,24
**12-month** 11:25
**120** 113:5
**12:30** 85:2
**12:55** 85:5
**139** 121:24
**13th** 132:4,10 134:17 135:20 136:8 137:23
**14** 25:18,20 83:16 86:11 122:21
**14th** 122:3
**16** 65:4,5 66:3 72:11,21 73:11,23 78:14 79:9 80:12,14, 23 81:13, 23 86:22 87:4,17 88:5,11 89:2,9
**16th** 65:3 77:22 78:6 88:12 121:21
**17** 53:8 73:11 80:6 115:24 120:7 121:3
**17th** 88:13
**18** 58:22,23
**19** 4:6 150:18
**19th** 150:18
**1:16** 100:14
**1:21** 100:17
**1:55** 123:19
**1E** 68:15
**1st** 77:24 89:10 112:15,16 113:14, 19,23 114:5,9

**2**

**2** 45:8 63:15 68:13
**2/14/17** 83:23
**20** 35:16 61:18 74:19
**2009** 43:8
**2016** 14:8 25:25 26:3,17 27:25 28:3 52:21,24 53:6 72:16,19 80:7
**2017** 53:7 65:3,5 66:3 72:12 78:15 79:9 80:23 81:13,23 83:16 86:22 87:4,17 88:5,19 89:2,9 107:22 108:7 121:3 122:3,21 128:20
**2018** 4:7 150:18 152:7
**22nd** 49:20
**23** 27:25 28:3
**23rd** 25:25

26:3,17
27:5,6

**24**
14:8
25:19,20
27:21
33:7

**24th**
15:18

**25**
120:15,21

**25th**
120:11

**26**
51:21
120:15,21

**26th**
52:3
120:11

**27**
43:8

**2:08**
123:22

**2:56**
157:15

**3**

**3**
63:15
100:17
105:7
123:24
155:18

**30**
61:19
93:18
97:18
121:3

**30(b)(6)**
157:3,8,
11,12,20

**300**
58:14
59:11

**302**
25:15
27:11,19
28:8 33:5

**303**
13:24,25
14:1,7

**304**
15:5

**305**
15:20

**307**
26:23
27:11
28:9
33:13

**308**
37:6
39:20
45:13

**30th**
23:1

**311**
43:4

**312**
40:13
47:18

**317**
32:17
35:16

**319**
82:19,20

**324**
85:6,9

**325**
103:21
104:1,2

**34**
40:2
44:25

**36**
147:19

**4**

**4**
13:10

**40**
13:10
29:21,22

**45**
52:12

**4:50**
86:12

**5**

**5**
25:20
27:21
33:7 58:5
61:15
98:7
146:17

**500**
145:11

**500,000**
139:4

**6**

**6**
146:17
147:21

**6:08**
83:16

**6th**
23:5
27:2,6
28:24

**7**

**70-foot**
33:10,16

**8**

**8**
44:1
83:22
93:1,25
94:14,23
95:9,21
98:16
133:5
147:21

**8-foot**
44:2

**8th**
27:1,2,6
28:24

**9**

**9**
94:14,23,
25 95:9
98:16

**91**
119:16

**92**
63:15

**93**
63:15

**94**
63:15

**95**
58:4
138:15

**99**
68:1

**A**

**A-201**
83:19

**a.m.**
4:7 45:5,
8 63:4

**abandoned**
148:1,11

**Absolute**
139:8,23
140:1,13

**absolutely**
21:1
92:12

**accelerate**
109:12
110:16
113:20
114:5,10,
14

**acceleration**
135:8,16
136:15
137:1,10,
13

**accept**
148:24
150:5

**accident**
142:11

**accurate**
37:20
38:22

39:24
40:7
44:10
129:22

**act**
91:16

**action**
97:1

**actively**
115:8

**actual**
48:15
133:19

**add**
110:2

**added**
28:4
49:15
117:25

**adding**
110:14

**addition**
14:12
15:14

**additional**
62:6,10
82:9
109:16
110:5
113:21
128:4
156:1

**address**
37:19
39:23
40:1
83:14

**addressed**
34:20

**adjust**
61:1 77:7
82:2,14
84:5
85:23

**adjusting**
62:15
77:15
81:18,22

**administration**
16:25

**administrative**
17:9
18:21
20:24

**advice**
129:13,25
131:19,22

**affected**
96:7

**affiliate**
141:8

**affiliation**
4:8

**affirm**
4:19

**affirmed**
5:1

**afternoon**
121:8

**age**
6:13

**agent**
9:21
39:8,12
90:5

**agree**
17:19
56:7 64:2
69:16
125:24,25
142:15

**agreed**
50:6
57:13
60:3
126:20
153:7

**agreeing**
126:19

**agreement**
23:11
63:20
81:23
97:1

**agreements**
62:22
63:10,19
64:3,7,22
66:20
67:4 68:4
77:11,13
78:6,11
79:2,7,15
80:3,19
81:20
82:1,15
86:18
91:1

**ahead**
21:9 37:7
100:12
135:10
157:16,23

**AIA**
83:19

**air**
8:16

**Allied**
4:12

**allowed**
11:21
111:4
129:18
156:17

**alter**
22:16

**altering**
21:21

**amendments**
153:14,16

**amount**
108:13
109:7
151:20
152:14
155:16

**amounts**
62:5

**analysis**
134:12
140:1

**angle**
65:18

**angles**
56:21

**answering**
84:13
141:16

**answers**
99:1
117:24
143:12

**anticipated**
66:22
67:6
73:21

**anytime**
41:1
66:10

**apartment**
7:17,22
42:22
76:2

**apartments**
7:18
58:14

**apologies**
5:7

**app**
130:2

**Apparently**
154:4

**appears**
85:14

**application**
9:22 10:3
20:6,7,8
23:2
25:4,17
26:4,13
27:20,24
28:2,10,25 29:6,18 32:24
33:5,12
34:8
35:13,21
36:13
38:14
41:6
45:21
49:19
51:10,17
52:13
119:23,24
121:4
122:4,25
130:1
133:24

**applications**
35:17
38:18
39:16
122:22
128:21
129:8,15

130:5,7 131:5,16, 20 132:19 133:1 134:2,6 140:2

**apply** 6:11,20 9:6 21:11

**applying** 9:11 22:22

**approvable** 119:7

**approval** 70:7 90:9 114:18 115:9 124:5 128:13 131:15

**approve** 39:15 124:8 125:11, 16,19 126:9 128:3 129:25 132:25 133:4

**approved** 38:18 39:9 87:24 118:24 119:5 121:17 122:14 123:3,5, 12 124:11, 14,18 125:15

126:12 127:2 129:11,15

**approving** 125:5,6, 23 131:12

**apps** 122:8 130:11, 18,19 131:10,12

**arbitration** 152:10

**architect** 45:18 46:6 115:12 116:19,21 119:5,8

**architects** 117:24

**area** 105:13

**areas** 104:16

**argue** 21:6

**argument** 104:25 155:13

**argumentive** 56:6

**arms** 139:13,16

**arrive** 134:9

**Article** 68:15

**articles** 68:8

**Assembly** 97:21

**assessment** 150:13

**assisted** 27:10

**assume** 98:25 102:1 120:19

**assured** 74:5 117:14

**astute** 94:6

**ate** 139:14

**ATO** 99:7,21, 22 109:22 110:8,11 147:6,7, 18 152:19, 23,25 153:4 154:10,20

**attach** 67:17 69:25

**attached** 50:2 71:9 72:8 78:5,10 79:6 81:22 86:23 152:14

**attaching** 119:23

**attachment** 69:1

**attention** 14:8 84:4 142:3

**attorney** 10:2 11:9 16:14,17 17:11 19:6,7 20:12 24:2 34:19 35:22 61:5 152:24 156:10

**attorney-client** 53:23

**attorneys** 148:12 149:13

**attorneys'** 153:21

**auditorium** 35:18 36:4,21 49:15

**August** 14:7 15:18 23:1 25:25 26:3,17 27:5,6,25 28:3 52:23

**authority** 31:1 46:23 78:1,2, 21,22 79:24 106:13 107:5,11

**authorization** 78:8,16 79:10 80:18 88:9,25 89:7,15, 19

**authorized** 81:12

**aware** 89:7,14, 20 100:6 102:15

**B**

**B-I-H-O-E-M** 54:24

**B-O-E-H-M** 54:25

**B-O-H-M** 54:21

**back** 4:5 10:6 21:5,8,16 22:19 25:21 28:22 30:7,8 41:19,21 45:7 47:5 49:20 57:10 62:16 63:4 66:3 79:5 81:16,19 85:4 88:15,24 91:22 92:2,15 93:17,18 98:24

100:16
107:19
108:11
111:10,24
116:23
117:15,23
118:4
123:21
126:5,16
128:10
132:14
139:19,21
147:4,18
148:20
149:17
150:6
154:25
157:24

**backseat**
98:20

**backwards**
55:16
114:8

**bad**
38:4
56:15,16

**Baez**
155:9

**bank**
122:8

**bankrupt**
148:4,5,7,8

**bankruptcy**
148:4,8

**Barbara**
12:11
25:11,13
26:7
30:22
34:12,24,25 35:4
50:10,12
51:16,18,19

**barely**
38:1

**Baruffi**
138:11
140:13
147:24
148:11

**based**
53:21,22
125:2
134:9,10,12

**basically**
8:23
48:19
70:9
75:18

**bear**
62:22
91:5

**beating**
114:22

**beginning**
33:5 93:7
125:9
140:25
141:1

**behalf**
54:15
64:24
115:17
137:13

**believed**
63:9 74:6
108:18
111:12
112:1
136:11
148:3

**Bell**
4:14
13:23
14:1 19:8
27:16
154:17
156:2,4,9,12,19
157:6,11

**benchmarks**
75:11
76:3

**benefit**
92:14

**Bennett**
138:22

**Bernard**
39:7,22
40:22
41:7
43:8,13
45:10

**bid**
46:7

**big**
42:1
98:19,21
132:9
133:7
134:17
141:2

**biggest**
56:11
57:8

**bill**
129:19
131:2
139:2
152:17

**bills**
152:23

**binder**
119:16

**bit**
10:1,11
12:19
15:11
28:20
29:16
58:25
60:15
71:7
79:17
88:15
91:6
98:25
114:17
135:22

**Black**
4:12
40:25

**blend**
135:13

**blew**
8:14,21
51:1

**blinds**
43:20

**blow**
31:25

**blown**
48:22
50:25

**board**
16:15
19:18,19,20 26:20
32:1
51:4,5,7
52:10

**Bob**
54:20
55:10

**Boehm**
54:20

**bolt**
56:21

**bond**
119:11,13
149:9,13

**bonding**
139:11
148:18
149:7

**bonds**
87:14
88:22
90:1,7,15,19
91:3

**booked**
51:8

**borrow**
59:7,20

**bottom**
14:9
21:10
39:4,6
45:23
47:21
51:21

**box**
38:8

**breach**
113:9

**break**
41:1 45:3
84:24
100:9

**Brian**
116:2
144:19

**Bridgette**
83:8,12
84:3
90:4,8
122:16

124:24

**briefly** 5:18 6:22 7:19,21 15:1 25:5 34:24

**bring** 58:19,24 59:11 109:10,16 110:6 136:22

**bringing** 59:24 95:15

**brought** 84:4 109:19,22 113:20

**Bruce** 4:10 53:9 153:12

**Bryant** 10:2,4,10 12:12,16, 18,25 13:7,16 15:4 23:6,12, 23,25 24:6,8 25:2 26:16,18 27:5,12 28:3 29:4,8, 12,17 30:18,25 31:10 32:2,14 34:3 35:9 36:20 50:3,12 51:18

52:5

**budget** 148:21 150:7

**build** 8:12 42:3 48:12,24

**building** 21:11,20 22:14,23 29:21 33:11 34:4 35:6 36:5 37:3 38:15 40:2,19 41:5,10, 13 42:4,5 43:14 44:9,11 46:9,22 47:1 58:15 66:23 69:11 80:24 97:13 108:11

**buildings** 8:4,25 30:6 35:25 57:12,17 59:15 81:3

**built** 29:21 82:8

**bullet** 68:25

**business** 148:15

**busy** 15:1

## C

**cabinets** 110:13

**calendar** 51:9

**call** 19:15 24:5,10, 11,13,22, 25 27:21 34:14 35:9 36:7 41:18 48:9 49:25 50:14 65:19 70:9 75:25 108:3 115:1 131:18 155:8

**called** 30:7,8 42:15 44:17,18 66:4 132:5,9 133:16 135:2 140:21 141:24 155:11

**calling** 65:17

**calls** 55:23,24 74:20 100:10 114:22 115:12,16 149:20

**candid** 55:23

**capable** 149:3,4, 18

**care** 157:13

**case** 23:18,20 51:6 112:5 153:1 156:17

**cash** 146:7

**Casualty** 4:15

**categories** 65:16

**caught** 97:21 142:3

**caulk** 76:22

**causing** 137:22

**ceiling** 8:15 42:13

**certified** 9:7,17 11:15,22 12:7 13:2 16:8 21:11,12, 19 22:14, 22,23

**chain** 86:7 122:2

**challenges** 90:15

**chance** 82:24 104:1

**change** 34:11 64:4 69:22 70:9 84:9,14, 18,20 85:21 91:6 124:2,3, 5,8,16, 17,22 125:2,6, 11,16,19 126:5,15 128:3,8, 11,12,16

**changed** 108:8

**changing** 84:9 141:21

**charge** 6:5 96:15 99:11,14 137:2 146:9,16

**charged** 133:23 152:24

**charges** 126:6,16 128:10

**charging** 81:9 133:15,23 145:15

**check**
23:7,9, 10,14,20 27:8 62:17 96:25 97:18 122:7,12

**checked**
51:9

**checks**
97:17

**church**
97:20,24

**Cicely**
4:1

**CILB**
53:24

**Civic**
22:15 55:11 100:3 108:10,23 109:4 111:14 112:8,22 113:16 120:1

**civil**
61:19

**claim**
60:12,14, 17,23 61:6,11, 16,20 62:11,15 96:20 150:19 151:4,12, 17,20,23 152:14 154:8

**claim's**
151:1

**claims**
60:12 62:3 98:11,18 153:20

**clarified**
117:25

**clarify**
45:11

**clean**
16:15

**clear**
13:18 14:18 24:7 48:12 53:17 70:22 130:10

**client**
7:15 20:12

**clips**
56:20,21 69:1

**close**
136:3

**coastal**
4:16,17 18:19,25 53:20 57:14 58:1,5 63:14,17, 18,20 64:3,6, 10,11,20 65:9,10 66:4,20, 25 67:4, 11,20 68:4 69:17 70:15 72:18 73:24 77:2,6, 13,14 78:7,11, 14,15 79:2,7, 14,20 80:1,7,8, 17,21 81:4,12, 17,21,22 82:1,13 85:23 86:18,22 87:19 88:25 89:8,15, 25 90:19 91:1 93:16 95:13,20 99:1,2,5, 20 106:12 107:15 114:6,8, 13,14,19, 25 115:2 117:2 118:5 119:3,9, 23 121:15,20 122:8,9, 13 123:1, 15 124:3, 4,6,9 125:7,11, 16,19,25 126:4,15, 22,23 127:6,9, 13,18,21, 25 128:4, 10,11,21 129:7,14 130:1,6, 17,18,19 131:6,12, 14,16,20 132:19 133:1,2 134:23 135:5,6, 7,9,10, 11,15 136:8 137:1 140:2,16 142:6,24 143:24 145:2,14 148:1,4, 7,11,14, 17,20 149:9,16 153:5

**Coastal's**
56:11,12, 14,18,25 87:3 106:16 107:21 114:19 136:14 148:18 149:24 150:6

**commentary**
20:22

**comments**
5:20 116:22,25 117:4

**commitment**
144:12

**commitments**
142:7,21 144:9,11, 14

**committal**
139:16

**committed**
78:3

**common**
45:14 56:3

**communicate**
24:17 73:2

**communicated**
24:21

**communicating**
24:15

**communication**
10:6 17:13

**communications**
17:3 20:12,19 22:10 53:10,23, 24 73:1

**companies**
80:2,8 85:23 89:1 91:2 96:11 111:6 114:2 133:22 140:3

**company**
9:23,25 59:6,7, 12,21

60:11 81:9 89:8,16 95:8,23 96:6,25 97:6,11, 14,16,23 109:22 139:8,12 141:2 148:18 149:7 157:4

**company's** 70:21

**compare** 37:1

**compensation** 91:23 92:15

**complained** 19:1 55:25 56:9 57:5

**complaint** 18:21,22 19:13 20:24 53:21 56:11 57:15

**complaints** 18:19,20 22:6 55:19 56:18,24 58:1

**complete** 38:23 79:8,14 111:12 112:1 113:17 119:7 133:19 135:14 150:6

**completed** 31:18,19, 21 46:8 47:3 60:2 112:7 117:14 118:6,12

**completely** 8:5,6

**Completing** 36:11

**completion** 36:16 107:18, 20,24,25 108:3,4, 6,8,11,19 109:3,10, 13 110:19 111:13 112:2,18, 23 113:17 115:6

**complex** 43:13 44:9 45:11 46:10,21 96:19

**complexes** 7:17,22

**compliant** 100:4

**comply** 99:18

**composed** 47:8

**computers** 94:7

**conceded** 62:11

**conclude** 157:23

**concludes** 157:14

**conclusion** 134:9

**concrete** 8:13 47:8,9 49:6 65:13,17 69:5,6 128:14,17

**concurrently** 75:20

**conditions** 82:23 83:3 149:8

**conference** 19:15 24:11 116:9

**confirmed** 30:9,10

**confused** 10:1,12 12:18 14:25 24:3 29:16 78:21

**confusing** 79:17

**confusion** 111:19

**consent** 139:11 145:9,12

**considered** 14:13 42:10

**consists** 37:6 44:9

**constantly** 146:13

**construction** 6:11,25 10:17 11:12,24 12:3,4, 21,23 13:10 14:10,13, 17,24 15:14 16:7 19:20 27:15 28:6 31:11,18, 21 32:3 44:21 55:22 56:4 66:15 87:9 91:13 92:23 94:9,12, 13,22 95:4,5 99:11,23 100:1 101:19 102:24 108:18 111:12 129:21 133:10

**constructive** 135:23

**consult** 150:4

**consultant** 137:14

**consultants** 140:15

**consulted** 130:3

**contact** 9:20 54:13,16 144:19

**contaminated** 43:19

**contemplated** 7:3 64:6

**continue** 5:8 6:18, 23 112:17

**contract** 22:16 62:7,20 63:8 66:6,9,12 67:2 71:22 72:5,9 75:1,9 76:5,25 77:2,5, 19,20,22, 25 78:25 79:11,19 87:15 88:7,12, 14,18 89:3,11, 14,18,21

90:12
91:1,25
110:4
112:19,22
113:10
118:16
121:15
126:9
150:1

**contract's**
77:17
151:25

**contracted**
70:4

**contractor**
4:11
21:12,20
37:19,25
39:23
45:24
58:8,19,
24 59:24
60:5

**contractor's**
46:4

**contractors**
9:7,17
11:16,22
12:7 13:2
16:9,15
19:19
22:14,22,
23

**contracts**
62:21
63:11,16
67:12
70:14,18,
21 71:6,
10 73:11,
19 77:8,
10 78:17
80:2
81:20
82:15
84:8,12,
19 85:15
86:18,21,
24 88:6
89:17
91:1
107:21
113:1
121:20
153:15,16

**contribute**
28:8
50:11

**contributed**
50:16

**control**
95:25
96:4
106:17
142:10

**conversation**
14:23
17:10,11,
22 19:9
29:11,15,
19 30:3
74:7
82:13
121:14

**conversations**
12:5
30:17
67:18
85:22

**conveying**
50:12

**coordinate**
86:13

**copies**
84:22

**copy**
38:4

**corner**
83:5

**corporate**
156:25

**correct**
22:18
26:15
33:23
35:19
43:23
67:8
68:24
69:8,19
78:18
79:3
106:14
110:12
112:25
113:4
118:8,9,
12,25
120:6
126:3,21
139:7
152:12
154:12

**correctly**
24:20
32:8,10
54:8
58:11
85:17
108:16
112:4
119:1
120:4
130:5

**cost**
38:12
97:4
135:17,18

**council's**
48:8

**counsel**
4:7

**count**
11:15
12:6

**counted**
13:1

**couple**
13:20
17:20
54:4,5
62:12
76:22
84:22
89:24
108:11,23
109:3
111:14
112:8,13,
23 124:1
138:8
141:10
150:23

**COURT**
4:18,23
37:16

**cover**
54:5
63:10
83:4
124:1
155:17,21

**covered**
64:6

**Crane**
66:23
108:10
109:7,13,
19 110:20
113:24,25
140:18
141:2,5
148:13

**crazy**
135:19

**create**
48:18

**credits**
59:9

**critical**
73:25
135:9

**Cronin**
4:14
115:2
116:8,23,
24 117:1,
3 133:22

**Cronin's**
115:4,20
133:21

**Crump**
39:7

**cut**
81:3
157:17

**D**

**dad**
6:24
100:11

**Daddy**
133:6

**damage**
8:1
43:12,21
44:3
48:14
49:8
58:15
66:15,24,

25 100:24

**damaged**
7:23 42:5 43:20 64:8 66:6 98:2

**damages**
66:10 113:3,10 150:19 151:12, 13,17

**danger**
100:23 101:10

**dash**
37:25

**date**
4:6 17:24 18:19 23:6,7,9, 14,16 26:18,23 28:4,24 43:9 51:8 52:14,16, 18 65:7,8 77:18 78:4,23, 24 79:6 81:1 98:1 108:3,4, 6,8,19 109:1,3, 11,13 110:19 111:13 112:2,18, 23 123:13 134:18

**dated**
25:25 65:2 83:16

121:3 122:3

**dates**
18:11 26:22 27:8 29:9,10 75:11 76:3,11, 13,15,23 77:23 78:13 84:9 113:17

**David**
10:2 12:12 14:20 15:3 22:24,25 23:6 24:6,8 26:16 27:12 35:9 50:3

**day**
15:10 17:5,18 20:3,13 23:16,17, 20 30:8 53:22 55:24 72:7,10 75:6 101:19 104:14 105:8,9 106:15

**day's**
141:14

**days**
52:12 59:18

74:19 75:8 76:22 93:18 97:18 109:20 112:14 113:2,5 121:4 136:4 138:8 156:13

**DBPR**
6:3 23:3 25:3 26:25 28:15,25 29:6 33:13,19 34:4 49:19,20 51:15,18

**deadline**
58:19,20, 21

**deal**
54:17 106:1 117:2

**dealing**
95:23 99:3,17 117:2

**debris**
43:18

**December**
53:1 107:21 108:7 152:7

**decided**
9:6

**decides**

146:11

**decision-making**
129:7

**deck**
8:15

**defect**
127:7

**defects**
127:22, 23,24

**defendant's**
85:6 103:21

**Deferred**
154:17

**defined**
107:24 108:20

**definition**
32:14 91:21

**delay**
137:4,5 151:12

**delayed**
87:15

**delaying**
117:7 137:4 153:23

**delays**
125:12, 14,20 126:1,6 128:4 137:22

**deliver**
126:17

**delivered**

75:15 90:13 122:22

**delivering**
142:13

**delivery**
75:18

**demo**
66:24 68:20 74:3,15 75:16,19, 23 76:20 79:16

**demoed**
58:16

**demolition**
75:14 76:13 110:12 137:5

**department**
16:24 46:23

**departments**
46:24 47:6

**Depend**
103:6

**depending**
152:4

**depicted**
40:15 41:6,23

**Depinto**
86:11 141:12

**depo**
82:19

**depose**
157:13

**deposed**
70:20
156:24

**deposition**
4:1 5:8,
17 6:4
7:20 9:25
13:20
63:7
157:15

**describe**
41:17
55:17

**description**
43:12
44:11

**deserved**
143:3

**design**
114:18
115:9

**desk**
5:23
117:5,8

**destroyed**
8:5,10
97:14

**detail**
32:13

**details**
31:24
117:22
134:4

**deteriorate
d**
69:25

**determine**
22:21
109:2

**difference**
21:15,18,
19 35:5
130:10
142:9,13
145:12

**differently**
69:15
95:24
96:3
98:25
110:19,24

**difficult**
95:14

**difficulty**
90:6 99:3

**dime**
60:21

**dire**
57:17

**direct**
5:3 6:5
14:8
119:19

**directed**
89:7

**directing**
89:15

**direction**
40:19

**directly**
24:14
73:3 97:6

**disapprove**
130:1
131:15
133:1
149:16

**disapproved**
129:11,15

**disapprovin
g**
131:12

**disbarred**
143:4

**disbursed**
97:7

**Disc**
4:6 45:8
100:17

**disclosing**
20:22

**discuss**
9:19 11:2
19:13
29:4
32:13
34:2
36:20
56:7
122:16

**discussed**
20:3,5
29:12
36:23
59:23
67:11,14
74:11,12
145:16

**discussing**
35:24

**discussion**
7:13 9:15
11:20
12:11
17:4,15,
17 27:12
31:16,23
52:8
59:18
81:25
105:2,10
139:1
143:20
153:15,20
155:6

**discussions**
7:8 11:5
12:13
59:16
62:16
67:5
71:20,21
75:12
77:14
81:17,21
153:13

**disparity**
133:7

**distinction**
11:11
13:4
31:10
34:17
69:10,12

**divulge**
98:20

**document**
37:12
85:24

**documents**
57:4
153:13,19
155:22

**dollar**
136:20
151:20
152:14

**dollars**
135:19
145:9

**Dominick**
138:11
140:13
141:8
147:24
148:10

**doors**
43:20

**draft**
25:17
27:20

**drafting**
25:3

**drafts**
36:18

**draw**
121:9,11,
16

**draw/pay**
122:8

**drawing**
114:18
115:9
120:12
128:23

**drawings**
74:14,25
76:12,17
78:2,23
79:24
80:16,20
81:1,14
82:5,11
87:7,13,
24
114:20,24
115:7
116:18,
21,23,25
117:4,21
118:1,6,
11,22
119:2,4,
10,12
120:5,10,
13,15
121:13,17
122:13
123:3,11,
15 126:13
127:2
133:21

137:4
**driving** 135:9
**drop** 75:24,25
**Drywall** 150:2
**Dudley** 16:18,19 17:3,23 18:9,15 22:8 53:4,6, 11,13,23
**Dudley's** 19:9
**due** 140:2
**Duke** 54:20
**duly** 5:1
**duration** 75:15,22 82:18
**durations** 71:19 73:20 74:2,5,13 76:4 77:17 95:16 108:9

**E**

**e-mail** 14:6 15:8,23 21:8,10 24:17 30:23 61:5 74:22 83:7,14 84:1 86:7,11 119:22 121:1 122:2,7 151:8
**e-mails** 122:1
**earlier** 5:9,16 14:18 74:24 78:22 79:5 133:20 136:18
**early** 17:25 18:13,24 74:25 79:18 80:6 87:24 143:1
**eat** 139:14
**edge** 41:19 63:13 64:1,20 65:10,12, 13,18 66:5,7, 17,18,19, 23 67:5 125:7 128:9,14, 17
**editorialize** 143:13
**effect** 31:8
**effort** 137:9
**efforts** 96:22
**ejected** 106:9,11
**electrocuted** 103:10
**eligibility** 9:16
**eligible** 11:15 12:7 13:2
**else's** 107:10
**embed** 65:13 69:24
**embedment** 65:19 67:9 125:7
**embedments** 65:19,22 67:9,10 69:1,5,6, 10,18 70:3,14 128:9
**emphasis** 13:5
**employee** 104:19 106:23
**employees** 55:13 102:4 103:1 107:4,11 116:8,9
**employer** 104:20 105:24 106:22
**enclosing** 85:15
**end** 59:10 80:14 153:9,10, 23
**ended** 63:2,6 135:22 139:23
**engage** 32:3
**engaged** 10:17
**engineering** 4:14 56:16 139:8
**engineers** 117:24
**entire** 22:15 56:22 107:22
**entities** 55:14 63:17 77:2
**entitled** 62:10 145:10 157:3
**entity** 54:11 55:11 79:21 80:11
**equipment** 43:2
**equivalent** 28:13 32:24,25 34:6 37:3 50:4,5,8, 13
**essentially** 21:10 120:4
**euphemism** 117:8
**evaluated** 137:12
**evaluation** 129:7
**events** 96:8
**eventually** 6:13 153:14
**everybody's** 99:8 101:12
**Everything's** 25:20
**exact** 72:10
**EXAMINATION** 5:3
**examined** 5:1
**excessively**

133:13

**exchange**
14:6
91:24

**exchanging**
77:3

**excluded**
122:24

**excuse**
58:7
73:18
113:14
127:10
138:2

**exhibit**
13:21,25
14:7
15:5,20
25:15
26:23
27:11,19
28:8
32:16
33:5,13
35:16
37:6
39:20
40:13
43:4
45:13
47:18
50:1
68:13
71:10
82:19
85:6,9
86:1,10
89:14
103:21,25
104:2
119:19,20
120:24
121:24

**exhibits**
13:19
54:2
63:15
119:17

**existed**
149:23

**existing**
48:19
66:10
69:1,10

**expanding**
7:9,11

**expectation**
113:11
136:25

**expecting**
136:16

**experience**
6:11 56:3
98:10
149:19

**expert**
19:21

**expired**
157:2

**explain**
91:20
116:15
127:16

**explanation**
61:25

**exposed**
101:10,
12,16

**extemporaneous**
143:20

**extent**
17:2
157:18

**exterior**
48:23

**extra**
70:5

**F**

**F-U**
55:5,6

**F-U-S-O-N**
55:3,6

**F-Y-S-O-N**
55:4

**fabricate**
74:15
75:4
79:22
89:16

**fabricating**
76:18
89:1,8
127:1

**fabrication**
76:12
127:19

**fabricator**
78:18

**face**
30:15

**facility**
75:7
106:16

**fact**
88:14
91:4
136:8,15

**factor**
152:5

**factors**
149:15
153:16

**factory**
127:17

**facts**
135:25

**failed**
125:22

**failures**
126:2,16

**fair**
16:6 67:7
68:11
70:7
146:17
155:16

**faith**
136:22
137:7

**fall**
17:13,17

**familiar**
43:9
71:10,12

**Farris**
10:7,9,11
13:8 14:7
15:11
16:19
17:23
20:22
21:10
24:22

**Farris's**
14:9

**farther**
25:21

**fast**
57:1
97:11
109:14

**faster**
96:9,13
110:25
113:21

**Favrot**
96:19

**fax**
34:21
51:21
52:1

**February**
65:3,5
66:3
72:11
73:11
77:22,24
78:6,14
79:1,9
80:23
81:13,23
83:16
86:11,22
87:4,17
88:5,7,
11,19
89:2,9
90:24
91:2
115:23
121:3,21

**fee**
45:22
78:3

**feel**
63:24

**fees**
152:19
153:3,4,
21

**feet**
13:10
29:21,22
30:1
31:2,7
33:22

34:5,17 35:6 38:9 40:2 42:7 44:25 49:22
**felt** 58:18 108:12
**female** 19:23
**fight** 60:2,3
**figure** 15:3 56:8 72:11 109:4 117:6 149:13 150:24 156:12
**figured** 58:16 62:23
**filed** 22:6 53:20 61:18
**filing** 148:4,8
**filings** 53:24
**fill** 30:9 39:1
**filled** 37:22
**Fills** 45:19
**final** 130:15
**finally** 62:11
123:11,15
**financial** 149:19
**find** 16:13 22:2 23:23 33:7 52:9 74:12 119:20 140:23 141:1
**finding** 60:9
**fine** 55:18 63:25 65:24 66:2
**finish** 59:3 108:10 112:18,21 148:21 151:13 152:4,6 154:9
**finished** 36:5 66:22 112:10 118:23 119:1
**finishing** 60:4
**fire** 63:7,9 97:21,24 107:4 154:21,24 155:4
**firm** 18:17
**fish** 138:14
**fitting** 56:19
**fix** 99:19
**FL** 108:9 109:7,13, 19 110:20 113:24,25 141:2,5 148:12
**flat** 48:15
**Flew** 103:15
**float** 113:2 136:4
**flooded** 42:4,6
**floor** 32:11 38:9,11 41:16,17, 22 42:6 46:12,18 47:13,14, 22 48:1, 5,6,10, 15,16,18, 20,21 49:16,17
**flooring** 48:13 110:14
**floors** 8:15 13:9 29:24 31:2,7 37:4
43:20 46:9 47:7,10 48:13 80:25
**Florida** 4:1,3 7:1,4,9, 13 9:7
**flowed** 96:9
**flying** 109:14
**focus** 12:22 64:22 119:18
**folded** 139:13,16
**folks** 44:3
**follow** 70:1,6 102:5 106:15
**fooling** 103:9,14, 16,17,19 153:24
**foolish** 92:13
**foot** 44:1
**footage** 30:2
**footage-wise** 42:1
**footprint** 42:14
**forces** 110:6
**Ford** 150:2
**foremans** 99:24
**forgot** 117:22
**form** 11:17 12:9 13:11,18 31:22 38:24 39:17 66:12 70:19,24 101:2,11 106:7 141:23
**formal** 151:3,20 152:13
**forms** 10:13
**Fort** 138:14
**forward** 86:13 87:25
**found** 9:13 16:11 25:6 52:4 60:7 76:14 141:7
**foundation** 8:7
**four-story** 29:21 37:3

**fourth**
42:11
48:10

**framing**
8:15,18,
21

**fraudulent**
91:16,18

**Fred**
16:18
19:21
22:7,10

**frequently**
154:5

**friendly**
55:23

**front**
13:22
16:24
47:19
51:3
52:10
63:14
82:22
83:2
119:18
121:18

**front-loaded**
129:20
133:25
134:3,7

**front-loading**
133:8,16

**fulfill**
144:9,12,
13

**fulfilling**
149:8

**full**
42:6

**full-time**
7:11

**funds**
122:13
153:11

**furious**
155:15

**Fuson**
54:20

**future**
7:5

**G**

**gather**
54:2

**gathering**
6:6

**gave**
5:9 15:3
50:7
52:11
74:9
76:13,16,
17,18,19
82:7,8,25
84:13
90:23
94:17,25
95:2
110:5,6
129:24
147:17

**general**
4:11 9:7,
17 11:16,
22 12:7
13:2 16:8
17:14
21:12
22:22
82:22
83:2
94:12,13

**gentleman**
19:23,24

**get all**
117:4
150:2

**get along**
107:8

**gist**
16:6

**give**
4:20
14:11
17:24
20:17
31:6
40:12
61:25
74:7,8
75:1,11,
22 76:3,
15,23
91:20
92:11
93:10,12,
14,21
95:11
131:15,19
137:10
139:6
140:9,24
141:4

**giving**
89:18

**Glass**
126:7,17

**goal**
108:24

**God**
97:21

**Golden**
153:4
154:10,20

**good**
5:5,7
40:25
95:12,15
98:12
106:17
107:19
136:22
137:7
154:18

**government**
43:13
44:9
45:15
46:21

**grab**
62:23

**grade**
93:7,10,
12,15

**great**
76:6

**grief**
115:12

**ground**
119:17

**grounds**
53:12

**group**
115:2

**groups**
130:21

**guess**
27:21
50:6
51:16
62:9
80:12
91:16
121:12
141:11
142:4,18
156:23

**guessing**
156:5

**gut**
8:23 9:1,
3

**Gutted**
9:4

**guy**
4:15
30:16
99:14
106:16
138:12
143:3
157:7

**guys**
7:25
47:10
55:12
105:10
117:10
139:6
140:22

**H**

**half**
48:7,8
134:15
145:3,8
156:6

**hall**
44:10

**hand**
4:19

**handle**
9:22

**handling**
6:5
23:18,19

61:6 98:10
**handwriting** 26:10
**handwritten** 26:8
**happen** 117:16 144:15
**happened** 12:10,11, 14 36:9 59:17 80:14 112:9 116:14 147:12
**happening** 92:20 125:10 156:7
**happy** 139:11
**hard** 61:22 102:25 104:8,10, 15 105:1, 11,13,24 106:1,5, 16,17,21 144:14
**harm** 101:10,16
**Harrison** 4:15 61:22 148:18 157:9,12, 18
**hat** 102:25
104:8,10, 15 105:1, 11,13,24 106:6,21
**head** 41:3 131:14 137:10
**hear** 76:9 135:7 139:18 144:17,21
**heard** 91:12,13, 19 92:20 111:17,25
**hearing** 16:25 32:1 50:21 52:9,19, 25
**hearings** 53:18
**heavily** 48:14
**height** 13:10 28:13 29:2 31:7 36:24,25 40:2 44:25 52:6
**heights** 35:24
**hell** 81:5 150:3
**high** 43:18,25
**higher** 10:18,22, 24 12:21 13:5,9,15 29:13,17, 20,25 32:4 35:25 41:10 93:12,14 94:5 95:2
**hire** 24:7 109:9 139:7,9
**hired** 23:6,15, 25 25:2 26:18 27:5,6 29:8 53:4,6 71:18 97:20,22 140:1
**hiring** 18:17 24:1
**hit** 109:1 112:12 113:11
**holding** 56:21 149:8
**holdups** 90:15
**holes** 81:3
**home** 90:9
**homework** 9:8 29:1
**hotel** 51:8
**hour** 124:2 156:6
**How'd** 16:13 140:23 141:1
**Huh-uh** 15:19 136:6 144:23
**hundred** 97:15 119:6
**hurricane** 7:23 8:2 57:10,16 58:3 62:14 96:1 108:9,17 109:1 112:14,16 113:23
**hurry** 117:10

**I**

**idea** 32:7 38:16 39:11,13 49:11 58:24 59:14,23 61:12,17 72:24
**identification** 85:7
103:22
**identified** 24:23 27:22 47:6 81:12
**identifies** 40:1
**identify** 13:23 33:8
**identifying** 27:10
**illegal** 91:16,18
**important** 139:20
**inability** 87:3
**incapable** 136:24 149:2 150:15
**incident** 106:4
**include** 69:5
**included** 122:24
**incomplete** 117:19,20 120:14
**incorrect** 43:22 118:7
**indemnify** 153:1
**independent** 134:10

**indicating** 113:15 120:4 154:23
**individually** 70:20 125:4 156:24
**industry** 19:20 91:13 94:20 129:21
**inexperienced** 106:2
**information** 6:7 25:3 26:4,12 37:19 38:23 39:23 40:7 45:12,14, 15,19 49:21 50:1 51:13 73:24 82:6 117:21 121:8
**initial** 53:14,19 83:19
**initialed** 124:17
**initially** 59:14
**initials** 83:24
**initiate** 23:10
**injury** 100:24 101:17
**input** 45:15 135:6,13 139:25 140:9,10
**inside** 8:24
**insisted** 138:12
**insisting** 59:2 135:24
**install** 47:10 68:15,22 69:18 79:22 89:16
**installation** 75:18 127:18,24
**installed** 56:20,21 76:22 87:20 129:18 132:22 134:13
**installing** 88:10 89:1,9
**instances** 106:19
**instruct** 20:16 53:11 110:2
**instructed** 106:5
**instructing** 88:25
**instruction** 20:17
**insurance** 59:6,20 60:11 62:3,7 88:20 95:23 96:5,11, 20,25 97:6,11, 14,16,23 98:11,18 111:6
**insured** 62:6,10
**insurer's** 62:5
**intact** 48:25
**intelligent** 94:7
**intention** 142:13
**intentionally** 144:16
**interest** 145:15,16 146:9,16 147:4,8, 17,18,19, 23
**interesting** 156:22
**interior** 42:20 49:1
**interpret** 69:15
**interpreted** 13:15
**interviewing** 18:16
**introduce** 4:8
**investigation** 9:8 10:23 134:10
**investigations** 111:7
**invite** 7:5
**invoice** 133:19 139:6 145:8
**invoices** 134:13
**involved** 10:25 62:2 93:24 94:21 114:18 115:9 129:6,10 131:25 133:3 134:5 143:1 144:20 148:18, 19,20
**involvement** 114:21
**Irma** 108:9,17 109:1,18, 25 110:4, 16,19,20, 24 111:1, 11,25 112:9,12 113:10
**irrespective** 84:16
**issuance** 107:25
**issue** 10:19 57:8 63:12,13 99:7 127:7 131:17 136:20
**issued** 50:20 51:12 52:4 90:16 96:25
**issues** 12:18,20 55:23 56:9 57:9 88:20 98:20 101:19 127:17, 18,19 149:11,12
**items** 110:7

J

**Jackie** 9:24 10:2,6,7, 8,11,25 11:5 12:11 13:8 14:7,9 15:3,11 16:11 17:23 20:22 21:10 23:24,25 24:3,6, 11,14,17, 21
**Jackie's** 11:7
**James** 138:22
**January** 89:12 90:23 91:2 120:7,11, 15,21 122:25 143:1
**Jason** 144:6,7
**Jeff** 4:14
**JEM** 155:10
**Jeremiah** 140:20
**Jessie** 155:9,13
**Jim** 116:17,20 119:7
**job** 7:6 21:20 31:21 60:4 73:25 74:4 80:12 87:25 91:24,25 92:18,20 93:1 95:15,16, 21 100:20,25 101:15,16 104:6,10, 15,21 114:9 131:16,17 135:9,11 140:24 141:6 148:1,11, 18 149:17 150:6 153:9,10 154:10
**job's** 139:20
**jobs** 25:9
**Jon** 132:6,10 134:24 135:23 136:2 138:3 139:2,19 142:25 143:2,23 154:20,23 155:3,11, 15
**judge** 141:13
**judgment** 141:14
**June** 130:6,13, 15,16,22, 23,24 131:3,4 132:4,10 133:1 134:17 135:20 136:7 137:23 147:25
**jurisdiction** 38:22

K

**Katrina** 7:23 42:5 97:13,25 98:3,7
**keeping** 90:4
**Keith** 19:8
**Kelsey** 4:12
**Kevin** 67:22,23 81:25 83:7 116:2,7 122:6 132:3,6 138:2,6, 7,21 139:15 144:20,22
**kickback** 91:7,8, 14,21
**kickbacks** 92:8
**kind** 10:1 25:7,18 53:17 54:5 58:16 59:17 73:20 92:2 98:20 111:7 132:14 138:17 146:14 149:20 153:9 154:13 155:15
**knew** 58:17 67:15 137:8 144:16
**knowing** 112:16 123:3 142:20 144:12
**knowledge** 94:8,22 95:4

L

**LA** 43:8
**labor** 109:9 110:3 129:17 150:1
**lady** 90:5
**Lafayette** 35:18 36:3,21 49:14
**Landry** 71:15,24 72:22 77:3 113:14
**Landry's** 136:9
**language** 34:7 62:21 63:8 68:7,9 70:13 154:1 155:1
**large** 4:3 51:2
**lashed** 105:3,4
**lashing** 106:2
**late** 146:7
**Lauderdale** 138:14
**Lawhon** 4:16 5:4 11:18 12:15 13:13,24 14:3

17:6,19, 21 20:4, 21 21:4,7 22:12 27:18 37:18 39:3,19 41:2,4 45:3,9 53:9,15 54:1 55:2,7 61:21 62:3,13, 18,19 63:5 70:22 71:1 84:22 85:8 98:8,9 100:12,18 101:4,13 103:18,23 106:10 111:20,22 123:17,23 141:25 143:17,22 154:4,6, 19 155:16 156:8,10 157:16,22

**lawsuit** 152:10

**lawsuit's** 154:10,11

**lawyer** 6:6

**lawyers** 150:4

**LDS** 151:13 152:3

**leading** 76:25 77:5

**learning** 13:8

**leave** 123:24 143:21 149:12 155:18,20

**led** 149:16 153:14,15

**left** 39:4

**left-hand** 83:5

**legal** 149:12 152:17, 19,23 153:3,4, 25

**lesson** 146:14

**letter** 32:20 33:18,20, 25 34:20 35:8 49:20,23 50:19 52:15 61:4 85:15 131:24 139:2 154:23,25 155:1

**letters** 89:22

**liar** 141:12, 22,24

**license** 6:12,21 9:7,9,17 11:16,22 12:8 13:3 16:9 18:22 19:1 21:12 22:14,22, 23 37:20 50:7,20 51:7,11 52:4

**licenses** 24:9 25:12,13

**licensing** 6:3,8 17:16 19:20 26:20 53:14,20

**lie** 141:7,18 142:2,6, 11 143:19

**lied** 143:25

**liens** 150:3

**lies** 144:22

**lifetime** 127:14,21 128:1

**Lifting** 103:20

**limits** 58:17

**liquidated** 113:2,10 151:13,17

**list** 157:4

**listed** 15:14 50:25

**listen** 99:24

**listens** 106:14

**live** 142:7

**LLJ** 147:2

**loan** 145:1,5, 10,12,17 147:4,17, 20

**loaned** 147:3,7, 22

**loaning** 145:14

**loans** 146:3,24

**locating** 27:11

**location** 33:14 56:20

**lodged** 18:22

**log** 25:9

**long** 74:2,3, 14,15,17 75:4,22 77:7 82:10 90:18,19 97:16 146:19, 20,22

**longer** 110:8 114:8 148:17 152:2

**looked** 29:19 79:18 105:13

**loose** 74:24

**loosely** 154:7

**losses** 126:6 128:5

**lot** 6:6 8:14 16:15 24:8 49:9 57:17 61:21 73:10 76:6 105:14, 17,18,21, 22 125:2 141:3 156:5

**Louisiana** 45:17 92:6 154:2

**Louisiana/ mississippi** 141:3

**low**
46:7

**Lowell**
140:20

**lower**
93:10,25 95:11,21, 22

**lunch**
84:23,24

**lying**
142:18

**M**

**M-O-Y-E**
116:6

**made**
9:20 18:19,20 28:2 34:10 35:12 52:11 56:24 59:13 70:22 79:25 123:15 142:7,14 144:9,11, 12,13 149:17 150:19 151:1,4 156:20

**Mail**
34:21

**main**
44:9

**maintenance**
4:16 63:18 64:12,14, 21 65:9 66:20 67:5 68:4 69:17 70:15 77:13 78:7,22 79:14,21 80:1,8,22 81:4,12, 17 122:9 124:3,6,9 125:7,12, 17 128:10,21 130:1,6, 17,18 131:6,13 132:20 133:2 134:23

**Maintenance's**
65:10 129:8,14

**major**
57:25

**make**
10:14 11:15 13:1 27:3 34:3 35:20 38:1,5 42:14 58:18 59:22 76:11 84:22 97:10 108:12

**makes**
90:22

**making**
12:6 69:9 70:13 98:21 110:21 127:6 142:9 156:20

**man**
141:14

**manage**
106:17 146:12,15

**management**
92:23 156:17

**managers**
38:21

**managing**
99:11 100:3,20, 25 101:9, 15

**manufacturer**
127:17

**March**
43:8 115:23 122:3,21

**Marine**
27:22 28:7 32:8,10, 23 33:8, 9,14,21 37:17 49:21

**marked**
13:19 32:16 85:6 103:21,25 129:4 130:8

**market**
141:3

**masonry**
8:13 43:19

**master**
25:9

**match**
134:14 135:14

**material**
66:10 129:17,19 134:14 155:17

**materials**
48:13 52:23

**matter**
27:4

**matter-wise**
128:9

**meaning**
57:20 96:1,10, 12,25 152:7

**means**
8:6 61:2 119:1 133:13

**meant**
10:24 13:9,15 29:2,13 31:7 32:3 52:6 111:23

**measure**
108:1

**mechanical**
43:1

**meet**
12:1 52:12 87:3 108:19 109:2,10, 12 110:19 138:15

**meeting**
19:12,14, 16 20:5, 19,23 43:19 44:10 97:14 105:6,7 115:1,3, 8,20 116:14 117:11,12 132:1,2, 4,8,9,16 133:4 134:17,25 135:2,21, 22 136:3, 8 137:24 138:2,7, 10,12,20, 25 140:3, 17

**meetings**
73:4 144:10

**Melbourne**
51:4

**member**
19:18 77:14

**memory**
64:18

84:16
85:21
125:4

**mention**
66:17
86:17

**mentioned**
17:22
50:20
58:6
60:11
63:9
89:24
115:20
134:18
138:1
143:23
153:12

**merits**
126:11

**mess**
16:15

**messed**
16:16

**met**
30:16
106:15
138:13,17
145:3,7

**metal**
43:20

**Miami**
138:13
141:6

**Mick**
116:11
138:21
154:21,24
155:4,8,
13

**mid-december**
58:21

**middle**
86:10
105:9

**Midship**
27:15,17,
22 28:7,
12 32:8,
10,23
33:8,14,
21 37:15,
17 49:21
50:19

**midst**
31:18

**million**
60:18
61:15
96:20
131:24
133:5
134:14,16
135:19
139:2
145:3,8

**mind**
6:4

**mine**
38:4
60:24
150:14

**minute**
29:11
76:9 83:1
99:2
119:17
132:14

**minutes**
21:3 41:2

**misrepresented**
82:10

**missing**
28:10
117:25

**misspoke**
105:19

**misunderstood**
111:9

**mode**
112:15

**mold**
9:5

**Moler**
116:2

**moment**
13:21
15:6,21
32:17
82:20
86:3

**money**
59:8,20
61:23
91:10
96:9,13
121:18
135:24
145:1,14,
17
146:12,15
147:4,7,
20,22
149:8
153:2

**month**
72:13
90:21,24
97:4,8
109:1
115:22
118:14
146:13,14

**monthly**
52:12

**months**
18:11
58:14
59:11
72:14

**Moore**
4:1

**morning**
5:5,7

**move**
20:19
54:4 56:8
63:12
67:1 74:5
87:9
89:19
143:15

**moved**
51:5

**moving**
51:11
59:5
81:10
88:1,2
109:21
143:5

**Moye**
116:4,5

**N**

**nail**
12:19

**Naples**
138:16

**nasty**
139:2

**necessarily**
17:12
143:15

**needed**
67:6
71:23
74:1 75:4
117:21
135:8

**needing**
77:6

**negotiate**
7:6
97:21,22
127:14,21
141:4

**negotiated**
7:15
57:10
88:15
128:1

**negotiating**
73:23
88:18

**negotiations**
67:22
96:5

**nice**
16:11
117:12
142:8,17

**Nick**
54:20
55:10

**nickel**
66:11

**nobody's**
94:16

**nods**
41:3

**nonresponsive**

67:1
**normal** 99:23,25
**Notary** 4:2
**Note** 69:4
**notes** 26:8,9,10
**notice** 45:13 53:21 151:3 152:14 157:8
**notices** 61:19
**notified** 69:23
**notify** 69:22
**November** 52:25 53:2
**number** 13:23 35:5 37:20 40:4,5 49:22 50:5 57:14,15, 23,24 104:1 119:24 122:25 140:9 145:8
**numbers** 134:16

O

**object** 11:17 12:9 13:11 20:16 38:24 39:17 53:11 70:19,24 101:2,11 106:7 141:23
**objection** 70:23 136:14
**obligated** 126:11
**obtained** 119:11,13
**occasionally** 73:5
**October** 4:6 52:25 53:2 109:5,7 150:18
**offer** 145:1,17 150:6
**offered** 143:7 147:10, 11,16
**office** 7:11 18:5,6 19:3,10 43:2 46:13,19 48:5,8 51:11 83:14 90:10 97:13 98:2 115:4,20
**offices** 46:14,20, 21 47:5, 13
**Ohio** 4:15
**one-story** 38:15
**online** 9:10,12 22:5
**open** 8:16 37:25 92:12 151:24
**opening** 156:13
**opinion** 31:6 150:13
**opposed** 19:23
**option** 148:24
**order** 9:16 54:3 64:4 69:22 70:6,9 84:9,14, 20 124:16,17 125:6 126:5,15 128:3,16 156:17 157:25
**orders** 124:2,3, 4,5,8,22 125:2,11, 16,19 128:8,11, 12
**original** 108:4,6, 7,12,19 109:2,10, 13 110:4, 19 111:13 112:1,18, 22 113:17 131:5
**originally** 62:5 95:16 107:21 110:12
**Orleans** 5:24
**OSHA** 100:4,6, 19 101:21 102:12, 14,18,21, 23 103:2 104:20 106:23
**outright** 57:10 142:11
**outstanding** 155:23
**overbill** 130:2 133:14
**overloaded** 57:19,20
**overnight** 117:15
**overnighted** 30:8
**overseeing** 92:22
**owe** 153:2
**owned** 96:19
**owner** 39:8,12 45:17 46:5 54:9,15 55:14 56:2 57:9 58:17 59:25 60:15 78:2 93:20 96:16 97:7 98:17 114:22 115:12 116:20 118:15 122:22 123:4 127:15 128:17 129:18,22 137:9 150:11,17 151:10,15 152:25 153:1 155:9
**owner's** 61:11

152:24

**owners**
54:7,9,16 55:12,17, 19 56:9, 18,24 57:5,15 58:1 59:6,16 82:8,18 128:13 148:12 150:8,19 151:4 152:2,11, 15 153:3, 7

**P**

**p.m.**
83:16 85:2,5 86:12 100:14,17 123:19,22 157:15

**PA**
61:6

**package**
35:15

**pages**
37:7,8 40:13,14

**paid**
60:14,15, 19 61:13 91:22 92:8 118:2,3 119:12 123:5 128:16,22 129:4 131:6 132:20 135:24 136:16 147:4,18, 23 153:8

**Palcon**
71:24

**panel**
56:22 67:17 68:16,23 69:1 74:3 75:15,16, 19

**panels**
49:4,5,6 56:19 64:17 75:6 76:18,19 108:14 109:7,20 110:21 111:5 126:24 127:6,11 128:1 133:6 137:6

**paperwork**
84:17

**parenthesis**
69:4

**parish**
39:22 43:8,13 44:19 45:11 48:5,7 53:20

**parking**
105:14, 17,18,21, 22

**Parrish**
142:25 143:2 154:21,23 155:3

**part**
43:1 45:13 48:2 50:1 53:15 65:10 66:12 70:4 71:8 80:12 83:22 87:13 110:11 129:3 132:20 136:19 153:15

**partial**
17:7

**partially**
8:9

**participate**
19:14 25:2 30:20 116:12 124:4

**participating**
72:25

**Partington**
4:10 11:17 12:9 13:11,25 17:1,8 20:2,10 21:1 22:9 38:24 39:17 53:13,16 54:25 55:5 61:18,24 62:4,14 70:19 88:17 98:7 100:9 101:2,11 103:16 106:7 111:18 141:23 143:14 154:2 156:16,22

**parts**
59:5

**party**
139:7,9 140:7,10

**pass**
6:13,15 126:7

**passed**
82:17

**past**
112:24

**path**
73:25 135:9

**Paul**
71:15,24 73:2,13, 15 74:10, 15 82:7 136:9 137:17,23

**pay**
45:22 66:16 78:3 97:11 118:1,5, 9,10,13, 22 119:4, 10,12,23 121:4 122:4,19, 22 123:8 128:20 129:14, 17,20 130:1,2, 5,7,11, 18,19 131:5,10, 12,16,23, 24 133:1, 20,24 134:2,6 137:11,21 139:10,12 140:2,11 145:9 146:20, 21,22 147:17,20

**paying**
59:7 60:12 121:15 147:19

**payment**
90:7 97:3,5 118:8 120:5 121:22 123:14 128:13 129:8 131:20 132:19 138:9 139:1 146:6

**pays**
118:15

**pending**
150:22
152:9

**penny**
60:22

**penthouse**
41:18,23
42:14
48:10,14,15,18

**people**
24:9 46:2
54:12,17
81:8 88:1
93:17
100:24
104:17
108:14
134:24
141:13
144:20
147:14
148:13

**percent**
58:5 68:2
97:15
119:7
133:6
146:18,19
147:19,21

**percentage**
58:4
133:19

**perfect**
94:15,16,19

**performance**
55:20
90:6
92:22
93:25
94:2
95:7,21
98:24

**period**
11:25
59:4,23
113:2
147:25

**permit**
20:14
37:15,17
38:18
39:16,22
41:6
44:15,19,20 45:12,20 87:19

**permits**
46:7

**permitted**
87:12

**permitting**
87:22

**person**
18:2,3,4,9 19:17
20:2 30:4
54:11
101:9
131:9

**personally**
29:1
39:15
92:24
93:24
95:22
97:10
99:10
149:15
157:13

**pertinent**
157:21

**Perused**
16:3

**perusing**
25:18

**Pete**
4:11
37:24
122:12

**PETER**
4:25

**phase**
93:9,11,13 95:10

**phases**
93:14

**phone**
12:13,25
18:2
19:15
24:22,25
30:4,5
115:1,12,16 116:12
132:6,10
134:24
139:20,21
155:10,11,14

**photograph**
43:7

**photographer**
51:1

**photographs**
40:14
43:16

**photos**
104:2

**phrase**
50:13
66:18

**physically**
57:12
58:6

**pick**
18:19

**picture**
31:21
40:12
41:20,21
47:15,18

**pictures**
30:6,8
31:13,15,17,24
40:20
41:23
48:24
50:24
103:24

**piecemeal**
111:6

**pieces**
10:5
150:23

**pillar**
47:21,22

**pillars**
47:19

**PJ**
22:21
25:10
34:24,25
67:19
85:15
86:11,12,17 94:25
115:10,11,19
116:11
119:22
122:12
124:19
129:4,13,25 130:7
131:9
132:18,25
134:10,12
156:24

**PJ's**
82:19
94:2,8
95:6
98:23
131:16,17

**place**
17:25
19:9
40:25
52:10,16,19 57:12
71:21
90:20
102:8,12
103:9
115:3,22
123:7
138:25

**plan**
6:22,25
38:25
39:1 59:4
97:1
135:11,12
136:17
137:1,10

**planned**
95:16

**plates**
65:18

**played**
131:12

**plenty**
15:13

**point**
22:24
25:10

53:4 62:24 65:7 68:25 72:12 87:11 107:20 110:23 111:3 112:13 123:5 126:5 127:2 131:23 137:16,24 141:14 148:17,19 151:19 157:22

**pointed** 22:7 27:13 28:5,12 32:23 44:7 62:9

**pointing** 78:24 89:13

**policies** 62:8

**policy** 39:14

**pop** 113:3

**popped** 143:2

**position** 20:21,25 21:1 156:16, 18,19,21 157:1,2

**positions** 155:20

**possibility** 65:9

**possibly** 7:9 103:4

**practice** 45:14

**praised** 93:17,19

**precise** 56:12 65:14

**precisely** 56:17

**predominately** 156:25

**prefab** 4:17 63:20 64:3,6, 17,20 78:11,14, 15,18,22 79:2,7,21 80:1,8,17 81:20,21, 22 119:23 122:8,13 123:1,15 124:4,6 125:20 126:23 127:6,9, 13,25 128:4,11, 22 130:6, 19 131:6, 14,20 132:19 133:2 134:23

**Prefab's** 131:16

**prepare** 5:13 10:3 26:4

**prepared** 32:1 50:2,4 51:3 113:15 148:20

**preparedness** 112:15

**preparing** 25:3 51:6

**present** 19:4 51:6 126:8,10

**presentation** 51:3

**presented** 76:10 151:3 152:15

**preserved** 154:8

**president** 48:7

**president's** 48:5

**pretty** 97:11 98:12 109:20 139:15 141:2 155:16

**prevent** 101:20

**price** 68:6 70:4

**primaries** 54:17

**primary** 54:13,16

**prime** 22:16 112:18,22 113:1,10

**principals** 55:10

**printed** 51:12 71:9

**prior** 114:5,6

**privilege** 17:14 20:25 53:12,24, 25

**privileged** 17:12 20:13

**problem** 82:9 87:14 91:4 95:13 107:7,10 136:17,19 138:15

**problems** 55:19 56:15 57:18 87:14 89:25 90:14 99:19 116:24 126:24 128:6

**procedure** 39:14 69:25 70:6 102:8,12

**procedures** 102:2,8, 10

**proceed** 88:10

**proceeding** 17:9,16 152:10

**process** 6:3,6 46:6 114:18,19 115:10,17 116:18 124:5

**processed** 36:14

**processor** 14:11

**produce** 109:8

**produced** 155:24

**production** 105:6 126:1,23 127:10, 11,25 128:5

**Professional** 4:2

**progression** 108:15

**project**
7:4,10
11:24
16:8
27:15,16,
22 32:9,
11 33:9
35:16
36:13
38:21
40:22
54:6
92:10,16,
23 93:8,
24 94:3,
12 95:8,
10 97:10
98:24
99:4,12
100:3
101:9
102:17
105:1
107:15,22
109:24
114:13
117:7
140:15
144:1
145:2,18,
24 146:23
147:5,9,
15 148:21
150:20
151:5
152:4,16

**projects**
7:12
14:10
15:2,13
25:6
27:10
31:18
38:23
50:25
72:3
97:19

**promise**
118:4
142:9,12,
21

**proper**
69:22

**properly**
56:20
74:4

**proposal**
148:20,25
149:16

**propose**
137:1

**proposed**
137:2
140:6

**protocol**
102:2,8

**proved**
106:18

**provide**
26:12
30:25
135:15

**provided**
62:8 77:1

**providing**
110:4

**Public**
4:2

**punt**
153:9,22

**punting**
153:20
154:8

**purchase**
62:22
63:10,20
64:3,6
78:10
79:2,6
80:18

**purpose**
19:12

**pursue**
151:17
152:3

**push**
117:9

**pushing**
108:11

**put**
29:9,10
34:6,8
47:5 50:4
54:3 58:4
69:12
71:13,15,
19 74:3,
16 88:3
96:5
99:2,6
105:11
107:1
116:23
119:16
126:5
137:10
142:4
156:23

**puts**
124:24

**putting**
72:15
108:14
137:6

**PVGC**
37:20
39:24
41:6
45:16
48:12,24
61:7
63:17,19,
20 64:24
68:4
72:18
82:2
86:22
92:9,14
95:11,19
99:14
102:1
107:13
109:9,11,
16 110:2,
15,18,24,
25 112:1
113:19,20
114:4,9,
14 115:18
116:10
118:1,5,
22 119:4,
10 120:7
122:21
128:12,16
129:25
137:2,13
150:19
151:4,5,
17
152:10,15
153:2

**PVGC's**
52:1
56:1,10
57:6
95:7,20
98:23
112:21

**Q**

**qualified**
25:10

**qualifier**
7:7

**qualify**
16:8

**quality**
55:20

**question**
6:10
10:18,22
11:19
12:24
15:12
20:15,18
22:19
27:5
28:22,23
56:17
66:3 67:2
79:5
84:10
86:8 89:5
91:20
99:1
101:8,14
127:3,20
128:11
131:13
141:11,16
143:6,18
157:9

**questions**
6:7
10:14,16
17:20
34:16
131:9
143:13
155:25
156:2
157:1,19,
21

**quick**
100:9

**quickly**

25:9 58:2

R

**R-Y-A-N** 55:8,9
**Rae** 67:23,25 68:1 83:7 122:6
**rain** 125:15
**rained** 8:21
**raise** 4:18 107:19
**random** 17:14
**rang** 155:15
**rate** 92:22,24, 25 93:25 94:2,8,11 95:7,20 98:10,15 146:17
**Raymond** 7:7
**Rea's** 83:24
**reach** 140:14
**reaction** 117:13
**read** 5:16 15:25 16:3,4,9, 10 21:9 22:1,20 69:19 70:12 104:20
**reading** 16:1 22:7,20
**ready** 88:2,22 89:19
**real** 95:14
**reality** 76:14 80:13
**realize** 59:22 72:10 88:14
**realized** 59:19 80:12 125:9
**Rear** 67:23
**reason** 51:9 59:3 63:24 64:19 84:13 90:25 129:3 149:5 150:15
**reasonable** 137:11
**reasons** 21:2 53:22 144:15 155:25
**rebuild** 49:2,3
**rebuilding** 42:19
**rebuilt** 58:16
**recall** 7:22 34:23 63:18 84:11 128:20
**receive** 9:16 92:14 120:10 121:21
**received** 33:24 34:21 78:7 79:10 85:19 120:7
**recess** 45:6 85:3 100:15 123:20
**recognize** 25:23 37:12 40:14
**recollection** 57:25
**recommence** 108:18 111:4
**recommend** 24:1 132:18,25
**recommendation** 129:24 131:22
**recommendations** 129:13 131:19
**recommended** 24:4,6
**recommending** 21:11
**record** 4:6 45:4, 7 53:9 62:1 63:4 84:25 85:1,4 100:13,16 123:18,21 155:20
**recovery** 135:8,12, 15 136:14
**redo** 42:4,12, 18
**reduced** 130:8
**refer** 38:15
**reference** 32:24 33:7 38:11 65:8 72:12 79:25 112:13
**referencing** 85:15
**referred** 10:2 14:20 29:18
**referring** 11:7 112:9 147:14
**refine** 101:14
**reflect** 33:21 136:10 137:20
**reflected** 89:10
**refrain** 141:15
**refresh** 85:21
**refreshed** 64:18
**registered** 9:21
**regs** 22:1 104:20
**regular** 55:22 73:4
**regularly** 146:24
**regulations** 102:23
**reinstalling** 69:6
**reject** 148:25
**rejected**

148:25
**relate** 17:8,15
**related** 54:6 81:14 129:7 150:20 152:15 156:25
**relates** 64:20
**relationship** 54:7 55:17
**relative** 56:10 57:6 63:11 67:10 72:21 114:19 155:21
**release** 122:12
**relying** 31:1
**remediate** 44:4
**remedy** 61:19
**remember** 5:8,23,25 7:20 10:18 11:10 15:17 18:12 19:18,22, 25 23:13, 22 24:25 26:22 27:8,9 31:12,24 32:5 34:15,21 35:4 36:7 37:23 40:18,19 42:2 49:11,22 51:17 52:18 53:6 54:23 57:3 62:25 63:16,18 66:14 67:23 81:1,24 82:13 84:2,7, 15,18 85:11,12, 13,24 86:9 88:16 97:25 98:5,6 113:7 114:12 119:15 122:18,23 123:13 124:13 125:5,6, 14,15,18, 23 127:8, 12 128:19 129:2 131:8 134:4,25 135:4 136:6,13 140:18 145:16 148:6,16, 22 152:17 155:2,5,9
**Remind** 60:17
**reminding** 99:25
**removal** 69:5 70:13
**remove** 69:11,17, 21,24
**removing** 70:3
**renovate** 44:4
**renovation** 7:25 11:11,14, 21 12:2, 6,22,23 13:1 14:11,17, 24 31:11, 20
**renovations** 14:12 49:1
**rep** 72:18 82:13
**repaid** 147:8
**repair** 8:1 63:13 64:1 65:10,12, 13,17 66:7,11 67:16 68:25 128:14,15
**repairing** 67:10 69:10
**repairs** 64:20 65:18 66:5,18, 23 67:6 125:7 128:9,18
**replace** 64:8 67:16 140:16
**replaced** 49:7 110:11
**replacement** 70:14 94:18
**replacing** 67:10 70:3
**reported** 101:3,6,7 102:13,16
**Reporter** 4:2,18,23 37:16
**reporting** 102:9
**represent** 25:16 26:24 28:14 34:4 118:5 129:22
**representation** 17:25 23:10 24:8 35:22 152:25
**representative** 77:15 81:18 134:20
**representatives** 81:21 126:23
**represented** 22:24,25 79:20 80:11 121:20
**representing** 4:10,12 16:23
**represents** 16:14
**request** 84:4 86:14 123:8 126:16 133:21 146:22
**requested** 85:16,19, 20
**requests** 69:23
**require** 39:15 102:21 103:2 110:15
**required** 38:20

78:6,14 80:22 87:23 102:5,24
**requirement** 12:1
**requirements** 9:9,11,16 101:21 102:23 103:2
**requires** 62:7 102:9
**research** 9:8 10:23 22:21 29:1 36:6
**reserve** 21:4 151:11 156:1 157:19
**reserved** 157:9
**resolve** 127:7
**resolved** 150:22,25 151:24
**resources** 57:21 58:2 109:10,17 110:3 113:21
**respect** 106:12 107:4
**respecting** 107:11
**respective** 155:19
**responding** 15:12
**response** 14:9 62:5 117:13
**responsible** 115:17
**responsive** 143:12
**rest** 8:17
**restaurant** 138:14
**restoration** 65:17 66:19 122:9
**result** 101:17 126:1
**resulting** 8:1 125:20 128:4
**retained** 18:16,18, 25
**retire** 6:18,23
**retired** 6:24
**return** 150:6
**review** 39:16 114:18 115:9 124:5 126:10
**reviewed** 38:17
**reviewer** 38:25
**reviewer's** 39:1
**revise** 33:22
**revised** 130:20, 22,24 131:2,5 134:15
**rights** 141:9
**risk** 59:9 127:2
**road** 28:19
**Robert** 86:12 104:25 105:2 138:21 144:2,3 154:21,24 155:4,8
**role** 25:8 131:11
**roll** 111:8
**roof** 8:15,18, 21 41:16 48:16,19, 21 57:16, 18,21,22 58:2,5
**roofers** 57:17
**roofs** 8:14
**room** 42:23,25 43:19 116:9
**rooms** 51:8
**round** 134:16 145:8
**row** 100:10
**rude** 139:15
**rules** 5:9
**run** 100:21
**Ryan** 54:13,20 55:3,10, 12,14 150:10 151:8,18 155:11
**Ryan's** 150:13

S

**Saddler** 83:8,12
**safely** 100:21
**safety** 101:17 102:1,7, 9,14,15, 16
**sat** 139:13
**save** 70:12
**scale** 93:2 98:14
**scanned** 81:3
**scanning** 80:24 81:11
**scenario** 123:7
**schedule** 71:4,7,9, 11,19 72:6,23 73:18,20 74:8,21 75:4,12 76:5,8,10 77:7,15, 18,23 78:5,10, 13,25 79:6,16 81:18,22 82:3,6,7, 14,18 83:23 84:5,19 85:16,20, 21,23 86:14,19, 23,25 87:3 89:10,13, 21 107:14, 18,20 108:10

109:12 113:20 114:15 116:16 120:3 135:5,14, 16 136:1, 3,4,8,9, 15,19,21, 23 137:3, 13,20 150:7 156:14

**scheduler** 71:13,14

**schedules** 73:8,10 74:9 77:1,3 81:16 106:15 107:14 110:16 113:15 114:5,11

**scope** 22:16 56:10 57:7 64:5 65:11 68:8,17 69:19 70:4 80:17,21 112:21

**score** 94:5 95:2,11

**scratch** 92:2

**sealed** 90:13

**secretary** 51:9 52:5

83:13 90:4

**section** 68:16,20 69:21

**secure** 11:21

**seeking** 120:4

**selections** 149:13

**send** 23:20 30:5 116:20 154:23

**sending** 86:11

**Senior** 22:15 55:11 108:21,22 109:3 112:7,19 113:16 120:1

**Seniors** 113:16

**sense** 8:6 10:14

**sentence** 14:14 44:8 121:7 122:7

**sentences** 86:15

**separate** 14:19 63:24 65:16

80:2,8

**separately** 65:25

**September** 23:5 27:1,6 28:24 35:16 49:20 51:20,21 52:3,24 108:25 109:4,6 112:12, 15,16 113:11, 14,19,22, 23 114:5, 9

**sequence** 49:18 122:1

**sequentially** 132:15

**series** 103:24

**Serinca** 66:24 109:22,24 110:2 147:2

**session** 5:9 63:6

**set** 52:25 155:14

**settled** 96:21,24 150:25

**settlement** 96:5

97:3,5 153:13

**severe** 49:8 58:15

**severely** 42:5

**Shane** 96:19

**sharp** 95:6

**she'd** 11:6

**shed** 37:25

**shell** 9:3

**shoes** 103:3 104:21

**shop** 74:14,24 76:12,17 78:2,23 79:24 80:16,20, 25 81:14 82:5,11 87:7,13, 24 114:17, 20,24 115:7,9 116:18 118:1,5, 10,22 119:1,4, 10,12 120:5,10, 12,13,15 121:12,17 122:13 123:3,11,

14 126:13 127:2 128:23 133:21 137:4

**shops** 74:18

**short** 56:19 61:25 146:7

**shortage** 58:1

**shortly** 148:19

**shoulders** 56:23

**show** 15:5 25:15 28:20 32:16 35:24 40:12 43:4 45:21 49:22 84:14 89:23 103:24 123:8 136:22

**showed** 133:20 134:21 137:8

**showing** 37:6 82:19 85:9

**shown** 43:14

**shut**
111:1
137:16

**shutdown**
128:5

**side**
39:4
107:2
155:12

**sideways**
155:8

**sign**
77:7
90:24
116:19

**signage**
47:4

**signature**
25:23
26:8,9
39:2,6
45:23,24
46:1,4

**signed**
23:11
46:3
64:24
67:4,11
71:22
72:6
73:12,19
75:1,9
76:5
77:2,10,
12,17,20,
22,25
78:16
79:11,15
80:3,6,
19,22
81:19
82:1,16
84:8,12,
19 86:18,
21 88:5,
7,13,18
89:4,17
90:12
91:2
107:21
121:15,21
124:19

**signing**
76:25
77:5,19
87:15

**similar**
91:10

**simultaneously**
116:21

**single**
44:10

**sir**
29:22
78:20
91:15
104:11,
13,22
134:8

**sit**
20:8
41:18,19
123:6
150:17
151:23
152:9,13
153:2

**site**
86:12
93:17
99:8
102:24
104:6
106:9,11
107:7
108:13
129:18
145:4
147:13,14

**sitting**
5:23
139:15
154:9

**situated**
157:17

**sixth**
115:14

**size**
42:22,23,
24 44:2
51:2

**slab**
63:13
64:1,19
65:10,12,
13,18
66:5,17,
18,19,23
67:5 69:5
125:7
128:9,14,
17

**slow**
111:8

**somebody's**
117:5,8

**son**
6:2,14,20
7:8,18
9:6
11:15,21
21:11
26:6
34:21,23
49:19
92:9,14

**son's**
13:19

**sooner**
155:14

**sort**
33:4
84:24
111:21
153:14

**sound**
10:7
43:9,21
59:13
63:21
65:3
72:19
85:20
110:18
128:22
132:12

**sounded**
111:24

**Southern**
114:1

**speak**
24:13
111:8
154:2

**speaking**
54:8
150:17
154:20

**speaks**
85:24

**specific**
17:16
37:17
50:18
65:12
66:17
82:13
93:9 98:1
101:18
123:13

**specifically**
9:12
13:17
27:9
31:12
34:2
36:20
50:5 64:4
66:14
72:7 81:1
105:25
141:18,24

**specification**
66:9

**speed**
90:5

**spelling**
54:22

**spend**
146:16

**spent**
6:2

**split**
48:4
79:19,23

**splitting**
80:5,13

**spoken**
52:5

**spot**
105:12

**square**
38:9 42:1

**St**
39:22
40:22
41:7
43:8,13
45:10

**stack**
75:25
76:2

**staff**
105:6
144:10

**stage**
36:16

**stamped**
26:24

**stand**
117:5

**standing**
117:8

**start**
6:25 33:4
37:11
42:18
54:6
76:18,19
77:17
78:23
79:8,14
80:18,22
81:13
88:1,2
89:1,8
111:11
112:15

**started**
12:17,25
13:7,16
16:23
22:6
59:19
72:18
75:8
80:5,10,
13 87:10
88:4
97:16

**starting**
87:9 88:8
117:7

**starts**
77:20

**state**
4:3 37:20
51:5

**statement**
29:16
67:7
68:11
70:7

**status**
51:10
60:12,23
61:16,20
122:8

**statute**
21:25
22:1
30:25

**statutory**
53:25

**steel**
33:10
103:9,12,
13,14,17,
20

**steel-toed**
103:3
104:21

**stick**
12:22

**Sto**
68:15,22
69:1
138:11
141:8

**stood**
73:5

**stop**
20:10
63:3
126:23
127:6,8,
10,25

**stopping**
63:7,9

**stories**
10:17,24
12:21
13:9,15
16:7
29:2,12,
17,20,25
31:7
32:3,25
33:21
34:4,6,17
35:5
40:4,5,11
44:14,16,
17,18
49:22
50:6,9,13
52:6

**storing**
129:19
134:13

**storm**
43:18,24
44:3,4
49:1

**story**
10:22
13:5
32:14
37:2,25
44:10

**streamline**
116:18

**strike**
11:19
14:22
18:14
32:9 67:1
77:11
87:17
95:18
102:21
113:13
143:5,15

**strong**
156:21

**structural**
33:10

**structure**
8:18
21:21
22:17
42:13
67:17

**structures**
50:5

**struggling**
13:17
14:19

**studio**
42:22

**studs**
9:2,4

**stuff**
25:12
94:7
96:11
100:1
149:14
150:3
157:5

**STY**
37:25
38:5,6

**subbed**
149:25
150:1

**subcontract**
63:9,19
64:22
66:20
67:4 68:3
77:11,13
78:5
79:15

**subcontract
or**
62:21
66:10
91:22,24
92:9,16
114:4,10

**subcontract
ors**
102:4
107:3
110:15
114:23
134:20,21
140:16

**subcontract
s**
80:23
81:19

**subject**
5:25
83:19,20
113:9
128:9
154:9

**subjects**
63:11
124:2

**submission**
52:11
115:15

**submit**
38:22
69:22
118:14,15
123:4
128:12

**submittal**

120:21

**submittals**
87:5,6
117:23

**submitted**
26:25
28:14,25
29:6
33:13
38:18
49:19
51:13,17
52:8
116:23
118:8,11,
12,23
120:15
121:5
123:4
128:17

**submitting**
38:22

**subs**
56:16
94:20
95:13
99:3,17
115:13
135:6,13
145:17
146:3,23
147:3,14
149:20,
22,24

**subs'**
135:12

**substance**
17:9,15
20:11,18
68:8

**substantial**
36:15
107:25
108:2,11

111:13

**successful**
74:1
95:12

**sudden**
150:2

**sue**
151:11

**sufficient**
22:14

**Sugarmill**
7:18
96:19

**suggest**
59:24

**suggesting**
17:7

**suggests**
14:21,23

**sum**
56:15

**summarize**
85:14

**summarizing**
85:16

**summer**
72:19,21
73:11

**summing**
59:17

**superintendent**
144:7

**superintendents**
107:9

**supers**
38:21

**superstructure**
48:23

**supervising**
99:11
100:2,20,
25 101:8,
15 149:7

**supplement**
28:15
35:20
49:25
50:12,17
51:14
109:22

**suppliers**
149:20,
22,24

**support**
137:9,18

**supposed**
50:21
52:19
78:3
79:8,14
90:14
102:13
134:19
136:21

**supposedly**
31:2

**surety**
145:9,13

**surge**
43:18,24
44:3,4

**surrounding**
149:11

**sustained**
48:14
58:15
126:1

**swear**
4:19

**swept**
43:18

**sworn**
5:1

**SWS**
148:13

**Systems**
114:1

**T**

**tabs**
62:24

**tag**
51:20

**takes**
74:13
124:24
146:22

**taking**
7:12
52:10
77:7
98:17
157:2

**talk**
6:20 9:13
10:10
11:9,10
13:14
31:10
32:2 35:9
64:19
66:4
71:4,7
75:3 76:4
77:6
98:17
114:17
123:25

135:20
139:19,22
145:14
150:9,24
156:10

**talked**
7:18,19
14:16
15:17
23:17,19
30:6,10
36:18
49:14
53:22
65:8
67:21
76:6
128:8
137:25
139:5
140:5,18

**talking**
6:2,6
12:13,18,
25 13:7,
16 32:22
35:4
45:10
52:25
63:7
72:18,22
80:10
91:17
95:4
98:23
100:19
105:5,15,
18,20,22
112:6
118:18
121:11,12
122:18
132:16
141:18
147:15,
24,25

151:8

**talks**
30:20
106:23

**tall**
33:10,16

**Tallahassee**
18:6

**taller**
37:2

**target**
81:10
112:21
113:17

**tax**
59:9

**taxing**
46:23

**teach**
146:14

**team**
86:13

**technically**
54:8

**technology**
95:3

**telling**
24:3 31:2
52:15
66:13
67:3 70:2
74:6,13
84:17
108:16
115:13
127:8
142:20
144:16

**tells**
61:19,23

**temporary**
87:10,17,
20 88:3,
10,24
89:1,9,16

**Ten**
146:19

**tenants**
88:2

**tension**
57:8

**term**
91:13
114:23
117:9
129:20
133:8,10
148:5,8
154:8

**terms**
62:4
88:18,20
130:4

**territorial**
141:6

**territory**
141:8

**test**
126:2

**testified**
5:2

**testimony**
4:19
5:13,17,
19 6:4
33:2 58:9
77:19
78:4,15
79:9
90:25
121:19
136:7

141:21

**tests**
125:21

**text**
24:17
142:4

**thing**
9:21
33:15
35:8 48:6
57:5 92:3
129:19
144:8

**things**
49:18
53:18
54:6
95:24
123:25
137:7
142:10,
11,20
152:22

**thinking**
7:10

**Thornton**
60:5

**thought**
25:10
32:23
45:12
75:14
93:6
111:25
112:7
143:20
147:13
148:3

**threatened**
151:7

**three-story**
41:10

**time**
4:7 6:2
7:9 14:11
15:2,13
17:24
19:2,4
24:21
32:6
39:15,25
46:6
51:14
52:3,6,
16,21
53:4
56:14
57:11,20
59:5,15,
23 64:7
67:4 68:2
70:12
72:8,11,
19 75:1,
16 76:18,
19 77:10,
12 79:19
80:7 82:9
83:22
86:21
87:16
93:21,23
95:17,19,
20,23
99:10,15
100:23
101:9,15
106:3,5
107:13
108:7,10
112:10
113:2
115:6
117:2
118:1,2
125:1,2
126:5,13
127:11
128:4
129:24
135:14
138:18
141:17
142:2,12
144:12
145:2
148:21
150:7
151:14
152:6,7
155:19,
20,24
156:13,17
157:1,15,
24

**timeliness**
55:20
56:1

**timely**
69:22

**times**
18:8,13,
15,24
32:2
42:24
53:18
55:25
72:7
89:24
96:14,17
97:9
100:4,21
139:24
141:10
143:10

**timing**
57:22
59:8

**today**
5:14
21:19
56:14
93:8

123:6 150:17 151:23 152:9,13 153:2 156:7 157:23

**today's**
4:6 157:14

**told**
13:8 16:19 28:3 29:25 34:6,7,13 36:1,25 50:13 52:13 74:20 75:5,9 79:23 105:16, 20,25 106:12, 15,16,25 111:10 118:10,18 126:8 132:23 134:11 137:19 141:5 142:1 152:21 154:7 155:18

**tomorrow**
86:13 121:8

**Tony**
4:16 157:7

**top**
26:24 41:16 47:22 83:5

**topic**
20:20 157:4

**topics**
54:5 91:6 155:21

**torch**
6:14,16, 17

**total**
30:17 97:15

**totally**
97:13

**tower**
22:15 54:9 58:7 63:19,21 87:20 113:16

**towers**
55:11 68:5 100:3 108:18 109:17 111:14 113:16 120:1

**trade**
71:19 91:23,24 92:9,16 114:4,10, 14

**trades**
73:6 99:3 100:24 102:4 109:9,16 132:5,9 134:19

**transaction**
92:6

**transcript**
5:16

**transferring**
91:10

**treat**
65:25

**treated**
9:4

**trouble**
99:17

**true**
106:18 129:22

**trust**
38:21

**truth**
4:20,21 105:9

**turn**
39:20 74:24 95:14

**turned**
58:8 151:19

**turning**
95:15

**two-by-four**
51:1

**two-by-three**
51:2

**two-story**
44:8,9

**type**
26:3 45:15 50:8 91:23 141:4

**typed**
34:10 45:14

**types**
56:9

**typically**
84:4

**typing**
26:7

**U**

**Uh-huh**
25:14 28:1 33:3 35:1 36:22 43:17 44:22 46:15 80:15 101:23 120:17 130:14 133:9 145:23,25 154:14

**ultimately**
99:7

**underneath**
40:1 43:7 68:22 107:1

**understand**
12:5 13:1 16:4 21:15,18, 19 24:20 29:1 32:8,10 33:2 38:2 53:15 54:7 58:8 59:22 60:15 62:18 69:13 70:23 73:24 74:1 76:9 80:25 82:12 86:8 88:23 92:1 107:20 108:16 112:4 113:1 117:4 118:16 129:3 130:4 131:4 132:17 133:20 142:13 152:1 153:24 154:3,7

**understanding**
21:22 44:5 67:3 69:9 110:21

**understands**
70:25

**understood**
12:17 22:13 147:16

156:8

**unexpected** 142:11

**units** 59:11 88:3

**unkept** 142:10

**unresponsive** 143:15

**update** 84:19

**updated** 83:23 86:14 107:15

**updates** 71:23 86:19

**upfront** 133:15

**upside** 155:12

**upstairs** 141:15

V

**Vaguely** 10:20 11:3 34:1 38:1 72:20 125:14 148:23

**values** 120:3

**verbal** 73:20 74:7 75:3,12 76:4

**verbally** 74:11 124:9,15 151:7

**version** 71:9

**versus** 12:21,23 14:17,24

**vertical** 76:2

**Vicari** 4:11,25 5:5,6,7 37:24 45:10 53:10 85:9 91:6 100:19 103:25 104:2 127:3 155:17 157:13

**video** 4:5 45:4, 7 63:4 85:1,4 100:13,16 123:18,21

**videotape** 157:15

**violation** 101:17 102:7

**violations** 100:6 102:13, 14,15,16

**visit** 18:8 30:15 154:4

**Vito** 67:15,18, 20,21 68:2 71:15 72:5,22 73:19 74:8,11 75:3 76:6 77:3,6 79:20,24 81:5,7 82:1 86:11 106:16 116:2,7 119:22 132:3,6, 10 134:15,24 136:2 138:3,6, 7,21 139:5,14, 24 141:5, 11,19 142:23 143:2,23

**Vito's** 145:8

W

**wait** 59:20

**waiver** 17:7 20:24 21:6

**walked** 93:16 105:10 114:6 131:23 138:8

**walking** 104:16 131:25

**wall** 56:22 75:16 114:1

**walls** 8:12 42:13,17 43:19 48:21 87:11,17, 20 88:3, 10,24 89:2,9,16

**wanted** 11:8,9 30:5 45:11 53:16 82:9 89:3 106:20 118:7 122:7 135:5,6 138:14 140:24 141:4 157:17

**warranty** 127:14,22 128:1

**Warren** 86:12 105:1,20, 23 106:5, 20 107:5 144:3

**water** 125:21

**wear** 102:25 104:10,21 105:24 106:5

**wearing** 104:8 105:1,12 106:21

**weather** 125:12 128:10

**website** 51:10

**week** 23:21 59:18 72:12 75:7,24 86:14 96:21,24 97:2 109:20 145:19, 21,22 146:5,6 151:18

**weekly** 73:7

**weeks** 62:12 74:19 108:12,23 109:3 111:14 112:8,23 122:4

**wet** 8:19,20

**whichever** 75:25

**Who'd**
150:9

**wife**
9:10,25 10:23 11:10,14, 20 13:8, 14 14:7, 16,24 15:12 19:6 22:5 24:2,10, 14 26:6 30:13 50:3,9

**wife's**
12:5

**wildly**
146:16

**wind**
42:5 48:14 125:17

**winding**
36:8,10

**window**
126:1,16 127:7,17 128:5

**windows**
43:20 47:24 56:19 92:12 125:21 126:25 127:10, 15,22,23

**wing**
48:7

**wire**
121:8

**wood**
43:20 47:8

**word**
16:3 70:16,17 92:5 141:10,18 153:22,24 154:18

**words**
145:10

**wore**
104:15

**work**
8:1,13 10:6 11:11,14, 21 12:2, 6,22,23 13:1 14:11,13, 17 15:14 22:15 31:11 38:25 44:6 49:12 55:16,20 56:1,5, 10,11,12, 16,18,25 57:7 58:7 61:22 63:13 64:1,4,5, 15 65:10, 11,17,18, 20,23 67:9 68:9,17 69:19 70:5,9 72:5 75:19,23 79:10 80:17,21 81:11 97:2 99:18 105:13 108:4,15 109:17 110:5,6, 7,9,16 112:17,22 113:21 114:8,10, 15 125:4, 6,8 126:24 134:12 139:17 141:4 146:21 149:10 150:7 154:13

**worked**
7:16 41:6 71:15 72:1 76:14 88:21 109:19

**worker**
106:18

**working**
7:10 36:13 57:1,11 88:17 95:18,19 100:25 101:16 102:24 103:4,6 104:9,17 105:11, 14,16 107:2 109:24 114:8,13 115:17 143:25

**works**
71:24 117:3 132:22

**World**
4:13

**wrapped**
131:14

**write**
34:7 154:25

**writing**
61:3 74:23 97:17 122:6 124:9,14, 18

**written**
23:11 31:6 77:1,3 78:1,8,16 79:10 80:18 88:9,25 89:7,15 107:14 151:3,20

**wrong**
44:13 45:1 56:20 105:3 117:17, 18,20 140:8

**Y**

**year**
11:24,25 59:10 62:13 72:14

**years**
104:18

**yes-or-no**
143:17

**Z**

**Zinsel**
126:7,17