Page 271

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO:  1:17-CV-23733 CMA

PETE VICARI GENERAL CONTRACTOR, LLC,
A foreign limited liability company,

       Plaintiff,

vs.

THE OHIO CASUALTY INSURANCE
COMPANY, d/b/a OHIO CASUALTY, a
Foreign insurance company; COASTAL
MAINTENANCE & RESTORATION,
INC., a Florida corporation; COASTAL
PREFAB, INC., a Florida corporation; and
CRONIN ENGINEERING, INC., a Florida
Corporation,et al,

       Defendants.
_____/


                     Esquire Deposition Solutions
                     44 West Flagler Street
                     Suite 1400
                     Miami, Florida 33130
                     Wednesday, 10:00  a.m.
                     October 17, 2018



      VIDEOTAPED DEPOSITION OF PETER VICARI Vol.III


      Taken before Marvalencia Miller, Florida

Professional Reporter, Notary Public in and for the

State of Florida at Large, pursuant to Notice of

Taking Deposition filed in the above case.

```
 1    APPEARANCES:

 2

 3    ON BEHALF OF THE PLAINTIFF:
      CLARK PARTINGTON
 4    106 E College Ave
      Suite 600
 5    Tallahassee, FL 32301-7721
      BY:  Bruce Partington, Esquire
 6    BY: Telephonic Keith Bell, Esquire

 7    ON BEHALF OF THE DEFENDANT:
      ANTHONY M. LAWHON, PA
 8    3003 Tamiami Trl N
      Suite 200
 9    Naples, FL 34103-2768
      BY:  Anthony Lawhon, Esquire
10
      JONATHAN P. COHEN, P.A.
11    500 E Broward Blvd
      Suite 1710
12    Fort Lauderdale, FL 33394-3012
      BY: Jonathan Cohen, Esquire
13

14    ETCHEVERRY & HARRISON, LLP
      150 S Pine Island Rd
15    Suite 105
      Fort Lauderdale, FL 33324-2605
16    BY: Guy Harrison, Esquire

17    BANKER LOPEZ GASSLER, P.A.
      1200 S Pine Island Rd
18    Suite 170
      Plantation, FL 33324-4469
19    BY: Douglas Melamed, Esquire

20

21

22

23

24

25
```

Page 273

```
  1                   - - - - - -

  2                  I N D E X

  3                   - - - - - -

  4    PETER VICARI                    PAGE
          By Mr. Anthony Lawhon         274
  5

  6

  7           EXHIBITS FOR IDENTIFICATION

  8
       DEFENDANT'S                     PAGE
  9    No. 319  E-mail 2/14/17          395

 10

 11

 12

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24

 25
```

Page 274

1   (Thereupon, the following proceedings were had)

2           THE VIDEOGRAPHER: Good morning.  We

3           are now on the record in the continuation

4           of deposition of Peter J. Vicari.  Today's

5           date is October 17, 2018.  The time on the

6           record is 10:00 a.m.

7   BY MR. LAWHON:

8       Q.   Good morning, Mr. Vicari.

9       A.   Good morning.

10      Q.   We are here to continue your

11  deposition.  Before we do that, couple of questions

12  from yesterday to follow up on.

13          Have you had any other lawyers,

14  besides Mr. Bryant, represent you in any way

15  related to your license, the potential suspension

16  or revocation or challenge to your license?

17      A.   We -- we had Fred Dudley, we had hired

18  when the complaint was filed.  And then a

19  consultant, I forgot the name, that Mr. Fred hired.

20  I don't know who -- I forgot who it was, what his

21  name was.

22      Q.   When you say when the complaint got

23  filed, the administrative compliant against your

24  license or the lawsuit?

25      A.   When Mr. Parish filed the complaint

Page 275

 1    against my license.

 2           Q.   Where does Fred Dudley work out of?

 3           A.   Tallahassee.

 4           Q.   When you say we hired him, was that

 5    you personally or did the company hire him?

 6           A.   Oh, I don't know exactly how it was

 7    done.  I'm sure the company.

 8           Q.   Did you communicate directly with

 9    Mr. Dudley about the representation or was that

10    handled through your dad or your mom?

11           A.   I think I was on the first phone call,

12    maybe, to bring him up to speed on everything.  And

13    then he took it from there.  And if any final

14    communication happened, it was with my dad.

15           Q.   Other than the first phone call, do

16    you recall having any direct communications with

17    Mr. Dudley, whether over the phone, face to face?

18           A.   I don't think so.

19           Q.   E-mail, text, anything like that?

20           A.   I don't think so.

21           Q.   Who participated in that first phone

22    call?

23                MR. PARTINGTON:  Let me just -- do you

24           intend to get into the substance of these

25           communications?  Because I'm going to

Page 276

```
 1          object to that on the basis of

 2          attorney-client privilege and that it's

 3          statutorily privileged, and statutorily

 4          confidential under the administrative

 5          rules.  So I can -- I can a lodge that

 6          objection now and then -- and then you can

 7          just reserve the right to ask about the

 8          substance of those communications later or

 9          I can instruct him not to answer every time

10          you ask the question.  What's your

11          preference on that?

12               MR. LAWHON:  So -- well, let me first

13          understand the objection.  Are you -- will

14          you be objecting to every question to him

15          about the substance of every communication

16          that he's participated in with Mr. Dudley?

17               THE WITNESS:  Yes.

18               MR. LAWHON:  Same basis?

19               MR. PARTINGTON:  Yes.

20               MR. LAWHON:  And to the extent that

21          he's talked to any consultant that he

22          mentioned, I haven't gotten into that yet,

23          but I think there's some other lawyers too.

24          Same objections?

25               MR. PARTINGTON:  I don't know that --
```

Page 277

1        well, I don't know that he had direct

2        communications with the consultant.  I

3        don't know the consultant actually provided

4        any -- the consultant never provided any

5        testimonial services in that proceeding

6        because they were unnecessary.

7             So at that point, if you want to

8        translate it to the litigation context,

9        which is not entirely applicable, but it

10       probably would been.  It would be, in

11       essence, a nontestimonial consultant, so

12       that would be privileged.

13            MR. LAWHON:  To the extent that -- and

14       maybe we need to take it in pieces, I may

15       be getting ahead of myself with the

16       consultant.  So why don't we do this.

17            To answer your question, I'd say I'm

18       okay if you are just going -- if I were to

19       ask the substance of the questions, if you

20       are telling me that you would instruct him

21       not to answer on the grounds of privilege,

22       both attorney-client and statutory, then we

23       will just sort of reserve every substantive

24       question for -- I'll evaluate whether or

25       not I want to pursue getting that provided,

Page 278

```
 1        with the understanding that I am going to

 2        ask some sort of related questions about

 3        who was present and all that stuff.  So--

 4            MR. PARTINGTON:  Your understanding is

 5        correct, I will be giving that instruction

 6        for any question about the substance of

 7        those communications.  If you want to ask

 8        who was in a meeting or who participated in

 9        a conversation.  And I will tell you that

10        Keith and myself were also involved in

11        those discussions, as well, although we

12        formally deal with the DBPR, that was with

13        Fred.  So I don't think that effects any of

14        the privilege or confidentiality issues.

15        Still an attorney-client relationship and

16        it's still the statutory confidentiality

17        for those administrative procedures.

18            MR. LAWHON:  Understood.  And let me

19        at least ask some of those questions and

20        see where they go.

21            MR. PARTINGTON:  Sure.

22            MR. LAWHON:  And just so we are clear,

23        because you would object and instruct him

24        not to answer, I am going to stay away from

25        asking him the substance of those
```

Page 279

```
 1            conversations, unless I get enough

 2            information that leads me to believe a

 3            waiver or something might actually allow me

 4            to ask that.

 5                 MR. PARTINGTON:  I understand that.

 6                 MR. LAWHON:  But I'm not waiving the

 7            right to ask those questions.

 8                 MR. PARTINGTON:  I understand.  You

 9            are acknowledging my objection and saving

10            us some time by my not having to object to

11            every single question.

12                 MR. LAWHON:  That's kind of the point.

13    BY MR. LAWHON:

14            Q.   All right.  A bunch of lawyers

15    talking, so let come back to what I was asking you.

16                 So the first phone call that you

17    participated in with Mr. Dudley, my question, I

18    believe, was not what was talked about yet,

19    perhaps, who participated in that call?

20            A.   Believe it was just probably me, my

21    mom, and dad those that were ever involved.

22            Q.   How long did the call last?

23            A.   I don't remember.  It wasn't long.

24    Wasn't in there for an hour, I can't tell you that.

25            Q.   It wasn't an hour?
```

Page 280

1          A.    No, it was not an hour.

2          Q.    Did you talk to anybody about what had

3    been discussed with Mr. Dudley, besides your mom

4    and your dad?

5          A.    No.  Not me.

6          Q.    At some point in time, was Mr. Dudley

7    hired?

8          A.    I believe so, yea.

9          Q.    Did you hire him or did somebody else

10   hire him?

11         A.    The company or PVGC.

12              MR. PARTINGTON:  Hang on.  I forgot to

13         call Keith.  I told him I would call him

14         and I forgot.  So I can probably do that

15         while we stay on the record, but probably

16         can't dial and listen at the same time so

17         bear with me.

18              THE VIDEOGRAPHER:  You want to go off?

19              MR. PARTINGTON:  Yea.  Just give me a

20         second.

21              THE VIDEOGRAPHER:  Okay.  We are off

22         the record, it's 10:06 a.m.

23              (Thereupon, a short recess was taken.)

24              THE VIDEOGRAPHER:  Back on the record.

25         10:08 a.m.

Page 281

 1  BY MR. LAWHON:

 2         Q.   I think my last question was asking

 3  you who had hired Mr. Dudley.  And you had

 4  indicated you thought it might have been PVGC.

 5              Was -- was Mr. Dudley a member of a

 6  law firm or was he a solo practitioner?

 7         A.   I don't remember.  I have no idea.

 8         Q.   How long did Mr. Dudley represent you

 9  or the company related to your license?

10         A.   From the time we hired him, whatever

11  date that was, until I think right after we got the

12  letter of finding of no probable cause, I think was

13  when it all was put to bed for awhile.  He gave me

14  more after that.

15         Q.   You had mentioned there was a

16  consultant as well that was hired?

17         A.   I had heard that Mr. Dudley had

18  somebody that he was going to use or had looked

19  through it, but I don't know to what extent that he

20  had done anything.  I've never seen anything he

21  produced.

22         Q.   Have you ever spoken to the

23  consultant?

24         A.   I haven't, no.

25         Q.   Have you ever communicated with the

Page 282

1    consultant --

2         A.   No.

3         Q.   -- in writing or otherwise?

4         A.   No.

5         Q.   What was the consultant's name?

6         A.   I have no idea.

7         Q.   Who would be the best person to ask

8    those questions?

9         A.   I'm sure Bruce, Keith, my dad, I

10   think, may have been involved in some conversation

11   when he was around.

12        Q.   Do you know why the consultant was

13   retained?

14        A.   No.

15        Q.   Just point of clarification.  My

16   recollection is that part of the damages that

17   you've reported to us and that your experts have

18   reported to us include attorney fees that have been

19   paid to Mr. Dudley's firm and other consultants,

20   perhaps this consultant is included in there?

21             MR. PARTINGTON:  I don't know that

22        we've included fees payable to Dudley.  I'm

23        not sure about that.  I don't know that --

24        I don't know whether anything may or may

25        not been paid to the consultant is included

Page 283

```
 1        in that.  I would have to look.  I don't --
 2        I don't know the answer to that, sitting
 3        here.  I know ours would be.  But -- but he
 4        is not in the sort of list of consultants
 5        he reports that he provided.
 6             MR. LAWHON:  Right.
 7             MR. PARTINGTON:  And I wouldn't
 8        anticipate his testimony in this case,
 9        anything.
10             MR. LAWHON:  Understood.  I'm just
11        thinking out loud, because you've raised
12        the privilege now.  Seems to me that if you
13        are seeking recovery for their fees, then,
14        in effect, you are waiving the privilege.
15        So I would be entitled to ask questions
16        about, certainly, the services that were
17        provided, if you are trying to collect for
18        those.  Would you agree?
19             MR. PARTINGTON:  No, I don't agree
20        that providing -- simply seeking attorney
21        fees waives the attorney-client privilege.
22        And I've never had anyone suggest that
23        before and I've sought attorney fees in
24        hundred of cases.  So typically, this a
25        little bit of a tangent.  For example, when
```

Page 284

```
 1              the fee records were submitted, privileged

 2              communications or things that might be

 3              privileged are redetected from the fee

 4              records because that's my standard practice

 5              and has been for a long time.  I don't

 6              think seeking attorney's fees waives the

 7              privilege.

 8                   MR. LAWHON:  Okay.

 9                   MR. PARTINGTON:  I never seen that or

10              seen anybody argue that.

11                   MR. LAWHON:  I -- well, we are talking

12              about fees in two different ways.  One is

13              an element of damages, which is what you're

14              doing here.  One is recovering attorney's

15              fees, you know, postjudgment as a

16              prevailing party.  I don't want to have too

17              much of a decision about it on the record

18              now.  But I'm just trying to determine

19              whether or not we probably will have to

20              evaluate the attorney-client privilege

21              that's being asserted and then we will

22              revisit that issue.  So let me move along

23              just to cover some other stuff.

24   BY MR. LAWHON:

25                   Q.   Besides Mr. Dudley, did PVGC or did
```

Page 285

1    you hire any other attorneys related to your

2    license or preserving or keeping the license?

3            A.    Not that I know of, except for Bruce

4    and his firm.

5            Q.    And it sounds like, from what Bruce

6    has just indicated, that they sort of let

7    Mr. Dudley and his firm be lead counsel or primary

8    counsel in charge of dealing with all things DBPR.

9    Does that sound right to you?

10           A.    I think that's what the situation was,

11   I think, for the most part.

12           Q.    Did -- did you have to go to any

13   hearings or testify at all in relationship to the

14   DBPR proceeding?

15           A.    No.

16           Q.    What, if anything, did you do to

17   prepare for your testimony today?

18           A.    Nothing.

19           Q.    Did you talk to anybody about your

20   testimony yesterday, other than perhaps Keith or

21   Bruce?

22           A.    No.

23           Q.    Not even your mom or your dad?

24           A.    No.

25           Q.    Not even for five minutes with your

Page 286

1    mom or your dad after yesterday's deposition,

2    family business, you guys are close and you are

3    telling me, under oath, that you didn't even talk

4    about your deposition yesterday?

5            A.    Nothing in particular.  I mean, I

6    don't remember anything in particular that we

7    discussed or went over.

8            Q.    Did you talk to them at all about

9    preparing for today's testimony?

10           A.    No.

11           Q.    Meant to ask you yesterday, we didn't

12   really get into this subject, but I want to cover

13   it a little bit today, and that is your racing

14   career.  I understand you've done some racing?

15           A.    Correct.

16           Q.    What type of cars?

17           A.    Drag racing, the dragsters and the

18   door cars.

19           Q.    When did you start doing that?

20           A.    I started racing when I was 8 years

21   old.

22           Q.    You still race today?

23           A.    I haven't raced this year.

24           Q.    When was the last time you raced?

25           A.    It's been awhile.  I think I may have

Page 287

1    raced in March of this year and that was it.  And I

2    don't think I raced but maybe one time last year.

3    Just been busy.  No time.  It's a hobby.

4            Q.   So let me sort of work backwards.

5    This is 2018.  I think you said you raced once this

6    year.  Did I understand that right?

7            A.   Correct.

8            Q.   Where was the race?

9            A.   I think we went to Dallas.

10           Q.   And what -- what type of work did you

11   have to put into getting ready for the race?  Did

12   you have to practice?  Did you have to work on the

13   vehicle?  What kind of things you have to do?

14           A.   The only thing we do is whatever

15   maintenance needs to be done, we do at the

16   racetrack.  We don't do much of anything.  The

17   truck and trailer stays parked in the building,

18   loaded, ready to go for any time I want to go.  And

19   just get in it and go.

20           Q.   So did you -- did you personally -- I

21   assume you have a team?

22           A.   No.  It's just me.  There is no team.

23   I can do it all.

24           Q.   You do all the maintenance, you do all

25   the repairs?

1          A.    Everything.

2          Q.    You keep your own stats, all that

3     stuff?

4          A.    Pretty much.

5          Q.    So before you went to the race in

6     March, did you -- did you do any practicing at all?

7          A.    No need to.  Been doing it a long

8     enough I don't need to practice.

9          Q.    You said you think you may have raced

10    one time last year.  So that would have been

11    calendar year of 2017?

12         A.    Correct.

13         Q.    When and where?

14         A.    There's always a race the beginning of

15    the year that's an hour from our house.  That is

16    one of the little points races that we sometimes

17    follow and I think that one was always the

18    beginning of the year, so it's probably in

19    February.  We just do that one because it's an hour

20    from the house.

21         Q.    Where exactly?

22         A.    In No Problem Raceway, which is

23    Donaldsonville, Louisiana.

24         Q.    Now, you just said "we."

25         A.    My dad comes.

Page 289

1          Q.   And did your dad go to Dallas?

2          A.   I think he showed up, yea, for the

3    weekend.  We only go Friday evening, Saturday,

4    Sunday.

5          Q.   What, if anything, did you -- did you

6    do to prepare for the race last year at the No

7    Problem Raceway?

8          A.   Like I said, nothing.  I mean,

9    everything stays pretty much ready to go.  Nothing.

10   A lot of maintenance  that we do.

11         Q.   Were you racing at all in 2016?

12         A.   I don't remember that far back.  I'm

13   sure.  I mean, every year we do one or two races

14   lately.  We haven't ran the series since, I think,

15   2013, when I won the championship.  And after that,

16   we kind of just slacked off because we just been

17   got busy.

18         Q.   Is there any work you have to do,

19   either online or through e-mails communicating with

20   people to sort of either prepare for or stay

21   involved in the racing circuit at all?

22         A.   Not really.  You kind of do at your

23   own will.

24         Q.   Did the racing interfere with you

25   working on the Civic Towers project in any way?

Page 290

1          A.   No.

2          Q.   Other than the one or two races that

3    you just mentioned, were you involved in racing at

4    all while you were working on the Civic Towers

5    project?

6          A.   I mean, there's no telling if I went

7    once or twice.  Like I said, nothing interfered.  I

8    never let anything interfere with my work; work

9    comes first.

10         Q.   Other than the one or two times a

11   year, I know it may be one, it may be two, I get

12   that.  Other than the one or two times a year, were

13   you involved in or doing anything with racing while

14   you were working on the Civic Towers project?

15         A.   Not that I know of.

16         Q.   Yesterday, I think we ended the day

17   talking about getting involved with Coastal on the

18   project.  I want to sort of start from there in a

19   minute and move forward.  But before I do that, let

20   me get a couple of things straight, if you remember

21   them.

22              Talked about yesterday the prime

23   contract.  So do you know what I am referring to

24   when I say the prime contract?

25         A.   Between GC and the owner?

Page 291

1          Q.   Yes.

2          A.   Correct.

3          Q.   So there's actually two of them for

4    the Civic Towers project; is that right?

5          A.   Correct.

6          Q.   Okay.  So I will just call those the

7    prime contracts.

8          A.   Okay.

9          Q.   Do you remember when those were

10   signed?

11         A.   I don't know offhand.  Early '16 I

12   guess, early '17.

13         Q.   Do you -- did you participate in the

14   negotiations or the back and forth of the contract

15   language before --

16         A.   No.

17         Q.   -- before those were signed?

18         A.   No.

19         Q.   My understanding is -- well, strike

20   that.

21              In terms of payment to PVGC under the

22   prime contracts, are they fixed price contracts or

23   are they cost plus contracts?  Or do you know?

24         A.   All I know is it's a cost plus

25   contract.

1          Q.   Cost plus what?

2          A.   Cost plus 14 percent, what I was told.

3     That's how it's set up.

4          Q.   Before the contracts were signed, did

5     you provide an estimate of the costs, a takeoff,

6     ProForma, anything to the owners?

7          A.   The scheduled values that we were

8     using for the project was the takeoff that I was

9     providing them.

10         Q.   I understand.  And you said that

11    yesterday, too.

12              To be more precise, the schedule of

13    values that you are referring to, did you prepare

14    that?

15         A.   It was my estimate/scheduled value, so

16    it was everything.

17         Q.   Did you provide that in writing to the

18    owners before the prime contracts were signed?

19         A.   I would have had to.  I think that was

20    attached to the contract.

21         Q.   Were you involved in negotiating or

22    discussing any of the schedule of values, the

23    estimates with any of the owners before the prime

24    contract was signed?

25         A.   I mean we were always in talks about

1    different things.  I mean, I don't know anything in

2    particular.  But when they had a question about an

3    issue -- about a line item, they would ask me what

4    it was or what it entailed.  I mean, I don't know

5    exactly what particularly you are looking for,

6    but--

7            Q.   I'm looking to know what you talked to

8    the owners about relative to the estimate of the

9    cost of the work before the contracts were signed.

10           So is there any particular trade,

11   product or line item in the schedule of values you

12   remember talking to any of the owners or the

13   owner's reps before the prime contracts were

14   signed?

15           A.   That schedule of values is pretty

16   long.  I mean, I'm sure we talked about different

17   line items.  I don't know anything in particular

18   that we talked about, but I mean, I'm sure there

19   was something.

20           Q.   We touched on a little bit yesterday

21   what subs you had actually hired, which ones had

22   been under contract, which ones you talked to

23   before the prime contracts were signed.  You

24   remember that sequence of conver- -- of

25   discussions?

Page 294

```
 1          A.   Correct.

 2          Q.   I want to go through a list of subs,

 3   and I want you the tell me, first of all, who

 4   brought them in to the job and then we will go from

 5   there.  Okay?

 6          A.   Okay.

 7          Q.   So, I think, if I remember correctly

 8   from your testimony yesterday, the only subs you

 9   could remember bringing in were the field framer

10   and the roofer before the prime contract is -- was

11   signed.  Am I recalling that correctly?

12          A.   I remember that.  I remember now two

13   or others that I remember.  I mean, just thinking

14   about it after I had left because that was the last

15   thing we talked about.

16          Q.   Who were the two or three others?

17          A.   I know Zensole(phonetic) was brought

18   on early.  And I know -- that's when I had got -- I

19   think Goosebumps Air Conditioning because PTACs was

20   a big issue at the very beginning.

21          Q.   PTACs?

22          A.   PTACs are units for the walls.

23          Q.   P-T-A-C.

24               Okay.  So, any others?

25          A.   That's what I can -- that's what I
```

1   remembered.

2        Q.   Okay.  Let me go through my list here

3   and you can tell -- we will talk about each one of

4   these.

5             ATO Golden, who brought in?

6        A.   ATO was brought in by the former

7   project manager.

8        Q.   Who was that?

9        A.   Robert Mick.

10       Q.   Atlantic Coast Electric?

11       A.   I think Mick brought them.  Mick

12   ultimately wanted them on the job.  I think I had

13   got other prices.  I forgot.  I mean, I had -- I

14   think I had two or three prices for each trade.

15       Q.   So before when I was asking you

16   yesterday about subs that you had spoken to or

17   gotten bids from, I think you only mentioned the

18   roofer and the field framer.  You did not mention

19   that you got two or three bids from every trade?

20       A.   Well, I don't remember.  I mean, I

21   know I had -- I know had some extra some other

22   bids, but like I said, we didn't use them.  So I

23   put them to the side and forgot about them.  I

24   mean, I don't know who they were and what their

25   prices were.  There was policy to get an extra --

Page 296

1    to have two prices or maybe three prices before we

2    actually award somebody a job.

3           Q.   Whose policy?

4           A.   That's just a company policy that we

5    normally try to enforce that you just don't give it

6    to one -- you got to give backup pricing to make

7    sure that their price is good.

8           Q.   Do you -- do you know if the policy is

9    to get two bids for every trade or is it three bids

10   or is it sometimes two and sometimes three?

11          A.   I mean, it's not written in stone.

12   It's just we need to get more than one price.

13          Q.   And you are testifying that you

14   received at least two bids for every trade that you

15   expected to work on the project before when?

16   Before the prime contract was signed?  Before you

17   started work?  When?

18          A.   I don't remember exactly when.  I

19   mean, like I said, it was a lot of stuff going on

20   back then at that time.  I don't know what time

21   things came in and when it went out or when I

22   awarded.  I mean, if I had the server here, I could

23   go through and see when a contract was signed and

24   when I got sub bids.

25          Q.   Who were the other electricians that

Page 297

1   you got sub bids from?

2          A.   I don't know.  I don't know their

3   names.  I know there was one more other.  There was

4   one more I remember another bid from.  However,

5   whether that was complete or not, I don't know

6   because it was tough to get all complete bids

7   sometimes.  Sometimes they didn't understand the

8   project and I didn't want to deal them.  I want

9   someone who understood the project.

10         Q.   What about the roofer, did you get

11  more than one bid?

12         A.   I think so.

13         Q.   Who was their other roofer?

14         A.   I don't remember their names.  We went

15  with the one we using now because it was

16  recommended by two other engineers I think.

17         Q.   Who is the roofer now?

18         A.   Decktight.

19         Q.   Since last -- so, the glass

20  manufacture, did you get other bids?

21         A.   I think we got one or two more.

22         Q.   From who?

23         A.   I think one came through Coastal.

24         Q.   Don't recall any of the names?

25         A.   I think maybe the one from Coastal.  I

1    think there were -- I don't know if there was a

2    manufacturer or a supplier.  I remember seeing

3    Clear Choice, whatever that is, if they are the

4    supplier or the manufacturer, I don't know.

5           Q.    Drywall, did you get more than one bid

6    for drywall?

7           A.    I think so.

8           Q.    From who?

9           A.    I don't remember.  I don't know if I

10   did or not.  I don't remember drywall.

11          Q.    Don't remember who it would have been?

12          A.    No.

13          Q.    Would any of these other bids that

14   you're talking about had been from local trades or

15   from Louisiana trades, or both?

16          A.    I think we got both.  Like ones we're

17   using now, which is some local guys from by us and

18   we had some bids from down here.

19          Q.    So you had mentioned Decktight Roofing

20   a minute ago.  Who brought them into the job?

21          A.    I did.

22          Q.    How did you find them?

23          A.    From the engineers that we were using

24   on the project.  I just asking around, you know,

25   who would they recommend for roofing, wanted to get

Page 299

1    reputable subs.

2         Q.    EE&G Environmental, who brought them

3    in?

4         A.    The owner.

5         Q.    Goosebumps you mentioned that you

6    brought them in?

7         A.    Yes.

8         Q.    How did you find them?

9         A.    I think we put out an invite, a bid

10   invite to I think -- I think what my secretary did

11   was call up some of the local supply houses down

12   here to get someone who they -- who they would

13   recommend for, like, a PTAC job, you know, what

14   very basic.

15        Q.    LLJ Environmental?

16        A.    Me, I brought them in.

17        Q.    How did you find them?

18        A.    They're a local contractor back in New

19   Orleans that does sub work for us.

20        Q.    Did you bid their work out?  Did you

21   bid that scope of work out?

22        A.    I had -- I think I gave -- well,

23   before the hurricane, it was just painting of the

24   job and installing the exterior wall drywall, so

25   mainly it was a painting job, so I remember having

1    a painting -- two or three painting prices maybe

2    from down here, but then I ultimately gave it to

3    LLJ.

4           Q.   Oracle Elevator?

5           A.   The owner -- actually, no, I'm sorry,

6    I did.  I brought Oracle in.  They had somebody

7    else.

8           Q.   How did you find Oracle?

9           A.   Went to find a local elevator company

10   that wasn't the big boys because the big boys are

11   hard to deal with.

12          Q.   Local as in Miami local?

13          A.   Well, just not a national elevator

14   firm, like Thyssen and Schindler and all them big

15   guys because they are hard to deal with, like back

16   in New Orleans, so I went to find somebody a little

17   more localized that was -- that you could pick the

18   phone up and talk to a manager quick.

19          Q.   How did you find them?

20          A.   I think through the internet, just

21   finding somebody that was a reputable elevator

22   company and calling them and talking to the

23   salesman that was for that area and had a meeting

24   with them.

25          Q.   You did all of that before the prime

Page 301

1    contract was signed?

2              A.    I think so.  May have been maybe on a

3    walkthrough or something to bring them over, let

4    them look at the elevators to see what he would

5    recommend doing.  I don't remember exactly the

6    time.

7              Q.    Prestige Marble?

8              A.    I brought them in.

9              Q.    How did you find them?

10             A.    They are a local supplier or

11   manufacturer, installer back home that does all of

12   our synthetic marble work.

13             Q.    Did you get bids for their -- their

14   scope of work?

15             A.    I think I had one other bid that the

16   owner had given me, but they couldn't meet the

17   timeline.

18             Q.    Rudolph.

19             A.    I brought them in.  That's all --

20   they do all our cabinetry work back home.

21             Q.    Competitive bids?

22             A.    I don't know if I got one because the

23   owner speced a certain manufacturer, and they were

24   a dealer for them.  And there was only a certain

25   markup you can put on those cabinets, so it was

Page 302

1    pretty one set price.

2          Q.    So you don't think you got another

3    bid?

4          A.    I think I did.  I think when I got

5    that price, showed the owner and he understood --

6    he figured it was right because he had just bought

7    those for some other project up north and it was

8    the same price.

9          Q.    Southwest Plumbing?

10         A.    I think Mick brought them in.

11         Q.    Who was the drywall company?

12         A.    Doing -- LLJ did the drywall.

13         Q.    On the job?

14         A.    Yes.

15         Q.    They did all the drywall?

16         A.    Yes.

17         Q.    And I think you said you'd worked with

18   them before?

19         A.    Yes.

20         Q.    For how long?

21         A.    I been knowing the owner since I was

22   in high school.  We've always done odds and ends

23   together.

24         Q.    Prestige, how long have you been doing

25   business with them?

Page 303

```
 1            A.   Long time.  Been doing a long time

 2    before me, when my dad was buying from them.

 3            Q.   How about Rudolph?

 4            A.   They are my neighbor at one of my

 5    buildings, so I been knowing them a long time too.

 6            Q.   And you mentioned Zinzo before.  How

 7    long have you been doing business with them?

 8            A.   A long time.  They're the largest

 9    supplier contractor in New Orleans.

10            Q.   Did -- did you or PVGC or anybody on

11    behalf of PVGC -- strike that.

12                 Do you know what a kickback is?

13            A.   Yea.

14            Q.   What is it?

15            A.   When you get something back off of

16    from that person.  You -- I don't know.  You

17    receive a benefit for something.

18            Q.   Do you know what a kickback is in the

19    construction industry?

20            A.   Yea.

21            Q.   How does it usually work?

22            A.   I mean, I figure you scratch my back,

23    I scratch yours type deal.

24            Q.   Was there any back scratching done or

25    was there any kickbacks paid or promised to be paid
```

Page 304

1    to any of the New Orleans trades that we just

2    talked about?

3             A.    No.

4             Q.    Have you ever done that with any of

5    those trades before?

6             A.    No.

7             Q.    Has anybody from the company ever done

8    that with any of those trades?

9             A.    No.

10            Q.    Did you or your dad ever receive any

11   payments back or kickbacks or anything from any of

12   the trades on the Civic Towers project?

13            A.    No.

14            Q.    Is there any other subs that I haven't

15   covered yet that you brought in before the prime

16   contract was signed?

17            A.    I don't remember offhand.  I mean,

18   there were so many little things on that job.  I

19   don't remember offhand.  If I had a list of all of

20   what I had, maybe I can point out.  I don't know.

21   I mean, there was some suppliers maybe.  Local

22   supplier.  I mean, I know I had A1 Appliance that I

23   bought all my appliances from.

24            Q.    When you say local supplier, I'm

25   getting confused because we are in Miami.  So are

1    you talking local to Miami or local to you because

2    you work out of New Orleans?

3         A.   Well, local -- I should say local New

4    Orleans supplier verses local Miami supplier, I

5    will say.  But I'm buying both; I'm buying from

6    here locally and buying from New Orleans locally.

7         Q.   A1, what was the name of the company?

8         A.   A1 Appliance, that's who I buy all my

9    appliances through.

10        Q.   How long have you been working with

11   them?

12        A.   That's a -- been knowing them years.

13   My dad knows the owner's dad.  I think my dad built

14   their building before it was A1 Appliance.

15        Q.   They are out of New Orleans?

16        A.   Yes.

17        Q.   Anybody else you can think of?

18        A.   No.  Everything else was bought HD

19   Supply or just internet company if it was something

20   small, but nothing major.

21        Q.   All right.  I want to move ahead a

22   little bit.  So the prime contracts I think I

23   mentioned yesterday, I don't remember the dates

24   either, but I think it was either the end of

25   December or early January when they were signed --

Page 306

1    December of '16, January of '17.  Does that sound

2    roughly about right?

3          A.   Sounds like it, yes.

4          Q.   Okay.  Was the signing of those

5    contracts delayed?  Did you expect it to happen

6    earlier in 2016?

7          A.   All I remember is I think we were

8    waiting on the owner to close on the property is

9    all I know.  That was dependent on that.

10         Q.   And do you know why the closing took

11   longer than expected?

12         A.   No.  I have no idea.

13         Q.   Did you -- were you doing any work to

14   sort of get ready for the project before the prime

15   contracts were signed?

16         A.   There was a lot of -- I don't know

17   when the meeting, but conference calls started

18   exactly, but we started have weekly calls with the

19   owner and with Coastal and Zencil(phonetic).  I

20   think it was just those two were the main ones that

21   was having, I guess, pre-con meetings weekly, just

22   getting ready for when it was time to go.

23         Q.   Do you know -- again, not holding you

24   to exact dates, but using December of '16, January

25   of '17 is kind of the time when the prime contracts

Page 307

1    were signed.  Do you know when prior to that those

2    weekly calls started?

3            A.   It had to be in late October maybe or

4    in October, November maybe when all those calls

5    maybe started.  Because, I want to say, Coastal was

6    released in November for 3D modeling and site

7    investigation.

8            Q.   When you say "site investigation," do

9    they actually go out to the site, start taking

10   measurements, photos?

11           A.   Yes.  They went out in 3D.  The

12   building had lifts out there going up, cutting

13   holes in the walls, measuring the floors.  I mean,

14   it was get everything you need to produce shop

15   drawings.

16           Q.   Was that in November?

17           A.   Yes.  I remember November something is

18   when they were released to go do it.  I don't know

19   the date.  I think it was early November.

20           Q.   Do you know when they actually came

21   out to the site for the first time to start doing

22   the 3D modeling?

23           A.   Not the date exactly.  I'm sure in the

24   records it states that -- because I know they had

25   to have an e-mail to the managers that Vito was

Page 308

 1   copying to have authority to go on the site.

 2        Q.   Would you have gone to the project

 3   site with them?

 4        A.   No.  I wasn't there.

 5        Q.   You weren't there?

 6        A.   No.

 7        Q.   You were in New Orleans?

 8        A.   Maybe.  Because the day they wanted to

 9   go we were back home and they just wanted to go out

10   for a day, so no need to go watch them.

11        Q.   Any other work done to get ready for

12   the projects other than the weekly calls and then

13   Coastal starting to do their site work and 3D

14   modeling?

15        A.   I mean, they were released in -- I

16   forgot the date.  They were released early in

17   December, January to do their shop drawings, as far

18   as their shop drawings.  Maybe middle of December,

19   I don't know the date exactly.  But they are

20   released early on to begin shop drawings.

21        Q.   Did they have a contract signed by

22   that time?

23        A.   I don't remember when theirs was

24   signed.  I don't know.  I know there was back and

25   forth on when they were released to do the modeling

Page 309

1    and shop drawings of approvals through e-mails and

2    agreeing to these amounts to do the pre --

3    pre-work.

4         Q.   Do you -- so I just asked you if

5    Coastal -- any of the Coastal companies had

6    contracts signs before they did the shop drawings.

7              Let me ask this question:  Were there

8    any signed contracts with any of the Coastal

9    companies when they were released to do the 3D

10   modeling or the site work?

11        A.   I don't think so, not in November.  I

12   mean, their contracts, I don't know when exactly

13   date they were signed, but they couldn't get signed

14   right away because there was issues getting their

15   bonding company, getting the bonds and backup they

16   had to have for those contracts so they couldn't

17   get signed right away.

18        Q.   What do you recall the issues being

19   for them getting bonds?

20        A.   Oh, I don't know.  I don't know the

21   specifics.  Bridgett and my dad handled a lot of

22   that.  I know they were going back and forth with

23   insurance company, their insurance company on

24   making sure they were getting correct insurances

25   and waivers and making sure all the language was --

Page 310

1    was where it was supposed to be.  That's all I

2    know.

3           Q.   Were you involved in any of the bonds,

4    whether it's the bond related to the prime

5    contracts or the bonds that -- that Coastal had to

6    secure for their contracts?

7           A.   No.

8           Q.   Any other work you can think of that

9    you or PVGC was doing to get ready for the project

10   before the prime contracts were signed?

11          A.   I don't remember offhand.  I mean,

12   like I said, we had weekly calls with the owner,

13   and it was always gearing up for when we start

14   talking about everything.  There's no telling what

15   it could have been.

16          Q.   When did you find out the closing

17   finally took place between the owner and the prior

18   owner of the property?

19          A.   I was not involved in that.  I have no

20   idea.  I'm sure whenever my dad told me.  They

21   talked to the owner and they said they closed.

22   That's about all I know.  I wasn't copied in those

23   e-mails, if there even was.

24          Q.   So once the closing took place, were

25   you involved in the permitting process at all?

1          A.    Not really.  They hired Mario Moss to

2     do drawings to submit to the permit office.  They

3     didn't need too, too much from me to get what they

4     needed going.

5          Q.    So, Miami is a typical, a lot like

6     some of the parishes we saw before where they

7     require an application for a building permit and

8     then a permit gets issued to -- for whatever the

9     scope of the work the permit is, whether it's the

10    master permit, demo permit, whatever.

11                So, are you familiar with what I'm

12    talking about?

13         A.    Correct.

14         Q.    All right.  So were you involved, in

15    any way, in applying for, filling out the

16    application, submitting the application for any of

17    the permitting on the Civic Towers projects?

18         A.    I didn't fill out -- I don't think I

19    remember filling out anything.  I know I remember

20    them having -- they'd always send me something

21    telling me to sign this application because I was

22    the qualifier.  They would fill out because it was

23    between the owners and Mario, the ones spearheading

24    the permit issues.  So, if there's something they

25    needed from us, they would call up and say, hey, we

Page 312

1    need this and we would just provide it to them and

2    they would bring and do whatever they needed to do

3    with the permit office.  We wasn't involved in

4    going to the permit office or filling out

5    paperwork.  The owner would pretty much was the one

6    doing it all and just tell us what we need to do.

7         Q.   So when you say they would do all

8    this, you are talking about the owners?

9         A.   Correct.

10         Q.   So the -- the permit applications for

11    the Civic Towers projects, am I understanding your

12    testimony that you would not have filled in any of

13    the information or participated in filling in any

14    of the information, you would have just signed it

15    if the owner asked you to because you were the

16    qualifier?

17         A.   I did what the owner asked.  I

18    would -- he would send it to me, say, hey, I need

19    you to sign this application and send it back.

20    Okay.

21         Q.   Other than just following the owner's

22    directions and signing stuff, did you participate

23    at all in the permitting process at all?

24         A.   To the extent.  I mean, I would --

25    whatever he would send me, I would make sure it

Page 313

1   wasn't -- it wasn't wrong, I guess.  But he would

2   send me the application, hey, I need you to sign

3   this so we can submit to the permit office.  Okay,

4   here you go.

5           Q.   What would you read the permit

6   application before you signed them?

7           A.   I would look over them.  But I mean,

8   there was nothing ever on there that was -- that

9   was there out -- that was a problem.

10          Q.   I have copies of a couple of the

11  permits.  I guess I'll just ask you these

12  questions.  And these are my copies.  I didn't

13  bring the extra copies.  So they have got some

14  highlighting on them and some of my writing, but

15  that's okay.  These were previously marked as

16  Exhibit Number 262, I think, to your father's

17  deposition.  Just have you take a look at -- there

18  should be three pages there.

19          MR. PARTINGTON:  Say, I'm sorry, 262?

20          MR. LAWHON:  Yes, sir.

21          THE WITNESS:  Okay.

22  BY MR. LAWHON:

23          Q.   I guess my first question is, we can

24  take them one at a time, do you recognize the first

25  page other than the highlighting?

1          A.   I don't remember.

2          Q.   Is your signature on that document

3     anywhere?

4          A.   No.  This is for access controls,

5     which is Stanley, the sub.  So it was signed by, I

6     guess, the Stanley Company as the qualifier.  And

7     my dad as the owner less -- lessee, I guess,

8     whatever it says.

9          Q.   Do you know why your dad -- is that --

10    there is a signature line that says owner lessee

11    that I circled on that page.

12         A.   Right.

13         Q.   There's a signature above that.  Are

14    you telling me that's your dad signature?

15         A.   Yes.

16         Q.   Do you know why your dad would sign it

17    as the owner or lessee?

18         A.   We were told by the owners that we

19    could sign on behalf of them on the sub permits.

20         Q.   It looks like your dad's signature is

21    notarized from somebody in Louisiana.  Am I seeing

22    that right?

23         A.   I have no idea.  Let me see.  Says the

24    State of Florida.  That's his driver's license

25    number.

Page 315

1          Q.   Okay.  Got you.  My mistake.

2               Second page of Exhibit Number 262.  Do

3     you recognize that document?

4          A.   It's a permit application, it looks

5     like.  Rehab.  I mean, they all -- a lot of these

6     applications look the same on a lot of the subs and

7     our stuff.  So I mean, obviously it's signed by me

8     and the owner.

9          Q.   And you say "obviously."  Let me --

10    let me walk through that a little bit here.  So

11    where is your signature on this document?

12         A.   Signature of qualifier.

13         Q.   And there is a notary jurat there, we

14    call that a jurat, but -- but I don't see it

15    notarized.  Is there a reason why that wouldn't

16    have been notarized?

17         A.   I have no idea.  That's what the

18    attorney back home did.

19         Q.   So, did you sign that in New Orleans

20    or did you sign that here in Florida?

21         A.   I -- I don't remember.

22         Q.   Why would they -- why would you say

23    the attorney back in New Orleans did it that way?

24         A.   Because I might have been home when I

25    was -- might have been at the office when I signed

Page 316

1    it with the attorney there.

2          Q.   The information that's typed in to the

3    page that we are looking at, would that have been

4    already prepared by the owner, as you had earlier

5    testified would have been their standard practice?

6          A.   Yea.  Yes.  The only thing that we

7    would remember seeing back then would have just a

8    contract or information on it, and the owner would

9    fill in the rest of the items that he was using the

10   application for.

11         Q.   Did that application come to you

12   signed by the owner first or was it blank in the

13   signature place for the owner and -- or were you

14   asked to sign it first and return it back to the

15   owner?

16         A.   I don't remember which way it went.

17         Q.   There is a -- there is a bonding

18   company listed there that's -- looks like CP Grace.

19   Do you see that?

20         A.   Correct.

21         Q.   That's not Allied, who I understand is

22   PVGC's bounding company.  Do you know whose bonding

23   company that was or why that's there?

24         A.   That's our agent.  That's our agent

25   company.

Page 317

 1          Q.   And then down here there is an

 2    engineer that's listed.  I can't really read the

 3    name.  Who is that?

 4          A.   I have no idea.  Something consulting,

 5    some engineer or architect.  Somebody Perez hired,

 6    the architect hired, engineer.

 7          Q.   The -- there is a -- just above that,

 8    there is a remodeling total there, and it says 7.7

 9    million dollars that appears to be typed in.  Do

10    you see that?

11          A.   Correct.

12          Q.   Would you have assisted in any way in

13    coming up with that calculation?

14          A.   No.  The owner did that.

15          Q.   My recollection is that the -- well,

16    strike that.

17               Which tower is that?

18          A.   Senior.

19          Q.   Senior, okay.

20               So, had you estimated the total cost

21    of work that was -- that it was going to cost to do

22    the -- to do the scope of the prime contract work

23    on the senior tower prior to signing this

24    application?

25          A.   I mean, I'm sure with the way it's

Page 318

1    dated, there was an estimate done before then, but

2    the owner came up with the values for the permit.

3         Q.   Was the estimate that you came up with

4    greater than the 7.7 million dollars that's

5    identified in that application?

6         A.   It's whatever the prime contract cost

7    is to a senior.

8         Q.   Do you recall what that number is?

9         A.   I don't know what it is exactly.

10        Q.   Roughly?

11        A.   I don't know.  10, 13.  I don't know.

12   Something in that area.

13        Q.   One of the contracts was about 13

14   million and the other was about $19 million.  Does

15   that sound right?

16        A.   Yea.

17        Q.   Do you know which was which?

18        A.   Well, Civic is the more.  The Civic

19   Towers is the higher one.

20        Q.   So at the time that the application

21   was signed, the estimate for the senior scope of

22   work under the prime contract was about

23   $13 million?

24        A.   Correct.

25        Q.   Did you talk to the owner or question

1    the owner as to why he put a 7.7 million dollar

2    valuation in the application?

3         A.   They had some spreadsheet they had

4    done and he told me there was items that don't get

5    permitted costs added to it for certain items in

6    the building that don't have to be permitted.

7    Like, I think he said appliances.  How you finish

8    is you don't put the value on for a permit cost is

9    what he explained to me.  And it was an IRS thing,

10   he was able to -- I don't know.  They are too smart

11   for me to figure out how they come up with numbers.

12        Q.   The spreadsheet that you just

13   identified and the conversation that you just

14   talked about that -- where the owner explained to

15   you the valuation, was that before or after you

16   signed the permit application?

17        A.   I don't remember.  I don't remember

18   when.

19        Q.   Would there have been any reason for

20   you the question the valuation before you signed

21   the permit application?

22        A.   I don't remember.  I mean, from what I

23   remember is Ryan told us what they done on how they

24   come up with the numbers.  Said, y'all are the

25   owners.  I mean, all y'all lead us, that's what

Page 320

1    y'all say that's what you are going to do that's

2    what y'all are going to do.  And they stood behind

3    it and we stand behind them.

4         Q.   The third page of that application --

5    excuse me, that third page of Exhibit 262, take a

6    look at that.

7         A.   Okay.

8         Q.   Seen that before?

9         A.   It's another permit application, I

10   think senior.

11        Q.   Is that for senior?

12        A.   I mean, facility that's like senior.

13        Q.   Okay.  Is that your signature on

14   there?

15        A.   Yes.

16        Q.   Did you sign that before or after the

17   owner signed?

18        A.   I don't remember.

19        Q.   Did you review the information before

20   you signed it?

21        A.   Like I say, probably a lot of it was

22   blank when I first signed it.  So they could fill

23   in what they needed for the architect and

24   engineer's information and send it down to the

25   permit office.

1          Q.   Do you remember who was sending those

2     to the permit office?

3          A.   Somebody.  The owner.  Whether it be

4     Nick or Ryan.

5          Q.   So you were signing them and returning

6     them back to the owner?

7          A.   Correct.

8          Q.   There is a handwritten valuation in

9     that application.  Can you tell me what that number

10    is?

11         A.   It says 4.5 million.

12         Q.   Whose handwriting is that?

13         A.   None of ours. I can bet it is the

14    owners or somebody with the owner.  I don't know.

15    Not us.

16         Q.   Did you question that figure before

17    you signed the application?

18         A.   I don't remember if I did before or

19    after.  But it was the same answer, the senior, how

20    they bid all of this.

21         Q.   Showing you previously marked as

22    Exhibit Number 263.  Take a moment to look at that.

23    It consists of two documents and let me know when

24    you are done.

25         A.   Okay.

Page 322

```
 1            Q.    You recognize those documents?

 2            A.    The permit that we had displayed on

 3   the wall.

 4            Q.    I'm sorry?

 5            A.    It was the permit that we had

 6   displayed on the wall in the office.

 7            Q.    Is that one permit for each tower?

 8            A.    It looks like it.

 9            Q.    Are those accurate copies of the

10   permits that you displayed on the wall for each

11   tower?

12            A.    I don't remember if it's the exact

13   ones.  I mean, I have no idea if it's the one

14   that's on the wall today or not.

15            Q.    What are the dates listed on those?

16            A.    February 16, 2017.  The next one,

17   February 17, 2017.

18            Q.    Does that sound right for the dates

19   that you got -- well, strike that.

20                  Would you call those master permits or

21   something else?

22            A.    Looks like the master permit.

23            Q.    Do those dates sound right for when

24   you were furnished with master permits from the

25   City of Miami for each tower?
```

1          A.    Looks like it.

2          Q.    Do you know, using those dates, as a

3    point of reference, how far into working on the

4    project were -- was PVGC, if at all?

5          A.    I think we started the projects the

6    first week of February was when we started

7    mobilizing and doing what we could, I guess.  We

8    started -- I think it was the first of February

9    when the job started.

10          Q.    What would you consider starting the

11    project, other than mobilizing people and equipment

12    to the job site?  What else would you do?

13          A.    I think the owner said that we were

14    able to do demolition.  That he had got the release

15    that we could start demo on units.  And I think EMG

16    had started there while their site remediation.

17    They were the first ones on the site.  They had to

18    get in and get out of our way.  They were able --

19    they were okay to start.

20          Q.    They had to get in and get out of your

21    way, what do you mean by that?

22          A.    Well, they had to go around both

23    towers and dig out 30 inches of the contaminated

24    soils and put back soil, so we want them to get in

25    and get out so we can work around the buildings and

Page 324

1    not being -- and working together, I guess.

2         Q.   Did they start working before the

3    master permits were issued?

4         A.   I don't remember the exact date they

5    started, but they were the first ones there

6    working.  So I don't know the exact date they

7    actually mobilized and started digging, but they

8    were early on.

9         Q.   How long were they there?

10        A.   I don't know.  I mean, I don't

11   remember the exact time frame.  They were -- they

12   were fairly quick, I mean.

13        Q.   We talking a month, we talking three

14   months?

15        A.   A month or two.  I don't remember the

16   exact date timeline.

17        Q.   Did they have to finish all of the

18   remediation work before you could start doing any

19   other phase of work?

20        A.   No.  They -- they had areas where they

21   wasn't going to be working that we could work on,

22   so I mean, they wasn't in our way.  We just wanted

23   them to do this job and just get out so we don't

24   have to deal with the mess.

25        Q.   Right.

1          And you said you could start demo

2    before the master permits were issued.  Did I

3    understand that correctly?

4          A.   I think that's what the case was.  We

5    could start doing interior demo on the first stack

6    of each phase of each apartment building.

7          Q.   Only interior demo, or were you also

8    released to do --

9          A.   I think --

10         Q.   Let me finish my question.

11              Only interior demo or were you also

12    released to do exterior demo before the master

13    permits were issued?

14         A.   Like I said, I think Coastal

15    mobilized, too, when we first started, with doing

16    their mast climbers on the building to do their

17    demo.  Now, the time I don't know exactly the date

18    they started, but the first stack on each building

19    was vacated when we started.  So we were doing

20    interior demo.  And I think maybe they were getting

21    ready to start doing their temporary walls while

22    they were erecting mast climbers so it was all

23    being done simultaneously.  So, I don't think -- I

24    don't know the exact date they started demoing the

25    exterior wall, but the permit was issued in the

Page 326

1    second week of February so I'm sure all that was in

2    place when they were working.

3         Q.   What date do you recall the first

4    stack of residence being vacated out of the

5    buildings?

6         A.   I don't remember exactly.  I don't

7    know the date.  There was another company involved

8    that dealt with removal of all the contents and the

9    people.

10        Q.   What was the name of that company?

11        A.   I don't remember the name.  U.S.

12   Residential was the management company on site.  I

13   don't remember.  I remember the girl's name was

14   Jennifer that was there that was in charge of that

15   company.  But they worked for the owner, they

16   didn't work for us.

17        Q.   I understand.  And let me just clarify

18   something.

19             Who was responsible for getting the

20   residents, not their furnishings, the residents

21   themselves out of the buildings?

22        A.   It was on the owner.  Between the

23   owner and that company.  From what I hear is that

24   the owner put up those residents in hotels and the

25   other company took out their belongings and stored

1    them.

2         Q.   Was PVGC involved at all in moving

3    residents out of any of the buildings?

4         A.   No.

5         Q.   Did PVGC help in any way in getting

6    residents out of the buildings?  Did you go knock

7    on doors and tell people that they need to get out

8    today, tomorrow or anything like that?  Or did you

9    leave it all to the owners?

10        A.   It was all on the owner, had nothing

11   to do with tenants nor belongings.  We were given

12   an empty unit.

13             MR. LAWHON:  Let's take a break.

14             THE VIDEOGRAPHER:  We are off the

15             record, it's 11:03 a.m.

16             (Thereupon, a short recess was taken.)

17             THE VIDEOGRAPHER:  We are back on the

18             record.  It's 11:21 a.m.

19   BY MR. LAWHON:

20        Q.   I want to move to the Coastal

21   contracts.  And I've asked you about some dates, so

22   I want to keep trying to put things in sort of a

23   date perspective.  So I'm going to show you -- do

24   this right -- the contracts.  Showing you what was

25   previously marked as Exhibit Number 2, and it

1    consists of the several pages.  Take a moment to

2    take a look at that and let me know when you are

3    done.

4             A.   Okay.  All of it.

5             Q.   Do you recognize that?

6             A.   Yea.

7             Q.   What do you recognize it as?

8             A.   The subcontract between PVGC and

9    Coastal Maintenance.

10            Q.   Is that for a particular project?

11            A.   For Civic Towers.

12            Q.   And if you look at Exhibit Number 3,

13   tell me what that is.

14            A.   That's a subcontract between PVGC and

15   Coastal Maintenance at Senior.

16            Q.   Showing you Exhibit Number 93, tell me

17   what that is.

18            A.   It's the purchase agreement between

19   PVGC and Coastal Prefab at Civic Towers.

20            Q.   And how about 94?  Let me see if I did

21   this right.  Yes.

22            A.   That's the purchase agreement between

23   PVGC and Coastal Prefab, Civic Towers Senior.

24            Q.   And we will get into the substance of

25   those maybe in a little bit.  But for the purposes

Page 329

1    of where I'm going right now, what are the dates of

2    those contracts?

3           A.    It's dated January 26th.

4           Q.    And what is the date they are actually

5    signed?

6           A.    February 16th.

7           Q.    Is that true for both contracts, both

8    purchase agreements?

9           A.    February 16th, looks like.

10          Q.    And is the date on the cover page or

11   the first page of the purchase agreement, that's

12   Exhibit Number 93, also January 26th?

13          A.    Yes.

14          Q.    Do you know why there is approximately

15   two and a half to three weeks between the date on

16   the cover page of each of the purchase agreements

17   we just looked at and the date they are actually

18   signed?

19          A.    I don't remember why.  I really don't.

20          Q.    And if you look back at the

21   subcontracts between Coastal Maintenance and PVGC,

22   what are the dates on the face of the first page of

23   those contracts?

24          A.    January 26th.

25          Q.    When are they signed?

Page 330

1          A.    February 16th.

2          Q.    Is that true for both subcontracts?

3          A.    January 26th and February 16th.

4          Q.    Okay.  To try to keep them separated,

5     I will call the subcontract agreements with Coastal

6     Maintenance and PVGC, they are the subcontracts or

7     I'll say the CMR subcontracts, the Coastal Prefab

8     purchase agreements, I'll call those the purchase

9     agreements so you know the differences.

10         A.    Okay.

11         Q.    Okay.  If I mess it up, let me know.

12               All right.  So using February 16,

13    2017, as the date point of reference, I have some

14    specific questions about specific topics, okay?

15         A.    Okay.

16         Q.    So, first of all, let's talk about

17    fire stopping or draft stopping.  What is your

18    understanding of -- do you know what fire stopping

19    is?

20         A.    Yes.

21         Q.    What is it?

22         A.    It's a product that you use to seal

23    the penetration or a -- or a joint to prevent fire

24    from coming through.

25         Q.    What is your experience before the

1    Civic Towers project with fire stopping?

2            A.    We use it on all commercial projects

3    anywhere to prevent fire.

4            Q.    How is it typically -- what trade

5    typically has as their scope of work fire stopping

6    on PVGC projects before Civic Towers?

7            A.    It all depends on scope of work that

8    that -- all depend on the job first and what sub

9    has taken responsibility for each trade.

10           Q.    Which subs have you worked with on

11   prior projects that would have performed fire

12   stopping?

13           A.    Ive had many different trades.  I've

14   had drywall subs do fire stopping, I've had

15   painters do fire stopping, I've had drywall guys do

16   fire stopping, I've had framers do fire stopping.

17   You know, I've had them kind of all do it.

18           Q.    What sort of -- you said it depends.

19   So what factors determine which subcontractor does

20   that work?

21           A.    If that sub is capable of performing

22   multiple trades.

23           Q.    In Louisiana, is there a specific or a

24   particular license that's required for fire

25   stopping?

Page 332

1          A.   I don't think so.  Because we've done

2     a past few projects where I had the sub that was

3     doing other trades do fire stopping, do the fire

4     caulking as we call it back -- you know.

5          Q.   And that was my next question.  What's

6     the application that's typically used in New

7     Orleans?  Is it just caulk?

8          A.   Depends on the joint size or the

9     penetration size.  It all depends on the assembly

10    you're trying to stop fire from coming through, so

11    it depends on the application.

12         Q.   What else could it be besides caulk?

13         A.   You use fire wool that you apply fire

14    caulk over.  You use packing materials that are

15    approved by -- by code to use.  It's different --

16    different types of ways to fire stopping

17    penetrations or joints.

18         Q.   You said that it's required on all the

19    commercial projects in New Orleans, or in

20    Louisiana, I guess?

21         A.   I'm sure it's require -- it depends on

22    the -- it depends on the building, while there are

23    fire -- fire caulk or fire -- any type of fire work

24    is needed.  Like in my Dairy Queens, there's no

25    fire caulking or any type of fire stopping needed

Page 333

1   because there's no fire walls inside.

2        Q.   Because they are one story or--

3        A.   No. Because there is no fire

4   separation walls in the building.  So it depends on

5   the building.

6        Q.   Those buildings where fire stopping is

7   required, do you typically include that in either

8   your schedule of values or your estimate to the

9   owner prior to or as part of a PVGC prime time

10  factor general contracting?

11       A.   Not necessarily.

12       Q.   What -- what dictates when you do it

13  and when you don't?

14       A.   In the bidding phase on certain

15  projects.  I subtle bid it with it, so I don't

16  break out in the SOV.  Fee included it gets part of

17  his scope of work, it's in his scope of work.  Or

18  if it's a job where I'm going to do it myself, I

19  break it out.  If it's a small -- we only do small,

20  small fire call jobs.  We don't take on big ones.

21  Subs do all of that.  So it all depends on the job.

22       Q.   But if I understand your testimony

23  correctly, either -- either PVGC will do it, at

24  which point in time it will be broken out in the

25  SOV, or a sub will include it in their bid.  And in

Page 334

1    either scenario that I just mentioned, it's still

2    part of the global price or contract with the GCI,

3    whether it's in the sub's scope or you do it

4    yourself.  But somehow, that's part of the contract

5    with the owner; is that a fair statement?

6              A.   If it's included in the project.

7              Q.   Fair enough.

8                   Okay.  If it's -- if it's speced, then

9    it's in the contract?

10             A.   It depends, right.

11             Q.   Did -- what is draft stopping?

12             A.   It depends.  A draft stop could be,

13   like, a smoke stop where it's just smoke seal,

14   where it's just sealed with a product where it

15   don't have to completely fire caulked.

16             Q.   And what dictates when you would have

17   to apply draft stopping verses fire stopping?

18             A.   That would be on the engineer's

19   recommendation on how they design the wall system.

20             Q.   And the same questions I asked before

21   about the fire stopping.  Is it your past

22   experience relative to draft stopping, either you

23   do it if it's a small enough job, you being PVGC,

24   at which point in time it's on your schedule of

25   values, or if it's in a sub's bid, it's including

Page 335

1    within your contract price to the owner?

2            A.    Correct.

3            Q.    Okay.  Coming back.  And do you have

4    experience on prior projects before Civic Towers

5    with draft stopping?

6            A.    I'm sure.  I mean, we've had jobs

7    where it's just smoke sealed.

8            Q.    Have there been projects that you'v

9    worked on where there's been fire stopping and

10   draft stopping required?

11           A.    I'm sure.

12           Q.    Frequently?

13           A.    I mean, probably so.  I mean, every

14   commercial project that we been doing in Louisiana

15   has got some type of probably fire stopping or fire

16   caulking or draft stops or anything.  I mean, a lot

17   of the schools we do requires that.  So, of course

18   it's going to be on it.

19           Q.    Have you had projects that you've

20   worked on in Louisiana that have draft stopping,

21   but not fire stopping?

22           A.    I don't remember.  I mean, there is no

23   telling.

24           Q.    Okay.  Let me come back to Civic

25   Towers.  Prior to February 16 of 2017, which is the

Page 336

1    dates -- the same date that all four of the

2    contracts that we just went over with Coastal had

3    been signed, before that date, did you personally

4    ever talk to anybody at Coastal about fire

5    stopping?

6             A.   Yes.

7             Q.   Okay.  Who did you talk to?

8             A.   Vito.  And Nick, the owner, talked to

9    Vito, too; via phone call and e-mail.

10            Q.   What date did you personally talk to

11   Vito about fire stopping before February 16th?

12            A.   Heard there was an e-mail and they

13   were doing some drawers back and forth with the

14   architect that came up about it.  And Vito

15   submitted those specs on fire stopping and slab

16   edge.  And I remember in particular it was a stove

17   that was an e-mail with four attachments, three of

18   them were stove details with fire stopping.  The

19   fourth one was a detail that he pulled from a

20   hospital job that had the same detail from Aventura

21   Hospital.

22            Q.   Okay.  So let me clarify something

23   here.  When I asked you when did you talk to Vito

24   about fire stopping before February 16th, you

25   started testifying about an e-mail.  So let me

Page 337

1   clarify something here.

2              Did you speak verbally, face to face

3   or on the phone, with Vito about fire stopping

4   before February 16th of 2017?

5        A.   Yes.  It was probably brought up on

6   the weekly calls that we were having with the

7   owners and Coastal.  And that's how the e-mail was

8   generated.

9        Q.   You said it was probably brought up.

10  Are you certain or you think --

11       A.   No --

12       Q.   Let me finish my question.

13              You say it was probably brought up.

14  Are you certain there was a discussion about it or

15  are you guessing?

16       A.   I'm 99 percent sure that's when it

17  would have got brought up.  That's the only time

18  things get brought up is on the weekly calls with

19  the owner and the sub.  We talk about everything on

20  the phone together, when it's relates to stuff like

21  this on the project.

22       Q.   Which weekly call involved discussing

23  fire stopping?

24       A.   I don't remember the exact one.  We

25  were having them back then, I think, every Friday,

Page 338

1   at like 1 or 2 o'clock.  So it was obviously one of

2   them was on that Friday prior to the e-mail being

3   sent.

4        Q.   Did anybody take notes of the weekly

5   calls?

6        A.   I think the owner was.

7        Q.   Why do you think that?

8        A.   Because I've heard Nick say that he

9   takes -- I mean, I hear him when we are on the

10  calls typing away.  And I've heard him say he keep

11  notes of -- I mean, every time I see the owners and

12  we have meetings, they have a pad in front of them

13  and they're writing down what goes on.

14       Q.   Was it customary for the owner to

15  circulate a -- an e-mail or memory or the notes

16  that would sort of summarize what happened during

17  each call?

18       A.   No.

19       Q.   Did anybody at PVGC take notes of

20  these weekly calls?

21       A.   Not complete notes of the whole

22  conversation.  We would just take maybe a note or

23  two of what we need to do because this was before

24  the project was starting so it wasn't like we were

25  keeping track of everything.  That was just weekly

Page 339

1   calls of -- it was mainly about what Coastal was

2   doing, relation how they were going to do things.

3          Q.   When you say "we would take notes,"

4   are these written notes are we typing something

5   into a phone or typing it into a computer?

6          A.   I don't remember back then.  I mean,

7   because it could have been a sticky note just to

8   say what we had -- what I had to do for that day of

9   send somebody an e-mail or buy this or call this

10  person.  But there was never a written out synopsis

11  of what was going on.  Because, I mean, it was very

12  early on, didn't feel I needed to do that yet

13  because we were not even contracted yet before

14  December.

15         Q.   How many times was fire stopping

16  discussed during the weekly phone calls that you're

17  mentioning?

18         A.   I don't remember how many times that

19  it was brought up.  Vito submitted that.  Mario

20  needed something with a UL.  Vito submitted another

21  e-mail with a UL assembly for a fire stopping slab

22  edge.  I mean, I don't know how many times total,

23  but here and there it was brought up.

24         Q.   Can you tell me any details of any of

25  the particular phone calls, these weekly calls,

Page 340

1    where fire stopping was discussed?

2            A.    Particulars.  But, I mean, I'm sure it

3    was brought that Mario, the engineer and architect

4    and Nick probably brought up we need a slab edge

5    detail for fire stopping because be part of the

6    assembly of your wall system.  And they were

7    looking for suggestions of what -- what they were

8    going to provide.

9            Q.    Who participated in these weekly

10   calls?

11           A.    Back then it was PVGC, the owner,

12   Vito.  I don't know if Vito ever had anybody else

13   on the phone.  Sometimes it was different ones he

14   might have had in the room with him.  I don't know

15   who.  Mario was on the phone pretty much all the

16   time.  Early on, GCI was on the phone.  That was

17   the main people.  He may have had some managers

18   from the site or something, apartments on the phone

19   call or maybe the relocation people he had on just

20   for -- just to hear what was going on.  They didn't

21   never send -- you know, talk about anything.  Those

22   were the people that discussed project, really,

23   things.

24           Q.    Other than these weekly calls, did you

25   have a conversation, that's verbal, conversation

Page 341

1    with Vito whether by phone or face to face about

2    fire stopping before the contracts were signed

3    February 16, 2017?

4            A.   I'm sure we did.  That's why these

5    e-mail -- I'm sure we talked about it, e-mails

6    came.  I'm sure there was a discussion about it.  I

7    know on one of the phone calls, I think that's

8    where Vito had said, I have details for this, I

9    will submit what we have from Sto on a job that we

10   are doing or going to do or whatever it was.

11   That's why the Aventura Hospital plan was in the

12   e-mail.

13           Q.   What else can you tell me about

14   talking to Vito about fire stopping?

15           A.   That was it; needing detail to do the

16   project to be included in the panel system.

17           Q.   Did, at any time before February 16th

18   of 2017, date of the contracts you signed, at any

19   time before that, did Vito tell you verbally, that

20   the Sto panels that were going to be manufactured

21   by Coastal would include fire stopping?

22           A.   He never said it wouldn't.  And he's

23   submitting details with Stow's -- on Stow's

24   letterhead that this is what he's proposing to use

25   in the panels.

Page 342

1          Q.   So my question was:  Did he ever tell

2     you it was going to be in the panels?  And your

3     answer was, he never said it wasn't.  So, let me

4     ask the question again, maybe you can give me a

5     more precise answer.

6               Did Vito DePinto ever tell you,

7     verbally, that the panels that Coastal Prefab was

8     going to manufacture would -- would include some

9     type of fire stopping?

10          A.   There was never reason tell me that it

11     was going to have it when he's submitting owner and

12     engineers are asking for what he's proposing to use

13     in the panel system for fire stopping and he's

14     submitting it.  That's telling us that he's doing

15     it.  Why would we ask him if he's going to do it if

16     he's giving us details on his letterhead or this

17     manufacturer's letterhead and with a job that's

18     from a hospital, this is what we done on the past

19     project or whatever project we are going to do.  So

20     that led us to believe that this is what you are

21     doing.  Never said he wasn't.

22          Q.   Other than the e-mail that you just

23     described, was there ever a time that Vito said to

24     you that the panels would include fire stopping?

25          A.   I don't remember offhand if he did or

1    if he didn't.

2         Q.   Other than the e-mail that you just

3    identified that had the attachments with the stove

4    specs and the Aventura example, have you ever

5    received any other written communication from Vito

6    indicating that Coastal Prefab would, in fact, be

7    installing fire stopping in the panels?

8         A.   It was during the submittal process

9    that I'm sure it was brought up again because

10   Cronin designed the system with slab edge

11   fireproofing with the design criteria and the shop

12   drawings with the stove spec attached.  This was

13   all in the shop drawings.  So, during the shop

14   drawings it was never said we are not doing this,

15   but it's in here.

16        Q.   It's your recollection that Cronin's

17   shop drawings includes a spec for fire stopping?

18        A.   It's a detail.

19        Q.   Is it one of the details that you say

20   was attached to Vito's e-mail that you were just

21   talking about earlier?

22        A.   There is an attachment part of the

23   shop drawing that was supplemental pages to the

24   shop drawings that had a bunch of details or other

25   items in the drawings, plus it had a -- a detail in

Page 344

1    there for a fire stopping slab edge.  And then on

2    the regular shop drawings, there was a page that

3    was handwritten out by Cronin that said all -- all

4    fire stopping is designed to whatever number UL --

5    whatever number it said, but it's in the shop

6    drawing saying, pay just for that plus the

7    attachment of the supplemental pages of the shop

8    drawings that have the details.

9         Q.   Do you recall what page or pages of

10   the shop drawings it's on?

11        A.   Which part?  Which one?

12        Q.   The -- well, the -- the detail itself

13   that you are talking about.

14        A.   It's in the supplemental page of the

15   shop drawings.

16        Q.   Which supplement pages?

17        A.   I have no idea.  It's a couple of

18   pages.

19        Q.   What date?

20        A.   I don't know the date of it.  I mean,

21   it was -- that was done right at the end when all

22   the shop drawings were done.  It's part of our log

23   that we keep track of the time that's submitted --

24   it's submitted at the bottom with the last one, the

25   supplemental pages.

Page 345

1          Q.   Is there a specific reference in the

2     shop drawings themselves to fire stopping?

3          A.   It's the detail shop drawings, excuse

4     my language, suck so there's not details pointing

5     to anything really.  They are very broad.  So there

6     are just pictures of things.

7          Q.   The detail that you said was attached

8     as part of the supplemental pages, you said that's

9     a slab edge detail?

10         A.   Yea.

11         Q.   How does it depict or what does it

12    identify that fire stopping system to be?

13         A.   It's a picture of the slab edge and

14    then a picture of the panel and then there's a --

15    to get the void and then it shows the fire -- the

16    wool and it shows the spray on top.  And it's on

17    the steel letterhead.

18         Q.   When you say void, what do you mean by

19    that?

20         A.   The gap between the slab edge and the

21    back side of the sheathing with the panel.  6-inch

22    void in the stud.

23         Q.   So, there is a gap, a 6-inch gap,

24    between the slab edge and the stud?

25         A.   No.  Between the lab edge and the back

Page 346

1    of the exterior sheathing.

2          Q.    Okay.  Back of the sheathing.  And

3    then what -- what product or material is identified

4    as the fire stopping?

5          A.    It's got a thing on the bottom that

6    lists the different steps of how to install it and

7    what product to use, it's a specific name of the

8    product.  I don't know, but it's on there.

9          Q.    You don't remember what the product

10   was?

11         A.    It just said -- I know it's a wool

12   that you put first and then you spray apply a

13   higher coating on top.

14         Q.    And is that application, that wool,

15   plus the spray in between the 6 inches between the

16   sheathing and the slab edge that you just describe?

17         A.    It's the gap that's, yea, between --

18   it's the width of the stud, so it's 6 inches from

19   the slab edge to the back edge of the exterior

20   sheathing, that -- that space.

21         Q.    Other than in the e-mail that you've

22   identified and the shop drawings, as you've just

23   described them with the supplemental pages and the

24   detail attached -- well, strike that.

25                My question was written communications

Page 347

1    that you had received from Vito before the contract

2    was signed.   Remember that?

3              A.    Uh-huh.

4              Q.    Okay.   Is that a yes?

5              A.    Yes.

6              Q.    All right.   The Cronin shop drawings

7    that depict the fire stopping detail or have the

8    supplemental pages, are those before or after the

9    contract is signed?

10             A.    Shop drawings were due January, end of

11   January.   So they were working on shop drawing

12   prior to that.   Now where -- how that stuff was

13   stuck in, I don't remember exact time.   But it was

14   known since whenever it was in November that those

15   details was submitted to us from Vito that they was

16   going to be included in the shop drawings.

17             Q.    And just to focus on this time period

18   before the contract is signed, okay?   Are there any

19   other communications, whether they are written or

20   verbal, that you can identify for me that you had

21   with Vito that indicated that the panel that

22   Coastal would be doing some type of fire stopping,

23   whether it's Coastal Maintenance or Coastal Prefab,

24   I don't care.

25             A.    I don't think there really was none

Page 348

1   needed if we asking for your detail on how you are

2   going to fire stop the panel and he sends us one,

3   well, that's what you are going to use and that's

4   what you are going to do.  So, there shouldn't be a

5   communication every day, every week, every month,

6   hey, make sure you are still doing it right.  No.

7   If you gave us something that's what you are doing,

8   that's what you are doing, that's what you are

9   doing.

10          Q.   I under -- you've said that already a

11   couple times.

12          A.   All right.

13          Q.   I got that communication.  That wasn't

14   my question so I'll ask it again.

15               Are there any others?

16          A.   I don't know.  I mean, I don't know if

17   there's any other lingering e-mails out there

18   talking about it.  I have no idea.  But that's the

19   main one when you are submitting attachments with

20   details with your letterhead or your manufacturer's

21   letterhead, that's more than enough and good enough

22   for me.

23          Q.   When you saw that e-mail, who did you

24   believe was going to be responsible for the fire

25   stopping?

Page 349

1          A.   It was Coastal.  I mean, that's -- we

2     are asking you what you are going to do and you are

3     giving us, that's pretty simply to say that that's

4     your job.

5          Q.   Which Coastal?

6          A.   Back then in November, we didn't know

7     there was going to be two Coastals or whatever it

8     was.  Just, you know, how they broke it up and when

9     they got broken on the exact date.  But when we

10    very first started, it was -- the quote came from

11    Coastal Prefab, everything, fabrication,

12    installation and demo from recollection.

13         Q.   The quote, you mean the bid?

14         A.   The first -- very first proposal that

15    Vito gave.

16         Q.   I'm showing you part of Exhibit

17    Number 72.  Appear to be a -- well, I'm showing you

18    part of Exhibit 72.  It's Bates stamped Coastal

19    5588.  Do you see that page?

20         A.   Correct.

21         Q.   And tell me what that is.

22         A.   It's an engineer and judgement fire

23    stop detail.

24         Q.   Is that something that was attached as

25    one of Vito's e-mails?

Page 350

1           A.   Not this one.  This is from State Line

2    Fire Stopping.

3           Q.   Okay.  Excuse me.  I'll make this

4    easier on me for a second.

5                Also included in that Exhibit Number

6    72 is Coastal Bates stamped 5594 through 5596, it

7    looks like.  Do you see those three pages?

8           A.   Correct.

9           Q.   Is that that proposal that you were

10   just talking about?

11          A.   I don't know if that's the first one,

12   second one, third one.  That was a few iterations.

13   I have no idea which one that is exactly.

14          Q.   Well, let's take a look at it a little

15   bit and then see if we can figure it out.

16                You see the date August 22 of 2016?

17          A.   Correct.

18          Q.   That would probably be one of the

19   first ones, right?

20          A.   Could be.  That was early on.

21          Q.   Do you recall talking to anybody at

22   Coastal before August of 2016?

23          A.   Probably not.  I mean, that's probably

24   when I started so it could be.

25          Q.   And then if I can show you also

Page 351

1    Coastal 5597, also part of Exhibit 72,

2    through 559 -- 5599, is that the other proposal for

3    the other tower that you would have received from

4    Coastal?

5          A.   I'm guessing.  I mean, I don't know.

6    I couldn't tell you.

7          Q.   Okay.  Well, why don't you do me a

8    favor, take a moment to look at those and why don't

9    you tell me -- you had just mentioned a little

10   while ago that it was -- I think I understood your

11   testimony, that it was part of the original

12   proposals that you got from Coastal and they were

13   prefab?

14         A.   What was the original?

15         Q.   Fire stopping.  Did I understand your

16   testimony correctly?

17         A.   I don't need proposal.  I said it was

18   brought up later in the conversations that we

19   needed your detail, what you are going to do to

20   fire stop the slab edge.

21         Q.   Oh.  We were talking about -- you

22   didn't know they were two separate companies?

23         A.   That's what I think you brought up,

24   maybe towards the end, about the company thing.

25         Q.   Okay.  So look at both of those

1    proposals, if you would, please.

2          A.   Right.

3          Q.   And my question is:  Are they from two

4    separate companies?

5          A.   This first one Coastal Prefab for

6    Civic Towers includes engineers, sole panel,

7    shipping, installation, open sale.  This is two

8    companies.  I remember it very, very early on.  I

9    don't know which one it was.  It was submitted on

10   one letterhead and he had said he was going to be

11   splitting them or something.  However it worked

12   out, it worked out.

13         Q.   Both of those proposal -- there are

14   two separate proposals there in the pages that I

15   just showed you, right?

16         A.   Right.

17         Q.   One is from Coastal Prefab, one is

18   from Coastal Maintenance and Restoration; is that

19   right?

20         A.   Correct.

21         Q.   And they're both dated August of 2016,

22   right?

23         A.   Right.

24         Q.   So at least by August of 2016, you

25   knew there were two separate companies doing two

Page 353

1    separate scopes of work?  They were proposed on

2    those proposals, right?

3           A.   Correct, for these.

4           Q.   Okay.  So going back to my question

5    that started this discussion, I think.  Who was

6    supposed to be doing the fire stopping?

7           A.   Back then, I mean, we didn't know --

8    it could have been -- it's really both, Coastal

9    Prefab would have to put the fire stopping within

10   the king stud that they designed and that you can't

11   have to access to in the factory.  And they

12   could -- Coastal Prefab could sub to whoever to

13   come do it in the field to finish the fire stopping

14   or they could sub the rest of Coastal Maintenance.

15   However they do it.  It's one company to us.  We

16   are working with Vito, it's both his.  He figures

17   out what company he is going to have do the fire

18   stopping.  But we do know that Coastal Prefab needs

19   to do some type of fire stopping within the king

20   studs because once they put them together, there is

21   no access to them.

22          Q.   Okay.  I guess I got a little

23   confused.

24               What you described for me earlier as

25   the detail that was attached as the supplemental

Page 354

1    pages where the fire stopping was a wool and a

2    spray in the 6-inch void, didn't say anything about

3    king studs.  And now you are talking about king

4    studs.  So is that two different fire stopping

5    applications?

6            A.   Back in November, we did not know how

7    they were going to build these panels with a king

8    stud, double -- double studs back to back, welded

9    solid, where you can't get to it.  That was early

10   on.  If now, today, FL Crane didn't do that.  They

11   just did a bigger C-channel and you didn't have to

12   worry about trying to get inside certain areas.

13   Some areas they use the double, but they fireproof

14   it before they did it.

15           So Coastal, once they got down the

16   road of doing shop drawings, if they were going to

17   do what they did, they needed to make sure that

18   that was properly fireproofed before putting them

19   together in the factory.

20           Q.   So that's Coastal Prefab?

21           A.   Yea.  That's who's building the

22   panels.

23           Q.   So, I don't really care about FL Crane

24   right now.  I want to focus on what you think some

25   Coastal company was supposed to do about fire

Page 355

1    stopping before the contract was signed.  So let's

2    come back to that time period.

3            Can you tell me which Coastal company

4    was supposed to do fire stopping by the time the

5    contracts were all signed in February -- on

6    February 16th of 2017?

7        A.   I guess that's hard to answer that

8    because the shop drawings were never approved until

9    May or April.  So to know what they were designing

10   and was going to work or not, it wasn't done until

11   April.  So to us, like I said, to us, it didn't

12   matter which company did it.  Vito, you have to do

13   it, figure out which one you are going to have do

14   it.

15       Q.   So, you don't really know which

16   company agreed to do it by the time the contracts

17   were signed, do you?

18            MR. PARTINGTON:  Object to the form.

19   BY MR. LAWHON:

20       Q.   Strike the question.

21            Do you know, by the time the contracts

22   were signed, February 16, 2017, which company was

23   contractually supposed to do fire stopping, if any?

24       A.   I believe it should be both.  Coastal

25   Prefab was going to be responsible for the king

Page 356

1    studs.  Now, obviously, you can't do the rest of

2    the fireproofing in the factory.  It has to be done

3    on the site after the panels are hung.  Well,

4    Prefab is not an installation company, from what

5    they are telling us, so Maintenance  got to do the

6    installation of the rest of the fire proofing.

7            Q.   What is the rest of the fire proofing

8    that has to be done in the field?

9            A.   The gap between the studs that --

10   whatever spacing the studs are, that spacing in

11   between.

12           Q.   Did you speak to anybody else at

13   Coastal besides Vito before February 16, 2017,

14   about fire stopping?

15           A.   I don't remember.  I mean, a lot of

16   early-on conversations was just Vito was the point

17   person.  I don't know -- remember when Kevin came

18   in, Brian, John, that was whatever time frame it

19   was.  But early on was Vito.

20           Q.   Is there any particular conversation

21   you can point me to that you had with anybody from

22   Coastal -- strike that.

23                Is there any conversation you can tell

24   me about that you had with any representative of

25   any Coastal company about fire stopping before

Page 357

1  February 16th of 2017, other than Vito?

2       A.   I don't remember.  Other than that

3  e-mail that Vito, and I'm sure he copied all his

4  partners or his people in the office.

5       Q.   I don't care what Vito did internally.

6  I am asking you.

7       A.   Right.  I dealt with Vito early on.

8       Q.   As we sit here today, there is not

9  another communication that you can point me to that

10 you had with any Coastal representative of any

11 Coastal company about fire stopping before

12 February 16, 2017, is there?

13          MR. PARTINGTON:  Object to the form.

14          THE WITNESS:  I don't remember.  I

15          mean, I have no clue who I was talking to

16          at Coastal back then.  I mean, it was all

17          of them.  When we got really cranking up on

18          getting things moving, they all started

19          popping up, Todd asking me this question,

20          Kevin asking me this question, Vito still

21          asking me this question.  I mean, it was --

22          everybody was involved by then.  I mean, I

23          don't know if somebody brought it up or

24          not.  I have no idea.

25 BY MR. LAWHON:

1          Q.   Todd and everybody getting involved

2    was ever after they mobilized and started working

3    on the project, right?

4          A.   No.  I was dealing with Todd with shop

5    drawings because Todd was asking for different

6    little things, asking questions of how things were

7    going to be done early on, too, when Todd got

8    involved with some shop drawings.  And Brian was

9    involved in shop drawings.  And Kevin was involved

10   in shop drawings.

11         Q.   Did you talk to any of those three

12   gentlemen about fire stopping before February 16,

13   2017?

14         A.   I don't know.  I have no -- I don't

15   remember.

16         Q.   Do you remember any e-mails or faxes

17   or any written communications with any of those

18   three gentlemen about fire stopping before

19   February 16, 2017?

20         A.   The e-mail that I got from Vito.

21         Q.   Okay.  You mentioned the e-mail 17

22   times.

23         A.   You keep asking me prior to contract

24   signed.  That's prior to contract signed.

25         Q.   Other than that e-mail, I have it

1   fused into my mind that you are talking about that

2   e-mail, I know that e-mail exists.  Just so I am

3   clear, so I don't have to say it again, okay, every

4   time I ask you about any other communications, I am

5   excluding that one because I know it already

6   exists.  So I want to know about any others.  Is

7   that clear now?

8          A.   Okay.

9          Q.   All right.  Are there any others?

10         A.   I don't remember if there is or if

11   there isn't.  If there is, you are going to pull it

12   out on me and I'll say, okay, there it is.  I mean,

13   I don't remember.

14         Q.   You mentioned that Nick talked to Vito

15   about fire stopping, too.  Did I understand that

16   correctly?

17         A.   I believe so.  Because Nick was

18   included in a lot of the conversations.

19         Q.   When you believe so, was it a

20   conversation that took place during these weekly

21   calls or are you talking about a different

22   conversation?

23         A.   It had to have been a weekly call

24   because that's the only time that we all got

25   together.  I don't think very early on that people

Page 360

1    were talking amongst themselves.  It was always

2    keep questions until the Friday meeting.  Or if

3    anything was really important, you conference

4    called everybody.  It was never a -- I don't

5    believe Nick ever just called Vito and talked

6    personally and not let us know what was going on.

7            Q.   Or vice versa?

8            A.   Or vice versa.  I think it was always

9    people -- everybody was involved.

10           Q.   Are you aware of any communications

11   taking place between Nick or any owner rep or any

12   Coastal rep, Vito, Brian, anybody else, really

13   before the contracts were signed at all?

14           A.   I mean, it was always e-mails where

15   everybody was copying e-mails, but I don't ever

16   remember them saying, hey, I called Vito and I

17   asked them this.  I don't know if they did.  If

18   they did, maybe it wasn't that important.  But

19   anything important, like I said, was always

20   discussed on weekly calls.

21           Q.   Were you involved at all in the

22   drafting or the negotiation back and forth of the

23   contracts themselves that we've just talked about,

24   the purchase agreements and the contracts?

25           A.   The language, no.  I think all I did

Page 361

1    was give the scope to Bridgett and that was it.

2    Anything besides that, I didn't have no involvement

3    in the language of the contract or a different

4    article.  I was not -- I'm not -- I'm never

5    involved in those.  That's my dad's.  He's the

6    final decision on those.

7              Q.   Let me shift subjects from fire

8    stopping to slab edge repairs, okay?

9              A.   Okay.

10             Q.   You know what I mean when I talk about

11   slab edge repairs?

12             A.   I do.

13             Q.   What does it mean?

14             A.   Any type of damage to the slab edge.

15             Q.   There is damage to the slab edge --

16   there is damage to the slab edges and they need to

17   be repaired?

18             A.   If there is damage to the slab edge.

19             Q.   Okay.  What type of damage would we be

20   talking about?

21             A.   Spoilage from demolition, breaking the

22   concrete edge.

23             Q.   Breaking the concrete edge as a result

24   of demolition itself?

25             A.   Improper demo.

1          Q.    Improper demo.  Okay.  Could there be

2    proper demo and still have damage --

3          A.    They could be --

4          Q.    Let me finish my question.

5                Could there be proper demo and still

6    have damage to slab edges that needs to be

7    repaired?

8          A.    No.  Because after Coastal left and we

9    proceeded on, we haven't fixed one slab edge.

10         Q.    So if I were to look at all of the

11   records that PVGC has produced, it's your testimony

12   there were no slab edge repairs that would be shown

13   in those records that were performed after Coastal

14   no longer worked on the job?

15         A.    Only thing we did recently was fix the

16   first floor ground floor bottom on a few areas that

17   were rebar was exposed that's been like that for

18   years because the rebar was all rusted.  It was

19   just something that wasn't done by us or anybody.

20   But from second floor up, we didn't do anything.

21   And the first floor, we just did a precautionary

22   fix that the inspector wanted fixed just for in

23   case.

24         Q.    So back to my question, then, because

25   I think you answered it by making it project

Page 363

1    specific and I was asking a general question.

2                My general question was:  Could you

3    have damage to slab edges that was caused by

4    demolition work that was done properly?

5         A.    It depends on the age of the building.

6    It depends on a lot of factors.  You just can't say

7    or yes or no to that.  It depends on a lot of

8    factors.

9         Q.    So it's possible depending on the

10   factors?

11        A.    Anything is possible.

12        Q.    Coming back to this particular

13   project, is it your testimony that all of the

14   demolition work that Coastal Maintenance performed

15   that resulted -- that -- strike that.

16                MR. PARTINGTON: I like that question.

17        Just kidding.

18                THE WITNESS:  Yea.

19                MR. LAWHON:  I'm going to ask

20        something close to it.

21   BY MR. LAWHON:

22        Q.    Is it your testimony that all of the

23   slab edge repair work that Coastal Maintenance did

24   or proposed to do was a result of Coastal

25   Maintenance improperly performing demolition work?

Page 364

1          A.   Yes.

2          Q.   Every bit of it was done wrong?  My

3    question is:  Was every bit of it was done wrong?

4          A.   I believe so because we haven't --

5    like I said, after they was -- they were gone and

6    we kept going, we haven't fixed one.

7          Q.   And what was specifically wrong with

8    the way that Coastal did its demo work?

9          A.   The way they were breaking the embeds

10   out of the slab edge with crowbars and hammers and

11   just not being careful with no proper supervision.

12              THE VIDEOGRAPHER:  Five minutes to

13         change.

14              MR. LAWHON:  Was that question to your

15         liking?

16              MR. PARTINGTON:  It was okay.  I did

17         like the results if it better, but it's all

18         right.

19              MR. LAWHON:  I'm tired, not that

20         tired.

21   BY MR. LAWHON:

22         Q.   Other than breaking the embeds out of

23   the slab edge, the way that Coastal Maintenance

24   broke the embeds out of the slab edge and there not

25   being proper supervision, as you testified, what

1   else, if anything, was wrong with the means and

2   methods that Coastal Maintenance used to perform

3   its demolition work?

4            A.   I wasn't there every day watching it,

5   so I couldn't tell you exact everything that was

6   wrong.  But me being in and out of it, talking on

7   the phone what's going on, you could tell.

8            Q.   Is there anything else you could tell

9   that you believe was an improper way of doing

10  demolition by Coastal Maintenance?

11           A.   Just overall of how they approached

12  doing the exterior wall removal.  They could have

13  been polished up a little bit better and not just

14  let these guys run wild and just however get it

15  down, get it down.  But actually care about what's

16  going on and, you know, destroy everything.  They

17  destroyed interior walls, they destroyed the slab

18  edge.  I mean, they destroyed the ceilings.  I

19  mean, pretty much everything 4-foot to that end was

20  damaged by them doing the exterior demo that was

21  not to be repaired.

22                And they were told to calm down with

23  the way they were just not watching the interior

24  wall.  They were just tearing Sheetrock back way

25  too far.  They only need to tear it back 2-foot

1    maybe.  And they were tearing it back into the room

2    so they could walk from room to room.

3         Q.   So you said a lot of things in that

4    last bit of testimony.  Let's unpack some of it.

5              Do you believe that Coastal

6    Maintenance did not care about the manner in which

7    they did their work?

8         A.   Their workers didn't care.  Maybe the

9    owners and upper management cared, but I think they

10   were just not watching what their people were

11   doing.  And they didn't care because a lot of it

12   was just labor company that was out there, seemed

13   like, with labor doing the work.  They were just

14   everywhere.

15        Q.   While Coastal was performing its

16   demolition work, how many days per week were you on

17   the site?

18        A.   At the beginning, I was there three,

19   four days a week, getting things set up for the

20   guys and the office and procuring whatever I need

21   to get for them.

22        Q.   And --

23        A.   I was there a good bit at the

24   beginning.

25        Q.   And what do you define as the

Page 367

1  beginning?

2          A.   The day we were able to start the

3  project on the notice of proceed, the first week of

4  February or whatever, when we go out there,

5  mobilizing.

6          Q.   When did you stop being on the project

7  three or four days a week?

8          A.   I don't remember exactly.  But I was

9  there a good month or two at least, strong there.

10  And then back and forth, but I mean, I was involved

11  daily.  I mean, that was a big job to start right

12  away that I was involved 24/7.  I knew everything

13  that was going on.

14          Q.   When you were not on the job site,

15  where were you?

16          A.   In my office watching it on camera,

17  talking to the guys.

18          Q.   Let me be more specific.  When -- when

19  you were not in Miami so that you could be

20  physically present on the job site, where were you;

21  in New Orleans, or someplace else?

22          A.   In New Orleans, in the PVGC office,

23  main office.

24          Q.   So the first month or two you were

25  basically going back and forth between New Orleans

Page 368

1    and Miami?

2         A.   Go home on the weekends for my wife

3    and kids.  But the main thing was I didn't come

4    back.

5         Q.   Now, when you were on the job site

6    during the beginning, as you just testified to,

7    three to four days a week, how many hours during

8    the day were you physically outside, either

9    patrolling the construction project, the towers

10   themselves, walking through the towers to look at

11   the work or otherwise watching the work being

12   performed?

13        A.   I was there all day.  When I came down

14   here, I don't go nowhere else but the job site.  We

15   got a place ten minutes away, get up in the

16   morning, I'm there for 7:30, 8:00.  I leave when

17   everybody else leaves.  Because back then we were

18   just working eight, ten hour days.  I was there

19   till maybe 5 o'clock and then go back to our place.

20        Q.   And I understand that you were

21   present.  Let me be a little more precise in my

22   question.

23             When PVGC started on the project, I

24   believe they had some office space and trailers on

25   the project site, right?

Page 369

1          A.   Day one, we had a little office in the

2    building and then we got some container offices

3    whatever time we did, but then we moved into

4    container offices, yea.

5          Q.   And did you work out of the container

6    offices?

7          A.   Yes.

8          Q.   Did you also work out of the one small

9    office at the beginning?

10         A.   Very shortly.  We wasn't in there

11   long.

12         Q.   Couple of weeks?

13         A.   Yea.  It wasn't long, from what I

14   remember.  It was just too small.  And we just had

15   to get setup something to get computers up and then

16   it was just trailers.

17         Q.   So let's go with what you called the

18   container offices.  Did you have a desk in the

19   container office?

20         A.   It was a 40-foot container and we had

21   two desks on each end, and then there was a

22   table -- a long table down the middle of that that

23   I would setup on when I went there.

24         Q.   Did you use a desktop or a laptop for

25   computer?

Page 370

1          A.   I have a Surface, my Microsoft Surface

2     that I am able to connect to the server and

3     anything.  I could access anything sitting right

4     there.

5                    THE VIDEOGRAPHER:  Can we go off?  I'm

6               sorry.  We are at the end.

7                    MR. LAWHON:  Yes.

8                    THE VIDEOGRAPHER:  We are off the

9               record.  This is Media 1, it's 12:16 p.m.

10                   (Thereupon, a short recess was taken.)

11                   THE VIDEOGRAPHER:  We are back on the

12              record.  The time is 12:20 p.m.  This

13              begins Media 2.

14    BY MR. LAWHON:

15         Q.   In the container office with your

16    Microsoft Surface --

17         A.   Correct.

18         Q.   -- you had a space where you could sit

19    down and do work.  Do I understand that right?

20         A.   Correct.

21         Q.   Approximately, how many hours per day

22    would you spend sitting at your space working on

23    your Microsoft Surface?

24         A.   Good part of the day I was in there.

25         Q.   While you were in there, did I

1   understand you earlier saying that you had cameras

2   and so you could see what was going on?

3        A.   We have cameras all around the site,

4   yes.

5        Q.   How many cameras?

6        A.   I think there is eight per site, per

7   building, I think.  I don't know.  Whatever --

8   whatever is on the poles.  Some of them don't, some

9   of them work.  It all depends on the day.  So I

10  don't know how many total ever worked every day.

11       Q.   Were they all exterior?

12       A.   They were all around the perimeter.

13  They had some that faced down and some that faced

14  up.

15       Q.   So, if there is any work being

16  performed by any of the trades on the interior of

17  the buildings, you are not able to see it from the

18  cameras; is that right?

19       A.   No.  That would be when I would go

20  walk, unless the building was open.  The panel was

21  missing and you could see what they were doing

22  inside.

23       Q.   How early on in the demo phase did you

24  notice, in your mind, that Coastal Maintenance was

25  performing its demo work improperly, as you've

Page 372

1    described it?

2          A.   Whenever that first section of panels

3    came down, the first phase, the first stack, you

4    want to call it and came down.  And when they

5    brought up or whoever -- I forgot who exactly

6    brought up that what are we going to do about all

7    these slab edges, like, well, they got to be fixed.

8    Obviously you can't leave them like that.  So after

9    the first slab edges exposed is when it was brought

10   up.

11         Q.   And did you tell Coastal that the --

12   they were going to be responsible for the cost and

13   the time associated with the slab edge repairs?  Or

14   did you tell Coastal that PVGC would pay for the

15   slab edge repairs?

16         A.   I think early on, on that one, they --

17   I don't know if we did an RFI, whatever we did to

18   the engineer, the engineer came out with a detail

19   how to fix whatever, slab edge, if they needed to

20   be fixed, to give to Coastal, we gave it to

21   Coastal, thy submitted a price on that stack.  Back

22   then, not knowing what we know now, I think the

23   first one was issued to CMR to fix them, a change

24   order.  And then it was right after that was when

25   started -- it got out of hand.

1           After every -- after every drop was

2    demoed, the price just kept escalating,

3    quadrupiling of what the cost was to fix all these

4    slab edges.  And after they left, is when we

5    noticed that that didn't have to be done.

6           Q.   Let me see if I can understand what

7    you just said.  What I heard was slab edge work had

8    to be performed, early on we saw it, we agreed to

9    pay for it, we agreed that it could be done, the

10   engineer gave a detail for it, and then the price

11   started to escalate.  And then after Coastal was

12   off the job, we decided it was not properly done?

13          A.   The work was not needed.  It was

14   determined that Coastal was the one damaging the

15   slab edge, and that's why we did not agree with

16   none of their change orders that they were

17   submitting for all the repairs, because it was not

18   needed.

19          Q.   Is it your testimony that you

20   personally did not believe the demolition work

21   performed by Coastal Maintenance was improper

22   before they were off the job?

23          A.   I don't remember when all of it

24   exactly happened.  But it started getting

25   suspicious after the first couple of drops of while

Page 374

1    we having all these slab edge repairs.  I think

2    maybe even the owner brought it up, why are we

3    having all these repairs, it's getting out of

4    control.  There's no way the slab is that damaged

5    from just being sitting there for however old the

6    building is.

7              So it was starting to get questioned

8    to Coastal to provide all kind of backup, from what

9    I remember, from Bridgette asking and the owners

10   asking for backup for all these additional repairs

11   that keep escalating.

12        Q.   When was that?

13        A.   I don't remember the date.  I mean,

14   obviously, they started in February, they were off

15   the job by June.  So very short span of when they

16   did demo and the job sat with just demo work done.

17        Q.   Did you personally ever tell any

18   Coastal representative that they were performing

19   the demolition work improperly at any time before

20   they were off the job?

21        A.   Me personally, no.  But I think my

22   guys, yes.

23        Q.   Did you personally ever tell Coastal

24   that they were not properly supervising the

25   demolition work at any time before Coastal was no

1   longer on the project?

2          A.   Me personally, no.  My guys, yes.

3          Q.   Which guys told which Coastal

4   representatives that they were not properly

5   supervising the demo work?

6          A.   I don't remember.  I think there

7   was -- I remember seeing e-mails from Nick and

8   maybe Chris or Ted.  I don't remember exactly who.

9   But I know I remember seeing e-mails going to, I

10  think, Robert was a supervisor for Coastal, telling

11  things that they are not doing, that they are just

12  running wild or any -- and get a handle on this

13  demo or whatever they were doing at the time.

14         Q.   Which guys told which Coastal reps

15  that they were performing the demolition work

16  improperly before Coastal was no longer on the job?

17         A.   I don't remember exactly.  It could

18  only been a few handful.  We only had Chris, Nick

19  and Ted out there on our team, and my dad.  And I

20  think on their side they had Robert and Jason I

21  think for -- were the two contacts of Coastal.  So

22  that's the only people that kind of talking to each

23  other.

24         Q.   You also mentioned that Coastal -- you

25  also mentioned they were tearing back the Sheetrock

Page 376

1   too far.  Did I understand that correctly?

2          A.   Right.

3          Q.   Did you personally ever tell any

4   Coastal representative that that was going on

5   before Coastal was no longer on the job?

6          A.   I'm pretty sure I did.

7          Q.   Who did you tell that to?

8          A.   Usually e-mail Vito.  I mean, normally

9   my point -- point contact is Vito and I will copy

10  everybody in their team.  And whoever responds to

11  it from them, I don't remember, but goes to

12  everybody.  I try to keep everybody in the loop on

13  their side.

14         Q.   When did you e-mail Vito about tearing

15  back the Sheetrock too far?

16         A.   I don't remember a date.  Now, whether

17  it was in specific to the Sheetrock, I know I

18  remember e-mailing them about probably multiple

19  issues, things that they were doing.  I was

20  e-mailing Vito, hey, your guys are talking to

21  tenants, hey, your guys are leaving trash.

22         Q.   I'm not there yet.

23         A.   I mean, I was always e-mailing Vito

24  something about what's going on to keep him in the

25  loop.

1          Q.   Let's focus on the Sheetrock for right

2     now, okay?

3          A.   Okay.

4          Q.   So, you don't remember when you

5     e-mailed Vito about the Sheetrock being pulled back

6     too far?

7          A.   There was an e-mail.

8          Q.   Do you remember if anybody responded,

9     on behalf of Coastal, to that?

10         A.   I don't remember exactly, but I know

11    Vito responds to a lot of my e-mails.  Yes, I will

12    look into it; yes, I will get with my team; yes, I

13    will get with Robert, you know.  Because Vito was

14    never on site.  It was always I will get with

15    Robert, Jason, Brian, whoever, whoever was the one

16    responsible for whatever phase.

17         Q.   Did somebody address that at some

18    point from Coastal?

19         A.   It may have got a little better.  But

20    it never was fixed; I mean, the damage was done.

21         Q.   Did PVGC ever tell Coastal that it

22    would not pay for repairs needed because the

23    Sheetrock was pulled back too far?

24         A.   Say it again now.

25         Q.   You said -- you said the damage was

1    already done?

2            A.    Right.

3            Q.    Just said that.

4                  Okay. Did PVGC ever tell Coastal it

5    was going to back charge it for the damage?

6            A.    I don't remember.  I mean, I think the

7    first phase, it was kind of like we will fix -- it

8    was not a big deal, we will fix it because we have

9    to Sheetrock the exterior wall, but please stop

10   going so far when you are continuing.  You know,

11   can you also make straight lines when you are

12   cutting the Sheetrock.  They were just ripping it

13   and leaving jaggedy lines and wasn't straight.  It

14   was just going to take labor and time to go fix

15   them.

16                So the first phase was like, all

17   right, we will fix it.  We didn't have a back

18   charge coming to them, but fix your issue going

19   down.  Do keep doing it.  Just let's do it right.

20   But they only went so far and everything stopped.

21           Q.    What do you mean?

22           A.    Well, I mean, Coastal only demoed --

23   so, you know, they only did phase one and two,

24   maybe three.  And that's where it stopped.  So it

25   wasn't like the whole building was demoed and we

 1   had all those issues.

 2        Q.   Let me just button up this last bit of

 3   discussion about the slab edge repairs.  We talked

 4   about things that you've complained about relative

 5   to the demo work that -- the demo work, and let me

 6   go back to the contract.

 7             Again, let's use February 16, 2017, as

 8   a point of reference.  Did you ever discuss with

 9   Vito the potential need for their to be slab edge

10   repairs to be performed?

11        A.   That was never brought up until after

12   the demo work was performed.

13        Q.   Did anybody from PVGC ever discuss

14   with any Coastal representative the possibility of

15   slab edge repairs being needed before all the

16   contracts purchase agreements were signed?

17        A.   I have no idea.  It wasn't never

18   brought up before demo started, because there was

19   no need to bring it up because they hadn't started

20   demo to see what we even were facing.  So, the

21   contracts were signed the 16th.  We started on the

22   2nd.  Where they started the actual demo in that

23   two weeks, I don't know offhand.  I mean, we can

24   sure go to daily dairies -- go to diaries and pull

25   exactly when the first panel was pulled from the

Page 380

1    mast climber.

2         Q.   Do you know of any conversations or

3    communications about possible slab edge repairs

4    that took place before the contracts and agreements

5    were signed?

6         A.   I have no idea.  I don't remember.

7              MR. LAWHON:  Let's break for lunch.

8              THE VIDEOGRAPHER:  We are off the

9         record.  It's 12:32 p.m.

10             (Thereupon, a lunch recess was taken.)

11             THE VIDEOGRAPHER:  We are back on

12        video record. It's 1:56 p.m.

13   BY MR. LAWHON:

14        Q.   Mr. Vicari, we've returned from lunch.

15   Think we ended our lunch discussion talking about

16   slab edge repairs in terms of discussions about it

17   before the contract was signed, precontract,

18   pre-agreement.  Let me talk about one other issue

19   about the contracts and then I will move to some

20   other stuff.  And that's pay applications and

21   payments to subs.

22             So, generally speaking, not this

23   project yet, generally speaking, what is PVGC's

24   practice and procedure with subcontractors in terms

25   of pay application procedure and then dates that

Page 381

1    they are due and if there are -- if there are filed

2    or provided on time, dates that subs are paid?

3              A.    Well, it depends on the -- on the job,

4    really.  Each job is different on when pay apps are

5    due to us because it's different when ours are due

6    to the owner sometimes.  Dates vary.  In

7    particular, Civic Towers jobs, subcontractors have

8    to have their invoices I think turned in by the

9    20th because ours are due to the owner by the 25th.

10   Because then the owner has to have the bank

11   inspector do their walkthrough by the end of the

12   month or the first part of the next month.  And

13   then we have a pay when-and-if clause in the

14   contract; whenever we are paid by the owner, we pay

15   the sub.

16             Q.    Okay.  So, I'd sort of asked a general

17   question, but then you steered us to the Civic

18   project anyways.

19             A.    I mean --

20             Q.    Okay.

21             A.    It kind of -- it varies.  I mean,

22   Louisiana --

23             Q.    Is your experience that it's kind of a

24   negotiable thing with the owner and the GCI when

25   you agree on under what I will keep referring to as

Page 382

1    a prom contract where you typically negotiate and

2    agree with the owner when your pay apps are due,

3    and when you will be paid, and then you sort of go

4    from that date to talk to the subs about how they

5    are going to be paid?

6            A.    Depends.  I mean, like the

7    municipality work in Louisiana, it's kind of set in

8    stone when pay apps are due and when we get paid.

9    But when you get to private jobs, you have to go by

10   if there's a bank involved, what their requirements

11   are for pay apps.

12           Q.    Okay.  So, coming back to the Civic

13   Towers project.  Again, before the Coastal

14   contracts and Coastal agreements were signed, was

15   there a bank involved?

16           A.    There's been a bank involved since day

17   one.

18           Q.    And what is the bank's requirements

19   for dates that pay apps are due from PVGC and when

20   PVGC is paid?

21           A.    On this project, I think it was set in

22   stone or we had to have our pay apps turned in by

23   the 25th of every month to the bank -- or to the

24   owner, and the owner would disburse it to the bank

25   or whatever, whoever he has to disburse it to.  But

Page 383

1    there's multiple people involved, so we had -- we

2    need a couple of days to gather all of the sub

3    invoices to put them into ours.

4              So we told everybody, we need it by

5    the 20th and the subs, and that gives us five days

6    to incorporate everything into one big one.

7         Q.   And if you submitted your pay app to

8    the owner by the 25th, when, under the prime

9    contract, were you supposed to be paid?

10        A.   I think it's 30 days.

11        Q.   And for the subs, you said their pay

12   apps -- well, you said their invoices were due by

13   the 20th.  Did you mean their pay applications or

14   both?

15        A.   What pay apps?  I mean, their AIAG702

16   and 703s.

17        Q.   Well, before you said invoices, you

18   said it a couple of times.  So I was confused as to

19   what you expected from the subs, but it's --

20        A.   AIA form.

21        Q.   It's the AIA payout.

22        A.   Correct.

23        Q.   All right.  So, they had to be to you

24   by the 20th.  And if they were to you by the 20th,

25   when were the subs supposed to be paid, forgetting

Page 384

1    just for a minute, if you can, the pay-when-paid

2    clause?

3         A.   They have -- I want to say we have

4    seven days to pay once we pay -- we are paid.  I

5    think that's kind of the law.

6         Q.   The law meaning the law of the

7    contracts?

8         A.   I think there's a law -- I mean, I'm

9    not 100 percent sure, but normally when the GC is

10   paid, you have a certain amount of time to pay a

11   sub.

12        Q.   Do you think that's a law in Florida?

13        A.   I know it's in Louisiana there's a

14   certain time frame.

15        Q.   Let's talk a little bit about the

16   schedule.  There is -- if you look at your

17   contracts.

18             I have given you, I think this is

19   Exhibit Number 2, one of the exhibits to the

20   exhibit, to the contract, which appears to be a

21   portion of a schedule.  Can you tell me what that

22   is?

23        A.   That's the job schedule.

24        Q.   For which project or which tower?

25        A.   Civic Towers.

Page 385

1        Q.   And do you agree with me that's just a

2   small portion of it?

3        A.   That's the front page, it looks like.

4        Q.   Is it the full front page?

5        A.   I think -- I think so.

6        Q.   All right.  And so there was a

7   complete --

8        A.   It was --

9        Q.   -- multipage job schedule that was

10  part of the contract?

11       A.   Correct.  In the Dropbox link, it

12  contained all the documents.

13       Q.   Where did that schedule come from?

14       A.   It was initiated, built by Pelcon.

15       Q.   Pelcon?

16       A.   Yes.

17       Q.   Were -- where did the dates that are

18  included in the schedule in terms of task to be

19  completed, where did those dates come from?

20       A.   From all subs.  I mean, came from

21  Coastal, came from different subs that were

22  critical to get dates from.  Pelcon talked to Vito

23  and talked to different -- the main sub on the job,

24  what type of time frame needed for different scopes

25  of work.

Page 386

1        Q.   Is it your testimony that the schedule

2   that's attached to each of the subcontracts

3   includes dates that were provided by Coastal for

4   Coastal to perform its scope of work?

5        A.   I think with Coastal, Coastal provided

6   a schedule based on what they needed.  And I

7   want -- and it was incorporated into this one.  And

8   Paul at Pelcon had discussions with Vito when they

9   were going through different little -- different

10  revisions on this one, so the initial schedule was

11  generated by Vito

12       Q.   Who at Pelcon would Vito have talked

13  to about the schedule?

14       A.   Paul Landry.

15       Q.   And you believe they were

16  conversations between Mr. Landry and Vito about

17  input from Coastal as to dates that go into the

18  schedule that's part of the subcontracts?

19       A.   Yes.  There was little items that Vito

20  wanted adjusted so they worked together to come to

21  an agreement on what could be done.

22       Q.   Do you know what the specific items

23  Vito asked to adjust the schedule on?

24       A.   And this was done, I know, it was

25  about -- they had an issue where one stack was

1  overlapping another one, something with the phasing

2  of something that had to be split because Vito sent

3  an e-mail, a crane could only hoist one stack at a

4  time, not two.  So there was something with an

5  overlap that Paul had to adjust or something.

6        Q.   Was that before or after the contract

7  was signed?

8        A.   I have no idea.  It was revised

9  constantly after the job was started, based on the

10 progress that Vito and them wasn't keeping up with.

11       Q.   Revised by who?

12       A.   Paul.  That all scheduling was done

13 through Paul Landry.

14       Q.   Did you have any conversations with

15 Vito before the subcontracts were signed about the

16 schedule needing to be adjusted?

17       A.   I don't remember prior to the

18 contracts.  I mean, I was given, from Vito, a

19 schedule that he prebuilt somewhat in Word and

20 project that reflected what his phases would be and

21 that's what I gave Paul Landry to make sure it was

22 incorporated and everything worked around that

23 schedule, because we were following close up on

24 everything.

25       Q.   Do know when that was?

Page 388

1        A.   It was early on when Vito created that

2   schedule.  And this -- these were worked on two to

3   three months prior to contract signing.  Because

4   the owner wanted a schedule to see how things were

5   going to be done.

6        Q.   So, this sounds like it would have

7   been sometime in the fall or maybe, like, October,

8   November, December of '16 is what you are talking

9   about?  Or was it before then?

10       A.   No.  It would be more, like, October,

11   November, December is when all that kind of stuff

12   started flying back and forth.

13       Q.   That schedule that Vito, you say,

14   provided, was that based on an understanding that

15   they would start work in November or December?

16       A.   Early on.  It really didn't have, I

17   don't think, a defined that they we are going to

18   start on this date.  I think he just plugged the

19   date in that -- to give durations and how it would

20   lay out for the different phases.  It wasn't this

21   is the date we starting.  It was -- I think the

22   schedule showing me how long it's going to take to

23   do each phase.

24       Q.   Were there ever -- did you ever have

25   discussions with Vito about when you expected them

Page 389

1    to be able to start work in 2016?  So, like, in

2    August said, hey, we are expecting to be able to

3    sign the contract in October, why don't you plan on

4    getting ready in November or anything like that?

5           A.   There may have been a discussion.  I

6    don't know.  Like we always said, we couldn't -- we

7    couldn't start the job till the owner is closing

8    the projects.  So everything was depending on that.

9    So, all we could say is the owners are telling us

10   they may close next month.  So when they start in

11   60 days, we don't know.  It's all depending on if

12   something -- nothing get snarled in the closing

13   process, we don't know when we are going to start

14   until the owner tells us definitely there's a

15   closing date, but we have to plan to be ready.

16          Q.   And that's what I'm getting at, is I

17   understand it was dependant on when the owner says

18   I will be closing for sure.  I get that part.

19               My question is:  At some point in

20   2016, you are at least starting to plan the

21   possibility that the owner may close on this date

22   or he may close on that date, so we need to get

23   ready to mobilize, we need to get ready to

24   commence.  Were those conversations taking place

25   with Vito before the contract was signed?

Page 390

1          A.   I know we talked about when, like,

2     leave time, when would need to go ahead and order

3     materials, when you would need the go -- the go

4     ahead to do certain tasks.  And he would just --

5     everyone -- we would talk and he would e-mail,

6     well, I need three, four weeks leave time on -- to

7     order materials or I need two weeks mobilize, or

8     whatever it was that -- because the owner was

9     asking us what time frame of different things do

10    you need when I say go.  I want to go.  I don't

11    want to wait.  So, we would always communicate

12    different scenarios, I guess, of when we could

13    start.

14         Q.   Did you ever give Vito a date that you

15    expected to be able to start?

16         A.   I have no idea.  I mean, I wouldn't

17    have said, yes, we were starting here.  I said the

18    owner is telling us they may be able to close this

19    date, so we may start here.  That's all we could

20    say.  I never said we starting here because I would

21    never say that, because the owner is not even --

22    they didn't own the property.

23         Q.   What would be the dates you would have

24    told Vito owner saying we may be able to start this

25    date or we may be able to start this month?  What

1   were the months or what were the dates that you

2   told Vito?

3        A.   I have no idea.  I mean, I don't think

4   I would ever say we are starting this date.  We

5   could have maybe said we think the owner is

6   thinking he is going to close the end of November.

7   So, we may start, who knows.  But it was never make

8   sure you are ready, we are starting next month.  We

9   couldn't do that.

10       Q.   Leading up, then, moving ahead a

11  little bit more, to the contracts themselves, when

12  the contracts, subcontracts and the agreements are

13  getting signed, leading up to the signing of those

14  and, let's say, January or February, did Vito start

15  talking to you about needing to adjust the schedule

16  because you are starting the work further down the

17  road than they had originally expected to?

18       A.   I don't think.  I mean, I think there

19  was always -- the schedule was built starting on

20  February 1st, the schedule, that's when it was told

21  that we were starting.  So the preplanning was

22  done, the shop drawings, they were released at a

23  date in writing that they were supposed to have

24  shop drawings done by, everybody knew we were

25  starting on the first, so whatever the first of the

Page 392

1   date we started, so they started right then after

2   they started mobilizing.  So things started going.

3          Q.   So, is it your testimony that Vito

4   never asked to adjust the schedule in January or

5   February before Coastal signed all the agreements

6   and contracts we are talking about?

7               MR. PARTINGTON:  Object to the form.

8               THE WITNESS:  I mean, I don't

9          remember.  I mean, if he said need

10         something done, I have no idea.  I don't --

11         I don't remember.

12  BY MR. LAWHON:

13         Q.   Did --

14         A.   The schedule was always in place and

15  it was adjusted pretty much right after we started

16  because of issues that were starting to pop up.

17  So, I mean, it was a moving target.

18         Q.   Did anybody from Coastal ask you to

19  adjust the schedule before the contracts and the

20  agreements were signed?

21         A.   Only thing I remember them bringing up

22  after we started was they started complaining about

23  shop drawings not being able to be -- enough time.

24  I said, y'all, we already agreed this months prior

25  that y'all were going to have shop drawings done by

Page 393

1    end of January, and we have e-mails showing at the

2    beginning of January, the 1st week, Vito sent an

3    e-mail, hey, I only need two or three more weeks to

4    finish shop drawings, as soon as y'all give me the

5    go ahead.  And I think the next day they gave them

6    the go ahead.  So, that's why the January 24th date

7    was put on the contract, purchase agreements, or

8    wherever it's put on, that shop drawings were going

9    to be done by.  And they were a day late turning

10   them in.  And they were dead wrong when they did

11   it.  They were all full of errors.

12            So, that's when they started, well,

13   we -- why didn't you give us more time.  Well, you

14   didn't tell us all of this.  You were -- everybody

15   was led to believe your shop drawings were going to

16   be done by then because you sent us e-mails only

17   need two, three more weeks to finish when y'all

18   give me the go ahead.

19            Q.   I move to strike as nonresponsive.

20            My question was:  Did anybody from

21   Coastal ask you, before the contracts and

22   agreements were signed, to adjust the schedule?

23            A.   I'm sure they said something because

24   it was always an issue with it, it seemed like

25   after we started the job.

1        Q.   And who said what?

2        A.   Before then, I mean, I was dealing

3   with Vito.

4        Q.   Did you ever talk to anybody else from

5   Coastal before the contracts and the agreements

6   were signed about adjusting the schedule?

7        A.   I don't remember who -- if I were to

8   talk to somebody.  I mean, there was a lot of

9   people over there that was in -- in the loop.

10       Q.   There was a lot of people everywhere

11   on this project?

12       A.   Well, yea, exactly.

13       Q.   A lot going on, on this project,

14   right?

15       A.   Every day.

16            MR. LAWHON:  319?

17            MADAME COURT REPORTER:  Yes.

18            MR. LAWHON:  You changed all the

19        dates?

20            MADAME COURT REPORTER:  Yes.  I made

21        the mistakes of putting 316.

22            (Thereupon,Defendant's Exhibit No. 319

23        was marked for identification.)

24   BY MR. LAWHON:

25       Q.   Showing you what we marked as

Page 395

1    Exhibit Number 319.  You seen this before?

2         A.   I don't recall.  It was sent to

3    Bridgette.

4         Q.   Do you know who Bridgette is?

5         A.   Our project secretary.

6         Q.   Is that her e-mail address?

7         A.   Yes.

8         Q.   Do you know who Kevin Ray is?

9         A.   Yes.

10        Q.   Who is Kevin Ray?

11        A.   He is a partner in Coastal.

12        Q.   And was it common practice for

13   Bridgette to forward to you or to print out or to

14   tell you about documents that came in on the Civic

15   Towers project that would have been important to

16   you?

17        A.   She may have.

18        Q.   So, it's possible she gave this to

19   you?

20        A.   She could have.  When it came to the

21   contracts, my dad dealt with a lot of it.

22        Q.   Do you see on the bottom, number 8,

23   where it says time, it's written in red, "Schedule

24   needs to be updated 2/14/17"?

25        A.   Yes.

1          Q.   Did you ever talk to Kevin Ray before

2     the contract was signed about updating the

3     schedule?

4          A.   There may have been a discussion.  But

5     two days later, the contract was signed with the

6     same schedule, so obviously they took it like it

7     was.

8          Q.   That's what you say?

9          A.   Well, that's what happened; the

10    contract is signed with the schedule, with no

11    clarifications like he put.

12         Q.   The -- well, I'm not going to argue

13    with you.  Deal with that at a later date.

14              Let's -- I think you've mentioned

15    before that Paul made schedule changes because

16    Coastal asked him to.  Did I understand that

17    correctly?

18         A.   When they were legit changes.  I mean,

19    if Paul felt they needed to be adjusted.  But, I

20    mean, it was based -- the original schedule was

21    based off of what Coastal provided.

22         Q.   When Coastal would ask Paul to change

23    the schedule, what was the procedure Paul was

24    supposed to follow in addressing that request?

25         A.   If it was something major, he would

1  e-mail me and ask me what I -- what he wanted me to

2  do.  And I would say yes or no, and I felt the need

3  to be done, I say yea.  If not, if it was in the

4  contract that we already spoke about that's what

5  they were going to do, that's what they were going

6  to do, we are not adjusting it.  He can't come back

7  later and say, hey, we need more time when you

8  originally told me one thing.

9       Q.   Do you -- any other steps Paul had to

10  go through before he could make a change to the

11  schedule?

12       A.   I mean, I don't know what he did on

13  his end, but I guess if he felt it was small enough

14  and it wouldn't effect the overall completion time

15  or effect any other trade, I think he would do it.

16  But to speak for him, I don't know what he did --

17  what he did on his end.

18       Q.   Were there times that you would talk

19  to Paul on the phone about a Coastal request for a

20  schedule change, but not necessarily have an e-mail

21  about whether or not it was approved or

22  disapproved?

23       A.   I don't remember.  I talked to a lot

24  of people when this project was going on.  I can't

25  remember every conversation, unless you give a

Page 398

1    document what shows what I said or what happened a

2    year and a half ago.

3         Q.   Was -- were you the contact person

4    that Paul dealt with about schedule changes?

5         A.   He dealt with me, my dad and he dealt

6    with Nick.  I mean, he dealt with them all.  He got

7    input from everybody on our team to make sure we

8    all agreed, if he would make a change on it.

9         Q.   What was his normal practice about

10   getting, I guess, what I could call approval from

11   PVGC for a schedule change?

12        A.   He'd either e-mail us or he'd call us.

13        Q.   Would he have to talk to you and your

14   dad or one or the other?

15        A.   One or the other.  It was never a --

16   we get three or four yeses.  If he got a yes or no

17   from me and my dad, that was good enough.

18        Q.   If he got a yes or a no from you, was

19   that good enough?

20        A.   Yea.

21        Q.   Are there any particular schedule

22   changes that Coastal requested that you can

23   remember right now that you approved?

24        A.   I don't know offhand.  I mean, show me

25   something, then I will tell you yes or no.  I have

1    no idea off the top of my head.

2         Q.   Are there any particular schedule

3    changes that Coastal requested that you can recall

4    that you disapproved?

5         A.   Like I said, I don't know offhand.

6    They submitted weather days and all these days

7    after we started that overlapped and was issues.

8    And that wasn't approved because it was overlapping

9    days on a bunch of them.  I remember that.  That's

10   about all.

11        Q.   Any others that you can remember that

12   you disapproved?

13        A.   The main one they started fighting

14   about after the project was up and going was they

15   felt they wanted -- that they should have been

16   given more time for shop drawings when that wasn't

17   what was discussed nor approved.

18        Q.   Did somebody from Coastal actually ask

19   that you adjust the schedule because of the shop

20   drawing review and approval process?

21        A.   I mean, they may have.  But that -- I

22   mean, to me, it was set in stone the contract, you

23   agreed to, just before signing months before, this

24   is what you needed time frame-wise for submittals.

25   That's why the owner released you early to have

Page 400

1    them done when the job was started.  They were

2    supposed to be done.

3              Q.   Do you remember speaking to anybody

4    from Coastal, Vito or anybody else, where they

5    specifically said please adjust the schedule

6    because of the shop drawing review and the approval

7    process?

8              A.   They may have after.  But it was moot

9    to me because that's not what we agreed to.  And

10   I'm not going to go back on something that you said

11   you were going to do and then change it when the

12   project is underway.

13             Q.   Showing you Exhibit 117.  It's a

14   couple of e-mails back and forth.  I'm going to ask

15   you to take a look at that, let me know when you

16   are done.  I will tell you that it's two pages

17   long.

18             A.   Two pages?

19             Q.   Should be.

20             A.   Just that?

21             Q.   That would be the second page.

22             A.   Okay.  Okay.

23             Q.   Had a chance to review that?

24             A.   Yes.

25             Q.   Do you recognize it?

Page 401

1          A.    It's an e-mail for me.  Sure, yea.

2          Q.    Is that your e-mail address?

3          A.    Yes.

4          Q.    Okay.  Let's start on the back page.

5     What I see is an e-mail in the middle of the page

6     from you, on February 14th at 4:26 p.m. to Vito,

7     telling Vito that they can start mobilizing and

8     install temporary walls.  Am I reading that

9     correctly?

10         A.    Correct.

11         Q.    Is that the first request that PVGC

12    made to Coastal to get started on the project?

13         A.    I mean, it could have been a phone

14    call.  I have no idea from the first, second, last.

15    I have no idea if it's exactly what point in time

16    this was, at what phase.  But I was telling them in

17    writing to get started.  But I know he had came and

18    walked the job as a pre-construction meeting maybe

19    prior to this, to come look at how he was going to

20    set up.

21         Q.    All right.  Your e-mail says, "The

22    relocation company is moving everyone out starting

23    tomorrow."  That didn't mean everybody in both

24    buildings, did it?

25         A.    I don't know how it was phased.  I'm

Page 402

```
 1    pretty sure each building was staged a week or two

 2    apart.  They took out one building and they came in

 3    the next building.

 4             Q.    Okay.  When you are saying moving

 5    everyone out, what you mean is, in accordance with

 6    the sequencing schedule?

 7             A.    Correct.

 8             Q.    All right.  Not moving everybody out

 9    of both buildings?

10             A.    No.

11             Q.    Vito's response to you is on the first

12    page of this exhibit.  And it includes a sentence

13    that says, "Please forward the updated schedule per

14    our request last week."  Do you see that?

15             A.    Correct.

16             Q.    So, Coastal had asked you before this

17    to update the schedule; is that right?

18             A.    They are asking.  I don't know basis

19    of what they are discussing for an updated schedule

20    for.

21             Q.    You don't remember Coastal requesting

22    that you update the schedule the week before

23    February 14th?

24             A.    I have no -- if they asked me, I don't

25    know if it was because we started a couple of days
```

Page 403

1    after we were supposed to and they wanted the start

2    dates pushed a little bit, but they were

3    requesting.  I don't remember.

4         Q.   Did you -- did you provide an updated

5    schedule?

6         A.   There was updated schedules done on

7    this job a lot.  Updated before, I don't remember.

8         Q.   Did you provide an updated schedule

9    between February 14th and February 16th?

10        A.   I don't remember.  I really don't.

11   Paul was doing them.

12        Q.   Would you have sent this request to

13   Paul?

14        A.   I have -- I don't -- I don't know.

15   Depending on what the original request was and how

16   I answered it and what -- how come the overall

17   request was.

18        Q.   Is it true that you or somebody on

19   behalf of PVGC had promised Coastal, several times

20   before they signed the contract, that the schedule

21   would be updated?

22        A.   I have no idea.  If you got something,

23   show me.  I don't know.

24        Q.   How many times did Coastal ask the

25   schedule to be updated after -- after the contract

1    was signed?

2            A.    I have no idea.

3            Q.    Was it a lot?  Was it a few?

4            A.    I'm sure it was updated at the end of

5    February.  We had to update it every month.

6            Q.    What -- and just so we are clear about

7    the language we are using.  What -- what does an

8    update mean?

9            A.    At the end of every month, the

10   schedule has to be updated to show the progress of

11   the work, to show where you are and what's behind

12   or what's ahead and how you are going to catch up

13   if you are behind, or what tasks needs to be caught

14   up.

15           Q.    Tell me what the process or procedure

16   was to go through the exercise of updating the

17   schedule at the end of every month.

18           A.    It varied.  Paul Landry came to the

19   site a few times to do an update, to sit down with

20   the Mick or Ted or whoever was on site to track --

21   himself walked the job to see where it was all at.

22   Or he would -- we would update the schedule, we

23   would just write on each line where we were at, at

24   the end of month, percentage-wise and he would

25   update it based off of that.  Or he had a sheet, I

Page 405

1    think he may have gave Mick, to just fill in the

2    blanks of where they were at.  And Paul would

3    calculate the percentages in his schedule.

4         Q.   And then what would Paul do?

5         A.   He would update it and send it to us.

6    And we'd publish it on Procore, I think it had to

7    go to pay app, I think.

8         Q.   It had to go with the pay app?  What

9    do you mean?

10        A.   I think early on the schedule was sent

11   with the pay application every month.

12        Q.   Are you talking about PVGC's pay apps

13   to the owner or are you talking about the

14   subcontractor's pay apps to PVGC?

15        A.   No.  I think -- I think that, I'm not

16   sure if it was on this one, but I think the

17   schedule -- PVGC's schedule was sent with PVGC's

18   pay app to the owner.  Because that was part of

19   them wanting -- the bank wanting it every month,

20   part of the package.

21        Q.   So, when you said that the schedule

22   would be published in Procore, is that -- is that

23   how the subcontractors and trades had access to the

24   new -- or the updated schedule?

25        A.   Correct.  When we would update the

1    Procore, it would send out an alert to all the subs

2    in Procore that updated schedule was put in the --

3    put on the file.  And that's how everybody stayed

4    in touch with everything.

5         Q.   Was that schedule supposed to then

6    replace whatever the schedule was from the month

7    before?

8         A.   I wouldn't say it replaces the

9    contract schedule.  It just updates -- it just

10   tracks the progress of the job.

11        Q.   That's what I'm confused about is,

12   when you say it tracks the progress of the job, but

13   we are calling it the schedule?

14        A.   It never changes the end date.  It

15   adjusts to where you are at that date.  So, if you

16   are not going to move to complete the -- the finish

17   date, so if you are behind, that trade has to do

18   what it takes on a recovery schedule to catch back

19   up.

20        Q.   And if -- to follow the example you

21   just gave, if a trade is behind, would the updated

22   schedule have a revised sequence of events that

23   that trade had to meet in order to catch up?

24        A.   It was -- it would just compress -- it

25   would compress certain activities or if it did --

Page 407

1    if it showed that it was going to go past the

2    completion date, that's when Paul had to get in

3    touch with subs and find out how you are going to

4    catch back up.  Because there was a drop, this

5    probably had to be done, no ifs, ands or butts

6    about it.

7          Q.   Did Paul ever -- you said that if a

8    trade or a sub got past a deadline, that Paul would

9    contact them and talk to them about how they would

10   catch up.  Did I understand that right?

11         A.   Correct.  And mainly, it was Coastal

12   that he was talking to or finding out how they

13   would catch up because everything -- Coastal drove

14   the project.

15         Q.   How do you know Paul was talking to

16   Coastal about catching up, as you've described it?

17         A.   There was, I'm sure, a few instances

18   where Vito and Paul talked of how can we accelerate

19   to get this thing back on track.

20         Q.   How do you know that?

21         A.   Because there was always issues where

22   they were behind.

23         Q.   Well, let me be more precise in my

24   question.  You are saying that Paul probably talked

25   to Vito about this.  My question to you is:  How do

1    you know that Paul had that conversation with Vito?

2           A.   I think there is an e-mail that states

3    that they were talking -- that they talked about

4    how to accelerate, how can Vito combine different

5    scopes to try and do things together and finish it

6    on time.

7           Q.   Can you recall any conversations that

8    you had with Paul where he described for you

9    talking to Vito about catching up the schedule, as

10   you called it?

11          A.   I don't know offhand.  Sure there is

12   something in there in the e-mails that depict that.

13          Q.   My understanding that your father

14   hired Robert Mick to be the project superintendent?

15          A.   Project manager.

16          Q.   Project manager, okay.

17               Were you involved in that hiring at

18   all?

19          A.   Not necessarily.  I was there for a

20   few days when he was interviewing, but I was in and

21   out because I was there walking the project, doing

22   other things.  I wasn't focussed on that.

23          Q.   Would it be fair for me to say that

24   your dad was in charge of hiring the management

25   team for running the project?

1          A.   He ultimately had the final say so.

2          Q.   Did you participate at all in

3    interviewing any of the candidates or approving or

4    disapproving anybody that wanted to be on the

5    management team?

6          A.   I didn't really see them running

7    interviews.  I may have met them on their way out

8    or on their way in.  But I never sat through the

9    whole interview and listened to everyone because I

10   was -- I know he had two days -- one or days days

11   picked out for that and I was on other things on

12   the site.  So, I wasn't there to sit next to him

13   and listen to everybody's interview.  He would tell

14   me after one was good, one was not, he liked this,

15   he didn't like that, but I don't remember.  He just

16   passing comment.

17         Q.   He didn't ask for your approval with

18   anybody, he didn't ask you to interview them or

19   anything like that?

20         A.   No.  He showed me their resume.  I

21   mean, I glanced over it and -- but, I mean, I

22   wasn't the ultimately deciding who was going to

23   work or not.

24         Q.   Did you see Robert Mick's resume

25   before he was hired?

Page 410

1          A.   He may have showed it to me.

2          Q.   Do you remember if you commented,

3    approved, disapproved or said anything about

4    whether or not Mr. Mick should be hired?

5          A.   I don't remember.  I mean, there was a

6    bunch of them that we -- he was hiring, looking to

7    hire or interviewing and reading some -- I mean,

8    nothing comes to mind.

9          Q.   Were you involved in the hiring of Ted

10   Brown?

11         A.   No.  Because Mick -- Mick brought them

12   in.  So that was between my dad and that's when we

13   were -- that was between them.  I wasn't involved

14   in the hiring of any of the team.

15         Q.   Did you approve or disapprove or were

16   you involved in the approval or disapproval of any

17   of the management team underneath Robert Mick?

18         A.   No.

19         Q.   So Ted Brown, Chris Little, you

20   weren't involved in their hiring or -- hiring,

21   whether or not they should be hired, were you?

22         A.   No.

23         Q.   Well, what do you -- what do you think

24   of Ted Brown's performance working on the project?

25         A.   I have nothing bad to say about him.

1         Q.   On a scale of 1 to 10, 1 being the

2    worst, 10 being the best, how would you rate

3    Mr. Brown's performance on the job?

4         A.   To me, my whole team is a 10.  I treat

5    them all equally, all of them.  We all strive to be

6    the best.

7         Q.   Do you consider Mr. Brown to be a

8    truthful person?

9         A.   Yea.

10        Q.   How would you rate Chris Little's

11   performance on the job?

12        A.   Like I said, I treated everybody the

13   same.  Everybody is the same in my book.  I don't

14   pick nobody.

15        Q.   So, you give him a 10 also?

16        A.   Everybody is a 10 in my book unless

17   something really bad happens.

18        Q.   Give Robert Mick a 10?

19        A.   At the time he was working for us, I

20   guess.  Things have changed.

21        Q.   From the time he was hired to the time

22   that he was fired or quit, would you have rated his

23   performance as a 10?

24        A.   He was good in my book.  I mean, he

25   acted as a decent person when he was working for

Page 412

1    us, I mean.

2         Q.    Would you have -- do you consider

3    Mr. Mick to be a truthful person?

4         A.    Not since he left.  Since we, I guess,

5    found out what was going on.

6         Q.    So before he left, you would have --

7    everything he told you -- are you okay?

8         A.    No.  Seeing if my wife needed

9    something, but she is all right.

10        Q.    You need to take a break?

11        A.    I'm good.  Sorry.

12        Q.    Not -- so, when Mr. Mick was on the

13   job working for you, he did good work and he was a

14   truthful person, but now that he has left, he's not

15   a truthful person.  Am I understanding your

16   testimony right?

17        A.    I think we just found some issues and

18   uncovered things I think maybe he was trying to

19   hide from us that found out after the fact.  But,

20   you know, being that we are a close-nit family, run

21   business, that we trust everybody that works for us

22   and try to give them the same respect.  And thought

23   that everybody was doing the right thing on the

24   jobs.  And we feel like what they are telling us is

25   truthful, and, you know, we don't question nobody

1    if they working for us.

2          Q.   What have you found out that has led

3    you to believe that Mr. Mick is not as good of a

4    worker or person as you thought he was?

5          A.   It's just, I guess, the issues that

6    came up with, I guess, that he was hiding the

7    dealings with ATO, was the main issue I guess.

8          Q.   Anything else that's come up?

9          A.   That was the main issue, I guess.

10          Q.   Now, looking back, do you have any

11    complaints about the performance of Chris Little or

12    Robert Mick while they were on the project?

13          A.   I never complained about them.  I

14    mean, everybody has their little issues here and

15    there that you just tell them what's the problem

16    and let's work it out.

17          Q.   Did you have problems working with

18    Mr. Little?

19          A.   I had no problems working with any of

20    them.

21          Q.   Did -- did you have problems working

22    with any subs or trades?

23          A.   I don't think so.  Try to get along

24    with everybody.  All the same team and get the same

25    thing done.

Page 414

1          Q.   Did anybody from PVGC have trouble

2     working with any subs or trades?

3          A.   I mean, I don't know what the other

4     guys had, if they had any issues with anybody.  I

5     have no idea.  I mean, if -- I'm sure there is also

6     something wrong with somebody that somebody is

7     having a problem with, nobody is perfect.  Try to

8     work through it.

9          Q.   Did you have regular meetings with the

10    management team about the construction or the

11    progress of construction on the project?

12         A.   They had their -- our team in the

13    field had meeting with subs and weekly sub meeting,

14    safety meetings.  I mean, I wasn't involved in

15    every single one of them.  That was their job,

16    that's what they do.  And that's all I know.  I

17    don't know.

18         Q.   Did -- did you participate in any

19    meetings with any of the construction management

20    team that we just been talking about, to go over

21    the progress of the construction?

22         A.   I mean, I may have been in a few of

23    them.  I mean, I don't remember any one particular

24    or any single meeting.  I mean, if I'm there and

25    they are having one, I'm in the office, I will sit

1  in on it.

2       Q.   Do you remember whether it was in a

3  meeting or not any of the construction management

4  team complaining about any particular trouble they

5  were having with any particular subs?

6       A.   Only thing you hear -- you hear from

7  any management team on a construction project is if

8  the sub is behind or if they are having an issue

9  with the performance at work.  I mean, they will

10  bring that up or something that needs to be

11  addressed.  I mean, that's their job; to make sure

12  that they address the issues on the site.  Not for

13  me.

14       Q.   Have you ever heard any of those

15  complaints, performance, being behind on the job,

16  anything, about any particular sub or any

17  particular trade at all ever on that project?

18       A.   Well, yea.  I mean, after we got

19  going, I mean, you hear about Coastal.  Coastal is

20  not doing this, they are not getting this done,

21  they said they are going to get this done, they

22  don't get it done.  They will be flying panels and

23  not flying panels.  Supposed to get delivery

24  panels, they're not here.  There was always --

25  that's when it started getting to where besides are

1   you here everyday is nobody else can work because

2   Coastal is not moving fast enough.  Because

3   everybody was behind them.

4        Q.   You said every day.  Was there a

5   complaint every day about Coastal?

6        A.   I mean, there was -- I don't know if

7   it was a complaint.  It was this was what should

8   have been done, it didn't get done, why didn't it

9   get done.  It was always I guess something that

10  Vito or them would say, well, this is why we can't

11  do this.  That's always, I guess, an excuse.

12       Q.   Other than Coastal, have there ever

13  been complaints about any trade being behind or not

14  performing up to standard or any other types of

15  complaints at all on that project ever?

16       A.   I mean, during the time Coastal was

17  there, it wasn't many other people you could

18  complain about because nobody else could work.  So,

19  everybody was at a standstill so I couldn't

20  complain about the other guys that couldn't work

21  because there was no work to be done because we

22  were waiting on Coastal.  And the owner couldn't

23  move out new tenants until things got caught up.

24       Q.   My question was not limited to when

25  Coastal was on the job.  Maybe it confused you so I

1    will try again.

2              At any time ever while you had been

3    the qualifying agent for PVGC on this particular

4    project, have there been any complaints about the

5    performance or the timeliness of any other sub or

6    trade besides Coastal ever?

7         A.   I mean, the job, I guess, would never

8    given a chance until just recently when it got

9    kicked back off the succeed.  I mean, we got hit

10   with a hurricane after -- whenever it was getting

11   prior to that, we was just getting started with FL

12   Crane, so the job never really was able to -- we go

13   until recently.  And now it's moving.  And, of

14   course, you always have issues with when they say

15   they are going to do something, a sub is going to

16   do something, they don't get it done that day when

17   you get them to do it the next day.  I mean, it's

18   not a complaint.  It's time to get things and just

19   deal with the issue and you keep it rolling.

20        Q.   Has PVGC had any difficulty or trouble

21   with any other subcontractor or trade on this

22   project ever, besides, as you've described it,

23   problems with Coastal?

24             MR. PARTINGTON:  Object to the form.

25             MR. LAWHON:  What's wrong with the

Page 418

1          form of that question?

2               MR. PARTINGTON:  Well, difficulty or

3          problem, you could encompass a whole range

4          of things.  So, are you talking about just

5          schedule and performance issues?  Or --

6               MR. LAWHON:  Okay.  I understand the

7          question -- I understand the objection.

8               MR. PARTINGTON:  It's just too broad.

9               MR. LAWHON:  I understand the

10         objection.

11    BY MR. LAWHON:

12         Q.   Has PVGC had trouble with any other

13    subcontractor or trade performing their work in a

14    timely manner on this project ever, besides what

15    you've complained about Coastal?

16         A.   Timely-wise, no.  Like I said, the job

17    was never given a chance to get off the ground and

18    run.  So, no sub was behind because we wasn't

19    working.

20         Q.   At some point in time after the

21    hurricane, PVGC hired FL Crane and Southern Wall

22    Systems to finish the fabrication and the

23    installation of the panels that Coastal companies

24    had started; is that right?

25         A.   Correct.

Page 419

1          Q.   All right.  So they did work at some

2    point after the hurricane, right?

3          A.   Right.

4          Q.   Fairly quickly after the hurricane,

5    they started their work; is that fair?

6          A.   Correct.

7          Q.   That would have been about a year ago?

8          A.   Yea.  I guess, yea.

9          Q.   All right.  So, you at least had two

10   subs working on the project about a year ago?

11         A.   Really wasn't working after the

12   hurricane.  We didn't get the release to do any

13   type of demo or work for a month or two.  So it was

14   limited when we did get released.

15         Q.   Sometime in the last year, FL Crane

16   has fabricated and made all the rest of the panels

17   that needed to be installed on the project; is that

18   true?

19         A.   Correct.

20         Q.   Sometime in the last year, Southern

21   Wall Systems has installed all of the panels that

22   were supposed to be installed on the project; is

23   that true?

24         A.   Correct.

25         Q.   Would you agree with me that most of

Page 420

1    that work was done by the spring of 2018?

2         A.   Okay.

3         Q.   That's about six months ago, right?

4         A.   I guess, yea.

5         Q.   Okay.

6         A.   I don't remember exactly the date we

7    stopped or we finished.

8         Q.   All right.  So, using the time period

9    of sometime after the hurricane through the spring

10   of 2018.  You with me so far?

11        A.   Okay.

12        Q.   Were there any complaints about the

13   timeliness of the performance of Southern Wall

14   Systems' work, for example?

15        A.   I mean, if something came up, I don't

16   remember exactly.  I mean, the job was done.  I

17   don't know if there was an issue where they were

18   behind.  I don't think they -- I don't remember.  I

19   mean, we all seem to work good together.  And

20   whenever they said they were going to do something,

21   they either did it or maybe if they were behind a

22   little bit, they caught back up pretty quick.

23        Q.   Somewhere between the time of shortly

24   after the hurricane and the spring of 2018, did

25   PVGC have any complaints about the timeliness of

Page 421

1   fabrication or delivery by FL Crane?

2          A.   I don't remember if we did or not.  If

3   we did, Jeremiah, FL Crane was pretty good about

4   catching back up because we told them we think

5   you're behind or you need to catch up.  Ultimately,

6   the job got done when he said it was going to be

7   done.

8          Q.   During that same time period, shortly

9   after the hurricane, spring of 2018, did PVGC have

10  any other problems or challenges with either FL

11  Crane or Southern Wall Systems relative to their

12  performance?

13         A.   I don't remember.  I mean, I don't

14  remember seeing any default letters or anything

15  like that.  I don't think we ever put them in

16  default or anything like like.  I mean, if they

17  were a couple of days behind or said there was, I

18  mean, maybe that could be the case.  I don't know.

19  But they never was so far behind where they would

20  never catch up.

21         Q.   Since you mentioned the default

22  notice, that's probably a good place to use as a

23  benchmark as well.

24              Did PVGC serve any default notices on

25  any other subcontractors or trades at any time on

Page 422

1   this project ever?

2           A.   On ATO and Coastal.

3           Q.   Other than Coastal and ATO?

4           A.   I don't remember if we did or not.  I

5   don't know.

6           Q.   Since you've mentioned Coastal several

7   times, we'll come back and talk about them in more

8   detail.

9                Using the same scale that I gave you

10  of 1 to 10, how would you rate Coastal's

11  performance on this project -- well, strike that.

12  Let me ask it in two pieces.

13                Using the same scale, 1 to 10, how

14  would you rate Coastal Maintenance's performance on

15  this project?

16          A.   Maintenance only did the demo and

17  installation and that was a disaster.  I mean, it

18  was a mess from the get-go from when they left, so

19  I couldn't give them anything.  Nothing got

20  accomplished like it was supposed to be.

21          Q.   So, are you suggesting that should be

22  a 0 instead of the 1?

23          A.   I can't even rate them.  They just --

24  in my book, it was a diaster.

25          Q.   So if -- if a 1 was the worst possible

Page 423

1   rating you could give Coastal, would they get a 1?

2          A.   I wouldn't rate them.  I just don't

3   think they need to be rated in my book.

4          Q.   Same question about Coastal Prefab,

5   scale of 1 to 10, 1 is the worst possible, absolute

6   worst rating anybody could ever get, and 10 is most

7   fantastic.

8          A.   I would be the same way.  The panels

9   were built wrong.

10         Q.   You a politician?

11         A.   No.

12              MR. PARTINGTON:  Move to strike the

13              question, it's not relevant.

14   BY MR. LAWHON:

15         Q.   Tell me all of the complaints or

16   problems that you have -- strike that.

17              Would you agree with me that Coastal

18   stayed on the project until about June 20th?

19         A.   Correct.

20         Q.   Okay.  And the contracts are signed

21   February 16th?

22         A.   Correct.

23         Q.   So, about four months?

24         A.   Okay.

25         Q.   Okay.  So, let's just use that

Page 424

1    four-month window when they are on the job.  All

2    right?  And I will start with Coastal Maintenance.

3    I want you give me all of the problems or

4    complaints that you had, we got all day, that you

5    had with Coastal Maintenance's performance during

6    that four-month period.  Fire away.

7              MR. PARTINGTON:  Object to the form.

8              THE WITNESS:  I mean, that's -- I got

9         a running list in my computer.  But I mean,

10        I don't have that handy.  I could bring

11        that and go all day on it.  I mean, I got a

12        list of issues with Prefab panels and on

13        the installation side.  To pinpoint every

14        one today, I can't remember every one.

15   BY MR. LAWHON:

16        Q.   Well, I'm not asking you to give me

17   the identification number for every panel, each

18   stack, each phase.  Just tell me what -- generally,

19   tell me what the complaints were.

20        A.   They didn't know how to do layout,

21   number one.

22        Q.   Let me go back here.  I want to go

23   back to my question, which is the CMR question.

24        A.   That's CMR.

25        Q.   I understand.  I just want to make

Page 425

1    sure we are on the same page.

2              So, all of the complaints that you can

3    recall, as detailed as you remember right now,

4    about CMR's scope of work.

5         A.   The demo was a mess, obviously, for

6    the reasons that we talked about earlier, that they

7    were destroying the slab edge.  They -- talking to

8    Robert about how to do layout and have string lines

9    ran everywhere and obviously didn't know what he

10   was doing when panels was showing up, not lining up

11   or anything.

12             All the steel angle that was

13   delivered, everything had to be readjusted in the

14   field because nothing lined up with what they built

15   in the shop.  Every hole was off, clips are off.

16   They are having to stab everything in to make it

17   work on the building.  Throwing panels up where

18   there was no connections behind columns.  And we

19   would bring up what you are going to do about that.

20   Oh, we will deal with that later.  Well, that's not

21   an answer we need to be hearing.

22             I mean, sheesh, I mean, there is

23   always an issue.  I don't remember all of them

24   offhand, but -- panels after panels they were

25   messing up with ten people on tag lines not knowing

Page 426

1    what they are doing, beating panels up.  I mean,

2    they are inside the building cutting things,

3    welding things when things should have been right

4    from the get-go, instead of destroying Sheetrock

5    where they shouldn't be destroying.  They are

6    blowing holes out in the ceilings and the

7    apartments.

8              I mean, if they could wrong what they

9    touched, they went wrong.  Panel joints not lining

10   up.  That's on CMR.  Nothing lines up.  The bottom

11   is too short, the top is too tall.  The top is too

12   short, the bottom is too long.  I mean, it just

13   goes on and on and on.  Holes don't line up in the

14   walls where it should.

15             They should have been yelling at the

16   factory fix it, move this, bring me something else.

17   I mean, nothing was fixed while they were doing it.

18   It was always we will get to it.  When does we will

19   get to it -- what does that mean?  We have

20   apartments to turn over on schedule, but nothing is

21   finished.  Ain't a panel in that building that was

22   finished when they left.  Clips wasn't tied off.

23   Missing screws on all the clips.  I mean, it just

24   goes on and on.

25             The parapet sheathing not installed.

Page 427

1    Roofers trying to start, can't do anything because

2    they don't have sheathing installed.  Inside,

3    outside corners don't match up what the plans show.

4    Robert's favorite word was I'm putting up what they

5    are sending me.

6                    I think they had some glass broke on

7    some windows in transit.  That could be Prefab I

8    guess.

9                    I mean, I don't know.  There's others,

10   I'm sure.  I just can't think off the top of my

11   head.  Put me on the spot with that.

12          Q.    I put you on the spot?

13          A.    You want me to list every deficiency.

14   I mean, Jesus Christ.  Look at the reports.  I

15   mean, jeez, you can find -- you can go read for

16   days that we are having to fix and correct.

17          Q.    All right.  If you think of any others

18   while we are talking, let me know.

19          A.    Okay.

20          Q.    Of all the items that you described

21   for CMR, how many of those items did you personally

22   talk to somebody at CMR about?

23          A.    I don't remember.  I'm sure it was

24   told to Brian -- I mean, I'm sorry, not Brian,

25   to -- I'm sorry, to Vito or say Robert.  It's like

1    that's what the two I was told between Vito and

2    Robert was the point people.

3         Q.   My question was:  Who from Coastal did

4    you specifically speak to about any of these items?

5         A.   I'm pretty sure Vito when I -- issues

6    that arise when I was there.  I mean, a lot of

7    certain things came up after they left.  While they

8    were there, it was brought to Vito that what are

9    you going to do about this, what are you going to

10   do about that.  Always tell Robert, what are you

11   going to do about this.  We're going to fix it, we

12   are going to get to it.  Well, nothing ever got

13   brought come back and got to.

14        Q.   When you say you talked to Vito --

15   Vito about it, was that mostly by e-mail or was

16   that on the phone or was it both?

17        A.   Probably both.

18        Q.   If you had a phone call with Vito

19   about complaints, some of the ones you listed, for

20   example, would you typically provide it in a follow

21   up e-mail or something in writing to them?

22        A.   I mean, depends.  I mean, like, some

23   of the smaller things, my guys in the field were

24   handling it.  If they didn't do something right,

25   Mick or Ted or Chris, they would send an e-mail to

1   him, say, hey, what are going to do about this.

2   When are you going to finish this.  Or I was there

3   when they -- I was there when, at senior, with a

4   corner and we were talking to Robert, hey, how are

5   you going to attach this panel.  I don't know.  We

6   will figure it out after we are done.

7                I mean, I was there for that.  And it

8   was like, well, no detail for it, but not be able

9   to get to there, how are you going to attach it.  I

10  don't know.  Let the engineers figure it out.  You

11  only hear that so many freaking times in a day, or

12  every other day when you ask them about the

13  questions what are you going to do, what are you

14  going to do, we'll get Cronin to do a detail.  You

15  know, it's like this thing is supposed to go up as

16  a system and be put up and walk away from, not go

17  back and adjust or fix or change or cut and weld.

18  That's what everybody's frustration was, that's the

19  whole purpose of using a prefab panel system.

20       Q.   I had asked you if you had spoken to

21  anybody from Coastal about any of these particular

22  issues that you just listed, that was my last

23  question to you.

24                My next question is:  Did you

25  participate in any conversations where somebody

1    from PVGC is talking to somebody from Coastal

2    Maintenance about any of these issues that you just

3    described?

4         A.    Like I said, I mean, I was involved in

5    hearing some of the conversations that were between

6    my staff and Coastal staff with issues.  I seen

7    e-mails go back and forth between my people in the

8    field and Coastal's people that I seen issues going

9    back and forth.

10        Q.    I'm not talking about e-mails.  I just

11   meant conversations.  So, did you --

12        A.    I was there for the one with the

13   corner.

14        Q.    That's the one I understand so far.

15   Is there another one you can point me to?

16        A.    I mean, I don't remember one in

17   particular.  But I mean, I was asking Robert

18   questions.  And when I was there, I would ask

19   Robert what you going to do about this, what you

20   going to do about that, what you going to do about

21   the bottom that's wide open.  Never had an answer,

22   clear answer from him.

23             But we are trying to move -- they are

24   trying to hang panels.  I can't, you know, stop the

25   job to fix it.  I got to let them keep hanging.

Page 431

1  But you need to get another crew here to fix some

2  of this stuff and nothing ever happened, where they

3  said they were sending another crew to fix the

4  inside corner at the first stack on the Civic.

5  Well, they never showed up for, you know, days.  At

6  the beginning it was always, well, Prefab is going

7  to send people out to fix it.  Well, we quickly

8  realized Maintenance was doing it all.  They wasn't

9  sending people from the factory.  It was whatever

10  guys they had in the field was going to do whatever

11  fixes needed to be done.

12       Q.   Is it fair for me to conclude that

13  either Vito or Robert would have been the primary

14  Coastal representative that you would have talked

15  to or you would have been involved in the

16  conversation with about any of the complaints with

17  CMR's work that we just talked about?

18       A.   That's who my main point of contacts

19  were.  I mean, Jason was in the field and he was

20  just an employee.  I wouldn't go to him with

21  anything.  Although, they said they put him on one

22  building and Robert was going to be on the other.

23  But Jason wasn't qualified to do that.

24       Q.   How do you know that?

25       A.   You could just tell.  Robert would go

Page 432

1    over there and check on him and see if they were

2    doing certain things.  And before you know it,

3    Robert was doing both.  I mean, Robert was a

4    superintendent for both of them, that's what it

5    boiled down to.

6         Q.   Let me ask you the same sequence of

7    questions about Coastal Prefab.  I think in your

8    list, you gave me some items that I think are

9    related to Coastal Prefab and not CMR.  But let's

10   see what you have to say and then we will come back

11   to that.

12        So here's the question:  What are all

13   of your complaints about the scope of work

14   performed by Coastal Prefab while Coastal Prefab

15   was on the project?

16        A.   If you give me the shop drawings, we

17   can go through page by page on both buildings.  We

18   can spend however long you want on that.  I just

19   need something that I can show you.  I don't

20   remember them in detail because it's a list.

21        Q.   Let me start with your memory.

22        A.   I mean, look at CDC's report and shop

23   drawings and fixes, that's the main ones.  I mean,

24   you got dimensions don't work on the -- what's

25   there versus what they built.  Panels are too

Page 433

1    short, too tall, not wide enough, not -- too

2    narrow.  That's on GCI master log when they were

3    doing their inspections at the facility that

4    Coastal, I guess, has the project was underway,

5    they were -- they sent a new guy out there, Steve,

6    Steve Casserman.  He came out on a job site to do

7    layout because they was seeing, after they started,

8    that things wasn't working like it should have

9    been, so Steve came out and he was the new layout

10   guy, because I was there one day when he was

11   pulling tapes and strings and marking floors and

12   figuring out what the dimensions should be for

13   these panels.  I asked him what you are doing, he

14   said, well, I'm referring back to the shop what

15   these panels need to be, to make sure they are

16   built properly.

17             And that's when GCI's master log

18   started getting remarks next to everything saying

19   that fabrication panel was altered to be smaller or

20   it was altered to be bigger, need details from

21   engineer on the approval of this because they were

22   shortening panels and they were adding onto panels

23   by cutting them up.  They were already done, then

24   they went back and cut them to be these alterations

25   on certain ones.  And to this day, Coastal never

Page 434

1    submitted any details on how they did that, because

2    GCI was -- the lab, the testing agency in the

3    factory --

4           Q.   Were you looking at these logs before

5    Coastal was off the job or after they were off the

6    job?

7           A.   I was given -- after they walked off

8    the job, I was given through however I got them,

9    through GCI.

10          Q.   Let me be a littler clearer with my

11   question, then.

12          A.   We can go back to that I guess.   I

13   didn't have GCI's log.   Obviously there were

14   adjustments made to these panels when they showed

15   up in the field because they didn't work.

16          Q.   Let me do this so I can be

17   chronological in the way that I'm doing this.

18               Between February 16th, when the

19   contract was signed, June 20th, that four-month

20   period that we've been talking about, tell me what

21   complaints you raised to Coastal, anybody about

22   Coastal Prefab's scope of work.

23          A.   Panel construction, things wasn't

24   built to what was field -- how it needed to be

25   built in the field.   Openings were wrong.   The stud

Page 435

1   sizes were wrong at the window jams per the shop

2   drawings.  Bridging wasn't installed where it was

3   per the shop drawings.  Inside and outside corners

4   wasn't built per the shop drawings.  Window height

5   and panel size were wrong at senior about the front

6   entrance were a disaster.

7              Top row of panels at senior was built

8   wrong.  All your columns had no details on how they

9   were going to connect them to the building, so the

10  panels wasn't built to span the columns without

11  being anchored.  And that's what I was bringing up

12  to Robert, that there was no way of attaching

13  these.  And that was his answer, is we will get to

14  it.  When I was dissecting the drawings, there was

15  a -- cat tracks that wasn't installed where they

16  were shown.

17         Q.   Let me just interrupt you for one

18  second because I want to make sure that we're

19  staying in the four-month period.

20              You said you were dissecting the

21  drawings.  Was this after --

22         A.   Towards the end.

23         Q.   -- after Coastal's off the job or is

24  this before June 20th?

25         A.   Right before they left.  Because I

1   remember having a conversation with John Parish

2   about certain issues that were coming up with

3   details that Jim was looking for and wasn't getting

4   them.  And I kept pounding on them I need these

5   details.  And that's when John Parish stepped in, I

6   will get them for you, I will have them for you in

7   a day or two.  It's like this has been going on for

8   days.  I mean, when Jim requested something, you

9   need to get it to them because this stuff is

10  already up on the building.  We can't get it

11  inspected unless you have details of what you did.

12              And, you know, after that, we got

13  them, but that's when they left so it was no use in

14  sending them or getting them approved because we

15  wasn't going to use them.  And everything came to a

16  halt, so we didn't know what we were going to do.

17        Q.   Okay.  I didn't mean to interrupt you.

18  I just want to make sure we stayed in that

19  four-month window of stuff that you raised.  So, go

20  ahead, please continue with your list.

21        A.   And then -- looking at my list in my

22  head, my computer.  If I had the shop drawing, I

23  could point to every detail.

24              There was just little things.  I mean,

25  when you give someone a set of shop drawings,

Page 437

 1    it's -- within the field, it's supposed to look

 2    like everything on the shop drawing.  And if they

 3    made an adjustment, they need to tell somebody, not

 4    just do it.  So, that was the issues where half the

 5    things were put up, it's like, what is this, what

 6    are you doing.  Oh, we had to adjust it to make it

 7    work.  Jim is not going to just okay it because you

 8    had to do it.  They need to know why.  If you

 9    change the corner, that don't match the drawings.

10    Well, we get a detail from Cronin.  That was the

11    famous answer.

12                What else?  Big thing I raised at the

13    very beginning is something I just thought of, was

14    when this whole project first started and we were

15    doing stuff in the factory.  It was obvious they

16    never done this whole system because when I was in

17    their office talking and looking at their boards on

18    the wall of all their Sto systems and they were

19    building a panel.  We can't put stucco finish on

20    all the openings for these windows, PTACs, anything

21    that's got to get caulk and applied, you can't put

22    finish on it.  Vito argued with me for a minute.

23    Yea, you can.  I said, no, you have to leave the

24    stove gold coated exposed per this detail I'm

25    looking at on your wall.  So that way any kind of

Page 438

1    ceiling could be applied to the gold coat not

2    finished.  And we went around and around and around

3    about that.  And he finally said, well, do you want

4    gold coat.  And I said I don't want gold coat.  The

5    drawing show that needs gold coat, not me.

6                    I said do it what your detail on the

7    wall shows so that way it's per the system.  And

8    finally, it was changed.  He'd go out there and he

9    would watch this guy's, he walked out behind them

10   and he told whatever guy was doing the gold

11   coating, hey come put gold coating on this opening

12   before they caulk it.  So, that's the way the

13   drawing shows.  That's how it needs to happen, even

14   on the PTACs, you leave gold coat, you don't put

15   finish because the caulk, per the specs, don't

16   stick to finish.  So, that was changed early on

17   that I caught.  I mean, if not, we'd probably have

18   issues.

19                    What else?  It was just so many small

20   things.  I just can't think of every single one,

21   but I got a list of them and I keep adding to my

22   computer and I just think of one and then I will go

23   add something to it that is on all these reports,

24   all scattered through these reports.

25                    What else?  Prefab not being able to

Page 439

1    ship panels properly, that were coming in damaged.

2    I mean, every -- every single one has strap marks

3    on it, on the building, that was the top panel or

4    the bottom panel, it has foam imprints on the

5    panels.  They are not watching their truck drivers

6    how they are strapping it.  The foam block blows

7    out on the way to the job site so the truck driver

8    just gets out there and cranks the strap down,

9    bends the whole side of the panel up.  He don't

10   care.  He just drops the trailer off and goes about

11   his business.

12              Whether it's CMR or Prefab was when

13   they were hanging that one panel and freaking hits

14   the building and cracks the panel and now Prefab's

15   got to come fix it.  That never -- who knows who

16   really did -- wasn't even fixed before they left.

17   If I had the shop drawings, I could point out

18   everything.

19              The top floor at senior, they got

20   dimensions of 8-foot on page, 10-foot another page,

21   12-foot another page.  Well, obviously, that was an

22   error.  Which was an error from day one.  They

23   should have caught when they was doing their site

24   investigation and 3D modeling that their drawings

25   wasn't right.

Page 440

1          We fought back and forth about how

2    they were attaching the top panel on the CME wall

3    where it shouldn't have been attached to the CME

4    wall.  But if you go look at it before we change

5    it, they were attached to the CME wall, where the

6    engineer said don't attach it to the CME wall.

7          Big issue was where they put the

8    punched opening of the stud too close to the clip

9    at the floor.  You got to be 12 inches off, which

10   was brought up.  Deaf ears. It was just something.

11          PTACs coming in damaged.  Had to

12   replace probably 14 -- well, I don't know if they

13   did it or not, I don't know if they did.  But they

14   was -- we've added Goosebumps sent an e-mail that

15   there was, like, 14 PTACs that were damaged and

16   missing all the insulation and Vito e-mailed back,

17   well, just send me the bill, tell my guy to try to

18   do better.  It's like we shouldn't be having these

19   little -- little bitty issues like this.

20          Toward the end there was a lot of

21   little small details from Parish that he had to get

22   from doing -- I forgot what the actual details were

23   that -- at the time they were doing something that

24   we had to get Jim detailing and forgot a few of

25   them, that they had to submit.  I think it was a

Page 441

1  connection detail at the top of the 18th floor of

2  senior or something with a kickback plate, a stud

3  or something they had to provide a detail on

4  because they added something.  The detail for the

5  entrance of senior that the panel was all built

6  wrong for the window location and the bottom of the

7  panel was too short.

8            Asking them how they were going to

9  make all these reveals line up that were off.

10  Who's going to do all of the blocking on the roof

11  to make the panel line up with the parapet since it

12  was off.  Whose going to put the sheathing on, on

13  the backside of the parapet of Civic because it

14  needed an attachment for the roofer.

15            Look at the drawings in my head.

16            I can't remember.  It's just

17  frustrating that all this happened and everybody --

18  all ever anybody ever says is we will get to it, we

19  will fix it, we will do this, we will do that.

20  Well, why did it happen in the first place?  You

21  know, it's so frustrating now and going forward you

22  see these engineer reports what all could be fixed.

23  Shouldn't happen, what it boils down to.  These are

24  supposed to be professional people that came in

25  that knew what they were supposed to be doing, we

Page 442

1    were led to believe that this is what their

2    profession is, and they have the engineers to do

3    it.

4              Well, they call Georgia Panels.  Why

5    didn't they use Georgia Panel?  Georgia Panel knew

6    what they were doing.

7         Q.   I'm going to interrupt you.  And if I

8    can, let me -- I don't know if you lost your focus

9    or what, but let's go back to what my question was,

10   which was the list of complaints you had in the

11   four-month period that you notified somebody from

12   Coastal about, Coastal Prefab's stuff.  So move to

13   strike all of the editorializing.  And let's go

14   back to the list that we are talking about for

15   Coastal Prefab stuff.  And do me a favor, if you

16   can, let's try to stick with the list, okay?

17        A.   I'm trying.  It's just things start --

18   just so much that happened prior to them and then

19   after, it just snowballed.

20        Q.   I see it's challenging.  I just ask

21   you to try to stick to the list.

22        A.   Fire stopping.  Why wasn't fire

23   stopping installed?  And whoever was responsible

24   for it.  But why didn't the king studs have some

25   type of fire stopping installed before they were

Page 443

1   put together, now we have no way of getting to them

2   to install anything.

3              Something else will come to mind, I'm

4   sure in a minute here.  But that's what I can

5   remember right now offhand.

6        Q.   The items that you just listed for

7   Coastal Prefab, which of these items did you

8   personally speak to somebody at Coastal Maintenance

9   or Coastal Prefab about while Coastal companies

10  were still on the project?

11       A.   Probably Vito and John on a few of

12  those.  I mean, Vito was always on them, but then

13  John stepped in towards the end when we wasn't

14  getting what we needed.  So it was between both of

15  them and then we had meetings on site with John and

16  Kevin, that Vito would never come to the site and

17  there was issues.

18       Q.   Which of these items do you remember

19  talking to either John or Kevin or Vito about

20  during the time they were on the job?

21       A.   I don't remember exactly which ones.

22  I mean, they are all the same to me, between John,

23  Kevin and Vito.  I mean, when I tell you this is

24  what happens, this is what needs to be done, y'all

25  figure it out on y'all end who is going to do it.

Page 444

1          Q.    Anything else you can think of for

2     that list?

3          A.    Drawing a blank right now.  Something

4     else comes up, I will let you know.

5                MR. LAWHON:  Let's take a break.

6                THE VIDEOGRAPHER:  We are off the

7          record.  It's 3:18 p.m.

8                (Thereupon, a short recess was taken.)

9                (Thereupon, concludes vol. III 3:18

10         p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25